1  STEPHEN R. HARRIS, ESQ.
   Nevada Bar No. 001463
2  HARRIS LAW PRACTICE LLC
3  6151 Lakeside Drive, Suite 2100
   Reno, NV 89511
4  Telephone: (775) 786-7600
   E-Mail: steve@harrislawreno.com
5  Attorneys for Debtors

6

7              UNITED STATES BANKRUPTCY COURT

8                FOR THE DISTRICT OF NEVADA

9                        * * * * *

10

11 IN RE:                          Case No.: BK-17-50472-btb (Chapter 11)
                                   Jointly Administered with:
12 BRISTLECONE, INC., dba BRISTLECONE   17-50473-btb BOONFI LLC
13 HOLDINGS                        17-50474-btb BRISTLECONE LENDING, LLC
                                   17-50475-btb BRISTLECONE SPV I, LLC
14 ☐ Affects this Debtor.          17-50476-btb I DO LENDING, LLC
                                   17-50478-btb MEDLY, LLC
15 ☒ Affects all Debtors.          17-50479-btb ONE ROAD LENDING, LLC
   ☐ Affects Boonfi LLC            17-50480-btb WAGS LENDING, LLC
16 ☐ Affects Bristlecone Lending, LLC
17 ☐ Affects Bristlecone SPV I, LLC  **DEBTORS' MOTION FOR ORDER**
   ☐ Affects I Do Lending, LLC      **APPROVING STIPULATION RE**
18 ☐ Affects Medly, LLC            **ADEQUATE PROTECTION OF**
                                   **MONTEREY'S CASH COLLATERAL**
19 ☐ Affects One Road Lending, LLC  **(11 U.S.C. §§361, 362, 363, 365 AND 553)**
   ☐ Affects Wags Lending, LLC
20
21      Debtors.                   Hearing Date:  OST Pending
                                   Hearing Time:  OST Pending
22                                 Est. Time:     10 minutes
   _____/  Set by:        Judge Beesley
23

24      BRISTLECONE, INC., dba BRISTLECONE HOLDINGS, a Delaware corporation,

25 and its wholly owned subsidiaries, BOONFI LLC, a Nevada limited liability company,

26 BRISTLECONE LENDING, LLC, a Nevada limited liability company, BRISTLECONE SPV

27 I, LLC, a Nevada limited liability, I DO LENDING, LLC, a Nevada limited liability company,

28 MEDLY, LLC, a Nevada limited liability, ONE ROAD LENDING, LLC, a Nevada limited

   liability company, and WAGS LENDING, LLC, a Nevada limited liability company

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive,
Suite 2100
Reno, NV 89511
775 786 7600

1

(collectively the "Debtors"), by and through their counsel, STEPHEN R. HARRIS, ESQ., of HARRIS LAW PRACTICE LLC, hereby move the Court for an entry of an order approving a stipulation for adequate protection of cash collateral between the Debtors and MONTEREY FINANCIAL SERVICES, INC. PROFIT SHARING PLAN AND TRUST, MONTEREY FINANCIAL SERVICES, INC., a California corporation, and MONTEREY RECEIVABLE FUNDING, LLC, a Delaware limited liability company (collectively referred to as "Monterey"). This Motion is supported by the entire record before the Court, and by the following memorandum of points and authorities.

## Jurisdiction and Venue

1. Each of the above-captioned Debtors filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101-1330 (the "Bankruptcy Code"), on April 18, 2017. On April 25, 2017, this Court entered its order jointly administering these estates on an interim basis and on May 30, 2017 at 2:00 p.m. final approval was granted.

2. This Court has jurisdiction over these Chapter 11 proceedings under 28 U.S.C. §§ 157 and 1334. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

3. Debtors are in the business of providing financial leases to consumers for tangible goods in various industries, including medical and dental products, pets, household goods, wedding products and automobile parts. The Debtors continue to operate their businesses as Debtors and Debtors-In-Possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. The headquarters for the Debtors' business is located in Reno, Nevada. Accordingly, venue of the Debtors' Chapter 11 proceeding is proper in this District under 28 U.S.C. §§ 1408 and 1409.

4. The statutory predicates for the relief requested in this Motion are Bankruptcy Code §§ 361, 362, 363, 365 and 553 of the Bankruptcy Code and Rule 4001 of the Bankruptcy Rules.

## Relief Requested

5. By this Motion, the Debtors seek authorization to enter into a Stipulation with Monterey for adequate protection of Monterey's cash collateral pursuant to 11 U.S.C. §361 and Fed. R. Bankr. P. 4001. A copy of the STIPULATION RE ADEQUATE PROTECTION OF

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive,
Suite 2100
Reno, NV 89511
775 786 7600

2

MONTEREY'S CASH COLLATERAL (11 U.S.C. §§361, 362, 363, 365 AND 553) ("Stipulation") is attached hereto as **Exhibit 1**.

6.     The Debtors generate revenue and working capital, inter alia, in the ordinary course of business from the sale of the aforementioned consumer leases to Monterey. Accordingly, Monterey entered into certain Receivable Purchase Agreements with WAGS on January 13, 2014 and May 20, 2015; with BRISTLECONE FINANCING on June 12, 2014; with I DO LENDING on November 19, 2014 and November 19, 2014; with ONE ROAD LENDING on June 12, 2015; and with BOON LLC on February 27, 2017 (collectively, the "Purchase Agreements") which Purchase Agreements are attached to the Stipulation as Exhibits A through G, respectively.  In part, the Purchase Agreements set forth protocols, procedures and provisions whereby consumer leases would be offered to Monterey, assuming that they met specified criteria.   The purchase price was set forth in a prescribed schedule.   Upon the occurrence of any event of default, including with respect to a default under the underlying consumer lease, the counterparty Debtor was required to either replace the defaulted consumer lease with a qualified new consumer lease or pay a stipulated amount in lieu thereof ("Repurchase Obligation").  Further, the Purchase Agreements included a component where the Debtors engaged Monterey to perform account management and collection services for all other consumer leases (the "Servicing Agreement").   Monterey's contractual service fees are deducted from the collections before remittances are forwarded to the Debtors. The  Debtors granted and conveyed to Monterey a continuing security interest in and lien against all of the other serviced leases and the proceeds generated (the "Monterey Collateral").  Monterey filed the required UCC financing statements to perfect its security interests. The Monterey Collateral secured the obligations and performance of the respective counterparty Debtor pursuant to the respective Purchase Agreement.

7.     Monterey asserts that Debtors were indebted to it for outstanding Repurchase Obligations as of the Petition Date in the amount of $2,158,754.00, which amount Debtors are still required to verify and account for ("Prepetition Indebtedness").  The amount has increased post-petition, and as of June 16, 2017, Monterey asserts that it is owed $3,606,298.00, based

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive,
Suite 2100
Reno, NV 89511
775 786 7600

3

1    upon the Debtors' Repurchase Obligations, which amount Debtors are still required to also

2    verify and account for.  The amount will change on a continuous basis as consumers perform

3    and default under their leases.  Because Monterey retains a security interest in all Serviced

4    Contracts, it also retains the right to offset any losses from Defaulted Contracts against other

5    Serviced Contracts.  As of the Petition Date, Monterey alleges that it held a cash collateral

6    interest in the Serviced Contracts and Purchased Contracts to secure an unknown obligation for

7    any Defaulted Contracts.  Post-petition Monterey has continued to purchase consumer leases

8    from the Debtors, and as of June 16, 2017, it has acquired leases with a face value of

9    $7,500,101.00, in consideration for payment to the Debtors in the amount of $6,003,802.00, in

10   accordance with the pricing schedule set forth in the various Purchase Agreements.  The

11   Debtors and Monterey are desirous of continuing the prepetition relationship on a post-petition

12   basis, and in that regard, Debtors are requesting Court approval to continue post-petition sales

13   of Debtors' consumer leases to Monterey and Monterey continuing to maintain perfected

14   security interests in the Monterey Collateral thereof, and any additions thereto.

**Applicable Authority**

16   11 U.S.C. §361 states as follows:

17        When adequate protection is required under section 362, 363 or 364 of this

18   title of an interest of an entity in property, such adequate protection may be

19   provided – by

20        (1) requiring the trustee to make a cash payment or periodic cash

21   payments to such entity, to the extent that the stay under section 362 of this title,

22   use, sale, or lease under section 363 of this title, or any grant of a lien under

23   section 364 of this title results in a decrease in the value of such entity's interest in

24   such property;

25   (2) providing to such entity an additional or replacement lien to the extent that

26   such stay, use, sale, lease or grant results in a decrease in the value of such

27   entity's interest in such property; or

28

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive,
Suite 2100
Reno, NV 89511
775 786 7600

4

1  (3) granting such other relief, other than entitling such entity to compensation

2  allowable under section 503(b)(1) of this title as an administrative expense, as it

3  will result in the realization by such entity of the indubitable equivalent of such

4  entity's interest in such property.

5  11 U.S.C. §361.

6      In the present case, Monterey informed the Debtors that it would not agree to continue to

7  purchase lease contracts from the Debtors in the ordinary course of business post-petition under

8  the existing Purchase Agreements unless the Debtors agreed to enter into the adequate

9  protection Stipulation with Monterey.   Accordingly, Debtors have entered into the Stipulation

10  with Monterey and the requirements have been satisfied to allow the Debtors to provide

11  Monterey with adequate protection.  Notwithstanding the consensual nature of the Stipulation,

12  out of an abundance of caution, the Debtors seek a Court order, after notice and hearing, to

13  approve the Stipulation.

14      Debtors shall seek an order shortening time for a hearing on this Motion.  Pursuant to

15  Fed. R. Bankr. P. 4001(d)(3), the hearing may be held on no less than seven days' notice to

16  parties in interest.

17  **CONCLUSION**

18      **WHEREFORE**, Debtors respectfully request that the Court approve the Stipulation

19  attached hereto as Exhibit 1, authorizing the Debtors to provide Monterey with adequate

20  protection pursuant to the terms and conditions set forth in the Stipulation, and for such further

21  relief as is just and proper.

22      DATED this 29th day of June, 2017.

23

24  STEPHEN R. HARRIS, ESQ.
HARRIS LAW PRACTICE LLC

25

26  */s/ Stephen R. Harris*

27  _____
Attorneys for Jointly Administered Debtors

28

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive,
Suite 2100
Reno, NV 89511
775 786 7600

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1

Stephen R. Harris, Esq.
Harris Law Practice LLC
6151 Lakeside Drive,
Suite 2100
Reno, NV 89511
775 786 7600

STEPHEN R. HARRIS, ESQ.
Nevada Bar No. 001463
HARRIS LAW PRACTICE LLC
6151 Lakeside Drive, Suite 2100
Reno, NV 89511
Telephone:  (775) 786-7600
Facsimile:  (775) 786-7764
E-Mail: steve@harrislawreno.com
Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEVADA

* * * * *

IN RE:

BRISTLECONE, INC., dba
BRISTLECONE HOLDINGS

☐ Affects this Debtor.
☒ Affects all Debtors.
☐ Affects Boonfi LLC
☐ Affects Bristlecone Lending, LLC
☐ Affects Bristlecone SPV I, LLC
☐ Affects I Do Lending, LLC
☐ Affects Medly, LLC
☐ Affects One Road Lending, LLC
☐ Affects Wags Lending, LLC

              Debtors.

_____/

Case No.: BK-17-50472-btb (Chapter 11)
Jointly Administered with:
17-50473-btb BOONFI LLC
17-50474-btb BRISTLECONE LENDING, LLC
17-50475-btb BRISTLECONE SPV I, LLC
17-50476-btb I DO LENDING, LLC
17-50478-btb MEDLY, LLC
17-50479-btb ONE ROAD LENDING, LLC
17-50480-btb WAGS LENDING, LLC

**STIPULATION RE ADEQUATE
PROTECTION OF MONTEREY'S CASH
COLLATERAL AND AUTHORIZATION
FOR DEBTORS' SALE OF ASSETS TO
MONTEREY(11 U.S.C §§361,362, 363, 365
AND 553)**

HRG DATE:
HRG TIME:

BRISTLECONE, INC., dba BRISTLECONE HOLDINGS, a Delaware corporation, and

its wholly owned subsidiaries, BOONFI LLC, a Nevada limited liability company,

BRISTLECONE LENDING, LLC, a Nevada limited liability company, BRISTLECONE SPV

I, LLC, a Nevada limited liability company, I DO LENDING, LLC, a Nevada limited liability

company, MEDLY, LLC, a Nevada limited liability company, ONE ROAD LENDING, LLC, a

Nevada limited liability company, and WAGS LENDING, LLC, a Nevada limited liability

company (collectively the "Debtors"), by and through their counsel, STEPHEN R. HARRIS,

1   ESQ., of HARRIS LAW PRACTICE LLC, and secured creditors MONTEREY FINANCIAL

2   SERVICES, INC. PROFIT SHARING PLAN AND TRUST,  MONTEREY FINANCIAL

3   SERVICES, INC., a California corporation, and MONTEREY RECEIVABLES FUNDING,

4   LLC, a Delaware limited liability company (collectively referred to as "Monterey"), by and

5   through their attorneys LIPPES MATHIAS WEXLER FRIEDMAN LLP (Raymond L. Fink,

6   Esq.) and Monterey's local counsel ROBISON, BELAUSTEGUI, SHARP & LOW ( Frank

7   Gilmore, Esq. and Stefanie Sharp, Esq.), hereby stipulate and agree, pursuant to 11 U.S.C.

8   §§361, 362, 363, 365 and 553, as follows:

9   **RECITALS**

10  A.   Petition.     On April 18, 2017 (the "Petition Date"), the Debtors commenced

11  the above-captioned Chapter 11 bankruptcy cases by each filing a voluntary petition with the

12  United States Bankruptcy Court for the District of Nevada.  No trustee has been appointed and

13  the Debtors are operating and managing their business activity in Reno, Nevada, as debtors-in-

14  possession, pursuant to Bankruptcy Code sections 1107 and 1108.

15  B.   Jurisdiction.   This Court has jurisdiction over these Chapter 11 cases, and the

16  parties and property affected hereby, pursuant to 28 U.S.C. §§ 157(b) and 1334.   This

17  proceeding constitutes a core proceeding as defined in 28 U.S.C. §157(b)(2).  Venue of these

18  bankruptcy cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

19  C.   Debtors.      Debtors are in the business of providing closed-end consumer

20  leases to consumers for tangible goods in various industries, including medical products, pets,

21  household goods, wedding products, jewelry, and automobile parts.  The Debtors continue to

22  operate their businesses as Debtors and Debtors-In-Possession pursuant to Sections 1107(a) and

23  1108 of the Bankruptcy Code.  The headquarters for the Debtors' business is located in Reno,

24  Nevada, although the Debtors all transact business online in order to provide leases in all fifty

25  (50) states.  As of the Petition Date, the Debtors collectively employed approximately 24

26  employees, but now employ 22 employees as of the date of this Motion. The Debtors generate

27  revenue and working capital, inter alia, in the ordinary course of business from the sale of the

28  aforementioned consumer leases to Monterey.  Accordingly, Monterey entered into certain

Receivable Purchase Agreements with WAGS on January 13, 2014 and May 20, 2015; with BRISTLECONE FINANCING on June 12, 2014; with I DO LENDING on November 19, 2014 and November 19, 2014; with ONE ROAD LENDING on June 12, 2015; and with BOON LLC on February 27, 2017 (collectively, the "Purchase Agreements"), which Purchase Agreements are attached hereto as Exhibits A through G, respectively.  In part, the Purchase Agreements set forth protocols, procedures and provisions whereby consumer leases would be offered to Monterey, assuming that they met specified criteria.  The purchase price was set forth in a prescribed schedule.  Upon the occurrence of any event of default, including with respect to a default under the underlying consumer lease, the counterparty Debtor was required to either replace the defaulted consumer lease with a qualified new consumer lease or pay a stipulated amount in lieu thereof ("Repurchase Obligation").  Further, the Purchase Agreements included a component where the Debtors engaged Monterey to perform account management and collection services for all other consumer leases (the "Servicing Agreement").  Monterey's contractual service fees are deducted from the collections before remittances are forwarded to the Debtors.  The Debtors granted and conveyed to Monterey a continuing security interest in and lien against all of the other serviced leases and the proceeds generated therefrom (the "Monterey Collateral").  Monterey filed the required UCC financing statements to perfect its security interests.  The Monterey Collateral secured the obligations and performance of the respective counterparty Debtor(s) pursuant to the respective Purchase Agreement(s).

D.    Monterey's Claim.    Monterey asserts that Debtors were indebted to it for outstanding Repurchase Obligations as of the Petition Date in the amount of $2,158,754.00, which amount Debtors are still required to verify and account for ("Prepetition Indebtedness").  The amount has increased post-petition, and as of June 16, 2017, Monterey asserts that it is owed $3,606,298.00, based upon the Debtors' Repurchase Obligations, which amount Debtors are still required to also verify and account for.  The amount will change on a continuous basis as consumer's perform and default under their leases.  Because Monterey retains a security interest in all Serviced Contracts, it also retains the right to offset any losses from Defaulted Contracts against other Serviced Contracts.  As of the Petition Date, Monterey alleges that it

held a cash collateral interest in the Serviced Contracts and Purchased Contracts to secure an unknown obligation for any Defaulted Contracts. Post-petition Monterey has continued to purchase consumer leases from the Debtors, and as of June 16, 2017, it has acquired leases with a face value of $7,500,101.00, in consideration for payment to the Debtors in the amount of $6,003,802.00, in accordance with the pricing schedule set forth in the various Purchase Agreements. The Debtors and Monterey are desirous of continuing the prepetition relationship on a post-petition basis, and in that regard, Debtors are requesting Court approval to continue post-petition sales of Debtors' consumer leases to Monterey and Monterey continuing to maintain perfected security interests in the Monterey Collateral thereof, and any additions thereto.

     E.    <u>Need for Adequate Protection Payments</u>. In order to facilitate the Debtors' post-petition business with Monterey, Debtors have proposed to provide adequate protection to Monterey, pursuant to 11 U.S.C. §§361, and further, in conjunction with entering into this Stipulation, the Debtors will seek court authorization to continue on a post-petition basis the purchasing of consumer leases in the ordinary course and assume the prepetition Purchase Agreements above referenced, pursuant to 11 U.S.C. §§363(b)(1) and 365.

<u>**AGREEMENT**</u>

Based upon the foregoing findings and conclusions, and good cause appearing therefore,

IT IS HEREBY STIPULATED, CONSENTED TO AND AGREED by and among the Debtors and Monterey (collectively, the "Parties"), as follows:

    1.    <u>Incorporation</u>.

The Recitals contained above are incorporated herein by this reference.

    2.    <u>Indebtedness</u>. The Debtor hereby acknowledges and agrees that the Debtors are liable to Monterey for the prepetition indebtedness in the amount of $2,158,754.00 ("Prepetition Indebtedness") which has increased to $3,606,298.00, as of June 16, 2017. For purposes of this Stipulation and 11 U.S.C. §362(d)(3)(B) adequate protection obligations to Monterey only, the Parties agree that the indebtedness shall accrue interest at the non-default contractual rate of 1.5% per month under the terms of the Repurchase Agreements.

3.     <u>Validity of Claims.</u>  Debtors acknowledge and agree to the following:

    a.     The Prepetition Indebtedness constitutes an allowed secured claim pursuant to 11 U.S.C. §506.

    b.     The Prepetition Indebtedness is secured by a valid, perfected, first priority security interests in the prepetition Monterey Collateral.

    c.     Monterey has purchased consumer leases from the Debtors postpetition in the ordinary course of business, with a face value of $7,500,101.00, and that these consumer leases sold to date and those consumer leases sold to Monterey in the future, are authorized pursuant to §363(b)(1) and deemed to be sold in the ordinary course of the Debtors' businesses.

4.     <u>Adequate Protection to Monterey</u>. As adequate protection of the interests of Monterey pursuant to 11 U.S.C.§§361 and 506(b) of the Bankruptcy Code. Monterey is hereby granted, nunc pro tunc to the Petition Date, an additional rollover and replacement lien (the "Postpetition Lien"), resulting from post-petition purchases of consumer leases retained by the Debtors, on each and all of the Debtors' Postpetition assets to the same extent as Monterey had in the prepetition Monterey Collateral, on the Petition Date (collectively, the "Postpetition Collateral") and any and all proceeds of such Postpetition Collateral, with such Postpetition Lien being a perfected security interest in and to the Postpetition Collateral having the same extent, validity and priority as Monterey had in the Prepetition Collateral on the Petition Date, provided that the Postpetition Collateral shall not include any causes of action, claims, or rights of the Debtor's bankruptcy estate under sections 506, 544, 547, 548, 549, 550, and/or 553 of the Bankruptcy Code. The security interest granted to Monterey shall be deemed fully and effectively granted and perfected immediately upon entry of an order by the Bankruptcy Court approving this Stipulation and Monterey need not take any further steps to create or perfect such security interest.

5.     <u>Payments</u>. As adequate protection of Monterey's interests in the Monterey Collateral and Postpetition Collateral, and pursuant to the provisions of 11 USC §362(d)(3)(B), Debtors shall pay to Monterey the amount of regular ongoing servicing fees owing to Monterey under the Purchase Agreements, in addition to honoring the set off rights set forth in Paragraph 8 of the Purchase Agreements with 5 days' prior notice to the Debtors, prior

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786 7600

5

to application of any set offs, until: (1) entry of an order confirming a plan of reorganization in this case, (2) dismissal of this Chapter 11 Case or (3) conversion of this Chapter 11 Case to proceedings under Chapter 7 of the Bankruptcy Code.

6.    No other changes.  All terms of the Purchase Agreements and UCC-1s shall remain in full force and effect and remain binding, except when inconsistent with an express provision of the Stipulation or the Court's Order.  Entitlements to late fees or charges, attorneys' fees, interest and costs shall either be agreed upon by the Parties or determined by the Bankruptcy Court under the controlling provisions of the Bankruptcy Code after appropriate notice and a hearing.

7.    Assumption of Purchase Agreements.  As soon as practical but not later than 14 days from the date of the Stipulation, the Debtors shall seek an order of the Court authorizing and allowing for the assumption of the Purchase Agreements pursuant to 11 U.S.C.§365, as well as the §§361, 362, 363 and 553 relief stipulated to herein.  The failure to obtain the aforesaid relief shall constitute and event of default hereunder.

8.    Stay Relief.  Monterey shall be granted relief from the provisions of 11 U.S.C. §§ 362 and 553 to the extent necessary to permit Monterey to replace defaulted consumer leases or to set off funds and collections in its possession as provided for in the Purchase Agreements.

9.    Events of Default.  In the event Debtors fail to make any payments due under this Stipulation, Monterey shall provide written notice of such default to Debtors' counsel, STEPHEN R. HARRIS, Esq. of HARRIS LAW PRACTICE LLC., and Debtors shall have fifteen (15) calendar days after actual delivery of the notice to Debtor's counsel to cure the default.  If Debtors fail to cure the default within the fifteen (15) calendar day cure period, Monterey may file a Declaration of Noncompliance, stating that: (1) the Debtors have failed to make payment(s), (2) the specific nature of the default and (3) that the Debtors have failed to cure after fifteen (15) calendar days from delivery of the Notice of Default upon the Debtors' counsel, after which time the automatic stay shall terminate to allow Monterey to proceed with its contractual remedies available under state and local laws. If the relief under 11 U.S.C.§365 is

1   not granted, the Debtors authorization to use cash collateral shall be suspended.

2       10.   Unenforceability.   If the Court does not approve this Stipulation for

3   any reason, then this Stipulation has no effect, and neither the Stipulation nor any action or

4   procedure taken, nor any statement made, in connection with the negotiation, preparation,

5   formulation or seeking approval of this Stipulation may be referred to by any entity in

6   connection with any proceeding or action, whether in this case or elsewhere.

7       11.   Consent and Mutual Agreement.   Whenever any action may be taken

8   under this Stipulation upon the prior written consent of Monterey or the prior mutual written

9   agreement of the parties, the action may be taken without any further notice or action or order of

10  the Bankruptcy Court.

11      12.   Neutral Construction.   Each of the parties hereto has been

12  involved in the negotiation, review, and execution of this Stipulation and each has had the

13  opportunity to receive independent legal advice from attorneys of its choice with respect to the

14  advisability of making and executing this Stipulation.  In the event of any dispute or controversy

15  regarding this Stipulation, the parties hereto shall be considered to be the joint authors of this

16  Stipulation and no provision of this Stipulation and the Approval Order shall be interpreted

17  against a party hereto because of authorship.

18      13.   Headings.   The parties acknowledge that the headings set forth herein

19  are for convenience only and shall not be used to limit, define, or interpret the rights and

20  responsibilities of the parties hereunder.

21      14.   Power of Representatives.   Any party executing this Stipulation and

22  Approval Order in a representative capacity warrants that he or she is duly authorized and

23  empowered to do so.

24      15.   Survival of Obligations.   Any  actions  taken  pursuant  to  this

25  Stipulation, including, but not limited to the Debtors' granting of the security interest in the

26  Postpetition Collateral in favor of Monterey and the Debtors' use of the Cash Collateral, shall

27  survive entry of any order that may be entered:   (a) confirming any plan in this case; (b)

28  converting this Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code; or (c)

1   dismissing this case.  Unless otherwise ordered by the Bankruptcy Court, the claims and liens

2   on the Postpetition Collateral continue in full force and effect and maintain their priority until

3   all the obligations owed under the terms of the Receivable Purchase Agreements and this

4   Stipulation are paid in full.

5           16.    Binding Effect.  This Stipulation is binding on and inures to the benefit of

6   the Debtors, their estates, any representative of the Debtors or their estate, any Trustee

7   appointed in these cases, whether under Chapter 11 or Chapter 7, any Examiner with expanded

8   or special powers to operate the Debtors' business appointed in this case, Monterey, and their

9   respective successors and assigns.

10  Dated:   June 29, 2017.                    STEPHEN R. HARRIS, ESQ.
11                                             HARRIS LAW PRACTICE LLC

12                                             /s/ Stephen R. Harris

13                                             _____
                                               Attorneys for Debtors
14

15  Dated:   June 29, 2017.                    RAYMOND L. FINK, ESQ.
16                                             LIPPES MATHIAS WEXLER FRIEDMAN LLP

17                                             /s/ Raymond L. Fink

18                                             _____
                                               Attorneys for MONTEREY FINANCIAL
19                                             SERVICES, INC., MONTEREY FINANCIAL
                                               SERVICES, INC. PROFIT SHARING PLAN
20                                             AND TRUST and MONTEREY RECEIVABLE
                                               FUNDING, LLC
21

22  Dated: June 29, 2017.                      FRANK C. GILMORE, ESQ.
23                                             ROBISON, BELAUSTEGUI, SHARP & LOW

24                                             /s/ Frank C. Gilmore

25                                             _____
                                               Attorneys for MONTEREY FINANCIAL
26                                             SERVICES, INC., MONTEREY FINANCIAL
                                               SERVICES, INC. PROFIT SHARING PLAN
27                                             AND TRUST and MONTEREY RECEIVABLE
                                               FUNDING, LLC
28

1    THE TERMS AND CONDITIONS OF THIS STIPULATION ARE HEREBY APPROVED

2    AND ACCEPTED.

3

4    Dated: June 29, 2017.                    BRANDON KYLE FERGUSON

                                        CEO/PRESIDENT OF

5                                  BRISTLECONE, INC.

6

7                                  */s/ Brandon Kyle Ferguson*

                                 ------------------------------------

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786 7600

# EXHIBIT "A"

# EXHIBIT "A"

# RECEIVABLES PURCHASE AGREEMENT

This Receivables Purchase Agreement (hereinafter "Agreement") is entered into as of January 13, 2014 (the "Effective Date"), by and between **MONTEREY FINANCIAL SERVICES, INC.** ("MFS"), a California corporation with its principal place of business located at 4095 Avenida de la Plata, in Oceanside, California 92056 and, **WAGS LLC ("SELLER")**, a(n) Nevada Limited Liability Corporation, with its principal place of business located at 9484 Double R Blvd Suite B Reno, NV 89521, with respect to the following facts:

## RECITALS

**A.**     SELLER is in the business of providing certain products and services to various individuals from time to time, and SELLER allows said individuals to finance the cost of such products and services by entering into retail installment contracts, promissory notes, security agreements, membership agreements and/or other instruments (each, a "Contract" and collectively, the "Contracts"). SELLER's services and/or products are described on Schedule "A" attached hereto and incorporated herein by this reference.

**B.**     MFS is in the business of purchasing instruments such as the Contracts in its ordinary course of business.

NOW, THEREFORE, in consideration of the above promises and of the representations, warranties and agreements contained herein, the parties hereby covenant and agree as follows:

## AGREEMENT

**1.**     **DEFINITIONS:** The following terms shall have the following meaning as used in this Agreement.

(a)     "Assignment" means an Irrevocable Assignment substantially in the form attached hereto as Exhibit "A", transferring and assigning to MFS all of SELLER's right, title and interest in and to a Purchased Contract, all payments thereunder and all related guaranties and collateral therefor in a form prescribed by MFS.

(b)     "Authenticate(d)" means to sign, execute or otherwise adopt a symbol or encrypt or similarly process a record in whole or in part, with the present of the authenticating person to identify the person and adopt or accept a record.

(c)     "Contract" has the meaning set forth in Schedule A above and must be in a form approved by MFS.

(d)     "Contract/Credit Application" means an Authenticated Contract (which is in original, executed form if on paper), an original credit application, and/or an original credit report or statement concerning the Customer and any related documents, information and Records from time to time required by MFS in accordance with MFS' standard procedures.

(e)     "Customer" means an individual who enters into a Contract with SELLER.

(f)     "Default" means (i) a breach by SELLER, which has not been cured during any applicable cure period, of any representation, warranty, covenant, term or condition of this Agreement or

of any other agreements to which SELLER is obligated or by which it is bound in connection with a Contract, (ii) a default under any guaranty of the obligations of SELLER hereunder or a default in SELLER's repurchase obligations as set forth in Section 6 hereof, in each case which has not been cured during any applicable cure period, (iii) a default by SELLER under any other agreement by and between SELLER or any affiliate thereof and MFS and any affiliate thereof which has not been cured during any applicable cure period, or (iv) a Material Adverse Change in Financial Condition with respect to SELLER.

        (g)    "Defaulted Contract" has the meaning set forth in Section 6(b) hereof.

        (h)    "Event of Cancellation" shall, with respect to a Contract, refer to (i) a Material Adverse Change in Financial Condition, business or operations of SELLER since the date of this Agreement or of the Customer since the date of the related Final Contract/Credit Applications; (ii) the occurrence of an event which causes a representation made by the Customer, SELLER or any other party in connection with the Contract or under this Agreement to be or become false or misleading in any material respect whether or not true when made; (iii) a breach of any term of such Contract, or of any related guaranty or credit support agreement, whether by the Customer or SELLER, including without limitation, failure of SELLER to deliver the underlying products or services to any Customer; (iv) any Default; (v) notification by a Customer to SELLER or to MFS of its intent to cancel all or any part of the Contract; or (vi) if the SELLER and/or MFS is named in a lawsuit over the actions or inactions of the SELLER.

        (i)    "Final Contract/Credit Application" means such documents or other Records as MFS shall from time to time require in accordance with its standard procedures in order to complete the purchase of a Contract and to pay the Purchase Price of the Contract to SELLER including, without limitation, (i) an Assignment; (ii) if the Purchased Contract is originally executed in paper form, the one and only executed original of the Purchased Contract; or, (iii) any Uniform Commercial Code financing statements necessary to perfect MFS' interest in the Purchased Contract; and (iv) any other document, instrument or Record required by the terms of MFS' written notice to SELLER pursuant to Section 2 below including, without limitation, any guaranties or security agreements.

        (j)    "Insolvency Event" means, with respect to any person or entity, (1) dissolution, liquidation or failure to operate as a going concern; (2) voluntarily or involuntarily filing bankruptcy, making an assignment, arrangement or composition with or for the benefit of creditors, appointment of a receiver; (2) it shall become insolvent or unable to pay its debts as they become due; or (3) it shall seek or become subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its property; (4) it shall have a secured party take possession of all or substantially all its property or have a distress, execution, attachment, sequestration or other legal process levied or enforced against all or substantially all its property and such secured party shall maintain possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter.

        (k)    "Material Adverse Change in Financial Condition" means a (1) material adverse change in the balance sheet or profit and loss statements or other financial condition or prospects of SELLER or a Customer from time to time, as determined by MFS in its sole discretion; (2) change in the corporate structure or any material change the ownership or capitalization of the SELLER, as determined by MFS in its sole discretion, (3) an Insolvency Event relating to the SELLER.

        (l)    "Origination Fee" means the non-refundable and renewing fee payable from SELLER to MFS on the Effective Date and each annual anniversary thereafter in the amounts set forth on Schedule "A," attached hereto, to cover the expenses of MFS in, among other things, reviewing SELLER

and this transaction including, without limitation, expenses in obtaining credit reports concerning SELLER, in obtaining a Dun and Bradstreet rating concerning SELLER, in performing and title and/or Uniform Commercial Code searches concerning SELLER and in the filing of Uniform Commercial Code financing statements.

(m)    "Purchased Contract" means a Contract, the Customer of which meets all of the credit and income requirements of MFS at the time it is purchased and which MFS elects, in its sole discretion, to purchase pursuant to the terms hereof.

(n)    "Purchase Price," with respect to each Contract, means the amount set forth on the attached Schedule "A".

(o)    "Repurchased Contract" means a Purchased Contract which has been repurchased by SELLER pursuant to the terms hereof.

(p)    "Record" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

(q)    "Repurchase Price" means the price at which SELLER is obligated to repurchase a Purchased Contract from MFS, and shall be an amount equal to (i) the principal outstanding balance of the Purchased Contract as of the original Effective Date of purchase from SELLER, less all payments attributable to principal received by MFS for such Purchased Contract, the result of which shall be multiplied by the original Purchase Price Rate as set forth in Schedule "A" attached hereto; plus (ii) a Repurchase Fee in an amount set forth in Schedule "A" attached hereto.

(r)    "Servicing Contract" means any Contract which MFS has elected not to purchase for any reason and any Repurchased Contracts, which MFS elects, in its sole discretion, to administer and service pursuant to the terms of this Agreement.

(s)    "Servicing Fee," with respect to each Servicing Contract, means the amount set forth on Schedule "A" attached hereto which will be paid by SELLER to MFS as compensation for MFS' administration and servicing of the Servicing Contracts.

(t)    "Term," with respect to this Agreement, means the period of time set forth on Schedule "A" attached hereto; provided, however, that MFS may terminate this Agreement immediately upon notice to SELLER in the event of a Default or upon thirty (30) days notice without Default.

2.    **PURCHASE OF CONTRACTS:** Subject to the terms and conditions of this Agreement, during the Term, MFS shall have the option, but not the obligation, in its sole discretion and on a case by case basis, to purchase all of SELLER'S right, title and interest in and to the Contracts submitted by SELLER to MFS.MFS shall give WAGS notice of their intent to stop purchasing and give 30 day notice unless the reason behind Monterey's intent to stop purchasing contracts are for any of the following reason: WAGS receives excessive Attorney General Complaints, MFS receives any attorney contact about WAGS, any delinquency issues with WAGS contracts purchased or serviced by MFS, or WAGS does not adhere to the Full Recourse guideline set forth in this agreement. If any of the reasons listed above are what has lead MFS to stop purchasing contracts then MFS is not required to give any type of notice.    Upon Authentication of a Contract by a Customer, SELLER shall provide to MFS the Contract/Credit Application. Upon receipt thereof, MFS shall review the Contract/Credit Application and shall notify SELLER whether it elects to exercise its option to purchase such Contract by delivery of written notice to SELLER within five business (5) days after MFS' receipt of the Contract/Credit Application. MFS' obligation to purchase any Contracts shall be conditioned upon MFS' receipt of a

complete Final Contract/Credit Application with respect thereto in form and substance acceptable to MFS and any other information MFS may reasonably request relating thereto. If MFS exercises its right to purchase a Contract, (a) the Contract that bears the confirmation code entered by the Customer shall be deemed to be the "single, authoritative copy" of such Contract (as such terms are used in section 9-105(1) of the Uniform Commercial Code). (b) such Contract (whether in electronic or hard copy form) may not be altered by SELLER, and may be altered by MFS in accordance with law upon prior written notice to SELLER; (c) any other copies of the Contract printed for any reason shall each be clearly and conspicuously labeled "COPY." In no event shall MFS assume or be delegated any of SELLER's duties, responsibilities, liabilities or obligations to the Customer under any Contract and SELLER shall remain liable therefore notwithstanding any assignment of a Purchased Contract to MFS. The parties agree that MFS shall be entitled to directly receive and retain any and all amounts due and payable under the Purchased Contracts. All Purchased Contracts shall be sold to MFS subject to the representations, warranties, covenants, agreements, terms and conditions set forth in this Agreement, and shall be accompanied by an Assignment. In addition MFS reserves the right to verbally verify the Contract with the Customer thereunder.

3.    3.    **PREAPPROVAL:**    WAGS will be using their own credit approval platform for pre-approval of all contracts to qualify accounts for purchase by MFS. All contracts that are to be purchased by MFS must meet all requirements and follow all attributes previously agreed upon by MFS and WAGS. The attributes that must be met are as follow: All consumers must have a 600 or greater Vantage score, Consumer may have no more than 2 charge-off accounts listed on their credit report in the last 24 months, All bankruptcy's listed on the credit report must be closed or discharged, Consumer can have no more than 1 bankruptcy listed on their credit report, All consumers with a Vantage Score between 600-650 must have a minimum income of $1,500 and shall be approved for a finance amount no greater than $2,500, Consumers with a Vantage score of 650 or greater minimum shall be approved for a max finance amount no greater than $5,000. These attributes and requirements can also be found in section VI Customer Credit Approval. Any customer approved for purchase through the WAGS approval platform shall be valid for (30) days from the date of the approval; provided that there are no changes in respect to such customer, the information presented to MFS in connection with the pre-approval process, or the relating contract/ credit application and all other relating therto unchanged. Within said thirty (30) day period, SELLER shall send MFS the original Contract or Record, the original Authenticated Contract/Credit Application, the certificate of completion, if applicable, and employment information, if applicable. If this information is not received by MFS within the thirty (30) day period, MFS will have the option to reject the Contract or to re-qualify the same under MFS' credit guidelines. **FUNDING OF PURCHASE PRICE:**

(a)    Provided that no Event of Cancellation has occurred with respect to a Contract that MFS has elected to purchase, MFS shall, within five (5) business days after SELLER's submission of a complete Final Contract/Credit Application to MFS, pay to SELLER the Purchase Price for each Purchased Contract less (i) the outstanding amount of the Origination Fee, which shall be withheld by MFS from the Purchase Price until the full Origination Fee due for such year (whether it be the initial Origination Fee or the renewal fee, in each case as set forth in Schedule "A") has been paid in full, and (iii) any adjustment to Purchase Price, if applicable, as set forth in Schedule "A".

4.    **REPRESENTATIONS AND WARRANTIES:**

(a)    SELLER hereby represents, warrants and covenants to MFS, its successors and assigns, as of the date hereof, as of the date of submission of each Contract/Credit Application, Final

Contract/Credit Application and Assignment in respect of each Contract and during the Term of this Agreement, that:

(1)    If a corporation, partnership or limited liability company, SELLER is duly organized and validly existing and in good standing in the state of its incorporation as such, and has full power to carry on its business as it is presently conducted including, without limitation, the sale of the Contracts, to enter into this Agreement and to carry out the transactions contemplated hereby;

(2)    The execution and delivery of this Agreement, the assignment of the Purchased Contracts to MFS, and the performance by SELLER of the transactions contemplated hereby have been duly authorized by all necessary action, including any action required under SELLER's governing instruments;

(3)    The execution, delivery and performance of this Agreement and the assignment of the Purchased Contracts to MFS, and the execution of any other instrument related to this Agreement, constitute a legal, valid and binding obligation of SELLER enforceable in accordance with its terms, without any offsets or counterclaims, and no further actions are required for SELLER to enter into this Agreement and such other instruments;

(4)    All of SELLER's business operations are duly licensed and permitted under all federal, state and local laws, rules and regulations of any governmental authority;

(5)    SELLER has duly paid any and all license, franchise, corporation or other taxes, fees, imposts, duties or charges levied, assessed or imposed upon it or upon any of its properties of whatsoever kind or description;

(6)    Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will constitute a violation or default of any statute, rule or decree of any court, administrative agency or governmental body to which SELLER is or may be subject;

(7)    There are and will be no agreements between SELLER or its agents and any Customer in connection with any Purchased Contract and no express or implied warranties have been or will be made by SELLER or its agents to such Customer, except as set forth in the Contract;

(8)    SELLER and its agents have not participated in and have no knowledge of any fraudulent and/or misleading act in connection with any Contract or with respect to any Customer;

(9)    Each Customer has presented appropriate documentation to verify his or her identity and has legal capacity to enter such Contract and has not engaged in any fraud or misrepresentation with respect to such Contract and the Authentication provided by the named Customer is genuine;

(10)    If a Contract is in electronic form, (a) SELLER has provided to the Customer all disclosures in such form and manner as may be necessary to create a valid and enforceable electronic contract, (b) the Customer has consented to conducting the electronic transaction in accordance with applicable law; and (c) the Contract was consummated through the SELLER's web site in accordance with applicable law.

(11)    Each Contract is and shall be valid, genuine and enforceable according to its terms (including, but not limited to, terms related to interest rate or time price differential), and each transaction (including the application process and the origination of the Contract) was at the time of its

origination and is as of the date of the assignment of the same to MFS in compliance with applicable laws, rules and regulations of any governmental authority whether federal, state, county, municipal or otherwise including, without limitation, usury laws, electronic or digital signature laws, electronic transaction laws, the Federal Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Magnuson-Moss Warranty Act, Federal Reserve Board Regulations B, M and Z, state adaptations of the Consumer Credit Protection Act (or parts thereof) and of the Uniform Consumer Credit Code and any other consumer credit, equal opportunity, disclosure or repossession laws or regulations applicable with respect to a particular Contract;

(12)    Each Contract is a valid deferred payment obligation for the amount therein set forth and such Contract shall not be subject to any disputes, offsets or counterclaims and the property, goods or services described in the Contract have never been the subject of any other Contract between SELLER and the Customer and the Contract has not been rescinded by SELLER or Customer for any reason whatsoever, SELLER is not in breach under any obligation to any Customer under any Contract, and has no actual knowledge of any personal defenses that the Customer could raise against the enforcement of the terms of any Contract; SELLER has no actual knowledge of any facts which may result in the uncollectability or unenforceability of any Contract;

(13)    All credit or other information reasonably relevant to a credit determination concerning the Customer shall be the sole responsibility of the SELLER to be disclosed to MFS and such credit information and all other information supplied by SELLER in connections with any Contract shall be true, complete and correct as of the date submitted; SELLER shall supplement such information as necessary so that such information remains true, complete and correct;  SELLER has no knowledge of any facts, which presently or upon the occurrence of certain events in the future, may result in the uncollectability and/or unenforceability of the Contract; SELLER acknowledges that MFS will rely upon information appearing on SELLER's records relating to all Contracts  and Final Contracts/Credit Applications, and in light of such acknowledgment, each item of information contained in and appearing on such records accurately reflects their true status;

(14)    Each Contract is current and the Customer is not in default with respect to any term thereunder as of the date of submission of each such Contract/Credit Application, Final Contract/Credit Application and Assignment in respect of each Contract;

(15)    SELLER owns each Contract submitted to MFS hereunder free and clear of any liens, charges, security interests, encumbrances or other restrictions or transfer which may adversely affect MFS' rights with respect thereto, including without limitation, MFS' rights under this Agreement to be the assignee of all Purchased Contracts and to collect all monies due thereunder, SELLER has the absolute right to sell, assign and transfer the contracts free and clear of all rights of third parties, and upon assignment MFS will obtain good title to such Purchased Contract free and clear of any liens, charges, encumbrances or other restrictions whatsoever;

(16)    The execution and delivery by SELLER  of this Agreement and the assignment of the Purchased Contracts to MFS and the security interests granted to MFS from time to time pursuant to the terms hereof, do not conflict with or constitute a material breach or default with respect to any indenture, loan or credit agreement, mortgage, lease, deed or other agreement to which it is a party or by which it or its properties are bound and there are no suits or proceedings pending or, to the knowledge of SELLER, threatened in any court or before any regulatory commission, board or other administrative or governmental agency against or affecting SELLER which could materially impair SELLER's ability to perform its obligations hereunder;

---

(17)    The financial statements of SELLER delivered to MFS from time to time fairly present the financial position of SELLER as of the date thereof in conformity with generally accepted accounting principles consistently applied and the results of operations of SELLER for the periods covered thereby and do not, as of the date thereof, include any material misstatement or omit to state any material liability, absolute or contingent, and since the date of the latest such financial statements, there has been no Material Adverse Change in the Financial Condition of SELLER;

(18)    There is no litigation or other proceeding pending, or to the best of SELLER's knowledge, threatened against SELLER that would affect SELLER'S ability to perform each and every of its obligations under this Agreement or any Agreement or instrument related hereto;

(19)    SELLER has delivered to Customer all products and services required to be delivered and/or performed in accordance with the Contract;

(20)    No false, fraudulent or misleading representations were made nor were unfair or deceptive trade practices engaged in by SELLER with respect to the Customer or the Contract and no statements, promises or representations about the payment terms under the Contract, except as stated in writing in the Contract;

(21)    SELLER is not insolvent, nor will the SELLER be made insolvent by the transfer or assignment of the Contacts, nor does the SELLER anticipate any pending Insolvency Event;

(22)    Each Contract has been serviced by SELLER in conformity with all applicable laws, rules and regulations and in conformity with SELLER's policies and procedures that are consistent with customary and prudent industry standards; and

(23)    In the event of any (a) transfer of control of SELLER, including, without limitation, any merger, consolidation or reorganization of SELLER with or into any person, firm or entity, where SELLER is not the surviving entity in such merger, consolidation or reorganization ( a "Change of Control Event"), (b) sale, lease conveyance, exchange, transfer or other disposition of all, or substantially all, the assets of SELLER (an "Asset Sale"), or (c) Insolvency Event of SELLER, prior to such event SELLER shall (x) give MFS written notice of the date of such event and, in the event of a Change of Control Event or an Asset Sale, the identity of the surviving or acquiring entity, and (y) purchase all outstanding amounts on the Purchased Contracts at the same rate as originally purchased by MFS hereunder; provided, however, that in the event of a Change of Control Event or an Asset Sale, MFS shall be entitled to elect, in its sole and absolute discretion, to have the surviving or acquiring corporation, as the case may be, to continue to honor the Purchased Contracts and assume SELLER's obligations hereunder, including, without limitation, providing any ongoing services described thereunder, subject to executing such documents as MFS may reasonable request.

(b)    The representations and warranties contained herein shall be deemed to be continuing representations, warranties and covenants of SELLER and shall continue beyond the Term of this Agreement and until all obligations of SELLER hereunder have been fully performed and all sums due to MFS under all Purchased Contracts and hereunder have been paid in full and MFS no longer has any contingent liability to return any amounts which it may have received pursuant to any Purchased Contract.

### 5.    SELLER'S REPURCHASE OBLIGATIONS; MFS' PROTECTION AGAINST LOSSES UPON DEFAULT:

(a)      If (i) SELLER knows or has reason to know that any Contract is not the bona fide legal obligation of the Customer, or any Contract and/or Authoritative Copy of an electronic Contract is the subject of fraud, is invalid, or has been tampered with in any way; (ii) any Contract becomes the subject of an interest rate reduction in accordance with the terms of the Soldier's and Sailor's Civil Relief Act; (iii) any of SELLER's representations or warranties contained in this Agreement shall be materially untrue or incorrect; (iv) any of SELLER's covenants and agreements contained herein shall be breached by SELLER with respect to any particular Purchased Contract(s) and, if capable of being cured, SELLER fails to cure such breach within thirty (30) days after written notice thereof; (v) the Customer does not receive the products and/or services contracted for in the Contract; or (vi) the Customer cancels the Contract pursuant to the terms of such Contract; (vii) if the Customer contact information provided by the SELLER to MFS in the contract and/or credit application proves to be insufficient to the extent that MFS is unable to establish contact within the first 90 days and the Customer's first payment to MFS remains unpaid, then SELLER unconditionally agrees that it will, within thirty (30) days after MFS' written notice and demand to SELLER, either and at MFS' option (aa) repurchase the Purchased Contract(s) affected by such breach for a price equal to the Repurchase Price; or (bb) replace the Purchased Contract affected by such breach by assigning to MFS all of its right, title and interest in and to Contract(s) owned by SELLER with a price equal to the Repurchase Price, which substituted Contracts shall be subject to review and approval of MFS in its sole discretion. In such event, MFS agrees to reassign the applicable Purchased Contract to SELLER, AS IS, WHERE IS, WITHOUT RECOURSE OR WARRANTY OF ANY KIND (except that MFS shall represent and warrant that it owns the applicable Purchased Contract and it has not transferred it to a third party).

(b)      In addition to SELLER's obligation to repurchase any Purchased Contracts pursuant to Section 6(a) above, (i) if any installment on a Contract becomes due and remains unpaid for more than ninety (90) days; upon the occurrence of an Insolvency Event with respect to any Customer (each, a "Defaulted Contract" and collectively, the "Defaulted Contracts"), then in any of such events, SELLER shall, within thirty (30) days after MFS' written notice of the Defaulted Contract, either and at MFS' option (x) repurchase the Defaulted Contract; or (y) replace the Defaulted Contract(s) on the terms set forth in Section 6(a) above. In addition to any remedy set forth herein or available to MFS under applicable law and equity and in addition to any other amounts owed by SELLER to MFS, MFS shall be entitled to offset any and all amounts it and its affiliates and agents incur in connection with collection efforts and efforts to remedy any Default (including, without limitation, any travel costs).

(c)      If SELLER is obligated to repurchase a Purchased Contract for any reason and does not provide MFS with cash or an acceptable replacement Contract(s) as set forth in this Section 6 within thirty (30) days following notice by MFS to SELLER as provided in this Section 6 (the date said notice is given being referred to herein as the "Notice Date"), then interest shall accrue on all amounts owed by SELLER (including, without limitation, the Repurchase Price of any Defaulted Contract and any costs incurred by MFS and its affiliates and agents in connection with collection and remedial efforts relating to any such Defaulted Contract or the repurchase of any Purchased Contract) to MFS at the rate of one and one half percent (1.5%) per month under applicable law from the Notice Date until paid in full.

6.      SECURITY AGREEMENT IN COLLATERAL:  To secure the accuracy and full performance of each of SELLER's representations, warranties, covenants and obligations hereunder, SELLER hereby grants to MFS a first priority security interest (the "Security Interest") in all of SELLER's right, title and interest in and to (i) all of the Purchased Contracts, (ii) all proceeds of the foregoing.  The Purchased Contracts and all proceeds of the foregoing are sometimes hereinafter collectively referred to as the "Collateral."  The transactions contemplated hereby are a full and absolute sale of the Purchased Contracts, subject to the conditions herein and no obligations and/or rights of SELLER hereunder shall in any way be construed to imply or grant SELLER any direct or indirect ownership interest and/or legal or equitable title in and/or to the Purchased Contracts.

7.    **RIGHT OF OFFSET** MFS has the right, without notice to SELLER to offset amounts owed by SELLER to MFS hereunder (including any and all accrued interest) and amounts incurred by MFS and its affiliates and agents in connection with collection and remedial efforts relating to any Default (including, without limitation, any travel costs) against any other amounts payable by MFS to SELLER. Nothing herein shall require MFS to first seek or exhaust any remedy against the Customer, its successors and assigns, or any other person obligated with respect to the Contract, or to first foreclose, exhaust or otherwise proceed against any collateral or security which may be given in connection with the Contract, if any.

8.    **RIGHT TO INSPECT:** MFS (through any of its officers, employees, or agents) shall have the right from time to time hereafter at its sole cost and expense to audit and inspect the books and financial statements of SELLER, and to check, test and appraise the Collateral in order to verify financial condition or the amount, quality, value, condition of, or any other matter relating to Collateral.

9.    **INDEMNIFICATION:**

(a)    SELLER and MFS each hereby agree to defend, indemnify and hold harmless each other, and the other party's affiliates, subsidiaries, employees, officers, directors, shareholders, attorneys and agents, from and against any and all losses, claims, liabilities, demands and expenses whatsoever, including without limitation reasonable attorneys' fees and costs arising out of or in connection with any breach by the indemnifying party of its representations, warranties, covenants or obligations. All indemnities and obligations contained herein shall survive the expiration or termination of the Agreement and the expiration or termination of any Purchased Contract or any Servicing Contract.

(b)    To the extent that SELLER elects to utilize in its operations, including but not limited to, in its individual transactions and dealings with Customers, any form contract, notice, or other written instrument (collectively, "Written Instruments") which MFS may volunteer, supply, or provide to SELLER from time to time, MFS makes no representation or warranty as to the fitness of said Written Instruments and SELLER expressly agrees to hold MFS harmless for the same. Pursuant to Section 5(a)(11) of this Agreement, SELLER represents and warrants that any and all contracts or Written Instruments underlying each Contract is compliant with all applicable law, and is legally binding and fully enforceable.

10.    **SERVICING OF CONTRACTS:**

(a)    As part of the consideration for MFS entering into this Agreement and agreeing to purchase Contracts from SELLER at its discretion, SELLER agrees that during the Term hereof, MFS shall have the option but not the obligation, in MFS' sole discretion, to service, as SELLER's exclusive collection agent, all Servicing Contracts entered into by SELLER and shall be entitled to retain the Servicing Fee for its performance of such services. If MFS elects to administer and service any Servicing Contracts, MFS shall perform the following duties with respect to such Servicing Contracts to the best of its skill and ability: (i) inform each Customer of the billing arrangements, send a welcome letter and a monthly billing statement or coupon book to each Customer of a Servicing Contract, proceed to collect all payments due thereunder by posting and depositing all payments or like monies received on the Servicing Contracts within forty-eight (48) hours of receipt (ii) re-deposit checks, drafts and other items of payment returned to MFS for reasons of "Return to Maker" or "Non-sufficient funds" or words of similar effect according to MFS' standard collection procedures; (iii) hold all post-dated checks, drafts or other items of payment and deposit them on the date appearing on the check, draft or other item of payment; (iv) use its own funds, tools, supplies and equipment in the performance of its services hereunder, (v) maintain books and records of all Servicing Contracts in accordance with generally accepted accounting principles

including, without limitation records concerning principal, interest, late charges, and pre-payments received through pre-authorized debits, checks, drafts or other items of payment and, upon SELLER's written request, give access thereto to SELLER; (vi) provide SELLER monthly with a full and complete accounting in respect of each and every Servicing Contract; (vii) service such delinquent Servicing Contracts with as many telephone calls and letters as MFS deems necessary; (viii) remit to SELLER, on a monthly basis, the Collected Funds less (A) the Servicing Fee, (B) the amount of any funds which MFS is required to return to a Customer for any reason including, without limitations, the Customer's bankruptcy or an erroneous payment, and (C) any other amounts due to MFS which may be offset pursuant to the terms of this Agreement, and (ix) perform such other duties and furnish such reports as are reasonable and customary for billing agents in California.

(b)    SELLER shall fully cooperate with MFS in MFS' performance of the foregoing duties. Notwithstanding the generality of the foregoing, SELLER agrees that it will submit to MFS in a timely manner, each of its Servicing Contracts including the credit statement, the executed Contract, all supporting documentation, the current balance and the date of the next payment in order to enable MFS to arrange for the periodic servicing of such Servicing Contract.

(c)    In the event any legal action or other legal or non-legal proceeding is brought relating to any of the Servicing Contracts, MFS will deliver to SELLER promptly after SELLER's written request therefor, such papers as MFS may have in its possession that SELLER reasonably deems relevant to such action, and SELLER shall be obligated to indemnify MFS pursuant to the terms of Section 10.

(d)    MFS may at any time, in its sole discretion, withdraw from administering and servicing any or all Servicing Contracts.

(e)    SELLER acknowledges and agrees MFS' rights with respect to the Service Contracts shall serve as additional Collateral for the security interest, and in accordance therewith, MFS shall be entitled to retain all Service Contracts until such time as all amounts due MFS under all Purchased Contracts and otherwise hereunder have been paid in full.

11.    **MFS' RIGHTS TO DEAL WITH CONTRACTS:**  MFS shall have the right to deal with all Contracts and Customers in the sole exercise of its business judgment and, without limiting the generality of the foregoing, may do the following without notice to or consent by SELLER:  (a) amend any Contract or renew or extend the time for payment or performance or grant any other indulgence to any Customer; (b) make any settlements or compromises therewith; (c) demand additional collateral or release any collateral securing such Contract; (d) restructure, defer or otherwise alter payment terms of such Contract; and (e) transfer or assign any of its rights or obligations in regard of any Contract without the prior written consent of SELLER.  MFS' and SELLER's rights and obligations hereunder shall remain unaffected by any such activities.

12.    **COVENANTS OF SELLER:**  During the Term hereof, SELLER agrees to: (a) cooperate with MFS in giving notice to the Customer of the assignment of the Purchased Contract; (b) comply with all of SELLER's representations, warranties and other statutory and contractual obligations to the Customer; (c) in the event SELLER receives any payment on a Contract, SELLER shall promptly notify MFS of its receipt of the same and promptly forward such payment to MFS and SELLER hereby irrevocably appoints MFS its attorney-in-fact to act in its name and stead in regard of the Contracts, including without limitation, the right to endorse or sign SELLER's name on all checks, collections, receipts or other documents with regard to the Contracts, as MFS deems necessary or appropriate, in its discretion, to protect MFS' right, title and interest in and to the Contract and any security intended to be afforded thereby, (d) give MFS written notice of any Default hereunder or any claim which might adversely affect the rights of MFS hereunder; (e) conduct its business in accordance with sound business

practices and standards and perform and fulfill all obligations to Customers under Contracts and related marketing materials, brochures and/or agreements delivered to Customers; (f) maintain all licenses and authorizations required by all applicable regulatory authorities; (g) secure, maintain and provide evidence of liability insurance in amounts as may be required by MFS; (h) notify MFS in writing of any change of ownership and/or any change in capitalization; and (i) promptly deliver to MFS such information concerning the financial or other condition of SELLER as MFS may reasonably request.

      **13.**    <u>**DEFAULT AND REMEDIES**</u>**:**  Upon the occurrence of a Default by, or with respect to, SELLER, MFS may exercise any or all remedies available to MFS under applicable law and as referenced in Section 6.

      **14.**    <u>**ORIGINATION FEE**</u>**:**  A non-refundable and renewing Origination Fee payable on the Effective Date and each anniversary thereafter during the Term in the amounts set forth on Schedule "A" must accompany application for financing the SELLERS receivables.  SELLER hereby acknowledges and agrees that any waiver of the Origination Fee in any year by MFS does not and shall not constitute a waiver of or its right to charge and collect the Origination Fee due in any subsequent year and SELLER is and shall continue to be responsible for the same.  This fee covers, among other things, the credit check of the SELLER and to perfect MFS interest in the Purchased Contracts, with the filing of a UCC-1.

      **15.**    <u>**MISCELLANEOUS**</u>**:**

SELLER further acknowledges and agrees that an assignment, transfer or sale to a third party in one or a series of related transactions of a fifty percent fully-diluted ownership interest in the  individual assets or liabilities directly related to the MFS agreement shall be deemed to be an assignment under this Agreement, which shall require the consent of MFS or an agreed upon guarantee on all contractual obligations by the current SELLER.

          (a)    The provisions of this Agreement and the representations, rights and obligations of the parties hereto shall survive the execution and delivery hereof, and except as they relate to entering into further Contracts, shall survive the termination of this Agreement.

          (b)    Any notice required to be given hereunder shall be delivered personally, shall be sent by first class mail, , return receipt requested, by overnight courier, or by facsimile or electronic mail, to the respective parties at the addresses given in the preamble of this Agreement, which addresses may be changed by the parties by written notice conforming to the requirements of this Agreement.  Any such notice deposited in the mail shall be conclusively deemed delivered to and received by the addressee four (4) days after deposit in the mail, if all of the foregoing conditions of notice shall have been satisfied.  All facsimile communications shall be deemed delivered and received on the date of the facsimile, if (1) the transmittal form showing a successful transmittal is retained by the sender, and (b) the facsimile communication is followed by mailing a copy thereof to the addressee of the facsimile in accordance with this paragraph.

          (c)    The parties agree that this Agreement has been executed and delivered in, and shall be construed in accordance with the internal laws of the State of California as applied to contracts between California residents entered into and to be performed wholly within California.  SELLER hereby consents to the jurisdiction of any local, state or federal court located within the County of San Diego, State of California; provided, however, nothing contained herein shall preclude MFS from commencing any action hereunder in any Court having jurisdiction thereof.  EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION

HEREWITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

(d)    If at any time any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement.

(e)    This Agreement together with all schedules and exhibits attached hereto, constitutes the entire agreement between the parties concerning the subject matter hereof and incorporates all representations made in connection with negotiation of the same.  All prior or contemporaneous agreements, understandings, representation, warranties and statements, oral or written, relating to the subject matter hereof are superseded and are null and void. The terms hereof may not be terminated, amended, supplemented or modified orally, but only by an instrument duly executed by each of the parties hereto.  The recitals set forth above are incorporated herein by this reference.

(f)    This Agreement and any amendments hereto shall be binding on and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

(g)    In the event there is any conflict between this Agreement and any ancillary agreements with respect to any Contract, the terms and conditions of this Agreement shall control.

(h)    If either party commences legal proceedings for any relief against the other party arising out this Agreement, the losing party shall pay the prevailing parties legal costs and expenses, including without limitation, reasonable attorney's fees.

(i)    This Agreement may be executed in one or more identical counterparts, all of which shall together constitute one and the same instrument when each party has signed one counterpart. To them as much extent permitted by applicable law, in the event that any signature to this Agreement or any amendment hereto is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

(j)    Additional terms of this Agreement, all of which are hereby incorporated herein by this reference, are set forth in the following schedules, addenda, exhibits or riders attached hereto.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective duly authorized representatives on the date first above written.

SELLER:                                                MFS:

WAGS LLC                                         MONTEREY FINANCIAL SERVICES, INC.

a Nevada Corporation                          a California Corporation

By: _____          By: : _____

Print: _Brian Davis_

Title: _MEMBER._

Date: _1/29/14_

Print: _Scott Little_

Title: _VP Sales_

Date: _2/14/14_

Federal Tax I.D.# <u>46-3328734</u>

# SCHEDULE A

to that RECEIVABLES PURCHASE AGREEMENT
dated January 13, 2014
by and between

**MONTEREY FINANCIAL SERVICES, INC.**
and
**WAGS LLC**

---

**I.    DESCRIPTION OF SELLERS SERVICES/PRODUCTS:**

Pet Financing

**II.    PURCHASE PRICE:**

The Purchase Price of a Purchased Contract, also understood as a purchase rate, shall be a percentage of the total contract balance (principal, rent charge, residual purchase payment), (the "Contract Balance") owed by the Customer named therein calculated as follows:

    a.  Seventy-Nine percent (79%) of the Contract Balance for Purchased Contracts payable in zero (0) months to seventeen (17) months from the date of assignment to MFS; and

    b.  Seventy-four percent (74%) of the Contract Balance for Purchased Contracts payable in nineteen (19) months to twenty-three (23) months from the date of assignment to MFS; and

    c.  Seventy-one percent (71%) of the Contract Balance for Purchased Contracts payable in twenty-four (24) months to twenty-seven (27) months from the date of assignment to MFS; and

    d.  Sixty-nine percent (69%) of the Contract Balance for Purchased Contracts payable in twenty-eight (28) months to twenty-nine (29) months from the date of assignment to MFS; and

    e.  Sixty-seven percent (67%) of the Contract Balance for Purchased Contracts payable in thirty (30) months to thirty-three (33) months from the date of assignment to MFS; and

    f.  Sixty-six percent (66%) of the Contract Balance for Purchased Contracts payable in thirty-four (34) months to thirty-five (35) months from the date of assignment to MFS; and

    g.  Sixty-four percent (64%) of the Contract Balance for Purchased Contracts payable in thirty-six (36) months to forty (40) months from the date of assignment to MFS; and

    h.  Sixty-one percent (61%) of the Contract Balance for Purchased Contracts payable in forty-one (41) months to forty-three (43) months from the date of assignment to MFS; and

    i.  Sixty percent (60%) of the Contract Balance for Purchased Contracts payable in forty-four (44) to forty-seven (47) months from the date of assignment to MFS.

**III.    ADJUSTMENTS TO PURCHASE PRICE:**

---

The foregoing Purchase Price percentages may be adjusted inversely either up or down on the date of purchase of a Contract by an amount equal to the change in the Three Month LIBOR as published in the Wall Street Journal ("LIBOR") from the first day of each month if the LIBOR rises above the rate of the LIBOR as it is published on the 1st day of the month of the Effective Date of this Agreement, which is <u>0.24%</u>.

IV.    <u>STIPULATIONS:</u>

    a.  All documents signed and UCC-1 filed.
    b.  Full recourse
    c.  Servicing Collateral: Client must maintain a 25% servicing to finance ratio based off of the current outstanding balance in Monterey's finance agency at all times.
    d.  MFS agrees to review performance and default on all servicing and finance accounts held at MFS after 6 months of booking business. At that point MFS will reassess the servicing collateral stipulation that is currently in place and make a decision based off of the performance review.

V.    <u>GENERAL FEES:</u>

    a.  <u>SET-UP FEE</u>:  A fee of zero dollars ($0.00) will be charged on each new Contract purchased.

    b.  <u>CHARGEBACK FEE</u>:  MFS shall be entitled to a processing fee for any credit card chargeback due to consumer disputes (presently $25.00).  Furthermore, SELLER shall be responsible for any additional fees, fines or penalties which MFS may incur from the merchant providers due to high or excessive consumer disputes or charge-backs.

    c.  <u>REPURCHASE FEE</u>:  The Repurchase Fee for each Repurchased Contract shall be twenty-five dollars ($25.00).

    d.  <u>ORIGINATION FEE</u>:  The non-refundable and renewing Origination Fee shall initially be five hundred dollars ($500.00) and shall be renewed on each anniversary of the Effective Date of this Agreement in the amount of two hundred fifty dollars ($250.00).  The initial Origination Fee shall be withheld by MFS from the Purchase Price and/or Servicing Fee of the first Contract(s) purchased or serviced in each year during the Term until the full Origination Fee due for such year has been paid in full (as provided in Section 4(a) of the Agreement).  All renewal Origination Fees shall be invoiced or offset from any amounts due to SELLER from MFS under this Agreement.

VI.    <u>CUSTOMER CREDIT APPROVAL:</u>

In connection with Contracts to be sold to MFS pursuant to this Agreement, prior to entering into any retail installment agreement or Contract with prospective Customers, for each such prospective Customer SELLER shall may either submit a credit approval application through MFS' proprietary online credit approval system or the consumers must be run through and approved for finance through the WAGS pre-approval platform. All contracts that are to be purchased by MFS must meet all requirements and follow all attributes previously agreed upon by MFS and WAGS.  The attributes that must be met are as follow: All consumers must have a 600 or greater Vantage score, Consumer may have no more than 2 charge-off accounts listed on their credit report in the last 24 months, All bankruptcy's listed on the credit report must be closed or

discharged, Consumer can have no more than 1 bankruptcy listed on their credit report,, All consumers with a Vantage Score between 600-650 must have a minimum income of $1,500 and shall be approved for a finance amount no greater than $2,500, Consumers with a Vantage score of 650 or greater minimum shall be approved for a max finance amount no greater than $5,000. These attributes and requirements can also be found in section Listed as Pre-Approval. It is understood and agreed that SELLER shall offer for sale to MFS, each contract which meets the above requirements and is approved.

VII.    **TERM:**

The Term of this Agreement is a period of one (1) year(s) commencing on the Effective Date and ending on the first anniversary thereafter. The Term shall automatically renew unless either party provides the other written notice at least thirty (30) days of its intent not to renew the same; provided, however that, notwithstanding any termination or expiration of this Agreement, SELLER's obligations to MFS shall continue and MFS shall be entitled to collect all outstanding payments under all Purchased Contracts until they have been paid in full.

Notwithstanding the termination of this Agreement due to expiration of its Term, SELLER's obligations to MFS shall continue and MFS shall be entitled to collect all outstanding payments under all Purchased Contracts until they have been paid in full.

VIII.    **SERVICING FEE:**

SELLER agrees that MFS shall be entitled to the following fees, all of which, collectively, shall constitute the Servicing Fee:

   a.  A flat rate of five dollars ($4.00) per month will be charged to SELLER for each Account serviced by MFS.

   b.  A one-time processing set-up fee of four dollars ( 5.00) will be charged to SELLER per Account.

   c.  MFS shall be entitled to a ten dollar ($10.00) processing fee for any Account cancelled by the SELLER.

   d.  MFS shall be entitled to a credit card chargeback fee of twenty five dollars ($25.00) for each credit card payment chargeback or reversal due to Customer disputes.

   e.  Should SELLER elect to have MFS report the Accounts to the credit reporting agencies, there will be a one time set up fee of two hundred dollars ($200.00), as well as a recurring monthly administrative fee of fifty dollars ($50.00).

   f.  In the event MFS is required to send a coupon book to a customer for ongoing monthly payments, SELLER will be charged a set-up fee of five dollars ($5.00).

   g.  Should SELLER later elect to sell any of the servicing Accounts to MFS, a four dollar ($4.00) account conversion fee will be charged to SELLER for each Account purchased. Said account conversion fee would be deducted from the purchase price payout.

h.  Should the Accounts be of the type and nature that require SELLER to provide Customers with an IRS Form 1098, and should SELLER request that MFS send said Form 1098 to Customers, MFS shall charge SELLER a fee of five dollars ($5.00) for each Form 1098 sent.

Please note that the correct tax payer identification number (TIN) or social security number (SS#) must be included for each Form 1098 filed with the IRS. To the extent that there is a missing or incorrect TIN or SS# associated with the Account placed by SELLER, the IRS may impose a per account fee or penalty. To the extent that MFS incurs any penalties, fees, costs, or expenses associated with an incorrect or missing TIN or SS#, SELLER shall indemnify MFS for the same.

Please also note that MFS shall not issue any Form 1098's for consumers residing outside of the United States of America

i.  MFS shall collect and retain all late charges, NSF fees, and consumer payment fees by which it collects from Customers.

j.  SELLER shall be responsible for all credit card fees, including but not limited to, per transaction fees and excess chargeback penalties or fines.

k.  On a case by case basis MFS may agree from time to time, to arrange for certain additional logistics-related services not expressly set forth in the Agreement or related addenda, including, but not limited to, courier services, special programming, special projects, and or the arrangement of lock box services. Should MFS agree to perform said services on an individual basis, SELLER shall reimburse MFS for all of MFS' costs and expenses related to the performance or procurement of said service. Any reimbursement due hereunder to be deducted from SELLER's monthly payout.

l.  SELLER agrees that MFS may adjust the fees set forth herein on an annual basis in an amount not to exceed ten percent (10%).

## IX.    PRIVACY POLICY:

Please be advised that the Federal Trade Commission recently passed the Privacy of Consumer Financial Information Act known as the Gramm-Leach-Bliley Act (the "Act"). Generally, the Act states that on or before July 1, 2001 all businesses must provide to each Customer notices setting forth its privacy policies. This notice must then be sent initially to all new Customers after July 1, 2001 and then annually to all Customers. We can supply you with a copy of the Act upon request.

MFS must send these notices to all Customers under Purchased Contracts. All servicing and collection agency clients of MFS must send this notice to all their customers.

Attached as Exhibit "B" is a sample of the notice MFS will be using.  We strongly recommend SELLER review the Act and MFS' notice (if you plan to have MFS send the notice for you) with your attorney to ensure you will comply with the Act.

_____ Yes, I would like MFS to send the Privacy Policy letter to each of my Consumers for a fee of two dollars and no cents ($2.00) per account.  (See attached Exhibit "B").  Should SELLER fail to pay the aforementioned fee, MFS reserves the right to discontinue sending privacy notice.

_____ No, I would not like MFS to send the Privacy Policy letter to each of my Consumers.

---

ACKNOWLEDGEMENT (initialed): _____ SELLER    _____ MFS

*"THE REMAINDER OF THIS PAGE HAS BEEN LEFT BLANK INTENTIONALLY"*

# EXHIBIT A
## FORM OF IRREVOCABLE ASSIGNMENT

FOR VALUE RECEIVED, the undersigned (the "Assignor") hereby sells, assigns and transfers unto MONTEREY FINANCIAL SERVICES, INC., ("MFS") a California corporation ("Assignee"), its successors and assigns, all of Assignor's right, title and interest in and to the contracts, promissory notes, security agreements, membership agreements, instruments and accounts receivable (each, a "Contract" and collectively, the "Contracts") described on the attached Annex A, together with the property described therein, if any, and all rights and remedies thereunder, including all guaranties thereof or collateral security therefore, without recourse or warranty except as provided herein. Assignor authorizes Assignee to collect any and all installments and payments due on each Contract and to take action thereunder which Assignor might otherwise take with respect to each Contract. This Assignment is being delivered pursuant to and upon all of the representations, warranties, covenants and agreements on the part of the undersigned Assignor contained in that certain Receivables Purchase Agreement, dated as of January 13, 2014. (the "Agreement") between Assignor and Assignee, which Agreement contains certain representations, warranties and covenants from Assignor to Assignee, including, without limitation, certain obligations on behalf of the Assignor to repurchase the Contracts or to replace the Contracts upon the terms and conditions set forth therein. This Assignment shall be governed by and interpreted in accordance with the terms of the Agreement and the laws of the State of California. Capitalized terms used herein, which are not defined herein, shall have the meanings set forth in the Agreement.

Assignee may, without notice to Assignor, enter into any settlement, forbearance or other variation in terms in connection with any Contract, or discharge or release the obligations of the Obligor or other person, by operation of law or otherwise, without affecting Assignor's liability hereunder, except that any settlement, forbearance, or other variation by Assignee or its assigns shall not cause Assignor's Repurchase Price to be greater than it would have been in the absence of the settlement, forbearance, or other variation. Assignee's failure or delay in enforcing any right hereunder does not constitute a waiver of that right. Assignor shall not make any collections or repossessions with respect to the Contracts.

Assignor hereby certifies on and as of the date hereof (a) that each and every representation and warranty of the undersigned contained in the Agreement is true and correct on and as of the date hereof in all material respects with the same force and effect as if originally expressed on and as of the date hereof and (b) that each of the conditions set forth in the Agreement with respect to the purchase of the Contracts hereunder has been fulfilled or waived on the date hereof.

Assignor does not delegate and Assignee shall not be required to assume any of the duties, responsibilities, liabilities or obligations of Assignor under any Contract assigned hereunder and Assignor shall remain liable therefore notwithstanding the assignment contained herein.

IN WITNESS WHEREOF, the undersigned has executed this Form Of Irrevocable Assignment to be duly executed this _20_ day of _JAN_ , 20_14_

_Brad Davis_
Print SELLER's Name Here

By: _[signature]_

Title: _MEMBER_

# EXHIBIT B
## PRIVACY POLICY

[Principal's Name and Address]                    [Contact Information for Consumers]

### PRIVACY POLICY

This Privacy Policy describes the personal customer information that [Your Company Name Here] collects, whom we share such information with and the circumstances under which we share it, and how we protect such information.

Please read this Privacy Policy carefully. This Privacy Policy applies to all personally identifiable financial and other information about you that we now have in our possession or that we obtain in the future. It will continue to apply to you even if you are no longer our customer. We hope that this Privacy Policy will help you understand how we keep your personal information private and secure while using it to serve you better.

**I.      Personal Information Collected**

In order to provide you with the consistent quality financial services that you desire and to manage our business, it is important that we collect and maintain accurate personal information about you. We obtain this information from (1) applications and other forms you fill out and submit to us, (2) consumer credit bureaus, and/or (3) a retailer or a party who originally provided you with credit if we purchased your account from such retailer or other party. For example, we may obtain the following information from the applications and other forms that you have filled out and submitted to us or to a retailer or other party who originally provided you with credit if we purchased your account from such retailer or other party: your name, date of birth, address, social security number, marital status and income. As another example, in evaluating whether to extend credit to you we may have requested consumer credit bureaus to provide us with information regarding the balances of your loans and your payment history with other lenders.

**II.     Sharing of Personal Information**

We do not share your personal information with others except (1) as necessary to service and update your account, (2) with consumer credit bureaus as permitted by federal law, such as the reporting of account activity, and (3) as otherwise permitted or required by law, such as to protect against fraud or to respond to a subpoena.

**III.    Protection of Personal Information**

We control access to your personal information by restricting access to our employees who need it in order to perform their duties for us and who are trained in the proper handling of such information. We maintain physical, electronic and procedural safeguards to protect your personal information.

Sincerely,

# EXHIBIT "B"

# EXHIBIT "B"

# RECEIVABLES PURCHASE AGREEMENT

This Receivables Purchase Agreement (hereinafter "Agreement") is entered into as of **May 20, 2015** (the "Effective Date"), by and between **MONTEREY FINANCIAL SERVICES, INC.** ("MFS"), a California Corporation with its principal place of business located at 4095 Avenida de la Plata, in Oceanside, California 92056 and, **WAGS LLC** ("SELLER"), a(n) Nevada limited liability company, with its principal place of business located at 9484 Double R Blvd Suite B, Reno, Nevada 89521, with respect to the following facts:

## RECITALS

**A.**      SELLER is in the business of providing certain products and services to various individuals from time to time, and SELLER allows said individuals to finance the cost of such products and services by entering into retail installment contracts, promissory notes, security agreements, membership agreements and/or other instruments (each, a "Contract" and collectively, the "Contracts"). SELLER's services and/or products are described on Schedule "A" attached hereto and incorporated herein by this reference.

**B.**      MFS is in the business of purchasing instruments such as the Contracts in its ordinary course of business.

NOW, THEREFORE, in consideration of the above promises and of the representations, warranties and agreements contained herein, the parties hereby covenant and agree as follows:

## AGREEMENT

1.      **DEFINITIONS:**  The following terms shall have the following meaning as used in this Agreement.

(a)      "Assignment" means an Irrevocable Assignment substantially in the form attached hereto as Exhibit "A", transferring and assigning to MFS all of SELLER's right, title and interest in and to a Purchased Contract, all payments thereunder and all related guaranties and collateral therefor in a form prescribed by MFS.

(b)      "Authenticate(d)" means to sign, execute or otherwise adopt a symbol or encrypt or similarly process a record in whole or in part, with the present of the authenticating person to identify the person and adopt or accept a record.

(c)      "Contract" has the meaning set forth in Schedule A above and must be in a form approved by MFS.

(d)      "Contract/Credit Application" means an Authenticated Contract (which is in original, executed form if on paper), an original credit application, and/or an original credit report or statement concerning the Customer and any related documents, information and Records from time to time required by MFS in accordance with MFS' standard procedures.

(e)      "Customer" means an individual who enters into a Contract with SELLER.

(f)      "Default" means (i) a breach by SELLER, which has not been cured during any applicable cure period, of any representation, warranty, covenant, term or condition of this Agreement or of any other agreements to which SELLER is obligated or by which it is bound in connection with a Contract, (ii) a default under any guaranty of the obligations of SELLER hereunder or a default in SELLER's repurchase obligations as set forth in Section 6 hereof, in each case which has not been cured during any applicable cure period, (iii) a default by SELLER under any other agreement by and between SELLER or any affiliate thereof and MFS and any affiliate thereof which has not been cured during any applicable cure period, or (iv) a Material Adverse Change in Financial Condition with respect to SELLER.

(g)      "Defaulted Contract" has the meaning set forth in Section 6(b) hereof.

(h)      "Event of Cancellation" shall, with respect to a Contract, refer to (i) a Material Adverse Change in Financial Condition, business or operations of SELLER since the date of this Agreement or of the Customer since the date of the related  Final Contract/Credit Applications; (ii) the occurrence of an event which causes a representation made by the Customer, SELLER or any other party in connection with the Contract or under this Agreement to be or become false or misleading in any material respect whether or not true when made; (iii) a breach of any term of such Contract, or of any

related guaranty or credit support agreement, whether by the Customer or SELLER, including without limitation, failure of SELLER to deliver the underlying products or services to any Customer; (iv) any Default; (v) notification by a Customer to SELLER or to MFS of its intent to cancel all or any part of the Contract; or (vi) if the SELLER and/or MFS is named in a lawsuit over the actions or inactions of the SELLER.

(i)     "Final Contract/Credit Application" means such documents or other Records as MFS shall from time to time require in accordance with its standard procedures in order to complete the purchase of a Contract and to pay the Purchase Price of the Contract to SELLER including, without limitation, (i) an Assignment; (ii) if the Purchased Contract is originally executed in paper form, the one and only executed original of the Purchased Contract; or, (iii) any Uniform Commercial Code financing statements necessary to perfect MFS' interest in the Purchased Contract; and (iv) any other document, instrument or Record required by the terms of MFS' written notice to SELLER pursuant to Section 2 below including, without limitation, any guaranties or security agreements.

(j)     "Insolvency Event" means, with respect to any person or entity, (1) dissolution, liquidation or failure to operate as a going concern; (2) voluntarily or involuntarily filing bankruptcy, making an assignment, arrangement or composition with or for the benefit of creditors, appointment of a receiver; (2) it shall become insolvent or unable to pay its debts as they become due; or (3) it shall seek or become subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its property; (4) it shall have a secured party take possession of all or substantially all its property or have a distress, execution, attachment, sequestration or other legal process levied or enforced against all or substantially all its property and such secured party shall maintain possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter.

(k)     "Material Adverse Change in Financial Condition" means a (1) material adverse change in the balance sheet or profit and loss statements or other financial condition or prospects of SELLER or a Customer from time to time, as determined by MFS in its sole discretion; (2) change in the corporate structure or any material change the ownership or capitalization of the SELLER, as determined by MFS in its sole discretion, (3) an Insolvency Event relating to the SELLER.

(l)     "Origination Fee" means the non-refundable and renewing fee payable from SELLER to MFS on the Effective Date and each annual anniversary thereafter in the amounts set forth on Schedule "A," attached hereto, to cover the expenses of MFS in, among other things, reviewing SELLER and this transaction including, without limitation, expenses in obtaining credit reports concerning SELLER, in obtaining a Dun and Bradstreet rating concerning SELLER, in performing and title and/or Uniform Commercial Code searches concerning SELLER and in the filing of Uniform Commercial Code financing statements.

(m)     "Purchased Contract" means a Contract, the Customer of which meets all of the credit and income requirements of MFS at the time it is purchased and which MFS elects, in its sole discretion, to purchase pursuant to the terms hereof.

(n)     "Purchase Price," with respect to each Contract, means the amount set forth on the attached Schedule "A".

(o)     "Repurchased Contract" means a Purchased Contract which has been repurchased by SELLER pursuant to the terms hereof.

(p)     "Record" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

(q)     "Repurchase Price" means the price at which SELLER is obligated to repurchase a Purchased Contract from MFS, and shall be an amount equal to (i) the principal outstanding balance of the Purchased Contract as of the original Effective Date of purchase from SELLER, less all payments attributable to principal received by MFS for such Purchased Contract, the result of which shall be multiplied by the original Purchase Price Rate as set forth in Schedule "A" attached hereto; plus (ii) a Repurchase Fee in an amount set forth in Schedule "A" attached hereto.

(r)     "Servicing Contract" means any Contract which MFS has elected not to purchase for any reason and any Repurchased Contracts, which MFS elects, in its sole discretion, to administer and service pursuant to the terms of this Agreement.

(s)     "Servicing Fee," with respect to each Servicing Contract, means the amount set forth on Schedule "A" attached hereto which will be paid by SELLER to MFS as compensation for MFS' administration and servicing of the Servicing Contracts.

(t)     "Term," with respect to this Agreement, means the period of time set forth on Schedule "A" attached hereto; provided, however, that MFS may terminate this Agreement immediately upon notice to SELLER in the event of a Default or upon thirty (30) days notice without Default.

2.     PURCHASE OF CONTRACTS:  Subject to the terms and conditions of this Agreement, during the Term, MFS shall have the option, but not the obligation, in its sole discretion and on a case by case basis, to purchase all of SELLER'S right, title and interest in and to the Contracts submitted by SELLER to MFS.   MFS shall give WAGS notice of their intent to stop purchasing and give 30 day notice unless the reason behind Monterey's intent to stop purchasing contracts are for any of the following reason: WAGS receives excessive Attorney General Complaints, MFS receives any attorney contact about WAGS, any delinquency issues with WAGS contracts purchased or serviced by MFS, or WAGS does not adhere to the Full Recourse guidelines set forth in this agreement. IF any of the reasons listed above are what has lead MFS to stop purchasing contracts then MFS is not required to give any type of notice. Upon Authentication of a Contract by a Customer, SELLER shall provide to MFS the Contract/Credit Application.  Upon receipt thereof, MFS shall review the Contract/Credit Application and shall notify SELLER whether it elects to exercise its option to purchase such Contract by delivery of written notice to SELLER within five business (5) days after MFS' receipt of the Contract/Credit Application. MFS' obligation to purchase any Contracts shall be conditioned upon MFS' receipt of a complete Final Contract/Credit Application with respect thereto in form and substance acceptable to MFS and any other information MFS may reasonably request relating thereto.  If MFS exercises its right to purchase a Contract, (a) the Contract that bears the confirmation code entered by the Customer shall be deemed to be the "single, authoritative copy" of such Contract (as such terms are used in section 9-105(1) of the Uniform Commercial Code). (b) such Contract (whether in electronic or hard copy form) may not be altered by SELLER, and may be altered by MFS in accordance with law upon prior written notice to SELLER; (c) any other copies of the Contract printed for any reason shall each be clearly and conspicuously labeled "COPY."  In no event shall MFS assume or be delegated any of SELLER's duties, responsibilities, liabilities or obligations to the Customer under any Contract and SELLER shall remain liable therefore notwithstanding any assignment of a Purchased Contract to MFS.  The parties agree that MFS shall be entitled to directly receive and retain any and all amounts due and payable under the Purchased Contracts. All Purchased Contracts shall be sold to MFS subject to the representations, warranties, covenants, agreements, terms and conditions set forth in this Agreement, and shall be accompanied by an Assignment.   In addition MFS reserves the right to verbally verify the Contract with the Customer thereunder.

3.     PREAPPROVAL:  WAGS will be using their own credit approval platform for pre-approval of all contracts to qualify accounts for purchase by MFS.  All contracts that are to be purchased by MFS must meet all requirements and follow all attributes previously agreed upon by MFS and WAGS. The attributes that must be met are as follow: All consumers must have a 600 or greater Vantage score, Consumer may have no more than 2 charge-off accounts listed on their credit report in the last 24 months, All bankruptcy's listed on the credit report must be closed or discharged, Consumer can have no more than 1 bankruptcy listed on their credit report, All consumers with a Vantage Score between 600-650 must have a minimum income of $1,500 and shall be approved for a finance amount no greater than $2,500, Consumers with a Vantage score of 650 or greater minimum shall be approved for a max finance amount no greater than $5,000. These attributes and requirements can also be found in section VI Customer Credit Approval. Any customer approved for purchase through the WAGS approval platform shall be valid for (30) days from the date of the approval; provided that there are no changes in respect to such customer, the information presented to MFS in connection with the pre-approval process, or the relating contract/ credit application and all other relating therto unchanged. Within said thirty (30) day period, SELLER shall send MFS the original Contract or Record, the original Authenticated Contract/Credit Application, the certificate of completion, if applicable, and employment information, if applicable.  If this information is not received by MFS within the thirty (30) day period, MFS will have the option to reject the Contract or to re-qualify the same under MFS' credit guidelines.

4.     FUNDING OF PURCHASE PRICE:

---

(a)    Provided that no Event of Cancellation has occurred with respect to a Contract that MFS has elected to purchase, MFS shall, within five (5) business days after SELLER's submission of a complete Final Contract/Credit Application to MFS, pay to SELLER the Purchase Price for each Purchased Contract less (i) the outstanding amount of the Origination Fee, which shall be withheld by MFS from the Purchase Price until the full Origination Fee due for such year (whether it be the initial Origination Fee or the renewal fee, in each case as set forth in Schedule "A") has been paid in full, and (iii) any adjustment to Purchase Price, if applicable, as set forth in Schedule "A".

5.    **REPRESENTATIONS AND WARRANTIES:**

(a)    SELLER hereby represents, warrants and covenants to MFS, its successors and assigns, as of the date hereof, as of the date of submission of each Contract/Credit Application, Final Contract/Credit Application and Assignment in respect of each Contract and during the Term of this Agreement, that:

(1)    If a corporation, partnership or limited liability company, SELLER is duly organized and validly existing and in good standing in the state of its incorporation as such, and has full power to carry on its business as it is presently conducted including, without limitation, the sale of the Contracts, to enter into this Agreement and to carry out the transactions contemplated hereby;

(2)    The execution and delivery of this Agreement, the assignment of the Purchased Contracts to MFS, and the performance by SELLER of the transactions contemplated hereby have been duly authorized by all necessary action, including any action required under SELLER's governing instruments;

(3)    The execution, delivery and performance of this Agreement and the assignment of the Purchased Contracts to MFS, and the execution of any other instrument related to this Agreement, constitute a legal, valid and binding obligation of SELLER enforceable in accordance with its terms, without any offsets or counterclaims, and no further actions are required for SELLER to enter into this Agreement and such other instruments;

(4)    All of SELLER's business operations are duly licensed and permitted under all federal, state and local laws, rules and regulations of any governmental authority;

(5)    SELLER has duly paid any and all license, franchise, corporation or other taxes, fees, imposts, duties or charges levied, assessed or imposed upon it or upon any of its properties of whatsoever kind or description;

(6)    Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will constitute a violation or default of any statute, rule or decree of any court, administrative agency or governmental body to which SELLER is or may be subject;

(7)    There are and will be no agreements between SELLER or its agents and any Customer in connection with any Purchased Contract and no express or implied warranties have been or will be made by SELLER or its agents to such Customer, except as set forth in the Contract;

(8)    SELLER and its agents have not participated in and have no knowledge of any fraudulent and/or misleading act in connection with any Contract or with respect to any Customer;

(9)    Each Customer has presented appropriate documentation to verify his or her identity and has legal capacity to enter such Contract and has not engaged in any fraud or misrepresentation with respect to such Contract and the Authentication provided by the named Customer is genuine;

(10)    If a Contract is in electronic form, (a) SELLER has provided to the Customer all disclosures in such form and manner as may be necessary to create a valid and enforceable electronic contract, (b) the Customer has consented to conducting the electronic transaction in accordance with applicable law; and (c) the Contract was consummated through the SELLER's web site in accordance with applicable law.

(11)    Each Contract is and shall be valid, genuine and enforceable according to its terms (including, but not limited to, terms related to interest rate or time price differential), and each transaction (including the application process and the origination of the Contract) was at the time of its origination and is as of the date of the assignment of the same to MFS in compliance with applicable laws, rules and regulations of any governmental authority

whether federal, state, county, municipal or otherwise including, without limitation, usury laws, electronic or digital signature laws, electronic transaction laws, the Federal Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Magnuson-Moss Warranty Act, Federal Reserve Board Regulations B, M and Z, state adaptations of the Consumer Credit Protection Act (or parts thereof) and of the Uniform Consumer Credit Code and any other consumer credit, equal opportunity, disclosure or repossession laws or regulations applicable with respect to a particular Contract;

(12)    Each Contract is a valid deferred payment obligation for the amount therein set forth and such Contract shall not be subject to any disputes, offsets or counterclaims and the property, goods or services described in the Contract have never been the subject of any other Contract between SELLER and the Customer and the Contract has not been rescinded by SELLER or Customer for any reason whatsoever, SELLER is not in breach under any obligation to any Customer under any Contract, and has no actual knowledge of any personal defenses that the Customer could raise against the enforcement of the terms of any Contract; SELLER has no actual knowledge of any facts which may result in the uncollectability or unenforecability of any Contract;

(13)    All credit or other information reasonably relevant to a credit determination concerning the Customer shall be the sole responsibility of the SELLER to be disclosed to MFS and such credit information and all other information supplied by SELLER in connections with any Contract shall be true, complete and correct as of the date submitted; SELLER shall supplement such information as necessary so that such information remains true, complete and correct; SELLER has no knowledge of any facts, which presently or upon the occurrence of certain events in the future, may result in the uncollectability and/or unenforceability of the Contract; SELLER acknowledges that MFS will rely upon information appearing on SELLER's records relating to all Contracts and Final Contracts/Credit Applications, and in light of such acknowledgment, each item of information contained in and appearing on such records accurately reflects their true status;

(14)    Each Contract is current and the Customer is not in default with respect to any term thereunder as of the date of submission of each such Contract/Credit Application, Final Contract/Credit Application and Assignment in respect of each Contract;

(15)    SELLER owns each Contract submitted to MFS hereunder free and clear of any liens, charges, security interests, encumbrances or other restrictions or transfer which may adversely affect MFS' rights with respect thereto, including without limitation, MFS' rights under this Agreement to be the assignee of all Purchased Contracts and to collect all monies due thereunder, SELLER has the absolute right to sell, assign and transfer the contracts free and clear of all rights of third parties, and upon assignment MFS will obtain good title to such Purchased Contract free and clear of any liens, charges, encumbrances or other restrictions whatsoever;

(16)    The execution and delivery by SELLER  of this Agreement and the assignment of the Purchased Contracts to MFS and the security interests granted to MFS from time to time pursuant to the terms hereof, do not conflict with or constitute a material breach or default with respect to any indenture, loan or credit agreement, mortgage, lease, deed or other agreement to which it is a party or by which it or its properties are bound and there are no suits or proceedings pending or, to the knowledge of SELLER, threatened in any court or before any regulatory commission, board or other administrative or governmental agency against or affecting SELLER which could materially impair SELLER's ability to perform its obligations hereunder;

(17)    The financial statements of SELLER delivered to MFS from time to time fairly present the financial position of SELLER as of the date thereof in conformity with generally accepted accounting principles consistently applied and the results of operations of SELLER for the periods covered thereby and do not, as of the date thereof, include any material misstatement or omit to state any material liability, absolute or contingent, and since the date of the latest such financial statements, there has been no Material Adverse Change in the Financial Condition of SELLER;

(18)    There is no litigation or other proceeding pending, or to the best of SELLER's knowledge, threatened against SELLER that would affect SELLER'S ability to perform each and every of its obligations under this Agreement or any Agreement or instrument related hereto;

(19)    SELLER has delivered to Customer all products and services required to be delivered and/or performed in accordance with the Contract;

(20)    No false, fraudulent or misleading representations were made nor were unfair or deceptive trade practices engaged in by SELLER with respect to the Customer or the Contract and no statements, promises or representations about the payment terms under the Contract, except as stated in writing in the Contract;

(21)    SELLER is not insolvent, nor will the SELLER be made insolvent by the transfer or assignment of the Contacts, nor does the SELLER anticipate any pending Insolvency Event;

(22)    Each Contract has been serviced by SELLER in conformity with all applicable laws, rules and regulations and in conformity with SELLER's policies and procedures that are consistent with customary and prudent industry standards; and

(23)    In the event of any (a) transfer of control of SELLER, including, without limitation, any merger, consolidation or reorganization of SELLER with or into any person, firm or entity, where SELLER is not the surviving entity in such merger, consolidation or reorganization ( a "Change of Control Event"), (b) sale, lease conveyance, exchange, transfer or other disposition of all, or substantially all, the assets of SELLER (an "Asset Sale"), or (c) Insolvency Event of SELLER, prior to such event SELLER shall (x) give MFS written notice of the date of such event and, in the event of a Change of Control Event or an Asset Sale, the identity of the surviving or acquiring entity, and (y) purchase all outstanding amounts on the Purchased Contracts at the same rate as originally purchased by MFS hereunder; provided, however, that in the event of a Change of Control Event or an Asset Sale, MFS shall be entitled to elect, in its sole and absolute discretion, to have the surviving or acquiring corporation, as the case may be, to continue to honor the Purchased Contracts and assume SELLER's obligations hereunder, including, without limitation, providing any ongoing services described thereunder, subject to executing such documents as MFS may reasonable request.

(b)    The representations and warranties contained herein shall be deemed to be continuing representations, warranties and covenants of SELLER and shall continue beyond the Term of this Agreement and until all obligations of SELLER hereunder have been fully performed and all sums due to MFS under all Purchased Contracts and hereunder have been paid in full and MFS no longer has any contingent liability to return any amounts which it may have received pursuant to any Purchased Contract.

6.    **SELLER'S REPURCHASE OBLIGATIONS; MFS' PROTECTION AGAINST LOSSES UPON DEFAULT:**

(a)    If (i) SELLER knows or has reason to know that any Contract is not the bona fide legal obligation of the Customer, or any Contract and/or Authoritative Copy of an electronic Contract is the subject of fraud, is invalid, or has been tampered with in any way; (ii) any Contract becomes the subject of an interest rate reduction in accordance with the terms of the Soldier's and Sailor's Civil Relief Act; (iii) any of SELLER's representations or warranties contained in this Agreement shall be materially untrue or incorrect; (iv) any of SELLER's covenants and agreements contained herein shall be breached by SELLER with respect to any particular Purchased Contract(s) and, if capable of being cured, SELLER fails to cure such breach within thirty (30) days after written notice thereof; (v) the Customer does not receive the products and/or services contracted for in the Contract; or (vi) the Customer cancels the Contract pursuant to the terms of such Contract; (vii) if the Customer contact information provided by the SELLER to MFS in the contract and/or credit application proves to be insufficient to the extent that MFS is unable to establish contact within the first 90 days and the Customer's first payment to MFS remains unpaid, then SELLER unconditionally agrees that it will, within thirty (30) days after MFS' written notice and demand to SELLER, either and at MFS' option (aa) repurchase the Purchased Contract(s) affected by such breach for a price equal to the Repurchase Price; or (bb) replace the Purchased Contract affected by such breach by assigning to MFS all of its right, title and interest in and to Contract(s) owned by SELLER with a price equal to the Repurchase Price, which substituted Contracts shall be subject to review and approval of MFS in its sole discretion. In such event, MFS agrees to reassign the applicable Purchased Contract to SELLER, AS IS, WHERE IS, WITHOUT RECOURSE OR WARRANTY OF ANY KIND (except that MFS shall represent and warrant that it owns the applicable Purchased Contract and it has not transferred it to a third party).

(b)    In addition to SELLER's obligation to repurchase any Purchased Contracts pursuant to Section 6(a) above, (i) if any installment on a Contract becomes due and remains unpaid for more than ninety (90) days; upon the occurrence of an Insolvency Event with respect to any Customer (each, a "Defaulted Contract" and collectively, the "Defaulted Contracts"), then in any of such events, SELLER shall, within thirty (30) days after MFS' written notice of the Defaulted Contract, either and at MFS' option (x) repurchase the Defaulted Contract; or (y) replace the Defaulted Contract(s)

on the terms set forth in Section 6(a) above. In addition to any remedy set forth herein or available to MFS under applicable law and equity and in addition to any other amounts owed by SELLER to MFS, MFS shall be entitled to offset any and all amounts it and its affiliates and agents incur in connection with collection efforts and efforts to remedy any Default (including, without limitation, any travel costs).

(c)    If SELLER is obligated to repurchase a Purchased Contract for any reason and does not provide MFS with cash or an acceptable replacement Contract(s) as set forth in this Section 6 within thirty (30) days following notice by MFS to SELLER as provided in this Section 6 (the date said notice is given being referred to herein as the "Notice Date"), then interest shall accrue on all amounts owed by SELLER (including, without limitation, the Repurchase Price of any Defaulted Contract and any costs incurred by MFS and its affiliates and agents in connection with collection and remedial efforts relating to any such Defaulted Contract or the repurchase of any Purchased Contract) to MFS at the rate of one and one half percent (1.5%) per month under applicable law from the Notice Date until paid in full.

7.    **SECURITY AGREEMENT IN COLLATERAL:** To secure the accuracy and full performance of each of SELLER's representations, warranties, covenants and obligations hereunder, SELLER hereby grants to MFS a first priority security interest (the "Security Interest") in all of SELLER's right, title and interest in and to (i) all of the Purchased Contracts, (ii) all of the Serviced Contracts, (iii) all proceeds of the foregoing. The Purchased Contracts, Serviced Contracts, and all proceeds of the foregoing are sometimes hereinafter collectively referred to as the "Collateral." The transactions contemplated hereby are a full and absolute sale of the Purchased Contracts, subject to the conditions herein and no obligations and/or rights of SELLER hereunder shall in any way be construed to imply or grant SELLER any direct or indirect ownership interest and/or legal or equitable title in and/or to the Purchased Contracts.

8.    **RIGHT OF OFFSET** MFS has the right, without notice to SELLER to offset amounts owed by SELLER to MFS hereunder (including any and all accrued interest) and amounts incurred by MFS and its affiliates and agents in connection with collection and remedial efforts relating to any Default (including, without limitation, any travel costs) against (i) proceeds from Serviced Contracts, (ii) Proceeds from Collection Contracts, and (iii) any other amounts payable by MFS to SELLER. Nothing herein shall require MFS to first seek or exhaust any remedy against the Customer, its successors and assigns, or any other person obligated with respect to the Contract, or to first foreclose, exhaust or otherwise proceed against any collateral or security which may be given in connection with the Contract, if any.

9.    **RIGHT TO INSPECT:** MFS (through any of its officers, employees, or agents) shall have the right from time to time hereafter at its sole cost and expense to audit and inspect the books and financial statements of SELLER, and to check, test and appraise the Collateral in order to verify financial condition or the amount, quality, value, condition of, or any other matter relating to Collateral.

10.    **INDEMNIFICATION:**

(a)    SELLER and MFS each hereby agree to defend, indemnify and hold harmless each other, and the other party's affiliates, subsidiaries, employees, officers, directors, shareholders, attorneys and agents, from and against any and all losses, claims, liabilities, demands and expenses whatsoever, including without limitation reasonable attorneys' fees and costs arising out of or in connection with any breach by the indemnifying party of its representations, warranties, covenants or obligations. All indemnities and obligations contained herein shall survive the expiration or termination of the Agreement and the expiration or termination of any Purchased Contract or any Servicing Contract.

(b)    To the extent that SELLER elects to utilize in its operations, including but not limited to, in its individual transactions and dealings with Customers, any form contract, notice, or other written instrument (collectively, "Written Instruments") which MFS may volunteer, supply, or provide to SELLER from time to time, MFS makes no representation or warranty as to the fitness of said Written Instruments and SELLER expressly agrees to hold MFS harmless for the same. Pursuant to Section 5(a)(11) of this Agreement, SELLER represents and warrants that any and all contracts or Written Instruments underlying each Contract is compliant with all applicable law, and is legally binding and fully enforceable.

11.    **SERVICING OF CONTRACTS:**

(a)    As part of the consideration for MFS entering into this Agreement and agreeing to purchase Contracts from SELLER at its discretion, SELLER agrees that during the Term hereof, MFS shall have the option but not the obligation, in MFS' sole discretion, to service, as SELLER's exclusive collection agent, all Servicing Contracts entered into

by SELLER and shall be entitled to retain the Servicing Fee for its performance of such services. If MFS elects to administer and service any Servicing Contracts, MFS shall perform the following duties with respect to such Servicing Contracts to the best of its skill and ability: (i) inform each Customer of the billing arrangements, send a welcome letter and a monthly billing statement or coupon book to each Customer of a Servicing Contract, proceed to collect all payments due thereunder by posting and depositing all payments or like monies received on the Servicing Contracts within forty-eight (48) hours of receipt (ii) re-deposit checks, drafts and other items of payment returned to MFS for reasons of "Return to Maker" or "Non-sufficient funds" or words of similar effect according to MFS' standard collection procedures; (iii) hold all post-dated checks, drafts or other items of payment and deposit them on the date appearing on the check, draft or other item of payment; (iv) use its own funds, tools, supplies and equipment in the performance of its services hereunder, (v) maintain books and records of all Servicing Contracts in accordance with generally accepted accounting principles including, without limitation records concerning principal, interest, late charges, and pre-payments received through pre-authorized debits, checks, drafts or other items of payment and, upon SELLER's written request, give access thereto to SELLER; (vi) provide SELLER monthly with a full and complete accounting in respect of each and every Servicing Contract; (vii) service such delinquent Servicing Contracts with as many telephone calls and letters as MFS deems necessary; (viii) remit to SELLER, on a monthly basis, the Collected Funds less (A) the Servicing Fee, (B) the amount of any funds which MFS is required to return to a Customer for any reason including, without limitations, the Customer's bankruptcy or an erroneous payment, and (C) any other amounts due to MFS which may be offset pursuant to the terms of this Agreement, and (ix) perform such other duties and furnish such reports as are reasonable and customary for billing agents in California.

(b)    SELLER shall fully cooperate with MFS in MFS' performance of the foregoing duties. Notwithstanding the generality of the foregoing, SELLER agrees that it will submit to MFS in a timely manner, each of its Servicing Contracts including the credit statement, the executed Contract, all supporting documentation, the current balance and the date of the next payment in order to enable MFS to arrange for the periodic servicing of such Servicing Contract.

(c)    In the event any legal action or other legal or non-legal proceeding is brought relating to any of the Servicing Contracts, MFS will deliver to SELLER promptly after SELLER's written request therefor, such papers as MFS may have in its possession that SELLER reasonably deems relevant to such action, and SELLER shall be obligated to indemnify MFS pursuant to the terms of Section 10.

(d)    MFS may at any time, in its sole discretion, withdraw from administering and servicing any or all Servicing Contracts.

(e)    SELLER acknowledges and agrees MFS' rights with respect to the Service Contracts shall serve as additional Collateral for the security interest, and in accordance therewith, MFS shall be entitled to retain all Service Contracts until such time as all amounts due MFS under all Purchased Contracts and otherwise hereunder have been paid in full.

12.    **MFS' RIGHTS TO DEAL WITH CONTRACTS:**  MFS shall have the right to deal with all Contracts and Customers in the sole exercise of its business judgment and, without limiting the generality of the foregoing, may do the following without notice to or consent by SELLER: (a) amend any Contract or renew or extend the time for payment or performance or grant any other indulgence to any Customer; (b) make any settlements or compromises therewith; (c) demand additional collateral or release any collateral securing such Contract; (d) restructure, defer or otherwise alter payment terms of such Contract; and (e) transfer or assign any of its rights or obligations in regard of any Contract without the prior written consent of SELLER. MFS' and SELLER's rights and obligations hereunder shall remain unaffected by any such activities.

13.    **COVENANTS OF SELLER:**  During the Term hereof, SELLER agrees to: (a) cooperate with MFS in giving notice to the Customer of the assignment of the Purchased Contract; (b) comply with all of SELLER's representations, warranties and other statutory and contractual obligations to the Customer; (c) in the event SELLER receives any payment on a Contract, SELLER shall promptly notify MFS of its receipt of the same and promptly forward such payment to MFS and SELLER hereby irrevocably appoints MFS its attorney-in-fact to act in its name and stead in regard of the Contracts, including without limitation, the right to endorse or sign SELLER's name on all checks, collections, receipts or other documents with regard to the Contracts, as MFS deems necessary or appropriate, in its discretion, to protect MFS' right, title and interest in and to the Contract and any security intended to be afforded thereby, (d) give MFS written notice of any Default hereunder or any claim which might adversely affect the rights of MFS hereunder; (e) conduct its business in accordance with sound business practices and standards and perform and fulfill all obligations to Customers under Contracts and related marketing materials, brochures and/or agreements delivered to Customers; (f) maintain all licenses and

authorizations required by all applicable regulatory authorities; (g) secure, maintain and provide evidence of liability insurance in amounts as may be required by MFS; (h) notify MFS in writing of any change of ownership and/or any change in capitalization; and (i) promptly deliver to MFS such information concerning the financial or other condition of SELLER as MFS may reasonably request.

14.    **DEFAULT AND REMEDIES:**  Upon the occurrence of a Default by, or with respect to, SELLER, MFS may exercise any or all remedies available to MFS under applicable law and as referenced in Section 6.

15.    **ORIGINATION FEE:**  A non-refundable and renewing Origination Fee payable on the Effective Date and each anniversary thereafter during the Term in the amounts set forth on Schedule "A" must accompany application for financing the SELLERS receivables.  SELLER hereby acknowledges and agrees that any waiver of the Origination Fee in any year by MFS does not and shall not constitute a waiver of or its right to charge and collect the Origination Fee due in any subsequent year and SELLER is and shall continue to be responsible for the same.  This fee covers, among other things, the credit check of the SELLER and to perfect MFS interest in the Purchased Contracts, with the filing of a UCC-1.

16.    **MISCELLANEOUS:**

(a)    SELLER further acknowledges and agrees that an assignment, transfer or sale to a third party in one or a series of related transactions of a fifty percent fully-diluted ownership interest in the individual assets or liabilities directly related to the MFS agreement shall shall be deemed to be an assignment under this Agreement, which shall require the consent of MFS or an agreed upon guarantee on all contractual obligations by the current SELLER.

(b)    The provisions of this Agreement and the representations, rights and obligations of the parties hereto shall survive the execution and delivery hereof, and except as they relate to entering into further Contracts, shall survive the termination of this Agreement.

(c)    Any notice required to be given hereunder shall be delivered personally, shall be sent by first class mail, , return receipt requested, by overnight courier, or by facsimile or electronic mail, to the respective parties at the addresses given in the preamble of this Agreement, which addresses may be changed by the parties by written notice conforming to the requirements of this Agreement.  Any such notice deposited in the mail shall be conclusively deemed delivered to and received by the addressee four (4) days after deposit in the mail, if all of the foregoing conditions of notice shall have been satisfied.  All facsimile communications shall be deemed delivered and received on the date of the facsimile, if (1) the transmittal form showing a successful transmittal is retained by the sender, and (b) the facsimile communication is followed by mailing a copy thereof to the addressee of the facsimile in accordance with this paragraph.

(d)    The parties agree that this Agreement has been executed and delivered in, and shall be construed in accordance with the internal laws of the State of California as applied to contracts between California residents entered into and to be performed wholly within California.  SELLER hereby consents to the jurisdiction of any local, state or federal court located within the County of San Diego, State of California; provided, however, nothing contained herein shall preclude MFS from commencing any action hereunder in any Court having jurisdiction thereof.    EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

(e)    If at any time any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement.

(f)    This Agreement together with all schedules and exhibits attached hereto, constitutes the entire agreement between the parties concerning the subject matter hereof and incorporates all representations made in connection with negotiation of the same.  All prior or contemporaneous agreements, understandings, representation, warranties and statements, oral or written, relating to the subject matter hereof are superseded and are null and void. The terms hereof may not be terminated, amended, supplemented or modified orally, but only by an instrument duly executed by each of the parties hereto.  The recitals set forth above are incorporated herein by this reference.

(g)     This Agreement and any amendments hereto shall be binding on and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

(h)     In the event there is any conflict between this Agreement and any ancillary agreements with respect to any Contract, the terms and conditions of this Agreement shall control.

(i)     If either party commences legal proceedings for any relief against the other party arising out this Agreement, the losing party shall pay the prevailing parties legal costs and expenses, including without limitation, reasonable attorney's fees.

(j)     This Agreement may be executed in one or more identical counterparts, all of which shall together constitute one and the same instrument when each party has signed one counterpart. To them as much extent permitted by applicable law, in the event that any signature to this Agreement or any amendment hereto is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

(k)     Additional terms of this Agreement, all of which are hereby incorporated herein by this reference, are set forth in the following schedules, addenda, exhibits or riders attached hereto.

    IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective duly authorized representatives on the date first above written.

SELLER:                                MFS:

WAGS LLC                               MONTEREY FINANCIAL SERVICES, INC.

a Nevada limited liability company     a California Corporation

By: _Dusty Wunderlich_                 By: : _____

Print: __Dustin Wunderlich__          Print: _Shann Lucas_

Title: __CEO__                         Title: _EVP_

Date: __06/09/2015__                   Date: _6-4-15_

Federal Tax I.D.# _46-3328734_

# SCHEDULE A

to that **RECEIVABLES PURCHASE AGREEMENT**
dated May 20, 2015
by and between

**MONTEREY FINANCIAL SERVICES, INC.**
and
**WAGS LLC**

---

**I.**    **DESCRIPTION OF SELLERS SERVICES/PRODUCTS:**

Pet Financing

**II.**    **PURCHASE PRICE:**

The Purchase Price of a Purchased Contract, also understood as a purchase rate, shall be a percentage of the total contract balance (principal, rent charge, residual purchase payment), (the "Contract Balance") owed by the Customer named therein calculated as follows:

    a.   Seventy-Nine percent (79%) of the Contract Balance for Purchased Contracts payable in zero (0) months to seventeen (17) months from the date of assignment to MFS; and

    b.   Seventy-four percent (74%) of the Contract Balance for Purchased Contracts payable in nineteen (19) months to twenty-three (23) months from the date of assignment to MFS; and

    c.   Seventy-one percent (71%) of the Contract Balance for Purchased Contracts payable in twenty-four (24) months to twenty-seven (27) months from the date of assignment to MFS; and

    d.   Sixty-nine percent (69%) of the Contract Balance for Purchased Contracts payable in twenty-eight (28) months to twenty-nine (29) months from the date of assignment to MFS; and

    e.   Sixty-seven percent (67%) of the Contract Balance for Purchased Contracts payable in thirty (30) months to thirty-three (33) months from the date of assignment to MFS; and

    f.   Sixty-six percent (66%) of the Contract Balance for Purchased Contracts payable in thirty-four (34) months to thirty-five (35) months from the date of assignment to MFS; and

    g.   Sixty-four percent (64%) of the Contract Balance for Purchased Contracts payable in thirty-six (36) months to forty (40) months from the date of assignment to MFS; and

    h.   Sixty-one percent (61%) of the Contract Balance for Purchased Contracts payable in forty-one (41) months to forty-three (43) months from the date of assignment to MFS; and

    i.   Sixty percent (60%) of the Contract Balance for Purchased Contracts payable in forty-four (44) to forty-seven (47) months from the date of assignment to MFS.

**III.**    **ADJUSTMENTS TO PURCHASE PRICE:**

The foregoing Purchase Price percentages may be adjusted inversely either up or down on the date of purchase of a Contract by an amount equal to the change in the Three Month LIBOR as published in the Wall Street Journal ("LIBOR") from the

first day of each month if the LIBOR rises above the rate of the LIBOR as it is published on the 1st day of the month of the Effective Date of this Agreement, which is <u>0.27%</u>.

IV.    <u>STIPULATIONS</u>:

    a.   All docs signed and UCC-1 Filed
    b.   Full Recourse
    c.   Servicing Collateral: WAGS must maintain a 45% servicing to finance ratio based off of the current outstanding balance in Monterey's finance agencies at all times.
    d.   WAGS will be responsible for any deficiency amount remaining on all contracts where their consumers take advantage of the early payoff option included in the lease agreement, if any is owed, in addition WAGS will be charged a 9% fee on all early buyout/termination contracts. The 9% fee will be based off of the MFS funding amount on each contract. This fee will remain in place on all contracts regardless of if there is a deficiency amount owed.

V.    <u>GENERAL FEES</u>:

    a.   <u>SET-UP FEE</u>:  A fee of zero dollars ($0.00) will be charged on each new Contract purchased.

    b.   <u>CHARGEBACK FEE</u>:  MFS shall be entitled to a processing fee for any credit card chargeback due to consumer disputes (presently $25.00).  Furthermore, SELLER shall be responsible for any additional fees, fines or penalties which MFS may incur from the merchant providers due to high or excessive consumer disputes or charge-backs.

    c.   <u>REPURCHASE FEE</u>:  The Repurchase Fee for each Repurchased Contract shall be twenty-five dollars ($25.00).

    d.   <u>ORIGINATION FEE</u>:  The non-refundable and renewing Origination Fee shall initially be five hundred dollars ($500.00) and shall be renewed on each anniversary of the Effective Date of this Agreement in the amount of two hundred fifty dollars ($250.00). The initial Origination Fee shall be withheld by MFS from the Purchase Price and/or Servicing Fee of the first Contract(s) purchased or serviced in each year during the Term until the full Origination Fee due for such year has been paid in full (as provided in Section 4(a) of the Agreement). All renewal Origination Fees shall be invoiced or offset from any amounts due to SELLER from MFS under this Agreement.

VI.    <u>CUSTOMER CREDIT APPROVAL</u>:

In connection with Contracts to be sold to MFS pursuant to this Agreement, prior to entering into any retail installment agreement or Contract with prospective Customers, for each such prospective Customer SELLER shall may either submit a credit approval application through MFS' proprietary online credit approval system or the consumers must be run through and approved for finance through the WAGS pre-approval platform. All contracts that are to be purchased by MFS must meet all requirements and follow all attributes previously agreed upon by MFS and WAGS. The attributes that must be met are as follow: All consumers must have a 600 or greater Vantage score, Consumer may have no more than 2 charge-off accounts listed on their credit report in the last 24 months, All bankruptcy's listed on the credit report must be closed or discharged, Consumer can have no more than 1 bankruptcy listed on their credit report,, All consumers with a Vantage Score between 600-650 must have a minimum income of $1,500 and shall be approved for a finance amount no greater than $2,500, Consumers with a Vantage score of 650 or greater minimum shall be approved for a max finance amount no greater than $5,000. These attributes and requirements can also be found in section Listed as Pre-Approval. It is understood and agreed that SELLER shall offer for sale to MFS, each contract which meets the above requirements and is approved.

VII.    <u>TERM</u>:

The Term of this Agreement is a period of one (1) year(s) commencing on the Effective Date and ending on the first anniversary thereafter. The Term shall automatically renew unless either party provides the other written notice at least thirty (30) days of its intent not to renew the same; provided, however that, notwithstanding any termination or expiration of this

Agreement, SELLER's obligations to MFS shall continue and MFS shall be entitled to collect all outstanding payments under all Purchased Contracts until they have been paid in full.

Notwithstanding the termination of this Agreement due to expiration of its Term, SELLER's obligations to MFS shall continue and MFS shall be entitled to collect all outstanding payments under all Purchased Contracts until they have been paid in full.

## VIII.   **SERVICING FEE:**

SELLER agrees that MFS shall be entitled to the following fees, all of which, collectively, shall constitute the Servicing Fee:

a.   A flat rate of four dollars ($4.00) per month will be charged to SELLER for each Account serviced by MFS.

b.   A one-time processing set-up fee of five dollars ($5.00) will be charged to SELLER per Account.

c.   MFS shall be entitled to a ten dollar ($10.00) processing fee for any Account cancelled by the SELLER.

d.   MFS shall be entitled to a credit card chargeback fee of twenty five dollars ($25.00) for each credit card payment chargeback or reversal due to Customer disputes.

e.   Should SELLER elect to have MFS report the Accounts to the credit reporting agencies, there will be a one time set up fee of two hundred dollars ($200.00), as well as a recurring monthly administrative fee of fifty dollars ($50.00).

f.   In the event MFS is required to send a coupon book to a customer for ongoing monthly payments, SELLER will be charged a set-up fee of five dollars ($5.00).

g.   Should SELLER later elect to sell any of the servicing Accounts to MFS, a four dollar ($4.00) account conversion fee will be charged to SELLER for each Account purchased. Said account conversion fee would be deducted from the purchase price payout.

h.   Should the Accounts be of the type and nature that require SELLER to provide Customers with an IRS Form 1098, and should SELLER request that MFS send said Form 1098 to Customers, MFS shall charge SELLER a fee of five dollars $5.00) for each Form 1098 sent.

Please note that the correct tax payer identification number (TIN) or social security number (SS#) must be included for each Form 1098 filed with the IRS. To the extent that there is a missing or incorrect TIN or SS# associated with the Account placed by SELLER, the IRS may impose a per account fee or penalty. To the extent that MFS incurs any penalties, fees, costs, or expenses associated with an incorrect or missing TIN or SS#, SELLER shall indemnify MFS for the same.

Please also note that MFS shall not issue any Form 1098's for consumers residing outside of the United States of America

i.   MFS shall collect and retain all late charges, NSF fees, and consumer payment fees by which it collects from Customers.

j.   SELLER shall be responsible for all credit card fees, including but not limited to, per transaction fees and excess chargeback penalties or fines.

---

k.   On a case by case basis MFS may agree from time to time, to arrange for certain additional logistics-related services not expressly set forth in the Agreement or related addenda, including, but not limited to, courier services, special programming, special projects, and or the arrangement of lock box services.  Should MFS agree to perform said services on an individual basis, SELLER shall reimburse MFS for all of MFS' costs and expenses related to the performance or procurement of said service.  Any reimbursement due hereunder to be deducted from SELLER's monthly payout.

l.   SELLER agrees that MFS may adjust the fees set forth herein on an annual basis in an amount not to exceed ten percent (10%).

## IX.    PRIVACY POLICY:

Please be advised that the Federal Trade Commission recently passed the Privacy of Consumer Financial Information Act known as the Gramm-Leach-Bliley Act (the "Act").  Generally, the Act states that on or before July 1, 2001 all businesses must provide to each Customer notices setting forth its privacy policies.  This notice must then be made available initially to all new Customers after July 1, 2001 and then annually to all Customers.  We can supply you with a copy of the Act upon request.

MFS must provide these notices to all Customers under Purchased Contracts.  All servicing and collection agency clients of MFS must provide this notice to all their customers.

Attached as Exhibit "C" is a sample of the notice MFS will be using.  We strongly recommend SELLER review the Act and MFS' notice (if you plan to have MFS provide the notice for you) to ensure you will comply with the Act.

_____Yes, I would like MFS to provide the Privacy Policy to each of my Consumers for a fee of two dollars and no cents ($2.00) per account.  (See attached Exhibit "C").  Should SELLER fail to pay the aforementioned fee, MFS reserves the right to discontinue providing privacy notice.

_____No, I would not like MFS to provide the Privacy Policy to each of my Consumers.

ACKNOWLEDGEMENT (initialed):    _____DW_____    _____S.L_____
                                                     SELLER                MFS

INITIAL HERE

## "THE REMAINDER OF THIS PAGE HAS BEEN LEFT BLANK INTENTIONALLY"

# EXHIBIT A
## FORM OF IRREVOCABLE ASSIGNMENT

FOR VALUE RECEIVED, the undersigned (the "Assignor") hereby sells, assigns and transfers unto **MONTEREY FINANCIAL SERVICES, INC.,** ("MFS") a California Corporation ("Assignee"), its successors and assigns, all of Assignor's right, title and interest in and to the contracts, promissory notes, security agreements, membership agreements, instruments and accounts receivable (each, a "Contract" and collectively, the "Contracts") described on the attached Annex A, together with the property described therein, if any, and all rights and remedies thereunder, including all guaranties thereof or collateral security therefore, without recourse or warranty except as provided herein. Assignor authorizes Assignee to collect any and all installments and payments due on each Contract and to take action thereunder which Assignor might otherwise take with respect to each Contract. This Assignment is being delivered pursuant to and upon all of the representations, warranties, covenants and agreements on the part of the undersigned Assignor contained in that certain Receivables Purchase Agreement, dated as of May 20, 2015. (the "Agreement") between Assignor and Assignee, which Agreement contains certain representations, warranties and covenants from Assignor to Assignee, including, without limitation, certain obligations on behalf of the Assignor to repurchase the Contracts or to replace the Contracts upon the terms and conditions set forth therein. This Assignment shall be governed by and interpreted in accordance with the terms of the Agreement and the laws of the State of California. Capitalized terms used herein, which are not defined herein, shall have the meanings set forth in the Agreement.

Assignee may, without notice to Assignor, enter into any settlement, forbearance or other variation in terms in connection with any Contract, or discharge or release the obligations of the Obligor or other person, by operation of law or otherwise, without affecting Assignor's liability hereunder, except that any settlement, forbearance, or other variation by Assignee or its assigns shall not cause Assignor's Repurchase Price to be greater than it would have been in the absence of the settlement, forbearance, or other variation. Assignee's failure or delay in enforcing any right hereunder does not constitute a waiver of that right. Assignor shall not make any collections or repossessions with respect to the Contracts.

Assignor hereby certifies on and as of the date hereof (a) that each and every representation and warranty of the undersigned contained in the Agreement is true and correct on and as of the date hereof in all material respects with the same force and effect as if originally expressed on and as of the date hereof and (b) that each of the conditions set forth in the Agreement with respect to the purchase of the Contracts hereunder has been fulfilled or waived on the date hereof.

Assignor does not delegate and Assignee shall not be required to assume any of the duties, responsibilities, liabilities or obligations of Assignor under any Contract assigned hereunder and Assignor shall remain liable therefore notwithstanding the assignment contained herein.

IN WITNESS WHEREOF, the undersigned has executed this Form Of Irrevocable Assignment to be duly executed this _09_ day of _June_____, 20_15_

WAGS LLC

By: _Dusty Wunderlich_____

Title: _CEO_____

SIGN HERE

# EXHIBIT B
## NON-DISCLOSURE AGREEMENT

This Non-Disclosure Agreement (the "Agreement") is made and entered into as of the last date set forth below by and between MONTEREY FINANCIAL SERVICES, INC., a California Corporation ("MFS") and the individual or entity identified below ("Company").

MONTEREY FINANCIAL SERVICES, INC. and the Company are evaluating a potential business relationship (hereinafter, the "Proposed Business Relationship") pursuant to which they may disclose to each other certain Confidential Information (as defined below). MFS and the Company each desire to share in confidence some of such Confidential Information in their possession with one another on the condition that each party provides proper safeguards to protect the other party's Confidential Information. The party providing Confidential Information in each case is called the "Disclosing Party"; the party receiving the Confidential Information is called the "Receiving Party." For purposes of this Agreement, each party hereto shall be deemed to include any parent and/or subsidiary companies under common control.

In consideration of the foregoing and of the mutual covenants and agreements hereinafter set forth and intending to be legally bound, the parties hereby agree as follows:

**1.      Definition of Confidential Information.** "Confidential Information" shall mean, with respect to a party hereto, all information or material which (i) gives that party some competitive business advantage or the opportunity of obtaining such advantage or the disclosure of which could be detrimental to the interests of that party; or (ii) which is either (A) marked "Confidential," "Restricted," or "Proprietary Information" or other similar marking, (B) known by the parties to be considered confidential and proprietary or (C) from all the relevant circumstances should reasonably be assumed to be confidential and proprietary, including without limitation, the Proposed Business Relationship and any and all discussion, negotiations or conversations stemming therefrom. Notwithstanding the foregoing, Confidential Information shall not be information which: (i) has entered the public domain through no action or failure to act of Receiving Party; (ii) prior to disclosure hereunder was already lawfully in Receiving Party's possession without any obligation of confidentiality; (iii) subsequent to disclosure hereunder is obtained by Receiving Party on a nonconfidential basis from a third party who has the right to disclose such information to Receiving Party; or (iv) is ordered to be or otherwise required to be disclosed by Receiving Party by a court of law or other governmental body provided, however, that Disclosing Party is notified of such order or requirement and given a reasonable opportunity to intervene.

**1.      Non-Disclosure.** Receiving Party agrees to: (i) keep confidential the negotiations and discussions regarding the Proposed Business Relationship as well as the Confidential Information; (ii) use the same degree of care (and in no event less than reasonable care) in protecting the Confidential Information that Receiving Party would use to protect its own Confidential Information of a similar nature; (iii) not to copy, publish, show, or disclose any information

relating to the Confidential Information and/or Proposed Business Relationship or discussions thereof, and (iv) to return the Confidential Information to Disclosing Party in accordance with Section 6. Receiving Party will not show or otherwise disclose the contents of the Confidential Information to any third parties without Disclosing Party's written consent.

**2.      Removal of Notices.** Receiving Party shall not remove any copyright, trade mark, service mark or other proprietary rights notice attached to or included in any Confidential Information furnished by Disclosing Party.

**3.      Use of Confidential Information.** The Confidential Information shall be used by Receiving Party solely as permitted hereunder. Each party agrees not to use Confidential Information of the other party for its own or any third party's benefit. RECEIVING PARTY ACKNOWLEDGES THAT THE CONFIDENTIAL INFORMATION IS RECEIVED "AS IS" FOR EVALUATION PURPOSES ONLY AND IS NOT TO BE RELIED UPON FOR ANY PURPOSE EXCEPT AS SET FORTH IN WRITING BY DISCLOSING PARTY. Disclosing Party makes no representations or warranties as to the accuracy, completeness, condition, suitability or performance of the Confidential Information, and Disclosing Party shall have no liability whatsoever to Receiving Party resulting from its use of the Confidential Information.

**4.      Reservation of Rights.** All rights not expressly granted by this Agreement are retained by Disclosing Party. Each party recognizes and agrees that nothing contained in this Agreement will be construed as granting any rights to a Receiving Party, by license or otherwise, to use any of the Disclosing Party's Confidential Information except as specified in this Agreement. All Confidential Information shall remain the property of Disclosing Party.

**5.      Return of Confidential Information.** Receiving Party shall destroy or return to Disclosing Party, at Disclosing Party sole option, all Confidential Information that Receiving Party possesses, regardless of whether the Confidential Information is in written, graphic or machine-readable form upon the earlier of: (i) completion of Receiving Party's review; or (ii) within five (5) business days of the request of Disclosing Party.

**6.      Injunctive Relief.** Receiving Party acknowledges that Disclosing Party will be irreparably harmed if Receiving Party's obligations under this Agreement are not specifically enforced and that Disclosing Party would not have an adequate remedy at law in the event of an actual or threatened violation by Receiving Party of its obligations. Therefore, Receiving Party agrees that Disclosing Party shall be entitled to an injunction or any appropriate decree of specific performance for any actual or threatened violations or breaches by Receiving Party or its employees and agents without the necessity of Disclosing Party showing actual damages or that monetary damages would not afford an adequate remedy.

**7.      No Required Disclosure or Further Obligation.** Nothing contained herein shall be construed as requiring either party to disclose any Confidential Information to the other. Any such disclosure shall be made in the sole discretion of the Disclosing Party. Neither party shall be under any obligation of any kind whatsoever to enter into any further agreement with the other party by reason of this Agreement.

**8.      Non-circumvention; Non-Solicitation.** Upon execution of this Agreement and for a period of one (1) year thereafter both parties agree not to solicit any employee or of the other without the prior

written consent of the other party. Each party agrees that it shall not, directly or indirectly, circumvent the other with respect to such party's actual, proposed or potential business plans and opportunities.

**9.    Term.**    Except as provided herein, this Agreement, and all rights and obligations contained herein, shall terminate five (5) years from the Effective Date (except for trade secrets, which shall be held in confidence for so long as they are protected under applicable law as trade secrets).

**10.    General.**

11.1 Governing Law and Venue. This Agreement shall be governed by and construed in accordance with the laws of the State of California without reference to the principles of conflict of laws. Except for actions seeking injunctive relief (which may be brought in any appropriate jurisdiction) suit under this Agreement shall only be brought in a court of competent jurisdiction in the County of San Diego, State of California. This choice of venue is intended by the parties to be mandatory and not permissive in nature, and to preclude the possibility of litigation between the parties with respect to, or arising out of, this Agreement in any jurisdiction other than that specified in this Section. Each party waives any right it may have to assert the doctrine of forum non conveniens or similar doctrine or to object to venue with respect to any proceeding brought in accordance with this Section.

11.2 Severability. If for any reason a court of competent jurisdiction finds any provision of this Agreement, or portion thereof, to be unenforceable, that provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement shall continue in full force and effect.

11.3 Survival. The provisions of Sections 3 through 5, inclusive, and 11 of this Agreement shall survive any expiration or termination of this Agreement.

11.4 No Joint Venture. The Parties hereto agree that this Agreement is for the purposes of protecting Disclosing Party's Confidential Information only. This Agreement is not a joint venture or other such business arrangement; and any agreement between the Parties as to any existing or future business activities is or will be set forth in other or subsequent written agreements, respectively.

11.5 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Agreement and all of which, when taken together, shall be deemed to constitute one and the same Agreement.

11.6 Entire Agreement. This Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements or understandings. This Agreement shall not be modified except in writing signed by both Parties.

The Parties hereto have executed this Agreement by their duly authorized representatives with full rights, power and authority to enter into and perform this Agreement.

*"MFS"*

**MONTEREY FINANCIAL SERVICES, INC.**

By: _Shan Lucas_
Print Name: _Shan Lucas_
Print Title: _EVP_
Date: _6-4-15_

*"Company"*

**Wags LLC**

By: _Dusty Wunderlich_
Print Name: Dustin Wunderlich
Print Title: CEO
Date: 06/09/12015

# EXHIBIT C

| FACTS | WHAT DOES MONTEREY FINANCIAL SERVICES, INC. DO WITH YOUR PERSONAL INFORMATION? |
|---|---|

Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share and protect your personal information. Please read this notice carefully to understand what we do.

The types of personal information we collect and share depend on the product or service you have with us. This information can include:

- Social Security number and income
- Credit history and payment history
- Credit scores and employment information

When you are no longer our customer, we continue to share your information as described in this notice.

All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information, the reasons MONTEREY FINANCIAL SERVICES, INC. chooses to share, and whether you can limit this sharing.

| | | |
|---|---|---|
| For our everyday business purposes— such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, report to credit bureaus, or for optional Debt Protection Program | Yes | No |
| For our marketing purposes— to offer our products and services to you | No | No |
| For joint marketing with other financial companies | No | No |
| For our affiliates' everyday business purposes— information about your transactions and experiences | No | No |
| For our affiliates' everyday business purposes— information about your creditworthiness | No | No |
| For nonaffiliates to market to you | No | No |

Call (877) 399-6374    or go to montereyfinancial.com

**Page 2**

| Who is providing this notice? | MONTEREY FINANCIAL SERVICES, INC. |
|---|---|
| How does MONTEREY FINANCIAL SERVICES, INC. protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| How does MONTEREY FINANCIAL SERVICES, INC. collect my personal information? | We collect your personal information, for example, when you<br><br>☒ Applications or other forms you submit to us<br>☒ Consumer credit bureaus<br>☒ A retailer or other party who originally provided you with credit if we purchased your account from such retailer or other party |
| Why can't I limit all sharing? | Federal law gives you the right to limit only<br><br>☒ sharing for affiliates' everyday business purposes—information about your creditworthiness<br>☒ affiliates from using your information to market to you<br>☒ sharing for nonaffiliates to market to you<br><br>State laws and individual companies may give you additional rights to limit sharing. |
| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>☒ MONTEREY FINANCIAL SERVICES, INC. does not share with its affiliates. |
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>☒ MONTEREY FINANCIAL SERVICES, INC. does not share with nonaffiliates. |
| Joint marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br><br>☒ MONTEREY FINANCIAL SERVICES, INC. does not joint market. |

Your account#:

150302MOR.SRV.FR -- Receivables Purchase Agreement -- Wags LLC                    Exhibit "C"

# EXHIBIT "C"

# EXHIBIT "C"

# RECEIVABLES PURCHASE AGREEMENT

This Receivables Purchase Agreement (hereinafter "Agreement") is entered into as of **June 12, 2014** (the "Effective Date"), by and between **MONTEREY FINANCIAL SERVICES, INC.** ("MFS"), a California corporation with its principal place of business located at 4095 Avenida de la Plata, in Oceanside, California 92056 and, **BRISTLECONE FINANCING LLC** ("SELLER"), a(n) Nevada Limited Liability Corporation, with its principal place of business located at 9484 Double R Blvd Suite B Reno, NV 89521, with respect to the following facts:

## RECITALS

**A.**    SELLER is in the business of providing certain products and services to various individuals from time to time, and SELLER allows said individuals to finance the cost of such products and services by entering into retail installment contracts, promissory notes, security agreements, membership agreements and/or other instruments (each, a "Contract" and collectively, the "Contracts"). SELLER's services and/or products are described on Schedule "A" attached hereto and incorporated herein by this reference.

**B.**    MFS is in the business of purchasing instruments such as the Contracts in its ordinary course of business.

NOW, THEREFORE, in consideration of the above promises and of the representations, warranties and agreements contained herein, the parties hereby covenant and agree as follows:

## AGREEMENT

**1.**    **DEFINITIONS:** The following terms shall have the following meaning as used in this Agreement.

(a)    "Assignment" means an Irrevocable Assignment substantially in the form attached hereto as Exhibit "A", transferring and assigning to MFS all of SELLER's right, title and interest in and to a Purchased Contract, all payments thereunder and all related guaranties and collateral therefor in a form prescribed by MFS.

(b)    "Authenticate(d)" means to sign, execute or otherwise adopt a symbol or encrypt or similarly process a record in whole or in part, with the present of the authenticating person to identify the person and adopt or accept a record.

(c)    "Contract" has the meaning set forth in Schedule A above and must be in a form approved by MFS.

(d)    "Contract/Credit Application" means an Authenticated Contract (which is in original, executed form if on paper), an original credit application, and/or an original credit report or statement concerning the Customer and any related documents, information and Records from time to time required by MFS in accordance with MFS' standard procedures.

(e)    "Customer" means an individual who enters into a Contract with SELLER.

(f)    "Default" means (i) a breach by SELLER, which has not been cured during any applicable cure period, of any representation, warranty, covenant, term or condition of this Agreement or

of any other agreements to which SELLER is obligated or by which it is bound in connection with a Contract, (ii) a default under any guaranty of the obligations of SELLER hereunder or a default in SELLER's repurchase obligations as set forth in Section 6 hereof, in each case which has not been cured during any applicable cure period, (iii) a default by SELLER under any other agreement by and between SELLER or any affiliate thereof and MFS and any affiliate thereof which has not been cured during any applicable cure period, or (iv) a Material Adverse Change in Financial Condition with respect to SELLER.

(g)    "Defaulted Contract" has the meaning set forth in Section 6(b) hereof.

(h)    "Event of Cancellation" shall, with respect to a Contract, refer to (i) a Material Adverse Change in Financial Condition, business or operations of SELLER since the date of this Agreement or of the Customer since the date of the related  Final Contract/Credit Applications; (ii) the occurrence of an event which causes a representation made by the Customer, SELLER or any other party in connection with the Contract or under this Agreement to be or become false or misleading in any material respect whether or not true when made; (iii) a breach of any term of such Contract, or of any related guaranty or credit support agreement, whether by the Customer or SELLER, including without limitation, failure of SELLER to deliver the underlying products or services to any Customer; (iv) any Default; (v) notification by a Customer to SELLER or to MFS of its intent to cancel all or any part of the Contract; or (vi) if the SELLER and/or MFS is named in a lawsuit over the actions or inactions of the SELLER.

(i)    "Final Contract/Credit Application" means such documents or other Records as MFS shall from time to time require in accordance with its standard procedures in order to complete the purchase of a Contract and to pay the Purchase Price of the Contract to SELLER including, without limitation, (i) an Assignment; (ii) if the Purchased Contract is originally executed in paper form, the one and only executed original of the Purchased Contract; or, (iii) any Uniform Commercial Code financing statements necessary to perfect MFS' interest in the Purchased Contract; and (iv) any other document, instrument or Record required by the terms of MFS' written notice to SELLER pursuant to Section 2 below including, without limitation, any guaranties or security agreements.

(j)    "Insolvency Event" means, with respect to any person or entity, (1) dissolution, liquidation or failure to operate as a going concern; (2) voluntarily or involuntarily filing bankruptcy, making an assignment, arrangement or composition with or for the benefit of creditors, appointment of a receiver; (2) it shall become insolvent or unable to pay its debts as they become due; or (3) it shall seek or become subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its property; (4) it shall have a secured party take possession of all or substantially all its property or have a distress, execution, attachment, sequestration or other legal process levied or enforced against all or substantially all its property and such secured party shall maintain possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter.

(k)    "Material Adverse Change in Financial Condition" means a (1) material adverse change in the balance sheet or profit and loss statements or other financial condition or prospects of SELLER or a Customer from time to time, as determined by MFS in its sole discretion; (2) change in the corporate structure or any material change the ownership or capitalization of the SELLER, as determined by MFS in its sole discretion, (3) an Insolvency Event relating to the SELLER.

(l)    "Origination Fee" means the non-refundable and renewing fee payable from SELLER to MFS on the Effective Date and each annual anniversary thereafter in the amounts set forth on Schedule "A," attached hereto, to cover the expenses of MFS in, among other things, reviewing SELLER

and this transaction including, without limitation, expenses in obtaining credit reports concerning SELLER, in obtaining a Dun and Bradstreet rating concerning SELLER, in performing and title and/or Uniform Commercial Code searches concerning SELLER and in the filing of Uniform Commercial Code financing statements.

(m)    "Purchased Contract" means a Contract, the Customer of which meets all of the credit and income requirements of MFS at the time it is purchased and which MFS elects, in its sole discretion, to purchase pursuant to the terms hereof.

(n)    "Purchase Price," with respect to each Contract, means the amount set forth on the attached Schedule "A".

(o)    "Repurchased Contract" means a Purchased Contract which has been repurchased by SELLER pursuant to the terms hereof.

(p)    "Record" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

(q)    "Repurchase Price" means the price at which SELLER is obligated to repurchase a Purchased Contract from MFS, and shall be an amount equal to (i) the principal outstanding balance of the Purchased Contract as of the original Effective Date of purchase from SELLER, less all payments attributable to principal received by MFS for such Purchased Contract, the result of which shall be multiplied by the original Purchase Price Rate as set forth in Schedule "A" attached hereto; plus (ii) a Repurchase Fee in an amount set forth in Schedule "A" attached hereto.

(r)    "Servicing Contract" means any Contract which MFS has elected not to purchase for any reason and any Repurchased Contracts, which MFS elects, in its sole discretion, to administer and service pursuant to the terms of this Agreement.

(s)    "Servicing Fee," with respect to each Servicing Contract, means the amount set forth on Schedule "A" attached hereto which will be paid by SELLER to MFS as compensation for MFS' administration and servicing of the Servicing Contracts.

(t)    "Term," with respect to this Agreement, means the period of time set forth on Schedule "A" attached hereto; provided, however, that MFS may terminate this Agreement immediately upon notice to SELLER in the event of a Default or upon thirty (30) days notice without Default.

2.    **PURCHASE OF CONTRACTS:**    Subject to the terms and conditions of this Agreement, during the Term, MFS shall have the option, but not the obligation, in its sole discretion and on a case by case basis, to purchase all of SELLER'S right, title and interest in and to the Contracts submitted by SELLER to MFS.MFS shall give BRISTLECONE FINANCING LLC notice of their intent to stop purchasing and give 30 day notice unless the reason behind Monterey's intent to stop purchasing contracts are for any of the following reason: BRISTLECONE FINANCING LLC receives excessive Attorney General Complaints, MFS receives any attorney contact about BRISTLECONE FINANCING LLC, any delinquency issues with BRISTLECONE FINANCING LLC contracts purchased or serviced by MFS, or BRISTLECONE FINANCING LLC does not adhere to the Full Recourse guideline set forth in this agreement. If any of the reasons listed above are what has lead MFS to stop purchasing contracts then MFS is not required to give any type of notice.    Upon Authentication of a Contract by a Customer, SELLER shall provide to MFS the Contract/Credit Application. Upon receipt thereof, MFS shall review the Contract/Credit Application and shall notify SELLER whether it elects to exercise its option to purchase such Contract by delivery of written notice to SELLER within five business (5) days after MFS'

receipt of the Contract/Credit Application. MFS' obligation to purchase any Contracts shall be conditioned upon MFS' receipt of a complete Final Contract/Credit Application with respect thereto in form and substance acceptable to MFS and any other information MFS may reasonably request relating thereto. If MFS exercises its right to purchase a Contract, (a) the Contract that bears the confirmation code entered by the Customer shall be deemed to be the "single, authoritative copy" of such Contract (as such terms are used in section 9-105(1) of the Uniform Commercial Code). (b) such Contract (whether in electronic or hard copy form) may not be altered by SELLER, and may be altered by MFS in accordance with law upon prior written notice to SELLER; (c) any other copies of the Contract printed for any reason shall each be clearly and conspicuously labeled "COPY." In no event shall MFS assume or be delegated any of SELLER's duties, responsibilities, liabilities or obligations to the Customer under any Contract and SELLER shall remain liable therefore notwithstanding any assignment of a Purchased Contract to MFS. The parties agree that MFS shall be entitled to directly receive and retain any and all amounts due and payable under the Purchased Contracts. All Purchased Contracts shall be sold to MFS subject to the representations, warranties, covenants, agreements, terms and conditions set forth in this Agreement, and shall be accompanied by an Assignment. In addition MFS reserves the right to verbally verify the Contract with the Customer thereunder.

3.    3.    **PREAPPROVAL:**    BRISTLECONE FINANCING LLC will be using their own credit approval platform for pre-approval of all contracts to qualify accounts for purchase by MFS. All contracts that are to be purchased by MFS must meet all requirements and follow all attributes previously agreed upon by MFS and BRISTLECONE FINANCING LLC. The attributes that must be met are as follow: All consumers must have a 600 or greater Vantage score, Consumer may have no more than 2 charge-off accounts listed on their credit report in the last 24 months, All bankruptcy's listed on the credit report must be closed or discharged, Consumer can have no more than 1 bankruptcy listed on their credit report, All consumers with a Vantage Score between 600-650 must have a minimum income of $1,500 and shall be approved for a finance amount no greater than $2,500, Consumers with a Vantage score of 650 or greater minimum shall be approved for a max finance amount no greater than $5,000. These attributes and requirements can also be found in section VI Customer Credit Approval. Any customer approved for purchase through the BRISTLECONE FINANCING LLC approval platform shall be valid for (30) days from the date of the approval; provided that there are no changes in respect to such customer, the information presented to MFS in connection with the pre-approval process, or the relating contract/ credit application and all other relating therto unchanged. Within said thirty (30) day period, SELLER shall send MFS the original Contract or Record, the original Authenticated Contract/Credit Application, the certificate of completion, if applicable, and employment information, if applicable. If this information is not received by MFS within the thirty (30) day period, MFS will have the option to reject the Contract or to re-qualify the same under MFS' credit guidelines. **FUNDING OF PURCHASE PRICE:**

(a)    Provided that no Event of Cancellation has occurred with respect to a Contract that MFS has elected to purchase, MFS shall, within five (5) business days after SELLER's submission of a complete Final Contract/Credit Application to MFS, pay to SELLER the Purchase Price for each Purchased Contract less (i) the outstanding amount of the Origination Fee, which shall be withheld by MFS from the Purchase Price until the full Origination Fee due for such year (whether it be the initial Origination Fee or the renewal fee, in each case as set forth in Schedule "A") has been paid in full, and (iii) any adjustment to Purchase Price, if applicable, as set forth in Schedule "A".

4.    **REPRESENTATIONS AND WARRANTIES:**

(a)    SELLER hereby represents, warrants and covenants to MFS, its successors and assigns, as of the date hereof, as of the date of submission of each Contract/Credit Application, Final Contract/Credit Application and Assignment in respect of each Contract and during the Term of this Agreement, that:

(1)    If a corporation, partnership or limited liability company, SELLER is duly organized and validly existing and in good standing in the state of its incorporation as such, and has full power to carry on its business as it is presently conducted including, without limitation, the sale of the Contracts, to enter into this Agreement and to carry out the transactions contemplated hereby;

(2)    The execution and delivery of this Agreement, the assignment of the Purchased Contracts to MFS, and the performance by SELLER of the transactions contemplated hereby have been duly authorized by all necessary action, including any action required under SELLER's governing instruments;

(3)    The execution, delivery and performance of this Agreement and the assignment of the Purchased Contracts to MFS, and the execution of any other instrument related to this Agreement, constitute a legal, valid and binding obligation of SELLER enforceable in accordance with its terms, without any offsets or counterclaims, and no further actions are required for SELLER to enter into this Agreement and such other instruments;

(4)    All of SELLER's business operations are duly licensed and permitted under all federal, state and local laws, rules and regulations of any governmental authority;

(5)    SELLER has duly paid any and all license, franchise, corporation or other taxes, fees, imposts, duties or charges levied, assessed or imposed upon it or upon any of its properties of whatsoever kind or description;

(6)    Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will constitute a violation or default of any statute, rule or decree of any court, administrative agency or governmental body to which SELLER is or may be subject;

(7)    There are and will be no agreements between SELLER or its agents and any Customer in connection with any Purchased Contract and no express or implied warranties have been or will be made by SELLER or its agents to such Customer, except as set forth in the Contract;

(8)    SELLER and its agents have not participated in and have no knowledge of any fraudulent and/or misleading act in connection with any Contract or with respect to any Customer;

(9)    Each Customer has presented appropriate documentation to verify his or her identity and has legal capacity to enter such Contract and has not engaged in any fraud or misrepresentation with respect to such Contract and the Authentication provided by the named Customer is genuine;

(10)    If a Contract is in electronic form, (a) SELLER has provided to the Customer all disclosures in such form and manner as may be necessary to create a valid and enforceable electronic contract, (b) the Customer has consented to conducting the electronic transaction in accordance with applicable law; and (c) the Contract was consummated through the SELLER's web site in accordance with applicable law.

(11)    Each Contract is and shall be valid, genuine and enforceable according to its terms (including, but not limited to, terms related to interest rate or time price differential), and each transaction (including the application process and the origination of the Contract) was at the time of its origination and is as of the date of the assignment of the same to MFS in compliance with applicable laws, rules and regulations of any governmental authority whether federal, state, county, municipal or otherwise including, without limitation, usury laws, electronic or digital signature laws, electronic transaction laws, the Federal Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Magnuson-Moss Warranty Act, Federal Reserve Board Regulations B, M and Z, state adaptations of the Consumer Credit Protection Act (or parts thereof) and of the Uniform Consumer Credit Code and any other consumer credit, equal opportunity, disclosure or repossession laws or regulations applicable with respect to a particular Contract;

(12)    Each Contract is a valid deferred payment obligation for the amount therein set forth and such Contract shall not be subject to any disputes, offsets or counterclaims and the property, goods or services described in the Contract have never been the subject of any other Contract between SELLER and the Customer and the Contract has not been rescinded by SELLER or Customer for any reason whatsoever, SELLER is not in breach under any obligation to any Customer under any Contract, and has no actual knowledge of any personal defenses that the Customer could raise against the enforcement of the terms of any Contract; SELLER has no actual knowledge of any facts which may result in the uncollectability or unenforecability of any Contract;

(13)    All credit or other information reasonably relevant to a credit determination concerning the Customer shall be the sole responsibility of the SELLER to be disclosed to MFS and such credit information and all other information supplied by SELLER in connections with any Contract shall be true, complete and correct as of the date submitted; SELLER shall supplement such information as necessary so that such information remains true, complete and correct;  SELLER has no knowledge of any facts, which presently or upon the occurrence of certain events in the future, may result in the uncollectability and/or unenforceability of the Contract; SELLER acknowledges that MFS will rely upon information appearing on SELLER's records relating to all Contracts  and Final Contracts/Credit Applications, and in light of such acknowledgment, each item of information contained in and appearing on such records accurately reflects their true status;

(14)    Each Contract is current and the Customer is not in default with respect to any term thereunder as of the date of submission of each such Contract/Credit Application, Final Contract/Credit Application and Assignment in respect of each Contract;

(15)    SELLER owns each Contract submitted to MFS hereunder free and clear of any liens, charges, security interests, encumbrances or other restrictions or transfer which may adversely affect MFS' rights with respect thereto, including without limitation, MFS' rights under this Agreement to be the assignee of all Purchased Contracts and to collect all monies due thereunder, SELLER has the absolute right to sell, assign and transfer the contracts free and clear of all rights of third parties, and upon assignment MFS will obtain good title to such Purchased Contract free and clear of any liens, charges, encumbrances or other restrictions whatsoever;

(16)    The execution and delivery by SELLER  of this Agreement and the assignment of the Purchased Contracts to MFS and the security interests granted to MFS from time to time pursuant to the terms hereof, do not conflict with or constitute a material breach or default with respect to any indenture, loan or credit agreement, mortgage, lease, deed or other agreement to which it is a party or by which it or its properties are bound and there are no suits or proceedings pending or, to the knowledge of SELLER, threatened in any court or before any regulatory commission, board or other

administrative or governmental agency against or affecting SELLER which could materially impair SELLER's ability to perform its obligations hereunder;

(17)    The financial statements of SELLER delivered to MFS from time to time fairly present the financial position of SELLER as of the date thereof in conformity with generally accepted accounting principles consistently applied and the results of operations of SELLER for the periods covered thereby and do not, as of the date thereof, include any material misstatement or omit to state any material liability, absolute or contingent, and since the date of the latest such financial statements, there has been no Material Adverse Change in the Financial Condition of SELLER;

(18)    There is no litigation or other proceeding pending, or to the best of SELLER's knowledge, threatened against SELLER that would affect SELLER'S ability to perform each and every of its obligations under this Agreement or any Agreement or instrument related hereto;

(19)    SELLER has delivered to Customer all products and services required to be delivered and/or performed in accordance with the Contract;

(20)    No false, fraudulent or misleading representations were made nor were unfair or deceptive trade practices engaged in by SELLER with respect to the Customer or the Contract and no statements, promises or representations about the payment terms under the Contract, except as stated in writing in the Contract;

(21)    SELLER is not insolvent, nor will the SELLER be made insolvent by the transfer or assignment of the Contacts, nor does the SELLER anticipate any pending Insolvency Event;

(22)    Each Contract has been serviced by SELLER in conformity with all applicable laws, rules and regulations and in conformity with SELLER's policies and procedures that are consistent with customary and prudent industry standards; and

(23)    In the event of any (a) transfer of control of SELLER, including, without limitation, any merger, consolidation or reorganization of SELLER with or into any person, firm or entity, where SELLER is not the surviving entity in such merger, consolidation or reorganization ( a "Change of Control Event"), (b) sale, lease conveyance, exchange, transfer or other disposition of all, or substantially all, the assets of SELLER (an "Asset Sale"), or (c) Insolvency Event of SELLER, prior to such event SELLER shall (x) give MFS written notice of the date of such event and, in the event of a Change of Control Event or an Asset Sale, the identity of the surviving or acquiring entity, and (y) purchase all outstanding amounts on the Purchased Contracts at the same rate as originally purchased by MFS hereunder; provided, however, that in the event of a Change of Control Event or an Asset Sale, MFS shall be entitled to elect, in its sole and absolute discretion, to have the surviving or acquiring corporation, as the case may be, to continue to honor the Purchased Contracts and assume SELLER's obligations hereunder, including, without limitation, providing any ongoing services described thereunder, subject to executing such documents as MFS may reasonable request.

(b)    The representations and warranties contained herein shall be deemed to be continuing representations, warranties and covenants of SELLER and shall continue beyond the Term of this Agreement and until all obligations of SELLER hereunder have been fully performed and all sums due to MFS under all Purchased Contracts and hereunder have been paid in full and MFS no longer has any contingent liability to return any amounts which it may have received pursuant to any Purchased Contract.

**5.    SELLER'S REPURCHASE OBLIGATIONS; MFS' PROTECTION AGAINST LOSSES UPON DEFAULT:**

(a)    If (i) SELLER knows or has reason to know that any Contract is not the bona fide legal obligation of the Customer, or any Contract and/or Authoritative Copy of an electronic Contract is the subject of fraud, is invalid, or has been tampered with in any way; (ii) any Contract becomes the subject of an interest rate reduction in accordance with the terms of the Soldier's and Sailor's Civil Relief Act; (iii) any of SELLER's representations or warranties contained in this Agreement shall be materially untrue or incorrect; (iv) any of SELLER's covenants and agreements contained herein shall be breached by SELLER with respect to any particular Purchased Contract(s) and, if capable of being cured, SELLER fails to cure such breach within thirty (30) days after written notice thereof; (v) the Customer does not receive the products and/or services contracted for in the Contract; or (vi) the Customer cancels the Contract pursuant to the terms of such Contract; (vii) if the Customer contact information provided by the SELLER to MFS in the contract and/or credit application proves to be insufficient to the extent that MFS is unable to establish contact within the first 90 days and the Customer's first payment to MFS remains unpaid, then SELLER unconditionally agrees that it will, within thirty (30) days after MFS' written notice and demand to SELLER, either and at MFS' option  (aa) repurchase the Purchased Contract(s) affected by such breach for a price equal to the Repurchase Price; or (bb) replace the Purchased Contract affected by such breach by assigning to MFS all of its right, title and interest in and to Contract(s) owned by SELLER with a price equal to the Repurchase Price, which substituted Contracts shall be subject to review and approval of MFS in its sole discretion.  In such event, MFS agrees to reassign the applicable Purchased Contract to SELLER, AS IS, WHERE IS, WITHOUT RECOURSE OR WARRANTY OF ANY KIND (except that MFS shall represent and warrant that it owns the applicable Purchased Contract and it has not transferred it to a third party).

(b)    In addition to SELLER's obligation to repurchase any Purchased Contracts pursuant to Section 6(a) above, (i) if any installment on a Contract becomes due and remains unpaid for more than ninety (90) days; upon the occurrence of an Insolvency Event with respect to any Customer (each, a "Defaulted Contract" and collectively, the "Defaulted Contracts"), then in any of such events, SELLER shall, within thirty (30) days after MFS' written notice of the Defaulted Contract, either and at MFS' option (x) repurchase the Defaulted Contract; or (y) replace the Defaulted Contract(s) on the terms set forth in Section 6(a) above.  In addition to any remedy set forth herein or available to MFS under applicable law and equity and in addition to any other amounts owed by SELLER to MFS, MFS shall be entitled to offset any and all amounts it and its affiliates and agents incur in connection with collection efforts and efforts to remedy any Default (including, without limitation, any travel costs).

(c)    If SELLER is obligated to repurchase a Purchased Contract for any reason and does not provide MFS with cash or an acceptable replacement Contract(s) as set forth in this Section 6 within thirty (30) days following notice by MFS to SELLER as provided in this Section 6 (the date said notice is given being referred to herein as the "Notice Date"), then interest shall accrue on all amounts owed by SELLER (including, without limitation, the Repurchase Price of any Defaulted Contract and any costs incurred by MFS and its affiliates and agents in connection with collection and remedial efforts relating to any such Defaulted Contract or the repurchase of any Purchased Contract) to MFS at the rate of one and one half percent (1.5%) per month under applicable law from the Notice Date until paid in full.

**6.    SECURITY AGREEMENT IN COLLATERAL:**  To secure the accuracy and full performance of each of SELLER's representations, warranties, covenants and obligations hereunder, SELLER hereby grants to MFS a first priority security interest (the "Security Interest") in all of SELLER's right, title and interest in and to (i) all of the Purchased Contracts, (ii) all proceeds of the foregoing.  The Purchased Contracts and all proceeds of the foregoing are sometimes hereinafter collectively referred to as the "Collateral."  The transactions contemplated hereby are a full and absolute

sale of the Purchased Contracts, subject to the conditions herein and no obligations and/or rights of SELLER hereunder shall in any way be construed to imply or grant SELLER any direct or indirect ownership interest and/or legal or equitable title in and/or to the Purchased Contracts.

7. **RIGHT OF OFFSET** MFS has the right, without notice to SELLER to offset amounts owed by SELLER to MFS hereunder (including any and all accrued interest) and amounts incurred by MFS and its affiliates and agents in connection with collection and remedial efforts relating to any Default (including, without limitation, any travel costs) against any other amounts payable by MFS to SELLER. Nothing herein shall require MFS to first seek or exhaust any remedy against the Customer, its successors and assigns, or any other person obligated with respect to the Contract, or to first foreclose, exhaust or otherwise proceed against any collateral or security which may be given in connection with the Contract, if any.

8. **RIGHT TO INSPECT:** MFS (through any of its officers, employees, or agents) shall have the right from time to time hereafter at its sole cost and expense to audit and inspect the books and financial statements of SELLER, and to check, test and appraise the Collateral in order to verify financial condition or the amount, quality, value, condition of, or any other matter relating to Collateral.

9. **INDEMNIFICATION:**

(a)    SELLER and MFS each hereby agree to defend, indemnify and hold harmless each other, and the other party's affiliates, subsidiaries, employees, officers, directors, shareholders, attorneys and agents, from and against any and all losses, claims, liabilities, demands and expenses whatsoever, including without limitation reasonable attorneys' fees and costs arising out of or in connection with any breach by the indemnifying party of its representations, warranties, covenants or obligations. All indemnities and obligations contained herein shall survive the expiration or termination of the Agreement and the expiration or termination of any Purchased Contract or any Servicing Contract.

(b)    To the extent that SELLER elects to utilize in its operations, including but not limited to, in its individual transactions and dealings with Customers, any form contract, notice, or other written instrument (collectively, "Written Instruments") which MFS may volunteer, supply, or provide to SELLER from time to time, MFS makes no representation or warranty as to the fitness of said Written Instruments and SELLER expressly agrees to hold MFS harmless for the same. Pursuant to Section 5(a)(11) of this Agreement, SELLER represents and warrants that any and all contracts or Written Instruments underlying each Contract is compliant with all applicable law, and is legally binding and fully enforceable.

10. **SERVICING OF CONTRACTS:**

(a)    As part of the consideration for MFS entering into this Agreement and agreeing to purchase Contracts from SELLER at its discretion, SELLER agrees that during the Term hereof, MFS shall have the option but not the obligation, in MFS' sole discretion, to service, as SELLER's exclusive collection agent, all Servicing Contracts entered into by SELLER and shall be entitled to retain the Servicing Fee for its performance of such services. If MFS elects to administer and service any Servicing Contracts, MFS shall perform the following duties with respect to such Servicing Contracts to the best of its skill and ability: (i)  inform each Customer of the billing arrangements, send a welcome letter and a monthly billing statement or coupon book to each Customer of a Servicing Contract, proceed to collect all payments due thereunder by posting and depositing all payments or like monies received on the Servicing Contracts within forty-eight (48) hours of receipt (ii) re-deposit checks, drafts and other items of payment returned to MFS for reasons of "Return to Maker" or "Non-sufficient funds" or words of similar effect

according to MFS' standard collection procedures; (iii) hold all post-dated checks, drafts or other items of payment and deposit them on the date appearing on the check, draft or other item of payment; (iv) use its own funds, tools, supplies and equipment in the performance of its services hereunder, (v) maintain books and records of all Servicing Contracts in accordance with generally accepted accounting principles including, without limitation records concerning principal, interest, late charges, and pre-payments received through pre-authorized debits, checks, drafts or other items of payment and, upon SELLER's written request, give access thereto to SELLER; (vi) provide SELLER monthly with a full and complete accounting in respect of each and every Servicing Contract; (vii) service such delinquent Servicing Contracts with as many telephone calls and letters as MFS deems necessary; (viii) remit to SELLER, on a monthly basis, the Collected Funds less (A) the Servicing Fee, (B) the amount of any funds which MFS is required to return to a Customer for any reason including, without limitations, the Customer's bankruptcy or an erroneous payment, and (C) any other amounts due to MFS which may be offset pursuant to the terms of this Agreement, and (ix) perform such other duties and furnish such reports as are reasonable and customary for billing agents in California.

(b)     SELLER shall fully cooperate with MFS in MFS' performance of the foregoing duties. Notwithstanding the generality of the foregoing, SELLER agrees that it will submit to MFS in a timely manner, each of its Servicing Contracts including the credit statement, the executed Contract, all supporting documentation, the current balance and the date of the next payment in order to enable MFS to arrange for the periodic servicing of such Servicing Contract.

(c)     In the event any legal action or other legal or non-legal proceeding is brought relating to any of the Servicing Contracts, MFS will deliver to SELLER promptly after SELLER's written request therefor, such papers as MFS may have in its possession that SELLER reasonably deems relevant to such action, and SELLER shall be obligated to indemnify MFS pursuant to the terms of Section 10.

(d)     MFS may at any time, in its sole discretion, withdraw from administering and servicing any or all Servicing Contracts.

(e)     SELLER acknowledges and agrees MFS' rights with respect to the Service Contracts shall serve as additional Collateral for the security interest, and in accordance therewith, MFS shall be entitled to retain all Service Contracts until such time as all amounts due MFS under all Purchased Contracts and otherwise hereunder have been paid in full.

**11.    MFS' RIGHTS TO DEAL WITH CONTRACTS:**  MFS shall have the right to deal with all Contracts and Customers in the sole exercise of its business judgment and, without limiting the generality of the foregoing, may do the following without notice to or consent by SELLER:  (a) amend any Contract or renew or extend the time for payment or performance or grant any other indulgence to any Customer; (b) make any settlements or compromises therewith; (c) demand additional collateral or release any collateral securing such Contract; (d) restructure, defer or otherwise alter payment terms of such Contract; and (e) transfer or assign any of its rights or obligations in regard of any Contract without the prior written consent of SELLER.  MFS' and SELLER's rights and obligations hereunder shall remain unaffected by any such activities.

**12.    COVENANTS OF SELLER:**  During the Term hereof, SELLER agrees to: (a) cooperate with MFS in giving notice to the Customer of the assignment of the Purchased Contract; (b) comply with all of SELLER's representations, warranties and other statutory and contractual obligations to the Customer; (c) in the event SELLER receives any payment on a Contract, SELLER shall promptly notify MFS of its receipt of the same and promptly forward such payment to MFS and SELLER hereby irrevocably appoints MFS its attorney-in-fact to act in its name and stead in regard of the Contracts, including without limitation, the right to endorse or sign SELLER's name on all checks, collections,

receipts or other documents with regard to the Contracts, as MFS deems necessary or appropriate, in its discretion, to protect MFS' right, title and interest in and to the Contract and any security intended to be afforded thereby, (d) give MFS written notice of any Default hereunder or any claim which might adversely affect the rights of MFS hereunder; (e) conduct its business in accordance with sound business practices and standards and perform and fulfill all obligations to Customers under Contracts and related marketing materials, brochures and/or agreements delivered to Customers; (f) maintain all licenses and authorizations required by all applicable regulatory authorities; (g) secure, maintain and provide evidence of liability insurance in amounts as may be required by MFS; (h) notify MFS in writing of any change of ownership and/or any change in capitalization; and (i) promptly deliver to MFS such information concerning the financial or other condition of SELLER as MFS may reasonably request.

**13.    DEFAULT AND REMEDIES:**  Upon the occurrence of a Default by, or with respect to, SELLER, MFS may exercise any or all remedies available to MFS under applicable law and as referenced in Section 6.

**14.    ORIGINATION FEE:**  A non-refundable and renewing Origination Fee payable on the Effective Date and each anniversary thereafter during the Term in the amounts set forth on Schedule "A" must accompany application for financing the SELLERS receivables.  SELLER hereby acknowledges and agrees that any waiver of the Origination Fee in any year by MFS does not and shall not constitute a waiver of or its right to charge and collect the Origination Fee due in any subsequent year and SELLER is and shall continue to be responsible for the same.  This fee covers, among other things, the credit check of the SELLER and to perfect MFS interest in the Purchased Contracts, with the filing of a UCC-1.

**15.    MISCELLANEOUS:**

SELLER further acknowledges and agrees that an assignment, transfer or sale to a third party in one or a series of related transactions of a fifty percent fully-diluted ownership interest in the  individual assets or liabilities directly related to the MFS agreement shall be deemed to be an assignment under this Agreement, which shall require the consent of MFS or an agreed upon guarantee on all contractual obligations by the current SELLER.

(a)    The provisions of this Agreement and the representations, rights and obligations of the parties hereto shall survive the execution and delivery hereof, and except as they relate to entering into further Contracts, shall survive the termination of this Agreement.

(b)    Any notice required to be given hereunder shall be delivered personally, shall be sent by first class mail, , return receipt requested, by overnight courier, or by facsimile or electronic mail, to the respective parties at the addresses given in the preamble of this Agreement, which addresses may be changed by the parties by written notice conforming to the requirements of this Agreement.  Any such notice deposited in the mail shall be conclusively deemed delivered to and received by the addressee four (4) days after deposit in the mail, if all of the foregoing conditions of notice shall have been satisfied.  All facsimile communications shall be deemed delivered and received on the date of the facsimile, if (1) the transmittal form showing a successful transmittal is retained by the sender, and (b) the facsimile communication is followed by mailing a copy thereof to the addressee of the facsimile in accordance with this paragraph.

(c)    The parties agree that this Agreement has been executed and delivered in, and shall be construed in accordance with the internal laws of the State of California as applied to contracts between California residents entered into and to be performed wholly within California.  SELLER hereby consents to the jurisdiction of any local, state or federal court located within the County of San Diego, State of California; provided, however, nothing contained herein shall preclude MFS from commencing

any action hereunder in any Court having jurisdiction thereof. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

(d)     If at any time any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement.

(e)     This Agreement together with all schedules and exhibits attached hereto, constitutes the entire agreement between the parties concerning the subject matter hereof and incorporates all representations made in connection with negotiation of the same. All prior or contemporaneous agreements, understandings, representation, warranties and statements, oral or written, relating to the subject matter hereof are superseded and are null and void. The terms hereof may not be terminated, amended, supplemented or modified orally, but only by an instrument duly executed by each of the parties hereto. The recitals set forth above are incorporated herein by this reference.

(f)     This Agreement and any amendments hereto shall be binding on and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

(g)     In the event there is any conflict between this Agreement and any ancillary agreements with respect to any Contract, the terms and conditions of this Agreement shall control.

(h)     If either party commences legal proceedings for any relief against the other party arising out this Agreement, the losing party shall pay the prevailing parties legal costs and expenses, including without limitation, reasonable attorney's fees.

(i)     This Agreement may be executed in one or more identical counterparts, all of which shall together constitute one and the same instrument when each party has signed one counterpart. To them as much extent permitted by applicable law, in the event that any signature to this Agreement or any amendment hereto is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

(j)     Additional terms of this Agreement, all of which are hereby incorporated herein by this reference, are set forth in the following schedules, addenda, exhibits or riders attached hereto.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective duly authorized representatives on the date first above written.

SELLER:                                    MFS:

**BRISTLECONE FINANCING LLC**              MONTEREY FINANCIAL SERVICES, INC.

a Nevada Corporation                        a California Corporation

*Dusty Wunderlich*
By: _____
    Dusty Wunderlich (Jun 12, 2014)

Print: Dusty Wunderlich
_____

Title: CEO
_____

Date: Jun 12, 2014
_____

*Shaun Lucas*
By: : _____
    Shaun Lucas (Jun 12, 2014)

Print: Shaun Lucas
_____

Title: VP Operations
_____

Date: Jun 12, 2014
_____

**Federal Tax I.D.# <u>35-2507838</u>**

# SCHEDULE A

to that **RECEIVABLES PURCHASE AGREEMENT**
dated June 12, 2014
by and between

**MONTEREY FINANCIAL SERVICES, INC.**
and
**BRISTLECONE FINANCING LLC**

---

## I.    DESCRIPTION OF SELLERS SERVICES/PRODUCTS:

Furniture Sales

## II.    PURCHASE PRICE:

The Purchase Price of a Purchased Contract, also understood as a purchase rate, shall be a percentage of the total contract balance (principal, rent charge, residual purchase payment), (the "Contract Balance") owed by the Customer named therein calculated as follows:

    a.  Eighty-four percent (84%) of the Contract Balance for Purchased Contracts payable in zero (0) months to eleven (11) months from the date of assignment to MFS; and

    b.  Seventy-nine percent (79%) of the Contract Balance for Purchased Contracts payable in twelve (12) months to seventeen (17) months from the date of assignment to MFS; and

    c.  Seventy-seven percent (77%) of the Contract Balance for Purchased Contracts payable in eighteen (18) months to nineteen (19) months from the date of assignment to MFS; and

    d.  Seventy-five and one half percent (75.5%) of the Contract Balance for Purchased Contracts payable in twenty (20) months to twenty-one (21) months from the date of assignment to MFS; and

    e.  Seventy-four percent (74%) of the Contract Balance for Purchased Contracts payable in twenty-two (22) months to twenty-three (23) months from the date of assignment to MFS; and

The interest rate of the Consumer Contracts purchased at the above rates will be at zero percent (0%) or greater.  For each one percent (1%) drop below this percentage the purchase price will be reduced by one percent (1%).

## III.    ADJUSTMENTS TO PURCHASE PRICE:

The foregoing Purchase Price percentages may be adjusted inversely either up or down on the date of purchase of a Contract by an amount equal to the change in the Three Month LIBOR as published in the Wall Street Journal ("LIBOR") from the first day of each month if the LIBOR rises above the rate of the

---

LIBOR as it is published on the 1st day of the month of the Effective Date of this Agreement, which is 0.24%.

**IV.  STIPULATIONS:**

    a.  All documents signed and UCC-1 filed.

    b.  Full recourse

    c.  Servicing Collateral: Client must maintain a 25% servicing to finance ratio based off of the current outstanding balance in Monterey's finance agency at all times.

    d.  MFS agrees to review performance and default on all servicing and finance accounts held at MFS after 6 months of booking business. At that point MFS will reassess the servicing collateral stipulation that is currently in place and make a decision based off of the performance review.

    e.  If the Client defaults on the agreed up deficiency calculation for consumers who have taken advantage of the early buyout option on their lease agreement the Client will be charged the full buyback amount.

**V.  GENERAL FEES:**

    a.  <u>SET-UP FEE</u>:  A fee of zero dollars ($0.00) will be charged on each new Contract purchased.

    b.  <u>CHARGEBACK FEE</u>:  MFS shall be entitled to a processing fee for any credit card chargeback due to consumer disputes (presently $25.00).  Furthermore, SELLER shall be responsible for any additional fees, fines or penalties which MFS may incur from the merchant providers due to high or excessive consumer disputes or charge-backs.

    c.  <u>REPURCHASE FEE</u>:  The Repurchase Fee for each Repurchased Contract shall be twenty-five dollars ($25.00).

    d.  <u>ORIGINATION FEE</u>:  The non-refundable and renewing Origination Fee shall initially be five hundred dollars ($500.00) and shall be renewed on each anniversary of the Effective Date of this Agreement in the amount of two hundred fifty dollars ($250.00).  The initial Origination Fee shall be withheld by MFS from the Purchase Price and/or Servicing Fee of the first Contract(s) purchased or serviced in each year during the Term until the full Origination Fee due for such year has been paid in full (as provided in Section 4(a) of the Agreement).  All renewal Origination Fees shall be invoiced or offset from any amounts due to SELLER from MFS under this Agreement.

**VI.  CUSTOMER CREDIT APPROVAL:**

In connection with Contracts to be sold to MFS pursuant to this Agreement, prior to entering into any retail installment agreement or Contract with prospective Customers, for each such prospective Customer SELLER shall may either submit a credit approval application through MFS' proprietary online credit approval system or the consumers must be run through and approved for finance through the BRISTLECONE FINANCING LLC pre-approval platform. All contracts that are to be purchased by MFS must meet all requirements and follow all attributes previously agreed upon by MFS and BRISTLECONE FINANCING LLC.  The attributes that must be met are as follow: All consumers must have a 600 or greater Vantage score, Consumer may have no more than 2 charge-off accounts listed on their credit report in the last 24 months, All bankruptcy's listed on the credit report must be closed or discharged, Consumer can have no more than 1

bankruptcy listed on their credit report,, All consumers with a Vantage Score between 600-650 must have a minimum income of $1,500 and shall be approved for a finance amount no greater than $2,500, Consumers with a Vantage score of 650 or greater minimum shall be approved for a max finance amount no greater than $5,000. These attributes and requirements can also be found in section Listed as Pre-Approval. It is understood and agreed that SELLER shall offer for sale to MFS, each contract which meets the above requirements and is approved.

**VII.    TERM:**

The Term of this Agreement is a period of one (1) year(s) commencing on the Effective Date and ending on the first anniversary thereafter.  The Term shall automatically renew unless either party provides the other written notice at least thirty (30) days of its intent not to renew the same; provided, however that, notwithstanding any termination or expiration of this Agreement, SELLER's obligations to MFS shall continue and MFS shall be entitled to collect all outstanding payments under all Purchased Contracts until they have been paid in full.

Notwithstanding the termination of this Agreement due to expiration of its Term, SELLER's obligations to MFS shall continue and MFS shall be entitled to collect all outstanding payments under all Purchased Contracts until they have been paid in full.

**VIII.    SERVICING FEE:**

SELLER agrees that MFS shall be entitled to the following fees, all of which, collectively, shall constitute the Servicing Fee:

a.    A flat rate of four dollars ($4.00) per month will be charged to SELLER for each Account serviced by MFS.

b.    A one-time processing set-up fee of  five dollars ($5.00) will be charged to SELLER per Account.

c.    MFS shall be entitled to a ten dollar ($10.00) processing fee for any Account cancelled by the SELLER.

d.    MFS shall be entitled to a credit card chargeback fee of twenty five dollars ($25.00) for each credit card payment chargeback or reversal due to Customer disputes.

e.    Should SELLER elect to have MFS report the Accounts to the credit reporting agencies, there will be a one time set up fee of two hundred dollars ($200.00), as well as a recurring monthly administrative fee of fifty dollars ($50.00).

f.    In the event MFS is required to send a coupon book to a customer for ongoing monthly payments, SELLER will be charged a set-up fee of five dollars ($5.00).

g.    Should SELLER later elect to sell any of the servicing Accounts to MFS, a four dollar ($4.00) account conversion fee will be charged to SELLER for each Account purchased. Said account conversion fee would be deducted from the purchase price payout.

h.   Should the Accounts be of the type and nature that require SELLER to provide Customers with an IRS Form 1098, and should SELLER request that MFS send said Form 1098 to Customers, MFS shall charge SELLER a fee of five dollars $5.00) for each Form 1098 sent.

Please note that the correct tax payer identification number (TIN) or social security number (SS#) must be included for each Form 1098 filed with the IRS.  To the extent that there is a missing or incorrect TIN or SS# associated with the Account placed by SELLER, the IRS may impose a per account fee or penalty.  To the extent that MFS incurs any penalties, fees, costs, or expenses associated with an incorrect or missing TIN or SS#, SELLER shall indemnify MFS for the same.

Please also note that MFS shall not issue any Form 1098's for consumers residing outside of the United States of America

i.   MFS shall collect and retain all late charges, NSF fees, and consumer payment fees by which it collects from Customers.

j.   SELLER shall be responsible for all credit card fees, including but not limited to, per transaction fees and excess chargeback penalties or fines.

k.   On a case by case basis MFS may agree from time to time, to arrange for certain additional logistics-related services not expressly set forth in the Agreement or related addenda, including, but not limited to, courier services, special programming, special projects, and or the arrangement of lock box services.  Should MFS agree to perform said services on an individual basis, SELLER shall reimburse MFS for all of MFS' costs and expenses related to the performance or procurement of said service.  Any reimbursement due hereunder to be deducted from SELLER's monthly payout.

l.   SELLER agrees that MFS may adjust the fees set forth herein on an annual basis in an amount not to exceed ten percent (10%).

## IX.   PRIVACY POLICY:

Please be advised that the Federal Trade Commission recently passed the Privacy of Consumer Financial Information Act known as the Gramm-Leach-Bliley Act (the "Act").  Generally, the Act states that on or before July 1, 2001 all businesses must provide to each Customer notices setting forth its privacy policies.  This notice must then be sent initially to all new Customers after July 1, 2001 and then annually to all Customers.  We can supply you with a copy of the Act upon request.

MFS must send these notices to all Customers under Purchased Contracts.  All servicing and collection agency clients of MFS must send this notice to all their customers.

Attached as Exhibit "B" is a sample of the notice MFS will be using.  We strongly recommend SELLER review the Act and MFS' notice (if you plan to have MFS send the notice for you) with your attorney to ensure you will comply with the Act.

_____ Yes, I would like MFS to send the Privacy Policy letter to each of my Consumers for a fee of two dollars and no cents ($2.00) per account.  (See attached Exhibit "B"). Should SELLER fail to pay the aforementioned fee, MFS reserves the right to discontinue sending privacy notice.

_____ No, I would not like MFS to send the Privacy Policy letter to each of my Consumers.

---

**ACKNOWLEDGEMENT** (initialed):  _____   _____

SELLER                    MFS

*"THE REMAINDER OF THIS PAGE HAS BEEN LEFT BLANK INTENTIONALLY"*

# EXHIBIT A
## FORM OF IRREVOCABLE ASSIGNMENT

FOR VALUE RECEIVED, the undersigned (the "Assignor") hereby sells, assigns and transfers unto MONTEREY FINANCIAL SERVICES, INC., ("MFS") a California corporation ("Assignee"), its successors and assigns, all of Assignor's right, title and interest in and to the contracts, promissory notes, security agreements, membership agreements, instruments and accounts receivable (each, a "Contract" and collectively, the "Contracts") described on the attached Annex A, together with the property described therein, if any, and all rights and remedies thereunder, including all guaranties thereof or collateral security therefore, without recourse or warranty except as provided herein. Assignor authorizes Assignee to collect any and all installments and payments due on each Contract and to take action thereunder which Assignor might otherwise take with respect to each Contract. This Assignment is being delivered pursuant to and upon all of the representations, warranties, covenants and agreements on the part of the undersigned Assignor contained in that certain Receivables Purchase Agreement, dated as of June 12, 2014. (the "Agreement") between Assignor and Assignee, which Agreement contains certain representations, warranties and covenants from Assignor to Assignee, including, without limitation, certain obligations on behalf of the Assignor to repurchase the Contracts or to replace the Contracts upon the terms and conditions set forth therein. This Assignment shall be governed by and interpreted in accordance with the terms of the Agreement and the laws of the State of California. Capitalized terms used herein, which are not defined herein, shall have the meanings set forth in the Agreement.

Assignee may, without notice to Assignor, enter into any settlement, forbearance or other variation in terms in connection with any Contract, or discharge or release the obligations of the Obligor or other person, by operation of law or otherwise, without affecting Assignor's liability hereunder, except that any settlement, forbearance, or other variation by Assignee or its assigns shall not cause Assignor's Repurchase Price to be greater than it would have been in the absence of the settlement, forbearance, or other variation. Assignee's failure or delay in enforcing any right hereunder does not constitute a waiver of that right. Assignor shall not make any collections or repossessions with respect to the Contracts.

Assignor hereby certifies on and as of the date hereof (a) that each and every representation and warranty of the undersigned contained in the Agreement is true and correct on and as of the date hereof in all material respects with the same force and effect as if originally expressed on and as of the date hereof and (b) that each of the conditions set forth in the Agreement with respect to the purchase of the Contracts hereunder has been fulfilled or waived on the date hereof.

Assignor does not delegate and Assignee shall not be required to assume any of the duties, responsibilities, liabilities or obligations of Assignor under any Contract assigned hereunder and Assignor shall remain liable therefore notwithstanding the assignment contained herein.

IN WITNESS WHEREOF, the undersigned has executed this Form Of Irrevocable Assignment to be duly executed this ___12th___ day of ___June___, 20 _14_.

**BRISTLECONE FINANCING LLC**

By: _Dusty Wunderlich_
Dusty Wunderlich (Jun 12, 2014)

Title: CEO

---

# EXHIBIT B
## PRIVACY POLICY

[Principal's Name and Address]                    [Contact Information for Consumers]

### PRIVACY POLICY

This Privacy Policy describes the personal customer information that [Your Company Name Here] collects, whom we share such information with and the circumstances under which we share it, and how we protect such information.

Please read this Privacy Policy carefully. This Privacy Policy applies to all personally identifiable financial and other information about you that we now have in our possession or that we obtain in the future. It will continue to apply to you even if you are no longer our customer. We hope that this Privacy Policy will help you understand how we keep your personal information private and secure while using it to serve you better.

### I.    Personal Information Collected

In order to provide you with the consistent quality financial services that you desire and to manage our business, it is important that we collect and maintain accurate personal information about you. We obtain this information from (1) applications and other forms you fill out and submit to us, (2) consumer credit bureaus, and/or (3) a retailer or a party who originally provided you with credit if we purchased your account from such retailer or other party. For example, we may obtain the following information from the applications and other forms that you have filled out and submitted to us or to a retailer or other party who originally provided you with credit if we purchased your account from such retailer or other party: your name, date of birth, address, social security number, marital status and income. As another example, in evaluating whether to extend credit to you we may have requested consumer credit bureaus to provide us with information regarding the balances of your loans and your payment history with other lenders.

### II.    Sharing of Personal Information

We do not share your personal information with others except (1) as necessary to service and update your account, (2) with consumer credit bureaus as permitted by federal law, such as the reporting of account activity, and (3) as otherwise permitted or required by law, such as to protect against fraud or to respond to a subpoena.

### III.    Protection of Personal Information

We control access to your personal information by restricting access to our employees who need it in order to perform their duties for us and who are trained in the proper handling of such information. We maintain physical, electronic and procedural safeguards to protect your personal information.

Sincerely,

# Bristlecone Financing LLC-MFS

EchoSign Document History                                    June 12, 2014

| | |
|---|---|
| Created: | June 12, 2014 |
| By: | Dusty Wunderlich (dusty@wagsfinancing.com) |
| Status: | SIGNED |
| Transaction ID: | XAE6QM74D2M7G47 |

# "Bristlecone Financing LLC- MFS" History

Document created by Dusty Wunderlich (dusty@wagsfinancing.com)
June 12, 2014 - 12:16 PM PDT - IP address: 71.83.125.162

Document e-signed by Dusty Wunderlich (dusty@wagsfinancing.com)
Signature Date: June 12, 2014 - 12:26 PM PDT - Time Source: server - IP address: 71.83.125.162

Document emailed to Shaun Lucas (slucas@montereyfinancial.com) for signature
June 12, 2014 - 12:26 PM PDT

Document viewed by Shaun Lucas (slucas@montereyfinancial.com)
June 12, 2014 - 12:29 PM PDT - IP address: 12.219.32.98

Document e-signed by Shaun Lucas (slucas@montereyfinancial.com)
Signature Date: June 12, 2014 - 2:07 PM PDT - Time Source: server - IP address: 12.219.32.98

Signed document emailed to Dusty Wunderlich (dusty@wagsfinancing.com), Shaun Lucas
(slucas@montereyfinancial.com) and mbrown@montereyfinancial.com
June 12, 2014 - 2:07 PM PDT

Adobe EchoSign

# EXHIBIT "D"

# EXHIBIT "D"

# RECEIVABLES PURCHASE AGREEMENT

This Receivables Purchase Agreement (hereinafter "Agreement") is entered into as of **November 19, 2014** (the "Effective Date"), by and between **MONTEREY FINANCIAL SERVICES, INC.** ("MFS"), a California corporation with its principal place of business located at 4095 Avenida de la Plata, in Oceanside, California 92056 and, **I DO LENDING, LLC** ("SELLER"), a(n) Nevada Limited Liability Corporation, with its principal place of business located at 9484 Double R Blvd Suite B Reno, NV 89521, with respect to the following facts:

## RECITALS

**A.**    SELLER is in the business of providing certain products and services to various individuals from time to time, and SELLER allows said individuals to finance the cost of such products and services by entering into retail installment contracts, promissory notes, security agreements, membership agreements and/or other instruments (each, a "Contract" and collectively, the "Contracts"). SELLER's services and/or products are described on Schedule "A" attached hereto and incorporated herein by this reference.

**B.**    MFS is in the business of purchasing instruments such as the Contracts in its ordinary course of business.

NOW, THEREFORE, in consideration of the above promises and of the representations, warranties and agreements contained herein, the parties hereby covenant and agree as follows:

## AGREEMENT

**1.**    **DEFINITIONS:**  The following terms shall have the following meaning as used in this Agreement.

(a)    "Assignment" means an Irrevocable Assignment substantially in the form attached hereto as Exhibit "A", transferring and assigning to MFS all of SELLER's right, title and interest in and to a Purchased Contract, all payments thereunder and all related guaranties and collateral therefor in a form prescribed by MFS.

(b)    "Authenticate(d)" means to sign, execute or otherwise adopt a symbol or encrypt or similarly process a record in whole or in part, with the present of the authenticating person to identify the person and adopt or accept a record.

(c)    "Contract" has the meaning set forth in Schedule A above and must be in a form approved by MFS.

(d)    "Contract/Credit Application" means an Authenticated Contract (which is in original, executed form if on paper), an original credit application, and/or an original credit report or statement concerning the Customer and any related documents, information and Records from time to time required by MFS in accordance with MFS' standard procedures.

(e)    "Customer" means an individual who enters into a Contract with SELLER.

(f)    "Default" means (i) a breach by SELLER, which has not been cured during any applicable cure period, of any representation, warranty, covenant, term or condition of this Agreement or

of any other agreements to which SELLER is obligated or by which it is bound in connection with a Contract, (ii) a default under any guaranty of the obligations of SELLER hereunder or a default in SELLER's repurchase obligations as set forth in Section 6 hereof, in each case which has not been cured during any applicable cure period, (iii) a default by SELLER under any other agreement by and between SELLER or any affiliate thereof and MFS and any affiliate thereof which has not been cured during any applicable cure period, or (iv) a Material Adverse Change in Financial Condition with respect to SELLER.

      (g)    "Defaulted Contract" has the meaning set forth in Section 6(b) hereof.

      (h)    "Event of Cancellation" shall, with respect to a Contract, refer to (i) a Material Adverse Change in Financial Condition, business or operations of SELLER since the date of this Agreement or of the Customer since the date of the related Final Contract/Credit Applications; (ii) the occurrence of an event which causes a representation made by the Customer, SELLER or any other party in connection with the Contract or under this Agreement to be or become false or misleading in any material respect whether or not true when made; (iii) a breach of any term of such Contract, or of any related guaranty or credit support agreement, whether by the Customer or SELLER, including without limitation, failure of SELLER to deliver the underlying products or services to any Customer; (iv) any Default; (v) notification by a Customer to SELLER or to MFS of its intent to cancel all or any part of the Contract; or (vi) if the SELLER and/or MFS is named in a lawsuit over the actions or inactions of the SELLER.

      (i)    "Final Contract/Credit Application" means such documents or other Records as MFS shall from time to time require in accordance with its standard procedures in order to complete the purchase of a Contract and to pay the Purchase Price of the Contract to SELLER including, without limitation, (i) an Assignment; (ii) if the Purchased Contract is originally executed in paper form, the one and only executed original of the Purchased Contract; or, (iii) any Uniform Commercial Code financing statements necessary to perfect MFS' interest in the Purchased Contract; and (iv) any other document, instrument or Record required by the terms of MFS' written notice to SELLER pursuant to Section 2 below including, without limitation, any guaranties or security agreements.

      (j)    "Insolvency Event" means, with respect to any person or entity, (1) dissolution, liquidation or failure to operate as a going concern; (2) voluntarily or involuntarily filing bankruptcy, making an assignment, arrangement or composition with or for the benefit of creditors, appointment of a receiver; (2) it shall become insolvent or unable to pay its debts as they become due; or (3) it shall seek or become subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its property; (4) it shall have a secured party take possession of all or substantially all its property or have a distress, execution, attachment, sequestration or other legal process levied or enforced against all or substantially all its property and such secured party shall maintain possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter.

      (k)    "Material Adverse Change in Financial Condition" means a (1) material adverse change in the balance sheet or profit and loss statements or other financial condition or prospects of SELLER or a Customer from time to time, as determined by MFS in its sole discretion; (2) change in the corporate structure or any material change the ownership or capitalization of the SELLER, as determined by MFS in its sole discretion, (3) an Insolvency Event relating to the SELLER.

      (l)    "Origination Fee" means the non-refundable and renewing fee payable from SELLER to MFS on the Effective Date and each annual anniversary thereafter in the amounts set forth on Schedule "A," attached hereto, to cover the expenses of MFS in, among other things, reviewing SELLER

and this transaction including, without limitation, expenses in obtaining credit reports concerning SELLER, in obtaining a Dun and Bradstreet rating concerning SELLER, in performing and title and/or Uniform Commercial Code searches concerning SELLER and in the filing of Uniform Commercial Code financing statements.

(m)     "Purchased Contract" means a Contract, the Customer of which meets all of the credit and income requirements of MFS at the time it is purchased and which MFS elects, in its sole discretion, to purchase pursuant to the terms hereof.

(n)     "Purchase Price," with respect to each Contract, means the amount set forth on the attached Schedule "A".

(o)     "Repurchased Contract" means a Purchased Contract which has been repurchased by SELLER pursuant to the terms hereof.

(p)     "Record" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

(q)     "Repurchase Price" means the price at which SELLER is obligated to repurchase a Purchased Contract from MFS, and shall be an amount equal to (i) the principal outstanding balance of the Purchased Contract as of the original Effective Date of purchase from SELLER, less all payments attributable to principal received by MFS for such Purchased Contract, the result of which shall be multiplied by the original Purchase Price Rate as set forth in Schedule "A" attached hereto; plus (ii) a Repurchase Fee in an amount set forth in Schedule "A" attached hereto.

(r)     "Servicing Contract" means any Contract which MFS has elected not to purchase for any reason and any Repurchased Contracts, which MFS elects, in its sole discretion, to administer and service pursuant to the terms of this Agreement.

(s)     "Servicing Fee," with respect to each Servicing Contract, means the amount set forth on Schedule "A" attached hereto which will be paid by SELLER to MFS as compensation for MFS' administration and servicing of the Servicing Contracts.

(t)     "Term," with respect to this Agreement, means the period of time set forth on Schedule "A" attached hereto; provided, however, that MFS may terminate this Agreement immediately upon notice to SELLER in the event of a Default or upon thirty (30) days notice without Default.

**2.     PURCHASE OF CONTRACTS:**     Subject to the terms and conditions of this Agreement, during the Term, MFS shall have the option, but not the obligation, in its sole discretion and on a case by case basis, to purchase all of SELLER'S right, title and interest in and to the Contracts submitted by SELLER to MFS.MFS shall give I DO LENDING, LLC notice of their intent to stop purchasing and give 30 day notice unless the reason behind Monterey's intent to stop purchasing contracts are for any of the following reason: I DO LENDING, LLC receives excessive Attorney General Complaints, MFS receives any attorney contact about I DO LENDING, LLC, any delinquency issues with I DO LENDING, LLC contracts purchased or serviced by MFS, or I DO LENDING, LLC does not adhere to the Full Recourse guideline set forth in this agreement. If any of the reasons listed above are what has lead MFS to stop purchasing contracts then MFS is not required to give any type of notice. Upon Authentication of a Contract by a Customer, SELLER shall provide to MFS the Contract/Credit Application.  Upon receipt thereof, MFS shall review the Contract/Credit Application and shall notify SELLER whether it elects to exercise its option to purchase such Contract by delivery of written notice to SELLER within five business (5) days after MFS' receipt of the Contract/Credit Application.  MFS'

obligation to purchase any Contracts shall be conditioned upon MFS' receipt of a complete Final Contract/Credit Application with respect thereto in form and substance acceptable to MFS and any other information MFS may reasonably request relating thereto. If MFS exercises its right to purchase a Contract, (a) the Contract that bears the confirmation code entered by the Customer shall be deemed to be the "single, authoritative copy" of such Contract (as such terms are used in section 9-105(1) of the Uniform Commercial Code). (b) such Contract (whether in electronic or hard copy form) may not be altered by SELLER, and may be altered by MFS in accordance with law upon prior written notice to SELLER; (c) any other copies of the Contract printed for any reason shall each be clearly and conspicuously labeled "COPY." In no event shall MFS assume or be delegated any of SELLER's duties, responsibilities, liabilities or obligations to the Customer under any Contract and SELLER shall remain liable therefore notwithstanding any assignment of a Purchased Contract to MFS. The parties agree that MFS shall be entitled to directly receive and retain any and all amounts due and payable under the Purchased Contracts. All Purchased Contracts shall be sold to MFS subject to the representations, warranties, covenants, agreements, terms and conditions set forth in this Agreement, and shall be accompanied by an Assignment. In addition MFS reserves the right to verbally verify the Contract with the Customer thereunder.

3.    **PREAPPROVAL:**    I DO LENDING, LLC will be using their own credit approval platform for pre-approval of all contracts to qualify accounts for purchase by MFS. All contracts that are to be purchased by MFS must meet all requirements and follow all attributes previously agreed upon by MFS and I DO LENDING, LLC. The attributes that must be met are as follow: All consumers must have a 600 or greater Vantage score, Consumer may have no more than 2 charge-off accounts listed on their credit report in the last 24 months, All bankruptcy's listed on the credit report must be closed or discharged, Consumer can have no more than 1 bankruptcy listed on their credit report, All consumers with a Vantage Score between 600-650 must have a minimum income of $1,500 and shall be approved for a finance amount no greater than $2,500, Consumers with a Vantage score of 650 or greater minimum shall be approved for a max finance amount no greater than $5,000. These attributes and requirements can also be found in section VI Customer Credit Approval. Any customer approved for purchase through the I DO LENDING, LLC approval platform shall be valid for (30) days from the date of the approval; provided that there are no changes in respect to such customer, the information presented to MFS in connection with the pre-approval process, or the relating contract/ credit application and all other relating therto unchanged. Within said thirty (30) day period, SELLER shall send MFS the original Contract or Record, the original Authenticated Contract/Credit Application, the certificate of completion, if applicable, and employment information, if applicable. If this information is not received by MFS within the thirty (30) day period, MFS will have the option to reject the Contract or to re-qualify the same under MFS' credit guidelines.

4.    **FUNDING OF PURCHASE PRICE:**

(a)    Provided that no Event of Cancellation has occurred with respect to a Contract that MFS has elected to purchase, MFS shall, within five (5) business days after SELLER's submission of a complete Final Contract/Credit Application to MFS, pay to SELLER the Purchase Price for each Purchased Contract less (i) the outstanding amount of the Origination Fee, which shall be withheld by MFS from the Purchase Price until the full Origination Fee due for such year (whether it be the initial Origination Fee or the renewal fee, in each case as set forth in Schedule "A") has been paid in full, and (iii) any adjustment to Purchase Price, if applicable, as set forth in Schedule "A".

5.    **REPRESENTATIONS AND WARRANTIES:**

(a)    SELLER hereby represents, warrants and covenants to MFS, its successors and assigns, as of the date hereof, as of the date of submission of each Contract/Credit Application, Final Contract/Credit Application and Assignment in respect of each Contract and during the Term of this Agreement, that:

(1)    If a corporation, partnership or limited liability company, SELLER is duly organized and validly existing and in good standing in the state of its incorporation as such, and has full power to carry on its business as it is presently conducted including, without limitation, the sale of the Contracts, to enter into this Agreement and to carry out the transactions contemplated hereby;

(2)    The execution and delivery of this Agreement, the assignment of the Purchased Contracts to MFS, and the performance by SELLER of the transactions contemplated hereby have been duly authorized by all necessary action, including any action required under SELLER's governing instruments;

(3)    The execution, delivery and performance of this Agreement and the assignment of the Purchased Contracts to MFS, and the execution of any other instrument related to this Agreement, constitute a legal, valid and binding obligation of SELLER enforceable in accordance with its terms, without any offsets or counterclaims, and no further actions are required for SELLER to enter into this Agreement and such other instruments;

(4)    All of SELLER's business operations are duly licensed and permitted under all federal, state and local laws, rules and regulations of any governmental authority;

(5)    SELLER has duly paid any and all license, franchise, corporation or other taxes, fees, imposts, duties or charges levied, assessed or imposed upon it or upon any of its properties of whatsoever kind or description;

(6)    Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will constitute a violation or default of any statute, rule or decree of any court, administrative agency or governmental body to which SELLER is or may be subject;

(7)    There are and will be no agreements between SELLER or its agents and any Customer in connection with any Purchased Contract and no express or implied warranties have been or will be made by SELLER or its agents to such Customer, except as set forth in the Contract;

(8)    SELLER and its agents have not participated in and have no knowledge of any fraudulent and/or misleading act in connection with any Contract or with respect to any Customer;

(9)    Each Customer has presented appropriate documentation to verify his or her identity and has legal capacity to enter such Contract and has not engaged in any fraud or misrepresentation with respect to such Contract and the Authentication provided by the named Customer is genuine;

(10)    If a Contract is in electronic form, (a) SELLER has provided to the Customer all disclosures in such form and manner as may be necessary to create a valid and enforceable electronic contract, (b) the Customer has consented to conducting the electronic transaction in accordance with applicable law; and (c) the Contract was consummated through the SELLER's web site in accordance with applicable law.

(11)    Each Contract is and shall be valid, genuine and enforceable according to its terms (including, but not limited to, terms related to interest rate or time price differential), and each transaction (including the application process and the origination of the Contract) was at the time of its origination and is as of the date of the assignment of the same to MFS in compliance with applicable laws, rules and regulations of any governmental authority whether federal, state, county, municipal or otherwise including, without limitation, usury laws, electronic or digital signature laws, electronic transaction laws, the Federal Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Magnuson-Moss Warranty Act, Federal Reserve Board Regulations B, M and Z, state adaptations of the Consumer Credit Protection Act (or parts thereof) and of the Uniform Consumer Credit Code and any other consumer credit, equal opportunity, disclosure or repossession laws or regulations applicable with respect to a particular Contract;

(12)    Each Contract is a valid deferred payment obligation for the amount therein set forth and such Contract shall not be subject to any disputes, offsets or counterclaims and the property, goods or services described in the Contract have never been the subject of any other Contract between SELLER and the Customer and the Contract has not been rescinded by SELLER or Customer for any reason whatsoever, SELLER is not in breach under any obligation to any Customer under any Contract, and has no actual knowledge of any personal defenses that the Customer could raise against the enforcement of the terms of any Contract; SELLER has no actual knowledge of any facts which may result in the uncollectability or unenforecability of any Contract;

(13)    All credit or other information reasonably relevant to a credit determination concerning the Customer shall be the sole responsibility of the SELLER to be disclosed to MFS and such credit information and all other information supplied by SELLER in connections with any Contract shall be true, complete and correct as of the date submitted; SELLER shall supplement such information as necessary so that such information remains true, complete and correct;  SELLER has no knowledge of any facts, which presently or upon the occurrence of certain events in the future, may result in the uncollectability and/or unenforceability of the Contract; SELLER acknowledges that MFS will rely upon information appearing on SELLER's records relating to all Contracts  and Final Contracts/Credit Applications, and in light of such acknowledgment, each item of information contained in and appearing on such records accurately reflects their true status;

(14)    Each Contract is current and the Customer is not in default with respect to any term thereunder as of the date of submission of each such Contract/Credit Application, Final Contract/Credit Application and Assignment in respect of each Contract;

(15)    SELLER owns each Contract submitted to MFS hereunder free and clear of any liens, charges, security interests, encumbrances or other restrictions or transfer which may adversely affect MFS' rights with respect thereto, including without limitation, MFS' rights under this Agreement to be the assignee of all Purchased Contracts and to collect all monies due thereunder, SELLER has the absolute right to sell, assign and transfer the contracts free and clear of all rights of third parties, and upon assignment MFS will obtain good title to such Purchased Contract free and clear of any liens, charges, encumbrances or other restrictions whatsoever;

(16)    The execution and delivery by SELLER  of this Agreement and the assignment of the Purchased Contracts to MFS and the security interests granted to MFS from time to time pursuant to the terms hereof, do not conflict with or constitute a material breach or default with respect to any indenture, loan or credit agreement, mortgage, lease, deed or other agreement to which it is a party or by which it or its properties are bound and there are no suits or proceedings pending or, to the knowledge of SELLER, threatened in any court or before any regulatory commission, board or other

administrative or governmental agency against or affecting SELLER which could materially impair SELLER's ability to perform its obligations hereunder;

(17)     The financial statements of SELLER delivered to MFS from time to time fairly present the financial position of SELLER as of the date thereof in conformity with generally accepted accounting principles consistently applied and the results of operations of SELLER for the periods covered thereby and do not, as of the date thereof, include any material misstatement or omit to state any material liability, absolute or contingent, and since the date of the latest such financial statements, there has been no Material Adverse Change in the Financial Condition of SELLER;

(18)     There is no litigation or other proceeding pending, or to the best of SELLER's knowledge, threatened against SELLER that would affect SELLER'S ability to perform each and every of its obligations under this Agreement or any Agreement or instrument related hereto;

(19)     SELLER has delivered to Customer all products and services required to be delivered and/or performed in accordance with the Contract;

(20)     No false, fraudulent or misleading representations were made nor were unfair or deceptive trade practices engaged in by SELLER with respect to the Customer or the Contract and no statements, promises or representations about the payment terms under the Contract, except as stated in writing in the Contract;

(21)     SELLER is not insolvent, nor will the SELLER be made insolvent by the transfer or assignment of the Contacts, nor does the SELLER anticipate any pending Insolvency Event;

(22)     Each Contract has been serviced by SELLER in conformity with all applicable laws, rules and regulations and in conformity with SELLER's policies and procedures that are consistent with customary and prudent industry standards; and

(23)     In the event of any (a) transfer of control of SELLER, including, without limitation, any merger, consolidation or reorganization of SELLER with or into any person, firm or entity, where SELLER is not the surviving entity in such merger, consolidation or reorganization ( a "Change of Control Event"), (b) sale, lease conveyance, exchange, transfer or other disposition of all, or substantially all, the assets of SELLER (an "Asset Sale"), or (c) Insolvency Event of SELLER, prior to such event SELLER shall (x) give MFS written notice of the date of such event and, in the event of a Change of Control Event or an Asset Sale, the identity of the surviving or acquiring entity, and (y) purchase all outstanding amounts on the Purchased Contracts at the same rate as originally purchased by MFS hereunder; provided, however, that in the event of a Change of Control Event or an Asset Sale, MFS shall be entitled to elect, in its sole and absolute discretion, to have the surviving or acquiring corporation, as the case may be, to continue to honor the Purchased Contracts and assume SELLER's obligations hereunder, including, without limitation, providing any ongoing services described thereunder, subject to executing such documents as MFS may reasonable request.

(b)     The representations and warranties contained herein shall be deemed to be continuing representations, warranties and covenants of SELLER and shall continue beyond the Term of this Agreement and until all obligations of SELLER hereunder have been fully performed and all sums due to MFS under all Purchased Contracts and hereunder have been paid in full and MFS no longer has any contingent liability to return any amounts which it may have received pursuant to any Purchased Contract.

**6.    SELLER'S REPURCHASE OBLIGATIONS; MFS' PROTECTION AGAINST LOSSES UPON DEFAULT:**

(a)    If (i) SELLER knows or has reason to know that any Contract is not the bona fide legal obligation of the Customer, or any Contract and/or Authoritative Copy of an electronic Contract is the subject of fraud, is invalid, or has been tampered with in any way; (ii) any Contract becomes the subject of an interest rate reduction in accordance with the terms of the Soldier's and Sailor's Civil Relief Act; (iii) any of SELLER's representations or warranties contained in this Agreement shall be materially untrue or incorrect; (iv) any of SELLER's covenants and agreements contained herein shall be breached by SELLER with respect to any particular Purchased Contract(s) and, if capable of being cured, SELLER fails to cure such breach within thirty (30) days after written notice thereof; (v) the Customer does not receive the products and/or services contracted for in the Contract; or (vi) the Customer cancels the Contract pursuant to the terms of such Contract; (vii) if the Customer contact information provided by the SELLER to MFS in the contract and/or credit application proves to be insufficient to the extent that MFS is unable to establish contact within the first 90 days and the Customer's first payment to MFS remains unpaid, then SELLER unconditionally agrees that it will, within thirty (30) days after MFS' written notice and demand to SELLER, either and at MFS' option  (aa) repurchase the Purchased Contract(s) affected by such breach for a price equal to the Repurchase Price; or (bb) replace the Purchased Contract affected by such breach by assigning to MFS all of its right, title and interest in and to Contract(s) owned by SELLER with a price equal to the Repurchase Price, which substituted Contracts shall be subject to review and approval of MFS in its sole discretion.  In such event, MFS agrees to reassign the applicable Purchased Contract to SELLER, AS IS, WHERE IS, WITHOUT RECOURSE OR WARRANTY OF ANY KIND (except that MFS shall represent and warrant that it owns the applicable Purchased Contract and it has not transferred it to a third party).

(b)    In addition to SELLER's obligation to repurchase any Purchased Contracts pursuant to Section 6(a) above, (i) if any installment on a Contract becomes due and remains unpaid for more than ninety (90) days; upon the occurrence of an Insolvency Event with respect to any Customer (each, a "Defaulted Contract" and collectively, the "Defaulted Contracts"), then in any of such events, SELLER shall, within thirty (30) days after MFS' written notice of the Defaulted Contract, either and at MFS' option (x) repurchase the Defaulted Contract; or (y) replace the Defaulted Contract(s) on the terms set forth in Section 6(a) above.  In addition to any remedy set forth herein or available to MFS under applicable law and equity and in addition to any other amounts owed by SELLER to MFS, MFS shall be entitled to offset any and all amounts it and its affiliates and agents incur in connection with collection efforts and efforts to remedy any Default (including, without limitation, any travel costs).

(c)    If SELLER is obligated to repurchase a Purchased Contract for any reason and does not provide MFS with cash or an acceptable replacement Contract(s) as set forth in this Section 6 within thirty (30) days following notice by MFS to SELLER as provided in this Section 6 (the date said notice is given being referred to herein as the "Notice Date"), then interest shall accrue on all amounts owed by SELLER (including, without limitation, the Repurchase Price of any Defaulted Contract and any costs incurred by MFS and its affiliates and agents in connection with collection and remedial efforts relating to any such Defaulted Contract or the repurchase of any Purchased Contract) to MFS at the rate of one and one half percent (1.5%) per month under applicable law from the Notice Date until paid in full.

**7.    SECURITY AGREEMENT IN COLLATERAL:**  To secure the accuracy and full performance of each of SELLER's representations, warranties, covenants and obligations hereunder, SELLER hereby grants to MFS a first priority security interest (the "Security Interest") in all of SELLER's right, title and interest in and to (i) all of the Purchased Contracts, (ii) all proceeds of the foregoing.  The Purchased Contracts and all proceeds of the foregoing are sometimes hereinafter collectively referred to as the "Collateral."   The transactions contemplated hereby are a full and absolute

sale of the Purchased Contracts, subject to the conditions herein and no obligations and/or rights of SELLER hereunder shall in any way be construed to imply or grant SELLER any direct or indirect ownership interest and/or legal or equitable title in and/or to the Purchased Contracts.

**8.    RIGHT OF OFFSET** MFS has the right, without notice to SELLER to offset amounts owed by SELLER to MFS hereunder (including any and all accrued interest) and amounts incurred by MFS and its affiliates and agents in connection with collection and remedial efforts relating to any Default (including, without limitation, any travel costs) against any other amounts payable by MFS to SELLER. Nothing herein shall require MFS to first seek or exhaust any remedy against the Customer, its successors and assigns, or any other person obligated with respect to the Contract, or to first foreclose, exhaust or otherwise proceed against any collateral or security which may be given in connection with the Contract, if any.

**9.    RIGHT TO INSPECT:** MFS (through any of its officers, employees, or agents) shall have the right from time to time hereafter at its sole cost and expense to audit and inspect the books and financial statements of SELLER, and to check, test and appraise the Collateral in order to verify financial condition or the amount, quality, value, condition of, or any other matter relating to Collateral.

**10.    INDEMNIFICATION:**

(a)    SELLER and MFS each hereby agree to defend, indemnify and hold harmless each other, and the other party's affiliates, subsidiaries, employees, officers, directors, shareholders, attorneys and agents, from and against any and all losses, claims, liabilities, demands and expenses whatsoever, including without limitation reasonable attorneys' fees and costs arising out of or in connection with any breach by the indemnifying party of its representations, warranties, covenants or obligations. All indemnities and obligations contained herein shall survive the expiration or termination of the Agreement and the expiration or termination of any Purchased Contract or any Servicing Contract.

(b)    To the extent that SELLER elects to utilize in its operations, including but not limited to, in its individual transactions and dealings with Customers, any form contract, notice, or other written instrument (collectively, "Written Instruments") which MFS may volunteer, supply, or provide to SELLER from time to time, MFS makes no representation or warranty as to the fitness of said Written Instruments and SELLER expressly agrees to hold MFS harmless for the same. Pursuant to Section 5(a)(11) of this Agreement, SELLER represents and warrants that any and all contracts or Written Instruments underlying each Contract is compliant with all applicable law, and is legally binding and fully enforceable.

**11.    SERVICING OF CONTRACTS:**

(a)    As part of the consideration for MFS entering into this Agreement and agreeing to purchase Contracts from SELLER at its discretion, SELLER agrees that during the Term hereof, MFS shall have the option but not the obligation, in MFS' sole discretion, to service, as SELLER's exclusive collection agent, all Servicing Contracts entered into by SELLER and shall be entitled to retain the Servicing Fee for its performance of such services. If MFS elects to administer and service any Servicing Contracts, MFS shall perform the following duties with respect to such Servicing Contracts to the best of its skill and ability: (i) inform each Customer of the billing arrangements, send a welcome letter and a monthly billing statement or coupon book to each Customer of a Servicing Contract, proceed to collect all payments due thereunder by posting and depositing all payments or like monies received on the Servicing Contracts within forty-eight (48) hours of receipt (ii) re-deposit checks, drafts and other items of payment returned to MFS for reasons of "Return to Maker" or "Non-sufficient funds" or words of similar effect

according to MFS' standard collection procedures; (iii) hold all post-dated checks, drafts or other items of payment and deposit them on the date appearing on the check, draft or other item of payment; (iv) use its own funds, tools, supplies and equipment in the performance of its services hereunder, (v) maintain books and records of all Servicing Contracts in accordance with generally accepted accounting principles including, without limitation records concerning principal, interest, late charges, and pre-payments received through pre-authorized debits, checks, drafts or other items of payment and, upon SELLER's written request, give access thereto to SELLER; (vi) provide SELLER monthly with a full and complete accounting in respect of each and every Servicing Contract; (vii) service such delinquent Servicing Contracts with as many telephone calls and letters as MFS deems necessary; (viii) remit to SELLER, on a monthly basis, the Collected Funds less (A) the Servicing Fee, (B) the amount of any funds which MFS is required to return to a Customer for any reason including, without limitations, the Customer's bankruptcy or an erroneous payment, and (C) any other amounts due to MFS which may be offset pursuant to the terms of this Agreement, and (ix) perform such other duties and furnish such reports as are reasonable and customary for billing agents in California.

(b)  SELLER shall fully cooperate with MFS in MFS' performance of the foregoing duties. Notwithstanding the generality of the foregoing, SELLER agrees that it will submit to MFS in a timely manner, each of its Servicing Contracts including the credit statement, the executed Contract, all supporting documentation, the current balance and the date of the next payment in order to enable MFS to arrange for the periodic servicing of such Servicing Contract.

(c)  In the event any legal action or other legal or non-legal proceeding is brought relating to any of the Servicing Contracts, MFS will deliver to SELLER promptly after SELLER's written request therefor, such papers as MFS may have in its possession that SELLER reasonably deems relevant to such action, and SELLER shall be obligated to indemnify MFS pursuant to the terms of Section 10.

(d)  MFS may at any time, in its sole discretion, withdraw from administering and servicing any or all Servicing Contracts.

(e)  SELLER acknowledges and agrees MFS' rights with respect to the Service Contracts shall serve as additional Collateral for the security interest, and in accordance therewith, MFS shall be entitled to retain all Service Contracts until such time as all amounts due MFS under all Purchased Contracts and otherwise hereunder have been paid in full.

12.  **MFS' RIGHTS TO DEAL WITH CONTRACTS:**  MFS shall have the right to deal with all Contracts and Customers in the sole exercise of its business judgment and, without limiting the generality of the foregoing, may do the following without notice to or consent by SELLER:  (a) amend any Contract or renew or extend the time for payment or performance or grant any other indulgence to any Customer; (b) make any settlements or compromises therewith; (c) demand additional collateral or release any collateral securing such Contract; (d) restructure, defer or otherwise alter payment terms of such Contract; and (e) transfer or assign any of its rights or obligations in regard of any Contract without the prior written consent of SELLER.  MFS' and SELLER's rights and obligations hereunder shall remain unaffected by any such activities.

13.  **COVENANTS OF SELLER:**  During the Term hereof, SELLER agrees to: (a) cooperate with MFS in giving notice to the Customer of the assignment of the Purchased Contract; (b) comply with all of SELLER's representations, warranties and other statutory and contractual obligations to the Customer; (c) in the event SELLER receives any payment on a Contract, SELLER shall promptly notify MFS of its receipt of the same and promptly forward such payment to MFS and SELLER hereby irrevocably appoints MFS its attorney-in-fact to act in its name and stead in regard of the Contracts, including without limitation, the right to endorse or sign SELLER's name on all checks, collections,

receipts or other documents with regard to the Contracts, as MFS deems necessary or appropriate, in its discretion, to protect MFS' right, title and interest in and to the Contract and any security intended to be afforded thereby, (d) give MFS written notice of any Default hereunder or any claim which might adversely affect the rights of MFS hereunder; (e) conduct its business in accordance with sound business practices and standards and perform and fulfill all obligations to Customers under Contracts and related marketing materials, brochures and/or agreements delivered to Customers; (f) maintain all licenses and authorizations required by all applicable regulatory authorities; (g) secure, maintain and provide evidence of liability insurance in amounts as may be required by MFS; (h) notify MFS in writing of any change of ownership and/or any change in capitalization; and (i) promptly deliver to MFS such information concerning the financial or other condition of SELLER as MFS may reasonably request.

**14.** **DEFAULT AND REMEDIES:** Upon the occurrence of a Default by, or with respect to, SELLER, MFS may exercise any or all remedies available to MFS under applicable law and as referenced in Section 6.

**15.** **ORIGINATION FEE:** A non-refundable and renewing Origination Fee payable on the Effective Date and each anniversary thereafter during the Term in the amounts set forth on Schedule "A" must accompany application for financing the SELLERS receivables. SELLER hereby acknowledges and agrees that any waiver of the Origination Fee in any year by MFS does not and shall not constitute a waiver of or its right to charge and collect the Origination Fee due in any subsequent year and SELLER is and shall continue to be responsible for the same. This fee covers, among other things, the credit check of the SELLER and to perfect MFS interest in the Purchased Contracts, with the filing of a UCC-1.

**16.** **MISCELLANEOUS:**

SELLER further acknowledges and agrees that an assignment, transfer or sale to a third party in one or a series of related transactions of a fifty percent fully-diluted ownership interest in the individual assets or liabilities directly related to the MFS agreement shall be deemed to be an assignment under this Agreement, which shall require the consent of MFS or an agreed upon guarantee on all contractual obligations by the current SELLER.

(a)    The provisions of this Agreement and the representations, rights and obligations of the parties hereto shall survive the execution and delivery hereof, and except as they relate to entering into further Contracts, shall survive the termination of this Agreement.

(b)    Any notice required to be given hereunder shall be delivered personally, shall be sent by first class mail, , return receipt requested, by overnight courier, or by facsimile or electronic mail, to the respective parties at the addresses given in the preamble of this Agreement, which addresses may be changed by the parties by written notice conforming to the requirements of this Agreement. Any such notice deposited in the mail shall be conclusively deemed delivered to and received by the addressee four (4) days after deposit in the mail, if all of the foregoing conditions of notice shall have been satisfied. All facsimile communications shall be deemed delivered and received on the date of the facsimile, if (1) the transmittal form showing a successful transmittal is retained by the sender, and (b) the facsimile communication is followed by mailing a copy thereof to the addressee of the facsimile in accordance with this paragraph.

(c)    The parties agree that this Agreement has been executed and delivered in, and shall be construed in accordance with the internal laws of the State of California as applied to contracts between California residents entered into and to be performed wholly within California. SELLER hereby consents to the jurisdiction of any local, state or federal court located within the County of San Diego, State of California; provided, however, nothing contained herein shall preclude MFS from commencing

any action hereunder in any Court having jurisdiction thereof.    EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

(d)    If at any time any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement.

(e)    This Agreement together with all schedules and exhibits attached hereto, constitutes the entire agreement between the parties concerning the subject matter hereof and incorporates all representations made in connection with negotiation of the same.    All prior or contemporaneous agreements, understandings, representation, warranties and statements, oral or written, relating to the subject matter hereof are superseded and are null and void. The terms hereof may not be terminated, amended, supplemented or modified orally, but only by an instrument duly executed by each of the parties hereto.  The recitals set forth above are incorporated herein by this reference.

(f)    This Agreement and any amendments hereto shall be binding on and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

(g)    In the event there is any conflict between this Agreement and any ancillary agreements with respect to any Contract, the terms and conditions of this Agreement shall control.

(h)    If either party commences legal proceedings for any relief against the other party arising out this Agreement, the losing party shall pay the prevailing parties legal costs and expenses, including without limitation, reasonable attorney's fees.

(i)    This Agreement may be executed in one or more identical counterparts, all of which shall together constitute one and the same instrument when each party has signed one counterpart. To them as much extent permitted by applicable law, in the event that any signature to this Agreement or any amendment hereto is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

(j)    Additional terms of this Agreement, all of which are hereby incorporated herein by this reference, are set forth in the following schedules, addenda, exhibits or riders attached hereto.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective duly authorized representatives on the date first above written.

SELLER:                                    MFS:

**I DO LENDING, LLC**                      MONTEREY FINANCIAL SERVICES, INC.

a Nevada limited liability corporation     a California Corporation

By: _Dusty Wunderlich_

Print: _Dusty Wunderlich_

Title: _CEO_

Date: _12/1/14_

By: _Shaun Lucas_
Shaun Lucas (Dec 2, 2014)

Print: _Shaun Lucas_

Title: _VP Operations_

Date: _Dec 2, 2014_

**Federal Tax I.D.#** _61-1745649_

# SCHEDULE A

### to that **RECEIVABLES PURCHASE AGREEMENT**
dated November 19, 2014
by and between

**MONTEREY FINANCIAL SERVICES, INC.**
and
**I DO LENDING, LLC**

---

## I.  DESCRIPTION OF SELLERS SERVICES/PRODUCTS:

Wedding dresses and accessories

## II.  PURCHASE PRICE:

The Purchase Price of a Purchased Contract, also understood as a purchase rate, shall be a percentage of the total contract balance (principal, rent charge, residual purchase payment), (the "<u>Contract Balance</u>") owed by the Customer named therein calculated as follows:

    a.  Eighty-three percent (83%) of the Contract Balance for Purchased Contracts payable in zero (0) months to twelve (12) months from the date of assignment to MFS; and

    b.  Eighty-one percent (81%) of the Contract Balance for Purchased Contracts payable in thirteen (13) months to fourteen (14) months from the date of assignment to MFS; and

    c.  Seventy-nine percent (79%) of the Contract Balance for Purchased Contracts payable in fifteen (15) months to sixteen (16) months from the date of assignment to MFS; and

    d.  Seventy-eight percent (78%) of the Contract Balance for Purchased Contracts payable in seventeen (17) months to eighteen (18) months from the date of assignment to MFS; and

The interest rate of the Consumer Contracts purchased at the above rates will be at <u>zero</u> percent (<u>0</u>%) or greater.  For each one percent (1%) drop below this percentage the purchase price will be reduced by one percent (1%).

## III.  ADJUSTMENTS TO PURCHASE PRICE:

The foregoing Purchase Price percentages may be adjusted inversely either up or down on the date of purchase of a Contract by an amount equal to the change in the Three Month LIBOR as published in the Wall Street Journal ("LIBOR") from the first day of each month if the LIBOR rises above the rate of the LIBOR as it is published on the 1st day of the month of the Effective Date of this Agreement, which is <u>0.24</u>%.

## IV.  STIPULATIONS:

---

a. All documents signed and UCC-1 filed.
b. Full recourse
c. Servicing Collateral: Client must maintain a 33% servicing to finance ratio based off of the current outstanding balance in Monterey's finance agency at all times.
d. I Do Lending, LLC will be responsible for any deficiency amount remaining on all contracts where their consumers take advantage of the early payoff option included in the lease agreement, if any is owed, in addition I DO LENDING, LLC will be charged a 9% fee on all early buyout/termination contracts. The 9% fee will be based off of the MFS funding amount on each contract. This fee will remain in place on all contracts regardless of if there is a deficiency amount owed.
e. If the Client defaults on the agreed up deficiency calculation for consumers who have taken advantage of the early buyout option on their lease agreement the Client will be charged the full buyback amount.

## V.    GENERAL FEES:

a. SET-UP FEE:  A fee of zero dollars ($0.00) will be charged on each new Contract purchased.

b. CHARGEBACK FEE:  MFS shall be entitled to a processing fee for any credit card chargeback due to consumer disputes (presently $25.00).  Furthermore, SELLER shall be responsible for any additional fees, fines or penalties which MFS may incur from the merchant providers due to high or excessive consumer disputes or charge-backs.

c. REPURCHASE FEE:  The Repurchase Fee for each Repurchased Contract shall be twenty-five dollars ($25.00).

d. ORIGINATION FEE:  The non-refundable and renewing Origination Fee shall initially be five hundred dollars ($500.00) and shall be renewed on each anniversary of the Effective Date of this Agreement in the amount of two hundred fifty dollars ($250.00).  The initial Origination Fee shall be withheld by MFS from the Purchase Price and/or Servicing Fee of the first Contract(s) purchased or serviced in each year during the Term until the full Origination Fee due for such year has been paid in full (as provided in Section 4(a) of the Agreement).  All renewal Origination Fees shall be invoiced or offset from any amounts due to SELLER from MFS under this Agreement.

## VI.    CUSTOMER CREDIT APPROVAL:

In connection with Contracts to be sold to MFS pursuant to this Agreement, prior to entering into any retail installment agreement or Contract with prospective Customers, for each such prospective Customer SELLER shall may either submit a credit approval application through MFS' proprietary online credit approval system or the consumers must be run through and approved for finance through the I DO LENDING, LLC pre-approval platform. All contracts that are to be purchased by MFS must meet all requirements and follow all attributes previously agreed upon by MFS and I DO LENDING, LLC.  The attributes that must be met are as follow: All consumers must have a 600 or greater Vantage score, Consumer may have no more than 2 charge-off accounts listed on their credit report in the last 24 months, All bankruptcy's listed on the credit report must be closed or discharged, Consumer can have no more than 1 bankruptcy listed on their credit report,, All consumers with a Vantage Score between 600-650 must have a minimum income of $1,500 and shall be approved for a finance amount no greater than $2,500, Consumers with a Vantage score of 650 or greater minimum shall be approved for a max finance amount no

greater than $5,000. These attributes and requirements can also be found in section Listed as Pre-Approval. It is understood and agreed that SELLER shall offer for sale to MFS, each contract which meets the above requirements and is approved.

## VII.    TERM:

The Term of this Agreement is a period of one (1) year(s) commencing on the Effective Date and ending on the first anniversary thereafter.  The Term shall automatically renew unless either party provides the other written notice at least thirty (30) days of its intent not to renew the same; provided, however that, notwithstanding any termination or expiration of this Agreement, SELLER's obligations to MFS shall continue and MFS shall be entitled to collect all outstanding payments under all Purchased Contracts until they have been paid in full.

Notwithstanding the termination of this Agreement due to expiration of its Term, SELLER's obligations to MFS shall continue and MFS shall be entitled to collect all outstanding payments under all Purchased Contracts until they have been paid in full.

## VIII.    SERVICING FEE:

SELLER agrees that MFS shall be entitled to the following fees, all of which, collectively, shall constitute the Servicing Fee:

    a.   A flat rate of four dollars ($4.00) per month will be charged to SELLER for each Account serviced by MFS.

    b.   A one-time processing set-up fee of five dollars ($5.00) will be charged to SELLER per Account.

    c.   MFS shall be entitled to a ten dollar ($10.00) processing fee for any Account cancelled by the SELLER.

    d.   MFS shall be entitled to a credit card chargeback fee of twenty five dollars ($25.00) for each credit card payment chargeback or reversal due to Customer disputes.

    e.   Should SELLER elect to have MFS report the Accounts to the credit reporting agencies, there will be a one time set up fee of two hundred dollars ($200.00), as well as a recurring monthly administrative fee of fifty dollars ($50.00).

    f.   In the event MFS is required to send a coupon book to a customer for ongoing monthly payments, SELLER will be charged a set-up fee of five dollars ($5.00).

    g.   Should SELLER later elect to sell any of the servicing Accounts to MFS, a four dollar ($4.00) account conversion fee will be charged to SELLER for each Account purchased. Said account conversion fee would be deducted from the purchase price payout.

    h.   Should the Accounts be of the type and nature that require SELLER to provide Customers with an IRS Form 1098, and should SELLER request that MFS send said Form 1098 to Customers, MFS shall charge SELLER a fee of five dollars $5.00) for each Form 1098 sent.

Please note that the correct tax payer identification number (TIN) or social security number (SS#) must be included for each Form 1098 filed with the IRS. To the extent that there is a missing or incorrect TIN or SS# associated with the Account placed by SELLER, the IRS may impose a per account fee or penalty. To the extent that MFS incurs any penalties, fees, costs, or expenses associated with an incorrect or missing TIN or SS#, SELLER shall indemnify MFS for the same.

Please also note that MFS shall not issue any Form 1098's for consumers residing outside of the United States of America

i. MFS shall collect and retain all late charges, NSF fees, and consumer payment fees by which it collects from Customers.

j. SELLER shall be responsible for all credit card fees, including but not limited to, per transaction fees and excess chargeback penalties or fines.

k. On a case by case basis MFS may agree from time to time, to arrange for certain additional logistics-related services not expressly set forth in the Agreement or related addenda, including, but not limited to, courier services, special programming, special projects, and or the arrangement of lock box services. Should MFS agree to perform said services on an individual basis, SELLER shall reimburse MFS for all of MFS' costs and expenses related to the performance or procurement of said service. Any reimbursement due hereunder to be deducted from SELLER's monthly payout.

l. SELLER agrees that MFS may adjust the fees set forth herein on an annual basis in an amount not to exceed ten percent (10%).

## IX.    PRIVACY POLICY:

Please be advised that the Federal Trade Commission recently passed the Privacy of Consumer Financial Information Act known as the Gramm-Leach-Bliley Act (the "Act"). Generally, the Act states that on or before July 1, 2001 all businesses must provide to each Customer notices setting forth its privacy policies. This notice must then be sent initially to all new Customers after July 1, 2001 and then annually to all Customers. We can supply you with a copy of the Act upon request.

MFS must send these notices to all Customers under Purchased Contracts. All servicing and collection agency clients of MFS must send this notice to all their customers.

Attached as Exhibit "B" is a sample of the notice MFS will be using. We strongly recommend SELLER review the Act and MFS' notice (if you plan to have MFS send the notice for you) with your attorney to ensure you will comply with the Act.

_____DW_____ Yes, I would like MFS to send the Privacy Policy letter to each of my Consumers for a fee of two dollars and no cents ($2.00) per account. (See attached Exhibit "B").

Should SELLER fail to pay the aforementioned fee, MFS reserves the right to discontinue sending privacy notice.

_____ No, I would not like MFS to send the Privacy Policy letter to each of my Consumers.

---

**ACKNOWLEDGEMENT** (initialed): ____*DW*____    ____*Sv*____
                                        SELLER           MFS

*"THE REMAINDER OF THIS PAGE HAS BEEN LEFT BLANK INTENTIONALLY"*

---

# EXHIBIT A
## FORM OF IRREVOCABLE ASSIGNMENT

FOR VALUE RECEIVED, the undersigned (the "Assignor") hereby sells, assigns and transfers unto MONTEREY FINANCIAL SERVICES, INC., ("MFS") a California corporation ("Assignee"), its successors and assigns, all of Assignor's right, title and interest in and to the contracts, promissory notes, security agreements, membership agreements, instruments and accounts receivable (each, a "Contract" and collectively, the "Contracts") described on the attached Annex A, together with the property described therein, if any, and all rights and remedies thereunder, including all guaranties thereof or collateral security therefore, without recourse or warranty except as provided herein. Assignor authorizes Assignee to collect any and all installments and payments due on each Contract and to take action thereunder which Assignor might otherwise take with respect to each Contract. This Assignment is being delivered pursuant to and upon all of the representations, warranties, covenants and agreements on the part of the undersigned Assignor contained in that certain Receivables Purchase Agreement, dated as of November 19, 2014. (the "Agreement") between Assignor and Assignee, which Agreement contains certain representations, warranties and covenants from Assignor to Assignee, including, without limitation, certain obligations on behalf of the Assignor to repurchase the Contracts or to replace the Contracts upon the terms and conditions set forth therein. This Assignment shall be governed by and interpreted in accordance with the terms of the Agreement and the laws of the State of California. Capitalized terms used herein, which are not defined herein, shall have the meanings set forth in the Agreement.

Assignee may, without notice to Assignor, enter into any settlement, forbearance or other variation in terms in connection with any Contract, or discharge or release the obligations of the Obligor or other person, by operation of law or otherwise, without affecting Assignor's liability hereunder, except that any settlement, forbearance, or other variation by Assignee or its assigns shall not cause Assignor's Repurchase Price to be greater than it would have been in the absence of the settlement, forbearance, or other variation. Assignee's failure or delay in enforcing any right hereunder does not constitute a waiver of that right. Assignor shall not make any collections or repossessions with respect to the Contracts.

Assignor hereby certifies on and as of the date hereof (a) that each and every representation and warranty of the undersigned contained in the Agreement is true and correct on and as of the date hereof in all material respects with the same force and effect as if originally expressed on and as of the date hereof and (b) that each of the conditions set forth in the Agreement with respect to the purchase of the Contracts hereunder has been fulfilled or waived on the date hereof.

Assignor does not delegate and Assignee shall not be required to assume any of the duties, responsibilities, liabilities or obligations of Assignor under any Contract assigned hereunder and Assignor shall remain liable therefore notwithstanding the assignment contained herein.

IN WITNESS WHEREOF, the undersigned has executed this Form Of Irrevocable Assignment to be duly executed this __1st__ day of __December__, 20__14__.

**I DO LENDING, LLC**

By: *Dusty Wunderlich*

Title: __CEO__

# EXHIBIT B
## PRIVACY POLICY

[Principal's Name and Address]                          [Contact Information for Consumers]

### PRIVACY POLICY

This Privacy Policy describes the personal customer information that [Your Company Name Here] collects, whom we share such information with and the circumstances under which we share it, and how we protect such information.

Please read this Privacy Policy carefully.  This Privacy Policy applies to all personally identifiable financial and other information about you that we now have in our possession or that we obtain in the future.  It will continue to apply to you even if you are no longer our customer.  We hope that this Privacy Policy will help you understand how we keep your personal information private and secure while using it to serve you better.

**I.        Personal Information Collected**

In order to provide you with the consistent quality financial services that you desire and to manage our business, it is important that we collect and maintain accurate personal information about you.  We obtain this information from (1) applications and other forms you fill out and submit to us, (2) consumer credit bureaus, and/or (3) a retailer or a party who originally provided you with credit if we purchased your account from such retailer or other party.  For example, we may obtain the following information from the applications and other forms that you have filled out and submitted to us or to a retailer or other party who originally provided you with credit if we purchased your account from such retailer or other party: your name, date of birth, address, social security number, marital status and income.  As another example, in evaluating whether to extend credit to you we may have requested consumer credit bureaus to provide us with information regarding the balances of your loans and your payment history with other lenders.

**II.       Sharing of Personal Information**

We do not share your personal information with others except (1) as necessary to service and update your account, (2) with consumer credit bureaus as permitted by federal law, such as the reporting of account activity, and (3) as otherwise permitted or required by law, such as to protect against fraud or to respond to a subpoena.

**III.      Protection of Personal Information**

We control access to your personal information by restricting access to our employees who need it in order to perform their duties for us and who are trained in the proper handling of such information.  We maintain physical, electronic and procedural safeguards to protect your personal information.

Sincerely,

---

# I DO LENDING, LLC - MPS (5)

EchoSign Document History                    December 02, 2014

| | |
|---|---|
| Created: | December 01, 2014 |
| By: | Dusty Wunderlich (dusty@wagsfinancing.com) |
| Status: | SIGNED |
| Transaction ID: | XHXX73R3Z7L7F5J |

## "I DO LENDING, LLC - MPS (5)" History

Document created by Dusty Wunderlich (dusty@wagsfinancing.com)
December 01, 2014 - 3:51 PM PST - IP address: 71.83.125.162

Document emailed to Shaun Lucas (slucas@montereyfinancial.com) for signature
December 01, 2014 - 3:54 PM PST

Document viewed by Shaun Lucas (slucas@montereyfinancial.com)
December 02, 2014 - 11:38 AM PST - IP address: 12.219.32.98

Document e-signed by Shaun Lucas (slucas@montereyfinancial.com)
Signature Date: December 02, 2014 - 12:38 PM PST - Time Source: server - IP address: 12.219.32.98

Signed document emailed to Shaun Lucas (slucas@montereyfinancial.com) and Dusty Wunderlich (dusty@wagsfinancing.com)
December 02, 2014 - 12:38 PM PST

# EXHIBIT "E"

# EXHIBIT "E"

# RECEIVABLES PURCHASE AGREEMENT

This Receivables Purchase Agreement (hereinafter "Agreement") is entered into as of **November 19, 2014**(the "Effective Date"), by and between **MONTEREY RECEIVABLES FUNDING, LLC** ("MRF"), Delaware limited liability company with its principal place of business located at 4095 Avenida de la Plata, in Oceanside, California 92056 and, **I DO LENDING, LLC** ("SELLER"), a(n) Nevada Limited Liability Corporation, with its principal place of business located at 9484 Double R Blvd Suite B Reno, NV 89521, with respect to the following facts:

## RECITALS

A.    SELLER is in the business of providing certain products and services to various individuals from time to time, and SELLER allows said individuals to finance the cost of such products and services by entering into retail installment contracts, promissory notes, security agreements, membership agreements and/or other instruments (each, a "Contract" and collectively, the "Contracts"). SELLER's services and/or products are described on Schedule "A" attached hereto and incorporated herein by this reference.

B.    MRF is in the business of purchasing instruments such as the Contracts in its ordinary course of business.

NOW, THEREFORE, in consideration of the above promises and of the representations, warranties and agreements contained herein, the parties hereby covenant and agree as follows:

## AGREEMENT

1.    **DEFINITIONS**:  The following terms shall have the following meaning as used in this Agreement.

(a)    "Assignment" means an Irrevocable Assignment substantially in the form attached hereto as Exhibit "A", transferring and assigning to MRF all of SELLER's right, title and interest in and to a Purchased Contract, all payments thereunder and all related guaranties and collateral therefor in a form prescribed by MRF.

(b)    "Authenticate(d)" means to sign, execute or otherwise adopt a symbol or encrypt or similarly process a record in whole or in part, with the present of the authenticating person to identify the person and adopt or accept a record.

(c)    "Contract" has the meaning set forth in Schedule A above and must be in a form approved by MRF.

(d)    "Contract/Credit Application" means an Authenticated Contract (which is in original, executed form if on paper), an original credit application, and/or an original credit report or statement concerning the Customer and any related documents, information and Records from time to time required by MRF in accordance with MRF' standard procedures.

(e)    "Customer" means an individual who enters into a Contract with SELLER.

(f)    "Default" means (i) a breach by SELLER, which has not been cured during any applicable cure period, of any representation, warranty, covenant, term or condition of this Agreement or

of any other agreements to which SELLER is obligated or by which it is bound in connection with a Contract, (ii) a default under any guaranty of the obligations of SELLER hereunder or a default in SELLER's repurchase obligations as set forth in Section 6 hereof, in each case which has not been cured during any applicable cure period, (iii) a default by SELLER under any other agreement by and between SELLER or any affiliate thereof and MRF and any affiliate thereof which has not been cured during any applicable cure period, or (iv) a Material Adverse Change in Financial Condition with respect to SELLER.

       (g)      "Defaulted Contract" has the meaning set forth in Section 6(b) hereof.

       (h)      "Event of Cancellation" shall, with respect to a Contract, refer to (i) a Material Adverse Change in Financial Condition, business or operations of SELLER since the date of this Agreement or of the Customer since the date of the related  Final Contract/Credit Applications; (ii) the occurrence of an event which causes a representation made by the Customer, SELLER or any other party in connection with the Contract or under this Agreement to be or become false or misleading in any material respect whether or not true when made; (iii) a breach of any term of such Contract, or of any related guaranty or credit support agreement, whether by the Customer or SELLER, including without limitation, failure of SELLER to deliver the underlying products or services to any Customer; (iv) any Default; (v) notification by a Customer to SELLER or to MRF of its intent to cancel all or any part of the Contract; or (vi) if the SELLER and/or MRF is named in a lawsuit over the actions or inactions of the SELLER.

       (i)      "Final Contract/Credit Application" means such documents or other Records as MRF shall from time to time require in accordance with its standard procedures in order to complete the purchase of a Contract and to pay the Purchase Price of the Contract to SELLER including, without limitation, (i) an Assignment; (ii) if the Purchased Contract is originally executed in paper form, the one and only executed original of the Purchased Contract; or, (iii) any Uniform Commercial Code financing statements necessary to perfect MRF' interest in the Purchased Contract; and (iv) any other document, instrument or Record required by the terms of MRF' written notice to SELLER pursuant to Section 2 below including, without limitation, any guaranties or security agreements.

       (j)      "Insolvency Event" means, with respect to any person or entity, (1) dissolution, liquidation or failure to operate as a going concern; (2) voluntarily or involuntarily filing bankruptcy, making an assignment, arrangement or composition with or for the benefit of creditors, appointment of a receiver; (2) it shall become insolvent or unable to pay its debts as they become due; or (3) it shall seek or become subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its property; (4) it shall have a secured party take possession of all or substantially all its property or have a distress, execution, attachment, sequestration or other legal process levied or enforced against all or substantially all its property and such secured party shall maintain possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter.

       (k)      "Material Adverse Change in Financial Condition" means a (1) material adverse change in the balance sheet or profit and loss statements or other financial condition or prospects of SELLER or a Customer from time to time, as determined by MRF in its sole discretion; (2) change in the corporate structure or any material change the ownership or capitalization of the SELLER, as determined by MRF in its sole discretion, (3) an Insolvency Event relating to the SELLER.

       (l)      "Origination Fee" means the non-refundable and renewing fee payable from SELLER to MRF on the Effective Date and each annual anniversary thereafter in the amounts set forth on Schedule "A," attached hereto, to cover the expenses of MRF in, among other things, reviewing SELLER

and this transaction including, without limitation, expenses in obtaining credit reports concerning SELLER, in obtaining a Dun and Bradstreet rating concerning SELLER, in performing and title and/or Uniform Commercial Code searches concerning SELLER and in the filing of Uniform Commercial Code financing statements.

(m)    "Purchased Contract" means a Contract, the Customer of which meets all of the credit and income requirements of MRF at the time it is purchased and which MRF elects, in its sole discretion, to purchase pursuant to the terms hereof.

(n)    "Purchase Price," with respect to each Contract, means the amount set forth on the attached Schedule "A".

(o)    "Repurchased Contract" means a Purchased Contract which has been repurchased by SELLER pursuant to the terms hereof.

(p)    "Record" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

(q)    "Repurchase Price" means the price at which SELLER is obligated to repurchase a Purchased Contract from MRF, and shall be an amount equal to (i) the principal outstanding balance of the Purchased Contract as of the original Effective Date of purchase from SELLER, less all payments attributable to principal received by MRF for such Purchased Contract, the result of which shall be multiplied by the original Purchase Price Rate as set forth in Schedule "A" attached hereto; plus (ii) a Repurchase Fee in an amount set forth in Schedule "A" attached hereto.

(r)    "Servicing Contract" means any Contract which MRF has elected not to purchase for any reason and any Repurchased Contracts, which MRF elects, in its sole discretion, to administer and service pursuant to the terms of this Agreement.

(s)    "Servicing Fee," with respect to each Servicing Contract, means the amount set forth on Schedule "A" attached hereto which will be paid by SELLER to MRF as compensation for MRF' administration and servicing of the Servicing Contracts.

(t)    "Term," with respect to this Agreement, means the period of time set forth on Schedule "A" attached hereto; provided, however, that MRF may terminate this Agreement immediately upon notice to SELLER in the event of a Default or upon thirty (30) days notice without Default.

2.    **PURCHASE OF CONTRACTS:**    Subject to the terms and conditions of this Agreement, during the Term, MRF shall have the option, but not the obligation, in its sole discretion and on a case by case basis, to purchase all of SELLER'S right, title and interest in and to the Contracts submitted by SELLER to MRF.MRF shall give I DO LENDING, LLC notice of their intent to stop purchasing and give 30 day notice unless the reason behind Monterey's intent to stop purchasing contracts are for any of the following reason: I DO LENDING, LLC receives excessive Attorney General Complaints, MRF receives any attorney contact about I DO LENDING, LLC, any delinquency issues with I DO LENDING, LLC contracts purchased or serviced by MRF, or I DO LENDING, LLC does not adhere to the Full Recourse guideline set forth in this agreement. If any of the reasons listed above are what has lead MRF to stop purchasing contracts then MRF is not required to give any type of notice. Upon Authentication of a Contract by a Customer, SELLER shall provide to MRF the Contract/Credit Application.  Upon receipt thereof, MRF shall review the Contract/Credit Application and shall notify SELLER whether it elects to exercise its option to purchase such Contract by delivery of written notice to SELLER within five business (5) days after MRF' receipt of the Contract/Credit Application.  MRF'

obligation to purchase any Contracts shall be conditioned upon MRF' receipt of a complete Final Contract/Credit Application with respect thereto in form and substance acceptable to MRF and any other information MRF may reasonably request relating thereto. If MRF exercises its right to purchase a Contract, (a) the Contract that bears the confirmation code entered by the Customer shall be deemed to be the "single, authoritative copy" of such Contract (as such terms are used in section 9-105(1) of the Uniform Commercial Code). (b) such Contract (whether in electronic or hard copy form) may not be altered by SELLER, and may be altered by MRF in accordance with law upon prior written notice to SELLER; (c) any other copies of the Contract printed for any reason shall each be clearly and conspicuously labeled "COPY." In no event shall MRF assume or be delegated any of SELLER's duties, responsibilities, liabilities or obligations to the Customer under any Contract and SELLER shall remain liable therefore notwithstanding any assignment of a Purchased Contract to MRF. The parties agree that MRF shall be entitled to directly receive and retain any and all amounts due and payable under the Purchased Contracts. All Purchased Contracts shall be sold to MRF subject to the representations, warranties, covenants, agreements, terms and conditions set forth in this Agreement, and shall be accompanied by an Assignment. In addition MRF reserves the right to verbally verify the Contract with the Customer thereunder.

3.    **3.    PREAPPROVAL:** I DO LENDING, LLC will be using their own credit approval platform for pre-approval of all contracts to qualify accounts for purchase by MRF. All contracts that are to be purchased by MRF must meet all requirements and follow all attributes previously agreed upon by MRF and I DO LENDING, LLC. The attributes that must be met are as follow: All consumers must have a 600 or greater Vantage score, Consumer may have no more than 2 charge-off accounts listed on their credit report in the last 24 months, All bankruptcy's listed on the credit report must be closed or discharged, Consumer can have no more than 1 bankruptcy listed on their credit report, All consumers with a Vantage Score between 600-650 must have a minimum income of $1,500 and shall be approved for a finance amount no greater than $2,500, Consumers with a Vantage score of 650 or greater minimum shall be approved for a max finance amount no greater than $5,000. These attributes and requirements can also be found in section VI Customer Credit Approval. Any customer approved for purchase through the I DO LENDING, LLC approval platform shall be valid for (30) days from the date of the approval; provided that there are no changes in respect to such customer, the information presented to MRF in connection with the pre-approval process, or the relating contract/ credit application and all other relating therto unchanged. Within said thirty (30) day period, SELLER shall send MRF the original Contract or Record, the original Authenticated Contract/Credit Application, the certificate of completion, if applicable, and employment information, if applicable. If this information is not received by MRF within the thirty (30) day period, MRF will have the option to reject the Contract or to re-qualify the same under MRF' credit guidelines. **FUNDING OF PURCHASE PRICE:**

(a)    Provided that no Event of Cancellation has occurred with respect to a Contract that MRF has elected to purchase, MRF shall, within five (5) business days after SELLER's submission of a complete Final Contract/Credit Application to MRF, pay to SELLER the Purchase Price for each Purchased Contract less (i) the outstanding amount of the Origination Fee, which shall be withheld by MRF from the Purchase Price until the full Origination Fee due for such year (whether it be the initial Origination Fee or the renewal fee, in each case as set forth in Schedule "A") has been paid in full, and (iii) any adjustment to Purchase Price, if applicable, as set forth in Schedule "A".

4.    **REPRESENTATIONS AND WARRANTIES:**

(a)     SELLER hereby represents, warrants and covenants to MRF, its successors and assigns, as of the date hereof, as of the date of submission of each Contract/Credit Application, Final Contract/Credit Application and Assignment in respect of each Contract and during the Term of this Agreement, that:

(1)     If a corporation, partnership or limited liability company, SELLER is duly organized and validly existing and in good standing in the state of its incorporation as such, and has full power to carry on its business as it is presently conducted including, without limitation, the sale of the Contracts, to enter into this Agreement and to carry out the transactions contemplated hereby;

(2)     The execution and delivery of this Agreement, the assignment of the Purchased Contracts to MRF, and the performance by SELLER of the transactions contemplated hereby have been duly authorized by all necessary action, including any action required under SELLER's governing instruments;

(3)     The execution, delivery and performance of this Agreement and the assignment of the Purchased Contracts to MRF, and the execution of any other instrument related to this Agreement, constitute a legal, valid and binding obligation of SELLER enforceable in accordance with its terms, without any offsets or counterclaims, and no further actions are required for SELLER to enter into this Agreement and such other instruments;

(4)     All of SELLER's business operations are duly licensed and permitted under all federal, state and local laws, rules and regulations of any governmental authority;

(5)     SELLER has duly paid any and all license, franchise, corporation or other taxes, fees, imposts, duties or charges levied, assessed or imposed upon it or upon any of its properties of whatsoever kind or description;

(6)     Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will constitute a violation or default of any statute, rule or decree of any court, administrative agency or governmental body to which SELLER is or may be subject;

(7)     There are and will be no agreements between SELLER or its agents and any Customer in connection with any Purchased Contract and no express or implied warranties have been or will be made by SELLER or its agents to such Customer, except as set forth in the Contract;

(8)     SELLER and its agents have not participated in and have no knowledge of any fraudulent and/or misleading act in connection with any Contract or with respect to any Customer;

(9)     Each Customer has presented appropriate documentation to verify his or her identity and has legal capacity to enter such Contract and has not engaged in any fraud or misrepresentation with respect to such Contract and the Authentication provided by the named Customer is genuine;

(10)    If a Contract is in electronic form, (a) SELLER has provided to the Customer all disclosures in such form and manner as may be necessary to create a valid and enforceable electronic contract, (b) the Customer has consented to conducting the electronic transaction in accordance with applicable law; and (c) the Contract was consummated through the SELLER's web site in accordance with applicable law.

(11)    Each Contract is and shall be valid, genuine and enforceable according to its terms (including, but not limited to, terms related to interest rate or time price differential), and each transaction (including the application process and the origination of the Contract) was at the time of its origination and is as of the date of the assignment of the same to MRF in compliance with applicable laws, rules and regulations of any governmental authority whether federal, state, county, municipal or otherwise including, without limitation, usury laws, electronic or digital signature laws, electronic transaction laws, the Federal Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Magnuson-Moss Warranty Act, Federal Reserve Board Regulations B, M and Z, state adaptations of the Consumer Credit Protection Act (or parts thereof) and of the Uniform Consumer Credit Code and any other consumer credit, equal opportunity, disclosure or repossession laws or regulations applicable with respect to a particular Contract;

(12)    Each Contract is a valid deferred payment obligation for the amount therein set forth and such Contract shall not be subject to any disputes, offsets or counterclaims and the property, goods or services described in the Contract have never been the subject of any other Contract between SELLER and the Customer and the Contract has not been rescinded by SELLER or Customer for any reason whatsoever, SELLER is not in breach under any obligation to any Customer under any Contract, and has no actual knowledge of any personal defenses that the Customer could raise against the enforcement of the terms of any Contract; SELLER has no actual knowledge of any facts which may result in the uncollectability or unenforceability of any Contract;

(13)    All credit or other information reasonably relevant to a credit determination concerning the Customer shall be the sole responsibility of the SELLER to be disclosed to MRF and such credit information and all other information supplied by SELLER in connections with any Contract shall be true, complete and correct as of the date submitted; SELLER shall supplement such information as necessary so that such information remains true, complete and correct; SELLER has no knowledge of any facts, which presently or upon the occurrence of certain events in the future, may result in the uncollectability and/or unenforceability of the Contract; SELLER acknowledges that MRF will rely upon information appearing on SELLER's records relating to all Contracts and Final Contracts/Credit Applications, and in light of such acknowledgment, each item of information contained in and appearing on such records accurately reflects their true status;

(14)    Each Contract is current and the Customer is not in default with respect to any term thereunder as of the date of submission of each such Contract/Credit Application, Final Contract/Credit Application and Assignment in respect of each Contract;

(15)    SELLER owns each Contract submitted to MRF hereunder free and clear of any liens, charges, security interests, encumbrances or other restrictions or transfer which may adversely affect MRF' rights with respect thereto, including without limitation, MRF' rights under this Agreement to be the assignee of all Purchased Contracts and to collect all monies due thereunder, SELLER has the absolute right to sell, assign and transfer the contracts free and clear of all rights of third parties, and upon assignment MRF will obtain good title to such Purchased Contract free and clear of any liens, charges, encumbrances or other restrictions whatsoever;

(16)    The execution and delivery by SELLER of this Agreement and the assignment of the Purchased Contracts to MRF and the security interests granted to MRF from time to time pursuant to the terms hereof, do not conflict with or constitute a material breach or default with respect to any indenture, loan or credit agreement, mortgage, lease, deed or other agreement to which it is a party or by which it or its properties are bound and there are no suits or proceedings pending or, to the knowledge of SELLER, threatened in any court or before any regulatory commission, board or other

administrative or governmental agency against or affecting SELLER which could materially impair SELLER's ability to perform its obligations hereunder;

(17)    The financial statements of SELLER delivered to MRF from time to time fairly present the financial position of SELLER as of the date thereof in conformity with generally accepted accounting principles consistently applied and the results of operations of SELLER for the periods covered thereby and do not, as of the date thereof, include any material misstatement or omit to state any material liability, absolute or contingent, and since the date of the latest such financial statements, there has been no Material Adverse Change in the Financial Condition of SELLER;

(18)    There is no litigation or other proceeding pending, or to the best of SELLER's knowledge, threatened against SELLER that would affect SELLER'S ability to perform each and every of its obligations under this Agreement or any Agreement or instrument related hereto;

(19)    SELLER has delivered to Customer all products and services required to be delivered and/or performed in accordance with the Contract;

(20)    No false, fraudulent or misleading representations were made nor were unfair or deceptive trade practices engaged in by SELLER with respect to the Customer or the Contract and no statements, promises or representations about the payment terms under the Contract, except as stated in writing in the Contract;

(21)    SELLER is not insolvent, nor will the SELLER be made insolvent by the transfer or assignment of the Contacts, nor does the SELLER anticipate any pending Insolvency Event;

(22)    Each Contract has been serviced by SELLER in conformity with all applicable laws, rules and regulations and in conformity with SELLER's policies and procedures that are consistent with customary and prudent industry standards; and

(23)    In the event of any (a) transfer of control of SELLER, including, without limitation, any merger, consolidation or reorganization of SELLER with or into any person, firm or entity, where SELLER is not the surviving entity in such merger, consolidation or reorganization ( a "Change of Control Event"), (b) sale, lease conveyance, exchange, transfer or other disposition of all, or substantially all, the assets of SELLER (an "Asset Sale"), or (c) Insolvency Event of SELLER, prior to such event SELLER shall (x) give MRF written notice of the date of such event and, in the event of a Change of Control Event or an Asset Sale, the identity of the surviving or acquiring entity, and (y) purchase all outstanding amounts on the Purchased Contracts at the same rate as originally purchased by MRF hereunder; provided, however, that in the event of a Change of Control Event or an Asset Sale, MRF shall be entitled to elect, in its sole and absolute discretion, to have the surviving or acquiring corporation, as the case may be, to continue to honor the Purchased Contracts and assume SELLER's obligations hereunder, including, without limitation, providing any ongoing services described thereunder, subject to executing such documents as MRF may reasonable request.

(b)    The representations and warranties contained herein shall be deemed to be continuing representations, warranties and covenants of SELLER and shall continue beyond the Term of this Agreement and until all obligations of SELLER hereunder have been fully performed and all sums due to MRF under all Purchased Contracts and hereunder have been paid in full and MRF no longer has any contingent liability to return any amounts which it may have received pursuant to any Purchased Contract.

## 5.    SELLER'S REPURCHASE OBLIGATIONS; MRF' PROTECTION AGAINST LOSSES UPON DEFAULT:

(a)      If (i) SELLER knows or has reason to know that any Contract is not the bona fide legal obligation of the Customer, or any Contract and/or Authoritative Copy of an electronic Contract is the subject of fraud, is invalid, or has been tampered with in any way; (ii) any Contract becomes the subject of an interest rate reduction in accordance with the terms of the Soldier's and Sailor's Civil Relief Act; (iii) any of SELLER's representations or warranties contained in this Agreement shall be materially untrue or incorrect; (iv) any of SELLER's covenants and agreements contained herein shall be breached by SELLER with respect to any particular Purchased Contract(s) and, if capable of being cured, SELLER fails to cure such breach within thirty (30) days after written notice thereof; (v) the Customer does not receive the products and/or services contracted for in the Contract; or (vi) the Customer cancels the Contract pursuant to the terms of such Contract; (vii) if the Customer contact information provided by the SELLER to MRF in the contract and/or credit application proves to be insufficient to the extent that MRF is unable to establish contact within the first 90 days and the Customer's first payment to MRF remains unpaid, then SELLER unconditionally agrees that it will, within thirty (30) days after MRF' written notice and demand to SELLER, either and at MRF' option  (aa) repurchase the Purchased Contract(s) affected by such breach for a price equal to the Repurchase Price; or (bb) replace the Purchased Contract affected by such breach by assigning to MRF all of its right, title and interest in and to Contract(s) owned by SELLER with a price equal to the Repurchase Price, which substituted Contracts shall be subject to review and approval of MRF in its sole discretion.  In such event, MRF agrees to reassign the applicable Purchased Contract to SELLER, AS IS, WHERE IS, WITHOUT RECOURSE OR WARRANTY OF ANY KIND (except that MRF shall represent and warrant that it owns the applicable Purchased Contract and it has not transferred it to a third party).

(b)      In addition to SELLER's obligation to repurchase any Purchased Contracts pursuant to Section 6(a) above, (i) if any installment on a Contract becomes due and remains unpaid for more than ninety (90) days; upon the occurrence of an Insolvency Event with respect to any Customer (each, a "Defaulted Contract" and collectively, the "Defaulted Contracts"), then in any of such events, SELLER shall, within thirty (30) days after MRF' written notice of the Defaulted Contract, either and at MRF' option (x) repurchase the Defaulted Contract; or (y) replace the Defaulted Contract(s) on the terms set forth in Section 6(a) above.  In addition to any remedy set forth herein or available to MRF under applicable law and equity and in addition to any other amounts owed by SELLER to MRF, MRF shall be entitled to offset any and all amounts it and its affiliates and agents incur in connection with collection efforts and efforts to remedy any Default (including, without limitation, any travel costs).

(c)      If SELLER is obligated to repurchase a Purchased Contract for any reason and does not provide MRF with cash or an acceptable replacement Contract(s) as set forth in this Section 6 within thirty (30) days following notice by MRF to SELLER as provided in this Section 6 (the date said notice is given being referred to herein as the "Notice Date"), then interest shall accrue on all amounts owed by SELLER (including, without limitation, the Repurchase Price of any Defaulted Contract and any costs incurred by MRF and its affiliates and agents in connection with collection and remedial efforts relating to any such Defaulted Contract or the repurchase of any Purchased Contract) to MRF at the rate of one and one half percent (1.5%) per month under applicable law from the Notice Date until paid in full.

## 6.    SECURITY AGREEMENT IN COLLATERAL:    To secure the accuracy and full performance of each of SELLER's representations, warranties, covenants and obligations hereunder, SELLER hereby grants to MRF a first priority security interest (the "Security Interest") in all of SELLER's right, title and interest in and to (i) all of the Purchased Contracts, (ii) all proceeds of the foregoing.   The Purchased Contracts and all proceeds of the foregoing are sometimes hereinafter collectively referred to as the "Collateral."    The transactions contemplated hereby are a full and absolute

sale of the Purchased Contracts, subject to the conditions herein and no obligations and/or rights of SELLER hereunder shall in any way be construed to imply or grant SELLER any direct or indirect ownership interest and/or legal or equitable title in and/or to the Purchased Contracts.

**7.    RIGHT OF OFFSET** MRF has the right, without notice to SELLER to offset amounts owed by SELLER to MRF hereunder (including any and all accrued interest) and amounts incurred by MRF and its affiliates and agents in connection with collection and remedial efforts relating to any Default (including, without limitation, any travel costs) against any other amounts payable by MRF to SELLER. Nothing herein shall require MRF to first seek or exhaust any remedy against the Customer, its successors and assigns, or any other person obligated with respect to the Contract, or to first foreclose, exhaust or otherwise proceed against any collateral or security which may be given in connection with the Contract, if any.

**8.    RIGHT TO INSPECT:** MRF (through any of its officers, employees, or agents) shall have the right from time to time hereafter at its sole cost and expense to audit and inspect the books and financial statements of SELLER, and to check, test and appraise the Collateral in order to verify financial condition or the amount, quality, value, condition of, or any other matter relating to Collateral.

**9.    INDEMNIFICATION:**

(a)    SELLER and MRF each hereby agree to defend, indemnify and hold harmless each other, and the other party's affiliates, subsidiaries, employees, officers, directors, shareholders, attorneys and agents, from and against any and all losses, claims, liabilities, demands and expenses whatsoever, including without limitation reasonable attorneys' fees and costs arising out of or in connection with any breach by the indemnifying party of its representations, warranties, covenants or obligations. All indemnities and obligations contained herein shall survive the expiration or termination of the Agreement and the expiration or termination of any Purchased Contract or any Servicing Contract.

(b)    To the extent that SELLER elects to utilize in its operations, including but not limited to, in its individual transactions and dealings with Customers, any form contract, notice, or other written instrument (collectively, "Written Instruments") which MRF may volunteer, supply, or provide to SELLER from time to time, MRF makes no representation or warranty as to the fitness of said Written Instruments and SELLER expressly agrees to hold MRF harmless for the same. Pursuant to Section 5(a)(11) of this Agreement, SELLER represents and warrants that any and all contracts or Written Instruments underlying each Contract is compliant with all applicable law, and is legally binding and fully enforceable.

**10.    SERVICING OF CONTRACTS:**

(a)    As part of the consideration for MRF entering into this Agreement and agreeing to purchase Contracts from SELLER at its discretion, SELLER agrees that during the Term hereof, MRF shall have the option but not the obligation, in MRF' sole discretion, to service, as SELLER's exclusive collection agent, all Servicing Contracts entered into by SELLER and shall be entitled to retain the Servicing Fee for its performance of such services. If MRF elects to administer and service any Servicing Contracts, MRF shall perform the following duties with respect to such Servicing Contracts to the best of its skill and ability: (i) inform each Customer of the billing arrangements, send a welcome letter and a monthly billing statement or coupon book to each Customer of a Servicing Contract, proceed to collect all payments due thereunder by posting and depositing all payments or like monies received on the Servicing Contracts within forty-eight (48) hours of receipt (ii) re-deposit checks, drafts and other items of payment returned to MRF for reasons of "Return to Maker" or "Non-sufficient funds" or words of similar effect

according to MRF' standard collection procedures; (iii) hold all post-dated checks, drafts or other items of payment and deposit them on the date appearing on the check, draft or other item of payment; (iv) use its own funds, tools, supplies and equipment in the performance of its services hereunder, (v) maintain books and records of all Servicing Contracts in accordance with generally accepted accounting principles including, without limitation records concerning principal, interest, late charges, and pre-payments received through pre-authorized debits, checks, drafts or other items of payment and, upon SELLER's written request, give access thereto to SELLER; (vi) provide SELLER monthly with a full and complete accounting in respect of each and every Servicing Contract; (vii) service such delinquent Servicing Contracts with as many telephone calls and letters as MRF deems necessary; (viii) remit to SELLER, on a monthly basis, the Collected Funds less (A) the Servicing Fee, (B) the amount of any funds which MRF is required to return to a Customer for any reason including, without limitations, the Customer's bankruptcy or an erroneous payment, and (C) any other amounts due to MRF which may be offset pursuant to the terms of this Agreement, and (ix) perform such other duties and furnish such reports as are reasonable and customary for billing agents in California.

(b)    SELLER shall fully cooperate with MRF in MRF' performance of the foregoing duties. Notwithstanding the generality of the foregoing, SELLER agrees that it will submit to MRF in a timely manner, each of its Servicing Contracts including the credit statement, the executed Contract, all supporting documentation, the current balance and the date of the next payment in order to enable MRF to arrange for the periodic servicing of such Servicing Contract.

(c)    In the event any legal action or other legal or non-legal proceeding is brought relating to any of the Servicing Contracts, MRF will deliver to SELLER promptly after SELLER's written request therefor, such papers as MRF may have in its possession that SELLER reasonably deems relevant to such action, and SELLER shall be obligated to indemnify MRF pursuant to the terms of Section 10.

(d)    MRF may at any time, in its sole discretion, withdraw from administering and servicing any or all Servicing Contracts.

(e)    SELLER acknowledges and agrees MRF' rights with respect to the Service Contracts shall serve as additional Collateral for the security interest, and in accordance therewith, MRF shall be entitled to retain all Service Contracts until such time as all amounts due MRF under all Purchased Contracts and otherwise hereunder have been paid in full.

**11.    MRF' RIGHTS TO DEAL WITH CONTRACTS:** MRF shall have the right to deal with all Contracts and Customers in the sole exercise of its business judgment and, without limiting the generality of the foregoing, may do the following without notice to or consent by SELLER: (a) amend any Contract or renew or extend the time for payment or performance or grant any other indulgence to any Customer; (b) make any settlements or compromises therewith; (c) demand additional collateral or release any collateral securing such Contract; (d) restructure, defer or otherwise alter payment terms of such Contract; and (e) transfer or assign any of its rights or obligations in regard of any Contract without the prior written consent of SELLER. MRF' and SELLER's rights and obligations hereunder shall remain unaffected by any such activities.

**12.    COVENANTS OF SELLER:** During the Term hereof, SELLER agrees to: (a) cooperate with MRF in giving notice to the Customer of the assignment of the Purchased Contract; (b) comply with all of SELLER's representations, warranties and other statutory and contractual obligations to the Customer; (c) in the event SELLER receives any payment on a Contract, SELLER shall promptly notify MRF of its receipt of the same and promptly forward such payment to MRF and SELLER hereby irrevocably appoints MRF its attorney-in-fact to act in its name and stead in regard of the Contracts,

including without limitation, the right to endorse or sign SELLER's name on all checks, collections, receipts or other documents with regard to the Contracts, as MRF deems necessary or appropriate, in its discretion, to protect MRF' right, title and interest in and to the Contract and any security intended to be afforded thereby, (d) give MRF written notice of any Default hereunder or any claim which might adversely affect the rights of MRF hereunder; (e) conduct its business in accordance with sound business practices and standards and perform and fulfill all obligations to Customers under Contracts and related marketing materials, brochures and/or agreements delivered to Customers; (f) maintain all licenses and authorizations required by all applicable regulatory authorities; (g) secure, maintain and provide evidence of liability insurance in amounts as may be required by MRF; (h) notify MRF in writing of any change of ownership and/or any change in capitalization; and (i) promptly deliver to MRF such information concerning the financial or other condition of SELLER as MRF may reasonably request.

      **13.**    **DEFAULT AND REMEDIES:**  Upon the occurrence of a Default by, or with respect to, SELLER, MRF may exercise any or all remedies available to MRF under applicable law and as referenced in Section 6.

      **14.**    **ORIGINATION FEE:**  A non-refundable and renewing Origination Fee payable on the Effective Date and each anniversary thereafter during the Term in the amounts set forth on Schedule "A" must accompany application for financing the SELLERS receivables.  SELLER hereby acknowledges and agrees that any waiver of the Origination Fee in any year by MRF does not and shall not constitute a waiver of or its right to charge and collect the Origination Fee due in any subsequent year and SELLER is and shall continue to be responsible for the same.  This fee covers, among other things, the credit check of the SELLER and to perfect MRF interest in the Purchased Contracts, with the filing of a UCC-1.

      **15.**    **MISCELLANEOUS:**

SELLER further acknowledges and agrees that an assignment, transfer or sale to a third party in one or a series of related transactions of a fifty percent fully-diluted ownership interest in the  individual assets or liabilities directly related to the MRF agreement shall be deemed to be an assignment under this Agreement, which shall require the consent of MRF or an agreed upon guarantee on all contractual obligations by the current SELLER.

      (a)    The provisions of this Agreement and the representations, rights and obligations of the parties hereto shall survive the execution and delivery hereof, and except as they relate to entering into further Contracts, shall survive the termination of this Agreement.

      (b)    Any notice required to be given hereunder shall be delivered personally, shall be sent by first class mail, , return receipt requested, by overnight courier, or by facsimile or electronic mail, to the respective parties at the addresses given in the preamble of this Agreement, which addresses may be changed by the parties by written notice conforming to the requirements of this Agreement.  Any such notice deposited in the mail shall be conclusively deemed delivered to and received by the addressee four (4) days after deposit in the mail, if all of the foregoing conditions of notice shall have been satisfied.  All facsimile communications shall be deemed delivered and received on the date of the facsimile, if (1) the transmittal form showing a successful transmittal is retained by the sender, and (b) the facsimile communication is followed by mailing a copy thereof to the addressee of the facsimile in accordance with this paragraph.

      (c)    The parties agree that this Agreement has been executed and delivered in, and shall be construed in accordance with the internal laws of the State of California as applied to contracts between California residents entered into and to be performed wholly within California.  SELLER hereby consents to the jurisdiction of any local, state or federal court located within the County of San Diego,

State of California; provided, however, nothing contained herein shall preclude MRF from commencing any action hereunder in any Court having jurisdiction thereof.    EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

        (d)     If at any time any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement.

        (e)     This Agreement together with all schedules and exhibits attached hereto, constitutes the entire agreement between the parties concerning the subject matter hereof and incorporates all representations made in connection with negotiation of the same.    All prior or contemporaneous agreements, understandings, representation, warranties and statements, oral or written, relating to the subject matter hereof are superseded and are null and void. The terms hereof may not be terminated, amended, supplemented or modified orally, but only by an instrument duly executed by each of the parties hereto.  The recitals set forth above are incorporated herein by this reference.

        (f)     This Agreement and any amendments hereto shall be binding on and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

        (g)     In the event there is any conflict between this Agreement and any ancillary agreements with respect to any Contract, the terms and conditions of this Agreement shall control.

        (h)     If either party commences legal proceedings for any relief against the other party arising out this Agreement, the losing party shall pay the prevailing parties legal costs and expenses, including without limitation, reasonable attorney's fees.

        (i)     This Agreement may be executed in one or more identical counterparts, all of which shall together constitute one and the same instrument when each party has signed one counterpart. To them as much extent permitted by applicable law, in the event that any signature to this Agreement or any amendment hereto is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

        (j)     Additional terms of this Agreement, all of which are hereby incorporated herein by this reference, are set forth in the following schedules, addenda, exhibits or riders attached hereto.

      IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective duly authorized representatives on the date first above written.

SELLER:                                  MRF:

**I DO LENDING, LLC**               MONTEREY RECEIVABLES FUNDING, LLC

a Nevada limited liability corporation      a Delaware limited liability company

By: _Dusty Wunderlich_

Print: _Dusty Wunderlich_

Title: _CEO_

Date: _12/1/14_

Federal Tax I.D.# _61-1745649_

By: _Shaun Lucas_
_Shaun Lucas (Dec 2, 2014)_

Print: _Shaun Lucas_

Title: _VP Operations_

Date: _Dec 2, 2014_

# SCHEDULE A

### to that **RECEIVABLES PURCHASE AGREEMENT**
dated November 19, 2014
by and between

### MONTEREY RECEIVABLES FUNDING, LLC
and
### I DO LENDING, LLC

---

**I.    DESCRIPTION OF SELLERS SERVICES/PRODUCTS:**

Wedding dresses and accessories

**II.    PURCHASE PRICE:**

The Purchase Price of a Purchased Contract, also understood as a purchase rate, shall be a percentage of the total contract balance (principal, rent charge, residual purchase payment), (the "Contract Balance") owed by the Customer named therein calculated as follows:

    a.  Eighty-three percent (83%) of the Contract Balance for Purchased Contracts payable in zero (0) months to twelve (12) months from the date of assignment to MRF; and

    b.  Eighty-one percent (81%) of the Contract Balance for Purchased Contracts payable in thirteen (13) months to fourteen (14) months from the date of assignment to MRF; and

    c.  Seventy-nine percent (79%) of the Contract Balance for Purchased Contracts payable in fifteen (15) months to sixteen (16) months from the date of assignment to MRF; and

    d.  Seventy-eight percent (78%) of the Contract Balance for Purchased Contracts payable in seventeen (17) months to eighteen (18) months from the date of assignment to MRF; and

The interest rate of the Consumer Contracts purchased at the above rates will be at zero percent (0%) or greater.  For each one percent (1%) drop below this percentage the purchase price will be reduced by one percent (1%).

**III.    ADJUSTMENTS TO PURCHASE PRICE:**

The foregoing Purchase Price percentages may be adjusted inversely either up or down on the date of purchase of a Contract by an amount equal to the change in the Three Month LIBOR as published in the Wall Street Journal ("LIBOR") from the first day of each month if the LIBOR rises above the rate of the LIBOR as it is published on the 1st day of the month of the Effective Date of this Agreement, which is 0.24%.

**IV.    STIPULATIONS:**

---

a. All documents signed and UCC-1 filed.
b. Full recourse
c. Servicing Collateral: Client must maintain a 33% servicing to finance ratio based off of the current outstanding balance in Monterey's finance agency at all times.
d. I Do Lending, LLC will be responsible for any deficiency amount remaining on all contracts where their consumers take advantage of the early payoff option included in the lease agreement, if any is owed, in addition I DO LENDING, LLC will be charged a 9% fee on all early buyout/termination contracts. The 9% fee will be based off of the MRF funding amount on each contract. This fee will remain in place on all contracts regardless of if there is a deficiency amount owed.
e. If the Client defaults on the agreed up deficiency calculation for consumers who have taken advantage of the early buyout option on their lease agreement the Client will be charged the full buyback amount.

## V.    **GENERAL FEES**:

a. <u>SET-UP FEE</u>:  A fee of zero dollars ($0.00) will be charged on each new Contract purchased.

b. <u>CHARGEBACK FEE</u>:  MRF shall be entitled to a processing fee for any credit card chargeback due to consumer disputes (presently $25.00).  Furthermore, SELLER shall be responsible for any additional fees, fines or penalties which MRF may incur from the merchant providers due to high or excessive consumer disputes or charge-backs.

c. <u>REPURCHASE FEE</u>:  The Repurchase Fee for each Repurchased Contract shall be twenty-five dollars ($25.00).

d. <u>ORIGINATION FEE</u>:  The non-refundable and renewing Origination Fee shall initially be five hundred dollars ($500.00) and shall be renewed on each anniversary of the Effective Date of this Agreement in the amount of two hundred fifty dollars ($250.00).  The initial Origination Fee shall be withheld by MRF from the Purchase Price and/or Servicing Fee of the first Contract(s) purchased or serviced in each year during the Term until the full Origination Fee due for such year has been paid in full (as provided in Section 4(a) of the Agreement).  All renewal Origination Fees shall be invoiced or offset from any amounts due to SELLER from MRF under this Agreement.

## VI.    **CUSTOMER CREDIT APPROVAL**:

In connection with Contracts to be sold to MRF pursuant to this Agreement, prior to entering into any retail installment agreement or Contract with prospective Customers, for each such prospective Customer SELLER shall may either submit a credit approval application through MRF' proprietary online credit approval system or the consumers must be run through and approved for finance through the I DO LENDING, LLC pre-approval platform. All contracts that are to be purchased by MRF must meet all requirements and follow all attributes previously agreed upon by MRF and I DO LENDING, LLC.  The attributes that must be met are as follow: All consumers must have a 600 or greater Vantage score, Consumer may have no more than 2 charge-off accounts listed on their credit report in the last 24 months, All bankruptcy's listed on the credit report must be closed or discharged, Consumer can have no more than 1 bankruptcy listed on their credit report,, All consumers with a Vantage Score between 600-650 must have a minimum income of $1,500 and shall be approved for a finance amount no greater than $2,500, Consumers with a Vantage score of 650 or greater minimum shall be approved for a max finance

amount no greater than $5,000. These attributes and requirements can also be found in section Listed as Pre-Approval. It is understood and agreed that SELLER shall offer for sale to MRF, each contract which meets the above requirements and is approved.

## VII.    TERM:

The Term of this Agreement is a period of one (1) year(s) commencing on the Effective Date and ending on the first anniversary thereafter.  The Term shall automatically renew unless either party provides the other written notice at least thirty (30) days of its intent not to renew the same; provided, however that, notwithstanding any termination or expiration of this Agreement, SELLER's obligations to MRF shall continue and MRF shall be entitled to collect all outstanding payments under all Purchased Contracts until they have been paid in full.

Notwithstanding the termination of this Agreement due to expiration of its Term, SELLER's obligations to MRF shall continue and MRF shall be entitled to collect all outstanding payments under all Purchased Contracts until they have been paid in full.

## VIII.    SERVICING FEE:

SELLER agrees that MRF shall be entitled to the following fees, all of which, collectively, shall constitute the Servicing Fee:

  a.   A flat rate of four dollars ($4.00) per month will be charged to SELLER for each Account serviced by MRF.

  b.   A one-time processing set-up fee of five dollars ($5.00) will be charged to SELLER per Account.

  c.   MRF shall be entitled to a ten dollar ($10.00) processing fee for any Account cancelled by the SELLER.

  d.   MRF shall be entitled to a credit card chargeback fee of twenty five dollars ($25.00) for each credit card payment chargeback or reversal due to Customer disputes.

  e.   Should SELLER elect to have MRF report the Accounts to the credit reporting agencies, there will be a one time set up fee of two hundred dollars ($200.00), as well as a recurring monthly administrative fee of fifty dollars ($50.00).

  f.   In the event MRF is required to send a coupon book to a customer for ongoing monthly payments, SELLER will be charged a set-up fee of five dollars ($5.00).

  g.   Should SELLER later elect to sell any of the servicing Accounts to MRF, a four dollar ($4.00) account conversion fee will be charged to SELLER for each Account purchased. Said account conversion fee would be deducted from the purchase price payout.

  h.   Should the Accounts be of the type and nature that require SELLER to provide Customers with an IRS Form 1098, and should SELLER request that MRF send said Form 1098 to Customers, MRF shall charge SELLER a fee of five dollars $5.00) for each Form 1098 sent.

Please note that the correct tax payer identification number (TIN) or social security number (SS#) must be included for each Form 1098 filed with the IRS. To the extent that there is a missing or incorrect TIN or SS# associated with the Account placed by SELLER, the IRS may impose a per account fee or penalty. To the extent that MRF incurs any penalties, fees, costs, or expenses associated with an incorrect or missing TIN or SS#, SELLER shall indemnify MRF for the same.

Please also note that MRF shall not issue any Form 1098's for consumers residing outside of the United States of America

i.  MRF shall collect and retain all late charges, NSF fees, and consumer payment fees by which it collects from Customers.

j.  SELLER shall be responsible for all credit card fees, including but not limited to, per transaction fees and excess chargeback penalties or fines.

k.  On a case by case basis MRF may agree from time to time, to arrange for certain additional logistics-related services not expressly set forth in the Agreement or related addenda, including, but not limited to, courier services, special programming, special projects, and or the arrangement of lock box services. Should MRF agree to perform said services on an individual basis, SELLER shall reimburse MRF for all of MRF' costs and expenses related to the performance or procurement of said service. Any reimbursement due hereunder to be deducted from SELLER's monthly payout.

l.  SELLER agrees that MRF may adjust the fees set forth herein on an annual basis in an amount not to exceed ten percent (10%).

## IX.  PRIVACY POLICY:

Please be advised that the Federal Trade Commission recently passed the Privacy of Consumer Financial Information Act known as the Gramm-Leach-Bliley Act (the "Act"). Generally, the Act states that on or before July 1, 2001 all businesses must provide to each Customer notices setting forth its privacy policies. This notice must then be sent initially to all new Customers after July 1, 2001 and then annually to all Customers. We can supply you with a copy of the Act upon request.

MRF must send these notices to all Customers under Purchased Contracts. All servicing and collection agency clients of MRF must send this notice to all their customers.

Attached as Exhibit "B" is a sample of the notice MRF will be using. We strongly recommend SELLER review the Act and MRF' notice (if you plan to have MRF send the notice for you) with your attorney to ensure you will comply with the Act.

_____DW_____ Yes, I would like MRF to send the Privacy Policy letter to each of my Consumers for a fee of two dollars and no cents ($2.00) per account. (See attached Exhibit "B").

Should SELLER fail to pay the aforementioned fee, MRF reserves the right to discontinue sending privacy notice.

_____ No, I would not like MRF to send the Privacy Policy letter to each of my Consumers.

---

**ACKNOWLEDGEMENT** (initialed): _____      _____

                                                SELLER                        MRF

*"THE REMAINDER OF THIS PAGE HAS BEEN LEFT BLANK INTENTIONALLY"*

# EXHIBIT A
## FORM OF IRREVOCABLE ASSIGNMENT

FOR VALUE RECEIVED, the undersigned (the "Assignor") hereby sells, assigns and transfers unto MONTEREY RECEIVABLES FUNDING, LLC, ("MRF") a Delaware limited liability company ("Assignee"), its successors and assigns, all of Assignor's right, title and interest in and to the contracts, promissory notes, security agreements, membership agreements, instruments and accounts receivable (each, a "Contract" and collectively, the "Contracts") described on the attached Annex A, together with the property described therein, if any, and all rights and remedies thereunder, including all guaranties thereof or collateral security therefore, without recourse or warranty except as provided herein. Assignor authorizes Assignee to collect any and all installments and payments due on each Contract and to take action thereunder which Assignor might otherwise take with respect to each Contract. This Assignment is being delivered pursuant to and upon all of the representations, warranties, covenants and agreements on the part of the undersigned Assignor contained in that certain Receivables Purchase Agreement, dated as of November 19, 2014. (the "Agreement") between Assignor and Assignee, which Agreement contains certain representations, warranties and covenants from Assignor to Assignee, including, without limitation, certain obligations on behalf of the Assignor to repurchase the Contracts or to replace the Contracts upon the terms and conditions set forth therein. This Assignment shall be governed by and interpreted in accordance with the terms of the Agreement and the laws of the State of California. Capitalized terms used herein, which are not defined herein, shall have the meanings set forth in the Agreement.

Assignee may, without notice to Assignor, enter into any settlement, forbearance or other variation in terms in connection with any Contract, or discharge or release the obligations of the Obligor or other person, by operation of law or otherwise, without affecting Assignor's liability hereunder, except that any settlement, forbearance, or other variation by Assignee or its assigns shall not cause Assignor's Repurchase Price to be greater than it would have been in the absence of the settlement, forbearance, or other variation. Assignee's failure or delay in enforcing any right hereunder does not constitute a waiver of that right. Assignor shall not make any collections or repossessions with respect to the Contracts.

Assignor hereby certifies on and as of the date hereof (a) that each and every representation and warranty of the undersigned contained in the Agreement is true and correct on and as of the date hereof in all material respects with the same force and effect as if originally expressed on and as of the date hereof and (b) that each of the conditions set forth in the Agreement with respect to the purchase of the Contracts hereunder has been fulfilled or waived on the date hereof.

Assignor does not delegate and Assignee shall not be required to assume any of the duties, responsibilities, liabilities or obligations of Assignor under any Contract assigned hereunder and Assignor shall remain liable therefore notwithstanding the assignment contained herein.

IN WITNESS WHEREOF, the undersigned has executed this Form Of Irrevocable Assignment to be duly executed this <u>1st</u> day of <u>December</u>, 2014.

**I DO LENDING, LLC**

By: _Dusty Wunderlich_

Title: <u>CEO</u>

---

# EXHIBIT B
### PRIVACY POLICY

[Principal's Name and Address]                    [Contact Information for Consumers]

### PRIVACY POLICY

This Privacy Policy describes the personal customer information that [Your Company Name Here] collects, whom we share such information with and the circumstances under which we share it, and how we protect such information.

Please read this Privacy Policy carefully.  This Privacy Policy applies to all personally identifiable financial and other information about you that we now have in our possession or that we obtain in the future.  It will continue to apply to you even if you are no longer our customer.  We hope that this Privacy Policy will help you understand how we keep your personal information private and secure while using it to serve you better.

## I.      Personal Information Collected

In order to provide you with the consistent quality financial services that you desire and to manage our business, it is important that we collect and maintain accurate personal information about you.  We obtain this information from (1) applications and other forms you fill out and submit to us, (2) consumer credit bureaus, and/or (3) a retailer or a party who originally provided you with credit if we purchased your account from such retailer or other party.  For example, we may obtain the following information from the applications and other forms that you have filled out and submitted to us or to a retailer or other party who originally provided you with credit if we purchased your account from such retailer or other party: your name, date of birth, address, social security number, marital status and income.  As another example, in evaluating whether to extend credit to you we may have requested consumer credit bureaus to provide us with information regarding the balances of your loans and your payment history with other lenders.

## II.      Sharing of Personal Information

We do not share your personal information with others except (1) as necessary to service and update your account, (2) with consumer credit bureaus as permitted by federal law, such as the reporting of account activity, and (3) as otherwise permitted or required by law, such as to protect against fraud or to respond to a subpoena.

## III.      Protection of Personal Information

We control access to your personal information by restricting access to our employees who need it in order to perform their duties for us and who are trained in the proper handling of such information.  We maintain physical, electronic and procedural safeguards to protect your personal information.

Sincerely,

# EXHIBIT "F"

# EXHIBIT "F"

# RECEIVABLES PURCHASE AGREEMENT

This Receivables Purchase Agreement (hereinafter "Agreement") is entered into as of **June 12, 2015** (the "Effective Date"), by and between **MONTEREY FINANCIAL SERVICES, INC.** ("MFS"), a California Corporation with its principal place of business located at 4095 Avenida de la Plata, in Oceanside, California 92056 and, **ONE ROAD LENDING LLC** ("SELLER"), a(n) Nevada limited liability company, with its principal place of business located at 9484 Double R Blvd Suite B, Reno, Nevada 89521, with respect to the following facts:

## RECITALS

**A.**     SELLER is in the business of providing certain products and services to various individuals from time to time, and SELLER allows said individuals to finance the cost of such products and services by entering into retail installment contracts, promissory notes, security agreements, membership agreements and/or other instruments (each, a "Contract" and collectively, the "Contracts"). SELLER's services and/or products are described on Schedule "A" attached hereto and incorporated herein by this reference.

**B.**     MFS is in the business of purchasing instruments such as the Contracts in its ordinary course of business.

NOW, THEREFORE, in consideration of the above promises and of the representations, warranties and agreements contained herein, the parties hereby covenant and agree as follows:

## AGREEMENT

1.     **DEFINITIONS:** The following terms shall have the following meaning as used in this Agreement.

    (a)     "Assignment" means an Irrevocable Assignment substantially in the form attached hereto as Exhibit "A", transferring and assigning to MFS all of SELLER's right, title and interest in and to a Purchased Contract, all payments thereunder and all related guaranties and collateral therefor in a form prescribed by MFS.

    (b)     "Authenticate(d)" means to sign, execute or otherwise adopt a symbol or encrypt or similarly process a record in whole or in part, with the present of the authenticating person to identify the person and adopt or accept a record.

    (c)     "Contract" has the meaning set forth in Schedule A above and must be in a form approved by MFS.

    (d)     "Contract/Credit Application" means an Authenticated Contract (which is in original, executed form if on paper), an original credit application, and/or an original credit report or statement concerning the Customer and any related documents, information and Records from time to time required by MFS in accordance with MFS' standard procedures.

    (e)     "Customer" means an individual who enters into a Contract with SELLER.

    (f)     "Default" means (i) a breach by SELLER, which has not been cured during any applicable cure period, of any representation, warranty, covenant, term or condition of this Agreement or of any other agreements to which SELLER is obligated or by which it is bound in connection with a Contract, (ii) a default under any guaranty of the obligations of SELLER hereunder or a default in SELLER's repurchase obligations as set forth in Section 6 hereof, in each case which has not been cured during any applicable cure period, (iii) a default by SELLER under any other agreement by and between SELLER or any affiliate thereof and MFS and any affiliate thereof which has not been cured during any applicable cure period, or (iv) a Material Adverse Change in Financial Condition with respect to SELLER.

    (g)     "Defaulted Contract" has the meaning set forth in Section 6(b) hereof.

    (h)     "Event of Cancellation" shall, with respect to a Contract, refer to (i) a Material Adverse Change in Financial Condition, business or operations of SELLER since the date of this Agreement or of the Customer since the date of the related Final Contract/Credit Applications; (ii) the occurrence of an event which causes a representation made by the Customer, SELLER or any other party in connection with the Contract or under this Agreement to be or become false or misleading in any material respect whether or not true when made; (iii) a breach of any term of such Contract, or of any

related guaranty or credit support agreement, whether by the Customer or SELLER, including without limitation, failure of SELLER to deliver the underlying products or services to any Customer; (iv) any Default; (v) notification by a Customer to SELLER or to MFS of its intent to cancel all or any part of the Contract; or (vi) if the SELLER and/or MFS is named in a lawsuit over the actions or inactions of the SELLER.

(i)    "Final Contract/Credit Application" means such documents or other Records as MFS shall from time to time require in accordance with its standard procedures in order to complete the purchase of a Contract and to pay the Purchase Price of the Contract to SELLER including, without limitation, (i) an Assignment; (ii) if the Purchased Contract is originally executed in paper form, the one and only executed original of the Purchased Contract; or, (iii) any Uniform Commercial Code financing statements necessary to perfect MFS' interest in the Purchased Contract; and (iv) any other document, instrument or Record required by the terms of MFS' written notice to SELLER pursuant to Section 2 below including, without limitation, any guaranties or security agreements.

(j)    "Insolvency Event" means, with respect to any person or entity, (1) dissolution, liquidation or failure to operate as a going concern; (2) voluntarily or involuntarily filing bankruptcy, making an assignment, arrangement or composition with or for the benefit of creditors, appointment of a receiver; (2) it shall become insolvent or unable to pay its debts as they become due; or (3) it shall seek or become subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its property; (4) it shall have a secured party take possession of all or substantially all its property or have a distress, execution, attachment, sequestration or other legal process levied or enforced against all or substantially all its property and such secured party shall maintain possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter.

(k)    "Material Adverse Change in Financial Condition" means a (1) material adverse change in the balance sheet or profit and loss statements or other financial condition or prospects of SELLER or a Customer from time to time, as determined by MFS in its sole discretion; (2) change in the corporate structure or any material change the ownership or capitalization of the SELLER, as determined by MFS in its sole discretion, (3) an Insolvency Event relating to the SELLER.

(l)    "Origination Fee" means the non-refundable and renewing fee payable from SELLER to MFS on the Effective Date and each annual anniversary thereafter in the amounts set forth on Schedule "A", attached hereto, to cover the expenses of MFS in, among other things, reviewing SELLER and this transaction including, without limitation, expenses in obtaining credit reports concerning SELLER, in obtaining a Dun and Bradstreet rating concerning SELLER, in performing and title and/or Uniform Commercial Code searches concerning SELLER and in the filing of Uniform Commercial Code financing statements.

(m)    "Purchased Contract" means a Contract, the Customer of which meets all of the credit and income requirements of MFS at the time it is purchased and which MFS elects, in its sole discretion, to purchase pursuant to the terms hereof.

(n)    "Purchase Price," with respect to each Contract, means the amount set forth on the attached Schedule "A".

(o)    "Repurchased Contract" means a Purchased Contract which has been repurchased by SELLER pursuant to the terms hereof.

(p)    "Record" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

(q)    "Repurchase Price" means the price at which SELLER is obligated to repurchase a Purchased Contract from MFS, and shall be an amount equal to (i) the principal outstanding balance of the Purchased Contract as of the original Effective Date of purchase from SELLER, less all payments attributable to principal received by MFS for such Purchased Contract, the result of which shall be multiplied by the original Purchase Price Rate as set forth in Schedule "A" attached hereto; plus (ii) a Repurchase Fee in an amount set forth in Schedule "A" attached hereto.

(r)    "Servicing Contract" means any Contract which MFS has elected not to purchase for any reason and any Repurchased Contracts, which MFS elects, in its sole discretion, to administer and service pursuant to the terms of this Agreement.

(s)    "Servicing Fee," with respect to each Servicing Contract, means the amount set forth on Schedule "A" attached hereto which will be paid by SELLER to MFS as compensation for MFS' administration and servicing of the Servicing Contracts.

(t)    "Term," with respect to this Agreement, means the period of time set forth on Schedule "A" attached hereto; provided, however, that MFS may terminate this Agreement immediately upon notice to SELLER in the event of a Default or upon thirty (30) days notice without Default.

2.    **PURCHASE OF CONTRACTS:** Subject to the terms and conditions of this Agreement, during the Term, MFS shall have the option, but not the obligation, in its sole discretion and on a case by case basis, to purchase all of SELLER'S right, title and interest in and to the Contracts submitted by SELLER to MFS.    MFS shall give ONE ROAD LENDING LLC notice of their intent to stop purchasing and give 30 day notice unless the reason behind Monterey's intent to stop purchasing contracts are for any of the following reason: ONE ROAD LENDING LLC receives excessive Attorney General Complaints, MFS receives any attorney contact about ONE ROAD LENDING LLC, any delinquency issues with ONE ROAD LENDING LLC contracts purchased or serviced by MFS, or ONE ROAD LENDING LLC does not adhere to the Full Recourse guidelines set forth in this agreement. IF any of the reasons listed above are what has lead MFS to stop purchasing contracts then MFS is not required to give any type of notice. Upon Authentication of a Contract by a Customer, SELLER shall provide to MFS the Contract/Credit Application.  Upon receipt thereof, MFS shall review the Contract/Credit Application and shall notify SELLER whether it elects to exercise its option to purchase such Contract by delivery of written notice to SELLER within five business (5) days after MFS' receipt of the Contract/Credit Application. MFS' obligation to purchase any Contracts shall be conditioned upon MFS' receipt of a complete Final Contract/Credit Application with respect thereto in form and substance acceptable to MFS and any other information MFS may reasonably request relating thereto. If MFS exercises its right to purchase a Contract, (a) the Contract that bears the confirmation code entered by the Customer shall be deemed to be the "single, authoritative copy" of such Contract (as such terms are used in section 9-105(1) of the Uniform Commercial Code). (b) such Contract (whether in electronic or hard copy form) may not be altered by SELLER, and may be altered by MFS in accordance with law upon prior written notice to SELLER; (c) any other copies of the Contract printed for any reason shall each be clearly and conspicuously labeled "COPY." In no event shall MFS assume or be delegated any of SELLER's duties, responsibilities, liabilities or obligations to the Customer under any Contract and SELLER shall remain liable therefore notwithstanding any assignment of a Purchased Contract to MFS. The parties agree that MFS shall be entitled to directly receive and retain any and all amounts due and payable under the Purchased Contracts. All Purchased Contracts shall be sold to MFS subject to the representations, warranties, covenants, agreements, terms and conditions set forth in this Agreement, and shall be accompanied by an Assignment.    In addition MFS reserves the right to verbally verify the Contract with the Customer thereunder.

3.    **PREAPPROVAL:** ONE ROAD LENDING LLC will be using their own credit approval platform for pre-approval of all contracts to qualify accounts for purchase by MFS. All contracts that are to be purchased by MFS must meet all requirements and follow all attributes previously agreed upon by MFS and ONE ROAD LENDING LLC. The attributes that must be met are as follow: All consumers must have a 600 or greater Vantage score, Consumer may have no more than 2 charge-off accounts listed on their credit report in the last 24 months, All bankruptcy's listed on the credit report must be closed or discharged, Consumer can have no more than 1 bankruptcy listed on their credit report, All consumers with a Vantage Score between 600-and 630 must have a minimum income of $1,000 and shall be approved for a finance amount no greater than $2,500, Consumers with a Vantage score of 630-659 must have a minimum income of $1,000  and shall be approved for a max finance amount no greater than $ 3,000, Consumers with a Vantage score of 660-720 must have a minimum income of $1,000 and shall be approved for a max finance amount no greater than $ 3,500, and Consumers with a Vantage score of 720+ must have a minimum income of $1,000 and shall be approved for a max finance amount no greater than $ 5,000 . These attributes and requirements can also be found in section VI Customer Credit Approval. Any customer approved for purchase through the ONE ROAD LENDING LLC approval platform shall be valid for (30) days from the date of the approval; provided that there are no changes in respect to such customer, the information presented to MFS in connection with the pre-approval process, or the relating contract/ credit application and all other relating therto unchanged. Within said thirty (30) day period, SELLER shall send MFS the original Contract or Record, the original Authenticated Contract/Credit Application, the certificate of completion, if applicable, and employment information, if applicable.  If this

information is not received by MFS within the thirty (30) day period, MFS will have the option to reject the Contract or to re-qualify the same under MFS' credit guidelines.

4.    <u>FUNDING OF PURCHASE PRICE</u>:

(a)    Provided that no Event of Cancellation has occurred with respect to a Contract that MFS has elected to purchase, MFS shall, within five (5) business days after SELLER's submission of a complete Final Contract/Credit Application to MFS, pay to SELLER the Purchase Price for each Purchased Contract less (i) the outstanding amount of the Origination Fee, which shall be withheld by MFS from the Purchase Price until the full Origination Fee due for such year (whether it be the initial Origination Fee or the renewal fee, in each case as set forth in Schedule "A") has been paid in full, and (iii) any adjustment to Purchase Price, if applicable, as set forth in Schedule "A".

5.    <u>REPRESENTATIONS AND WARRANTIES</u>:

(a)    SELLER hereby represents, warrants and covenants to MFS, its successors and assigns, as of the date hereof, as of the date of submission of each Contract/Credit Application, Final Contract/Credit Application and Assignment in respect of each Contract and during the Term of this Agreement, that:

(1)    If a corporation, partnership or limited liability company, SELLER is duly organized and validly existing and in good standing in the state of its incorporation as such, and has full power to carry on its business as it is presently conducted including, without limitation, the sale of the Contracts, to enter into this Agreement and to carry out the transactions contemplated hereby;

(2)    The execution and delivery of this Agreement, the assignment of the Purchased Contracts to MFS, and the performance by SELLER of the transactions contemplated hereby have been duly authorized by all necessary action, including any action required under SELLER's governing instruments;

(3)    The execution, delivery and performance of this Agreement and the assignment of the Purchased Contracts to MFS, and the execution of any other instrument related to this Agreement, constitute a legal, valid and binding obligation of SELLER enforceable in accordance with its terms, without any offsets or counterclaims, and no further actions are required for SELLER to enter into this Agreement and such other instruments;

(4)    All of SELLER's business operations are duly licensed and permitted under all federal, state and local laws, rules and regulations of any governmental authority;

(5)    SELLER has duly paid any and all license, franchise, corporation or other taxes, fees, imposts, duties or charges levied, assessed or imposed upon it or upon any of its properties of whatsoever kind or description;

(6)    Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will constitute a violation or default of any statute, rule or decree of any court, administrative agency or governmental body to which SELLER is or may be subject;

(7)    There are and will be no agreements between SELLER or its agents and any Customer in connection with any Purchased Contract and no express or implied warranties have been or will be made by SELLER or its agents to such Customer, except as set forth in the Contract;

(8)    SELLER and its agents have not participated in and have no knowledge of any fraudulent and/or misleading act in connection with any Contract or with respect to any Customer;

(9)    Each Customer has presented appropriate documentation to verify his or her identity and has legal capacity to enter such Contract and has not engaged in any fraud or misrepresentation with respect to such Contract and the Authentication provided by the named Customer is genuine;

(10)    If a Contract is in electronic form, (a) SELLER has provided to the Customer all disclosures in such form and manner as may be necessary to create a valid and enforceable electronic contract, (b) the Customer has consented to conducting the electronic transaction in accordance with applicable law; and (c) the Contract was consummated through the SELLER's web site in accordance with applicable law.

(11)    Each Contract is and shall be valid, genuine and enforceable according to its terms (including, but not limited to, terms related to interest rate or time price differential), and each transaction (including the application process and the origination of the Contract) was at the time of its origination and is as of the date of the assignment of the same to MFS in compliance with applicable laws, rules and regulations of any governmental authority whether federal, state, county, municipal or otherwise including, without limitation, usury laws, electronic or digital signature laws, electronic transaction laws, the Federal Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Magnuson-Moss Warranty Act, Federal Reserve Board Regulations B, M and Z, state adaptations of the Consumer Credit Protection Act (or parts thereof) and of the Uniform Consumer Credit Code and any other consumer credit, equal opportunity, disclosure or repossession laws or regulations applicable with respect to a particular Contract;

(12)    Each Contract is a valid deferred payment obligation for the amount therein set forth and such Contract shall not be subject to any disputes, offsets or counterclaims and the property, goods or services described in the Contract have never been the subject of any other Contract between SELLER and the Customer and the Contract has not been rescinded by SELLER or Customer for any reason whatsoever, SELLER is not in breach under any obligation to any Customer under any Contract, and has no actual knowledge of any personal defenses that the Customer could raise against the enforcement of the terms of any Contract; SELLER has no actual knowledge of any facts which may result in the uncollectability or unenforceability of any Contract;

(13)    All credit or other information reasonably relevant to a credit determination concerning the Customer shall be the sole responsibility of the SELLER to be disclosed to MFS and such credit information and all other information supplied by SELLER in connections with any Contract shall be true, complete and correct as of the date submitted; SELLER shall supplement such information as necessary so that such information remains true, complete and correct; SELLER has no knowledge of any facts, which presently or upon the occurrence of certain events in the future, may result in the uncollectability and/or unenforceability of the Contract; SELLER acknowledges that MFS will rely upon information appearing on SELLER's records relating to all Contracts and Final Contracts/Credit Applications, and in light of such acknowledgment, each item of information contained in and appearing on such records accurately reflects their true status;

(14)    Each Contract is current and the Customer is not in default with respect to any term thereunder as of the date of submission of each such Contract/Credit Application, Final Contract/Credit Application and Assignment in respect of each Contract;

(15)    SELLER owns each Contract submitted to MFS hereunder free and clear of any liens, charges, security interests, encumbrances or other restrictions or transfer which may adversely affect MFS' rights with respect thereto, including without limitation, MFS' rights under this Agreement to be the assignee of all Purchased Contracts and to collect all monies due thereunder, SELLER has the absolute right to sell, assign and transfer the contracts free and clear of all rights of third parties, and upon assignment MFS will obtain good title to such Purchased Contract free and clear of any liens, charges, encumbrances or other restrictions whatsoever;

(16)    The execution and delivery by SELLER of this Agreement and the assignment of the Purchased Contracts to MFS and the security interests granted to MFS from time to time pursuant to the terms hereof, do not conflict with or constitute a material breach or default with respect to any indenture, loan or credit agreement, mortgage, lease, deed or other agreement to which it is a party or by which it or its properties are bound and there are no suits or proceedings pending or, to the knowledge of SELLER, threatened in any court or before any regulatory commission, board or other administrative or governmental agency against or affecting SELLER which could materially impair SELLER's ability to perform its obligations hereunder;

(17)    The financial statements of SELLER delivered to MFS from time to time fairly present the financial position of SELLER as of the date thereof in conformity with generally accepted accounting principles consistently applied and the results of operations of SELLER for the periods covered thereby and do not, as of the date thereof, include any material misstatement or omit to state any material liability, absolute or contingent, and since the date of the latest such financial statements, there has been no Material Adverse Change in the Financial Condition of SELLER;

(18)    There is no litigation or other proceeding pending, or to the best of SELLER's knowledge, threatened against SELLER that would affect SELLER'S ability to perform each and every of its obligations under this Agreement or any Agreement or instrument related hereto;

(19)    SELLER has delivered to Customer all products and services required to be delivered and/or performed in accordance with the Contract;

(20)    No false, fraudulent or misleading representations were made nor were unfair or deceptive trade practices engaged in by SELLER with respect to the Customer or the Contract and no statements, promises or representations about the payment terms under the Contract, except as stated in writing in the Contract;

(21)    SELLER is not insolvent, nor will the SELLER be made insolvent by the transfer or assignment of the Contacts, nor does the SELLER anticipate any pending Insolvency Event;

(22)    Each Contract has been serviced by SELLER in conformity with all applicable laws, rules and regulations and in conformity with SELLER's policies and procedures that are consistent with customary and prudent industry standards; and

(23)    In the event of any (a) transfer of control of SELLER, including, without limitation, any merger, consolidation or reorganization of SELLER with or into any person, firm or entity, where SELLER is not the surviving entity in such merger, consolidation or reorganization ( a "Change of Control Event"), (b) sale, lease conveyance, exchange, transfer or other disposition of all, or substantially all, the assets of SELLER (an "Asset Sale"), or (c) Insolvency Event of SELLER, prior to such event SELLER shall (x) give MFS written notice of the date of such event and, in the event of a Change of Control Event or an Asset Sale, the identity of the surviving or acquiring entity, and (y) purchase all outstanding amounts on the Purchased Contracts at the same rate as originally purchased by MFS hereunder; provided, however, that in the event of a Change of Control Event or an Asset Sale, MFS shall be entitled to elect, in its sole and absolute discretion, to have the surviving or acquiring corporation, as the case may be, to continue to honor the Purchased Contracts and assume SELLER's obligations hereunder, including, without limitation, providing any ongoing services described thereunder, subject to executing such documents as MFS may reasonable request.

(b)    The representations and warranties contained herein shall be deemed to be continuing representations, warranties and covenants of SELLER and shall continue beyond the Term of this Agreement and until all obligations of SELLER hereunder have been fully performed and all sums due to MFS under all Purchased Contracts and hereunder have been paid in full and MFS no longer has any contingent liability to return any amounts which it may have received pursuant to any Purchased Contract.

## 6.    SELLER'S REPURCHASE OBLIGATIONS; MFS' PROTECTION AGAINST LOSSES UPON DEFAULT:

(a)    If (i) SELLER knows or has reason to know that any Contract is not the bona fide legal obligation of the Customer, or any Contract and/or Authoritative Copy of an electronic Contract is the subject of fraud, is invalid, or has been tampered with in any way; (ii) any Contract becomes the subject of an interest rate reduction in accordance with the terms of the Soldier's and Sailor's Civil Relief Act; (iii) any of SELLER's representations or warranties contained in this Agreement shall be materially untrue or incorrect; (iv) any of SELLER's covenants and agreements contained herein shall be breached by SELLER with respect to any particular Purchased Contract(s) and, if capable of being cured, SELLER fails to cure such breach within thirty (30) days after written notice thereof; (v) the Customer does not receive the products and/or services contracted for in the Contract; or (vi) the Customer cancels the Contract pursuant to the terms of such Contract; (vii) if the Customer contact information provided by the SELLER to MFS in the contract and/or credit application proves to be insufficient to the extent that MFS is unable to establish contact within the first 90 days and the Customer's first payment to MFS remains unpaid, then SELLER unconditionally agrees that it will, within thirty (30) days after MFS' written notice and demand to SELLER, either and at MFS' option (aa) repurchase the Purchased Contract(s) affected by such breach for a price equal to the Repurchase Price; or (bb) replace the Purchased Contract affected by such breach by assigning to MFS all of its right, title and interest in and to Contract(s) owned by SELLER with a price equal to the Repurchase Price, which substituted Contracts shall be subject to review and approval of MFS in its sole discretion. In such event, MFS agrees to reassign the applicable Purchased Contract to SELLER, AS IS, WHERE IS, WITHOUT RECOURSE OR WARRANTY OF ANY KIND

(except that MFS shall represent and warrant that it owns the applicable Purchased Contract and it has not transferred it to a third party).

(b)    In addition to SELLER's obligation to repurchase any Purchased Contracts pursuant to Section 6(a) above, (i) if any installment on a Contract becomes due and remains unpaid for more than ninety (90) days; upon the occurrence of an Insolvency Event with respect to any Customer (each, a "Defaulted Contract" and collectively, the "Defaulted Contracts"), then in any of such events, SELLER shall, within thirty (30) days after MFS' written notice of the Defaulted Contract, either and at MFS' option (x) repurchase the Defaulted Contract; or (y) replace the Defaulted Contract(s) on the terms set forth in Section 6(a) above. In addition to any remedy set forth herein or available to MFS under applicable law and equity and in addition to any other amounts owed by SELLER to MFS, MFS shall be entitled to offset any and all amounts it and its affiliates and agents incur in connection with collection efforts and efforts to remedy any Default (including, without limitation, any travel costs).

(c)    If SELLER is obligated to repurchase a Purchased Contract for any reason and does not provide MFS with cash or an acceptable replacement Contract(s) as set forth in this Section 6 within thirty (30) days following notice by MFS to SELLER as provided in this Section 6 (the date said notice is given being referred to herein as the "Notice Date"), then interest shall accrue on all amounts owed by SELLER (including, without limitation, the Repurchase Price of any Defaulted Contract and any costs incurred by MFS and its affiliates and agents in connection with collection and remedial efforts relating to any such Defaulted Contract or the repurchase of any Purchased Contract) to MFS at the rate of one and one half percent (1.5%) per month under applicable law from the Notice Date until paid in full.

7.    **SECURITY AGREEMENT IN COLLATERAL**: To secure the accuracy and full performance of each of SELLER's representations, warranties, covenants and obligations hereunder, SELLER hereby grants to MFS a first priority security interest (the "Security Interest") in all of SELLER's right, title and interest in and to (i) all of the Purchased Contracts, (ii) all of the Serviced Contracts, (iii) all proceeds of the foregoing. The Purchased Contracts, Serviced Contracts, and all proceeds of the foregoing are sometimes hereinafter collectively referred to as the "Collateral." The transactions contemplated hereby are a full and absolute sale of the Purchased Contracts, subject to the conditions herein and no obligations and/or rights of SELLER hereunder shall in any way be construed to imply or grant SELLER any direct or indirect ownership interest and/or legal or equitable title in and/or to the Purchased Contracts.

8.    **RIGHT OF OFFSET** MFS has the right, without notice to SELLER to offset amounts owed by SELLER to MFS hereunder (including any and all accrued interest) and amounts incurred by MFS and its affiliates and agents in connection with collection and remedial efforts relating to any Default (including, without limitation, any travel costs) against (i) proceeds from Serviced Contracts, (ii) Proceeds from Collection Contracts, and (iii) any other amounts payable by MFS to SELLER. Nothing herein shall require MFS to first seek or exhaust any remedy against the Customer, its successors and assigns, or any other person obligated with respect to the Contract, or to first foreclose, exhaust or otherwise proceed against any collateral or security which may be given in connection with the Contract, if any.

9.    **RIGHT TO INSPECT**: MFS (through any of its officers, employees, or agents) shall have the right from time to time hereafter at its sole cost and expense to audit and inspect the books and financial statements of SELLER, and to check, test and appraise the Collateral in order to verify financial condition or the amount, quality, value, condition of, or any other matter relating to Collateral.

10.    **INDEMNIFICATION**:

(a)    SELLER and MFS each hereby agree to defend, indemnify and hold harmless each other, and the other party's affiliates, subsidiaries, employees, officers, directors, shareholders, attorneys and agents, from and against any and all losses, claims, liabilities, demands and expenses whatsoever, including without limitation reasonable attorneys' fees and costs arising out of or in connection with any breach by the indemnifying party of its representations, warranties, covenants or obligations. All indemnities and obligations contained herein shall survive the expiration or termination of the Agreement and the expiration or termination of any Purchased Contract or any Servicing Contract.

(b)    To the extent that SELLER elects to utilize in its operations, including but not limited to, in its individual transactions and dealings with Customers, any form contract, notice, or other written instrument (collectively, "Written Instruments") which MFS may volunteer, supply, or provide to SELLER from time to time, MFS makes no representation or warranty as to the fitness of said Written Instruments and SELLER expressly agrees to hold MFS harmless for the same.

Pursuant to Section 5(a)(11) of this Agreement, SELLER represents and warrants that any and all contracts or Written Instruments underlying each Contract is compliant with all applicable law, and is legally binding and fully enforceable.

**11.    SERVICING OF CONTRACTS:**

(a)    As part of the consideration for MFS entering into this Agreement and agreeing to purchase Contracts from SELLER at its discretion, SELLER agrees that during the Term hereof, MFS shall have the option but not the obligation, in MFS' sole discretion, to service, as SELLER's exclusive collection agent, all Servicing Contracts entered into by SELLER and shall be entitled to retain the Servicing Fee for its performance of such services. If MFS elects to administer and service any Servicing Contracts, MFS shall perform the following duties with respect to such Servicing Contracts to the best of its skill and ability: (i) inform each Customer of the billing arrangements, send a welcome letter and a monthly billing statement or coupon book to each Customer of a Servicing Contract, proceed to collect all payments due thereunder by posting and depositing all payments or like monies received on the Servicing Contracts within forty-eight (48) hours of receipt (ii) re-deposit checks, drafts and other items of payment returned to MFS for reasons of "Return to Maker" or "Non-sufficient funds" or words of similar effect according to MFS' standard collection procedures; (iii) hold all post-dated checks, drafts or other items of payment and deposit them on the date appearing on the check, draft or other item of payment; (iv) use its own funds, tools, supplies and equipment in the performance of its services hereunder, (v) maintain books and records of all Servicing Contracts in accordance with generally accepted accounting principles including, without limitation records concerning principal, interest, late charges, and pre-payments received through pre-authorized debits, checks, drafts or other items of payment and, upon SELLER's written request, give access thereto to SELLER; (vi) provide SELLER monthly with a full and complete accounting in respect of each and every Servicing Contract; (vii) service such delinquent Servicing Contracts with as many telephone calls and letters as MFS deems necessary; (viii) remit to SELLER, on a monthly basis, the Collected Funds less (A) the Servicing Fee, (B) the amount of any funds which MFS is required to return to a Customer for any reason including, without limitations, the Customer's bankruptcy or an erroneous payment, and (C) any other amounts due to MFS which may be offset pursuant to the terms of this Agreement, and (ix) perform such other duties and furnish such reports as are reasonable and customary for billing agents in California.

(b)    SELLER shall fully cooperate with MFS in MFS' performance of the foregoing duties. Notwithstanding the generality of the foregoing, SELLER agrees that it will submit to MFS in a timely manner, each of its Servicing Contracts including the credit statement, the executed Contract, all supporting documentation, the current balance and the date of the next payment in order to enable MFS to arrange for the periodic servicing of such Servicing Contract.

(c)    In the event any legal action or other legal or non-legal proceeding is brought relating to any of the Servicing Contracts, MFS will deliver to SELLER promptly after SELLER's written request therefor, such papers as MFS may have in its possession that SELLER reasonably deems relevant to such action, and SELLER shall be obligated to indemnify MFS pursuant to the terms of Section 10.

(d)    MFS may at any time, in its sole discretion, withdraw from administering and servicing any or all Servicing Contracts.

(e)    SELLER acknowledges and agrees MFS' rights with respect to the Service Contracts shall serve as additional Collateral for the security interest, and in accordance therewith, MFS shall be entitled to retain all Service Contracts until such time as all amounts due MFS under all Purchased Contracts and otherwise hereunder have been paid in full.

**12.    MFS' RIGHTS TO DEAL WITH CONTRACTS:** MFS shall have the right to deal with all Contracts and Customers in the sole exercise of its business judgment and, without limiting the generality of the foregoing, may do the following without notice to or consent by SELLER: (a) amend any Contract or renew or extend the time for payment or performance or grant any other indulgence to any Customer; (b) make any settlements or compromises therewith; (c) demand additional collateral or release any collateral securing such Contract; (d) restructure, defer or otherwise alter payment terms of such Contract; and (e) transfer or assign any of its rights or obligations in regard of any Contract without the prior written consent of SELLER. MFS' and SELLER's rights and obligations hereunder shall remain unaffected by any such activities.

**13.    COVENANTS OF SELLER:** During the Term hereof, SELLER agrees to: (a) cooperate with MFS in giving notice to the Customer of the assignment of the Purchased Contract; (b) comply with all of SELLER's representations, warranties and other statutory and contractual obligations to the Customer; (c) in the event SELLER receives any payment on

a Contract, SELLER shall promptly notify MFS of its receipt of the same and promptly forward such payment to MFS and SELLER hereby irrevocably appoints MFS its attorney-in-fact to act in its name and stead in regard of the Contracts, including without limitation, the right to endorse or sign SELLER's name on all checks, collections, receipts or other documents with regard to the Contracts, as MFS deems necessary or appropriate, in its discretion, to protect MFS' right, title and interest in and to the Contract and any security intended to be afforded thereby, (d) give MFS written notice of any Default hereunder or any claim which might adversely affect the rights of MFS hereunder; (e) conduct its business in accordance with sound business practices and standards and perform and fulfill all obligations to Customers under Contracts and related marketing materials, brochures and/or agreements delivered to Customers; (f) maintain all licenses and authorizations required by all applicable regulatory authorities; (g) secure, maintain and provide evidence of liability insurance in amounts as may be required by MFS; (h) notify MFS in writing of any change of ownership and/or any change in capitalization; and (i) promptly deliver to MFS such information concerning the financial or other condition of SELLER as MFS may reasonably request.

14.    **DEFAULT AND REMEDIES:**  Upon the occurrence of a Default by, or with respect to, SELLER, MFS may exercise any or all remedies available to MFS under applicable law and as referenced in Section 6.

15.    **ORIGINATION FEE:**  A non-refundable and renewing Origination Fee payable on the Effective Date and each anniversary thereafter during the Term in the amounts set forth on Schedule "A" must accompany application for financing the SELLERS receivables.  SELLER hereby acknowledges and agrees that any waiver of the Origination Fee in any year by MFS does not and shall not constitute a waiver of or its right to charge and collect the Origination Fee due in any subsequent year and SELLER is and shall continue to be responsible for the same.  This fee covers, among other things, the credit check of the SELLER and to perfect MFS interest in the Purchased Contracts, with the filing of a UCC-1.

16.    **MISCELLANEOUS:**

(a)    SELLER further acknowledges and agrees that an assignment, transfer or sale to a third party in one or a series of related transactions of a fifty percent fully-diluted ownership interest in the individual assets or liabilities directly related to the MFS agreement shall be deemed to be an assignment under this Agreement, which shall require the consent of MFS or an agreed upon guarantee on all contractual obligations by the current SELLER.

(b)    The provisions of this Agreement and the representations, rights and obligations of the parties hereto shall survive the execution and delivery hereof, and except as they relate to entering into further Contracts, shall survive the termination of this Agreement.

(c)    Any notice required to be given hereunder shall be delivered personally, shall be sent by first class mail, , return receipt requested, by overnight courier, or by facsimile or electronic mail, to the respective parties at the addresses given in the preamble of this Agreement, which addresses may be changed by the parties by written notice conforming to the requirements of this Agreement.  Any such notice deposited in the mail shall be conclusively deemed delivered to and received by the addressee four (4) days after deposit in the mail, if all of the foregoing conditions of notice shall have been satisfied. All facsimile communications shall be deemed delivered and received on the date of the facsimile, if (1) the transmittal form showing a successful transmittal is retained by the sender, and (b) the facsimile communication is followed by mailing a copy thereof to the addressee of the facsimile in accordance with this paragraph.

(d)    The parties agree that this Agreement has been executed and delivered in, and shall be construed in accordance with the internal laws of the State of California as applied to contracts between California residents entered into and to be performed wholly within California.  SELLER hereby consents to the jurisdiction of any local, state or federal court located within the County of San Diego, State of California; provided, however, nothing contained herein shall preclude MFS from commencing any action hereunder in any Court having jurisdiction thereof.    EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

(e)    If at any time any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement.

(f)      This Agreement together with all schedules and exhibits attached hereto, constitutes the entire agreement between the parties concerning the subject matter hereof and incorporates all representations made in connection with negotiation of the same.  All prior or contemporaneous agreements, understandings, representation, warranties and statements, oral or written, relating to the subject matter hereof are superseded and are null and void. The terms hereof may not be terminated, amended, supplemented or modified orally, but only by an instrument duly executed by each of the parties hereto.  The recitals set forth above are incorporated herein by this reference.

(g)      This Agreement and any amendments hereto shall be binding on and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

(h)      In the event there is any conflict between this Agreement and any ancillary agreements with respect to any Contract, the terms and conditions of this Agreement shall control.

(i)      If either party commences legal proceedings for any relief against the other party arising out this Agreement, the losing party shall pay the prevailing parties legal costs and expenses, including without limitation, reasonable attorney's fees.

(j)      This Agreement may be executed in one or more identical counterparts, all of which shall together constitute one and the same instrument when each party has signed one counterpart.  To them as much extent permitted by applicable law, in the event that any signature to this Agreement or any amendment hereto is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

(k)      Additional terms of this Agreement, all of which are hereby incorporated herein by this reference, are set forth in the following schedules, addenda, exhibits or riders attached hereto.


IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective duly authorized representatives on the date first above written.

SELLER:                                                    MFS:


ONE ROAD LENDING LLC                    MONTEREY FINANCIAL SERVICES, INC.

a Nevada limited liability company              a California Corporation


By: _Dusty Wunderlich_                            By: : _Shan Lucas_

Print: _Dustin Wunderlich_                        Print: _Shaun Lucas_

Title: _CEO_                                              Title: _EVP_

Date: _06/12/2015_                                    Date: _6-12-15_


Federal Tax I.D.#

# SCHEDULE A

to that **RECEIVABLES PURCHASE AGREEMENT**
dated June 12, 2015
by and between

**MONTEREY FINANCIAL SERVICES, INC.**
and
**ONE ROAD LENDING LLC**

---

**I.    DESCRIPTION OF SELLERS SERVICES/PRODUCTS:**

Rims and Tire sales

**II.    PURCHASE PRICE:**

The Purchase Price of a Purchased Contract, also understood as a purchase rate, shall be a percentage of the total contract balance (principal, rent charge, residual purchase payment), (the "Contract Balance") owed by the Customer named therein calculated as follows:

   a.  Eighty-four percent (84%) of the Contract Balance for Purchased Contracts payable in zero (0) months to twelve (12) months from the date of assignment to MFS; and

The interest rate of the Consumer Contracts purchased at the above rates will be at zero percent (0%) or greater.  For each one percent (1%) drop below this percentage the purchase price will be reduced by one percent (1%).

**III.    ADJUSTMENTS TO PURCHASE PRICE:**

The foregoing Purchase Price percentages may be adjusted inversely either up or down on the date of purchase of a Contract by an amount equal to the change in the Three Month LIBOR as published in the Wall Street Journal ("LIBOR") from the first day of each month if the LIBOR rises above the rate of the LIBOR as it is published on the 1st day of the month of the Effective Date of this Agreement, which is 0.27%.

**IV.    STIPULATIONS:**

   a.  All docs signed and UCC-1 Filed
   b.  Full Recourse
   c.  Servicing Collateral: ONE ROAD LENDING LLC must maintain a 33% servicing to finance ratio based off of the current outstanding balance in Monterey's finance agencies at all times.
   d.  Contracts must have a Vantage score of 550 or greater to be considered collateral towards the 33% servicing collateral stipulation listed as IV(c) in the stipulations.
   e.  ONE ROAD LENDING LLC will be responsible to pay Monterey any deficiency amount, if any between what was funded to ONE ROAD LENDING LLC by MFS and what MFS has collected through the consumer's monthly payments and the early buyout payment.
   f.  In addition to the deficiency amount, if any is owed, ONE ROAD LENDING LLC will be charged a 9% fee on all early buyout/termination contracts. The 9% fee will be based off of the MFS funding amount on each contract. This fee will remain in place on all contracts regardless of if there is a deficiency amount owed.

---

V.    **GENERAL FEES:**

    a.    SET-UP FEE: A fee of zero dollars ($0.00) will be charged on each new Contract purchased.

    b.    CHARGEBACK FEE: MFS shall be entitled to a processing fee for any credit card chargeback due to consumer disputes (presently $25.00). Furthermore, SELLER shall be responsible for any additional fees, fines or penalties which MFS may incur from the merchant providers due to high or excessive consumer disputes or charge-backs.

    c.    REPURCHASE FEE: The Repurchase Fee for each Repurchased Contract shall be twenty-five dollars ($25.00).

    d.    ORIGINATION FEE: The non-refundable and renewing Origination Fee shall initially be five hundred dollars ($500.00) and shall be renewed on each anniversary of the Effective Date of this Agreement in the amount of two hundred fifty dollars ($250.00). The initial Origination Fee shall be withheld by MFS from the Purchase Price and/or Servicing Fee of the first Contract(s) purchased or serviced in each year during the Term until the full Origination Fee due for such year has been paid in full (as provided in Section 4(a) of the Agreement). All renewal Origination Fees shall be invoiced or offset from any amounts due to SELLER from MFS under this Agreement.

VI.    **CUSTOMER CREDIT APPROVAL:**

In connection with Contracts to be sold to MFS pursuant to this Agreement, prior to entering into any retail installment agreement or Contract with prospective Customers, for each such prospective Customer SELLER shall may either submit a credit approval application through MFS' proprietary online credit approval system or the consumers must be run through and approved for finance through the ONE ROAD LENDING LLC pre-approval platform. All contracts that are to be purchased by MFS must meet all requirements and follow all attributes previously agreed upon by MFS and ONE ROAD LENDING LLC. The attributes that must be met are as follow: All consumers must have a 600 or greater Vantage score, Consumer may have no more than 2 charge-off accounts listed on their credit report in the last 24 months, All bankruptcy's listed on the credit report must be closed or discharged, Consumer can have no more than 1 bankruptcy listed on their credit report,, All consumers with a Vantage Score between 600-650 must have a minimum income of $1,500 and shall be approved for a finance amount no greater than $2,500, Consumers with a Vantage score of 650 or greater minimum shall be approved for a max finance amount no greater than $5,000. These attributes and requirements can also be found in section Listed as Pre-Approval. It is understood and agreed that SELLER shall offer for sale to MFS, each contract which meets the above requirements and is approved.

VII.    **TERM:**

The Term of this Agreement is a period of one (1) year(s) commencing on the Effective Date and ending on the first anniversary thereafter. The Term shall automatically renew unless either party provides the other written notice at least thirty (30) days of its intent not to renew the same; provided, however that, notwithstanding any termination or expiration of this Agreement, SELLER's obligations to MFS shall continue and MFS shall be entitled to collect all outstanding payments under all Purchased Contracts until they have been paid in full.


Notwithstanding the termination of this Agreement due to expiration of its Term, SELLER's obligations to MFS shall continue and MFS shall be entitled to collect all outstanding payments under all Purchased Contracts until they have been paid in full.

VIII.    **SERVICING FEE:**

SELLER agrees that MFS shall be entitled to the following fees, all of which, collectively, shall constitute the Servicing Fee:

    a.    A flat rate of four dollars ($4.00) per month will be charged to SELLER for each Account serviced by MFS.

    b.    A one-time processing set-up fee of five dollars ($5.00) will be charged to SELLER per Account.

c. MFS shall be entitled to a ten dollar ($10.00) processing fee for any Account cancelled by the SELLER.

d. MFS shall be entitled to a credit card chargeback fee of twenty five dollars ($25.00) for each credit card payment chargeback or reversal due to Customer disputes.

e. Should SELLER elect to have MFS report the Accounts to the credit reporting agencies, there will be a one time set up fee of two hundred dollars ($200.00), as well as a recurring monthly administrative fee of fifty dollars ($50.00).

f. In the event MFS is required to send a coupon book to a customer for ongoing monthly payments, SELLER will be charged a set-up fee of five dollars ($5.00).

g. Should SELLER later elect to sell any of the servicing Accounts to MFS, a four dollar ($4.00) account conversion fee will be charged to SELLER for each Account purchased. Said account conversion fee would be deducted from the purchase price payout.

h. Should the Accounts be of the type and nature that require SELLER to provide Customers with an IRS Form 1098, and should SELLER request that MFS send said Form 1098 to Customers, MFS shall charge SELLER a fee of five dollars $5.00) for each Form 1098 sent.

Please note that the correct tax payer identification number (TIN) or social security number (SS#) must be included for each Form 1098 filed with the IRS. To the extent that there is a missing or incorrect TIN or SS# associated with the Account placed by SELLER, the IRS may impose a per account fee or penalty. To the extent that MFS incurs any penalties, fees, costs, or expenses associated with an incorrect or missing TIN or SS#, SELLER shall indemnify MFS for the same.

Please also note that MFS shall not issue any Form 1098's for consumers residing outside of the United States of America

i. MFS shall collect and retain all late charges, NSF fees, and consumer payment fees by which it collects from Customers.

j. SELLER shall be responsible for all credit card fees, including but not limited to, per transaction fees and excess chargeback penalties or fines.

k. On a case by case basis MFS may agree from time to time, to arrange for certain additional logistics-related services not expressly set forth in the Agreement or related addenda, including, but not limited to, courier services, special programming, special projects, and or the arrangement of lock box services. Should MFS agree to perform said services on an individual basis, SELLER shall reimburse MFS for all of MFS' costs and expenses related to the performance or procurement of said service. Any reimbursement due hereunder to be deducted from SELLER's monthly payout.

l. SELLER agrees that MFS may adjust the fees set forth herein on an annual basis in an amount not to exceed ten percent (10%).

IX.    **PRIVACY POLICY:**

Please be advised that the Federal Trade Commission recently passed the Privacy of Consumer Financial Information Act known as the Gramm-Leach-Bliley Act (the "Act"). Generally, the Act states that on or before July 1, 2001 all businesses must provide to each Customer notices setting forth its privacy policies. This notice must then be made available initially to all new Customers after July 1, 2001 and then annually to all Customers. We can supply you with a copy of the Act upon request.

MFS must provide these notices to all Customers under Purchased Contracts. All servicing and collection agency clients of MFS must provide this notice to all their customers.

Attached as Exhibit "C" is a sample of the notice MFS will be using. We strongly recommend SELLER review the Act and MFS' notice (if you plan to have MFS provide the notice for you) to ensure you will comply with the Act.

_____Yes, I would like MFS to provide the Privacy Policy to each of my Consumers for a fee of two dollars and no cents ($2.00) per account. (See attached Exhibit "C"). Should SELLER fail to pay the aforementioned fee, MFS reserves the right to discontinue providing privacy notice.

_____No, I would not like MFS to provide the Privacy Policy to each of my Consumers.

ACKNOWLEDGEMENT (initialed):    _____*DW*_____    _____*S.L*_____
                                        SELLER                  MFS

INITIAL HERE

*"THE REMAINDER OF THIS PAGE HAS BEEN LEFT BLANK INTENTIONALLY"*

# EXHIBIT A
## FORM OF IRREVOCABLE ASSIGNMENT

FOR VALUE RECEIVED, the undersigned (the "Assignor") hereby sells, assigns and transfers unto **MONTEREY FINANCIAL SERVICES, INC.,** ("MFS") a California Corporation ("Assignee"), its successors and assigns, all of Assignor's right, title and interest in and to the contracts, promissory notes, security agreements, membership agreements, instruments and accounts receivable (each, a "Contract" and collectively, the "Contracts") described on the attached Annex A, together with the property described therein, if any, and all rights and remedies thereunder, including all guaranties thereof or collateral security therefore, without recourse or warranty except as provided herein. Assignor authorizes Assignee to collect any and all installments and payments due on each Contract and to take action thereunder which Assignor might otherwise take with respect to each Contract. This Assignment is being delivered pursuant to and upon all of the representations, warranties, covenants and agreements on the part of the undersigned Assignor contained in that certain Receivables Purchase Agreement, dated as of June 12, 2015. (the "Agreement") between Assignor and Assignee, which Agreement contains certain representations, warranties and covenants from Assignor to Assignee, including, without limitation, certain obligations on behalf of the Assignor to repurchase the Contracts or to replace the Contracts upon the terms and conditions set forth therein. This Assignment shall be governed by and interpreted in accordance with the terms of the Agreement and the laws of the State of California. Capitalized terms used herein, which are not defined herein, shall have the meanings set forth in the Agreement.

Assignee may, without notice to Assignor, enter into any settlement, forbearance or other variation in terms in connection with any Contract, or discharge or release the obligations of the Obligor or other person, by operation of law or otherwise, without affecting Assignor's liability hereunder, except that any settlement, forbearance, or other variation by Assignee or its assigns shall not cause Assignor's Repurchase Price to be greater than it would have been in the absence of the settlement, forbearance, or other variation. Assignee's failure or delay in enforcing any right hereunder does not constitute a waiver of that right. Assignor shall not make any collections or repossessions with respect to the Contracts.

Assignor hereby certifies on and as of the date hereof (a) that each and every representation and warranty of the undersigned contained in the Agreement is true and correct on and as of the date hereof in all material respects with the same force and effect as if originally expressed on and as of the date hereof and (b) that each of the conditions set forth in the Agreement with respect to the purchase of the Contracts hereunder has been fulfilled or waived on the date hereof.

Assignor does not delegate and Assignee shall not be required to assume any of the duties, responsibilities, liabilities or obligations of Assignor under any Contract assigned hereunder and Assignor shall remain liable therefore notwithstanding the assignment contained herein.

IN WITNESS WHEREOF, the undersigned has executed this Form Of Irrevocable Assignment to be duly executed this 12 day of June , 20 15

**ONE ROAD LENDING LLC**

By: _Dusty Wunderlich_

Title: CEO

SIGN HERE

# EXHIBIT B
## NON-DISCLOSURE AGREEMENT

This Non-Disclosure Agreement (the "Agreement") is made and entered into as of the last date set forth below by and between MONTEREY FINANCIAL SERVICES, INC., a California Corporation ("MFS") and the individual or entity identified below ("Company").

MONTEREY FINANCIAL SERVICES, INC. and the Company are evaluating a potential business relationship (hereinafter, the "Proposed Business Relationship") pursuant to which they may disclose to each other certain Confidential Information (as defined below). MFS and the Company each desire to share in confidence some of such Confidential Information in their possession with one another on the condition that each party provides proper safeguards to protect the other party's Confidential Information. The party providing Confidential Information in each case is called the "Disclosing Party"; the party receiving the Confidential Information is called the "Receiving Party." For purposes of this Agreement, each party hereto shall be deemed to include any parent and/or subsidiary companies under common control.

In consideration of the foregoing and of the mutual covenants and agreements hereinafter set forth and intending to be legally bound, the parties hereby agree as follows:

**1. Definition of Confidential Information.** "Confidential Information" shall mean, with respect to a party hereto, all information or material which (i) gives that party some competitive business advantage or the opportunity of obtaining such advantage or the disclosure of which could be detrimental to the interests of that party; or (ii) which is either (A) marked "Confidential," "Restricted," or "Proprietary Information" or other similar marking, (B) known by the parties to be considered confidential and proprietary or (C) from all the relevant circumstances should reasonably be assumed to be confidential and proprietary, including without limitation, the Proposed Business Relationship and any and all discussion, negotiations or conversations stemming therefrom. Notwithstanding the foregoing, Confidential Information shall not be information which: (i) has entered the public domain through no action or failure to act of Receiving Party; (ii) prior to disclosure hereunder was already lawfully in Receiving Party's possession without any obligation of confidentiality; (iii) subsequent to disclosure hereunder is obtained by Receiving Party on a nonconfidential basis from a third party who has the right to disclose such information to Receiving Party; or (iv) is ordered to be or otherwise required to be disclosed by Receiving Party by a court of law or other governmental body provided, however, that Disclosing Party is notified of such order or requirement and given a reasonable opportunity to intervene.

**1. Non-Disclosure.** Receiving Party agrees to: (i) keep confidential the negotiations and discussions regarding the Proposed Business Relationship as well as the Confidential Information; (ii) use the same degree of care (and in no event less than reasonable care) in protecting the Confidential Information that Receiving Party would use to protect its own Confidential Information of a similar nature; (iii) not to copy, publish, show, or disclose any information

relating to the Confidential Information and/or Proposed Business Relationship or discussions thereof; and (iv) to return the Confidential Information to Disclosing Party in accordance with Section 6. Receiving Party will not show or otherwise disclose the contents of the Confidential Information to any third parties without Disclosing Party's written consent.

**2. Removal of Notices.** Receiving Party shall not remove any copyright, trade mark, service mark or other proprietary rights notice attached to or included in any Confidential Information furnished by Disclosing Party.

**3. Use of Confidential Information.** The Confidential Information shall be used by Receiving Party solely as permitted hereunder. Each party agrees not to use Confidential Information of the other party for its own or any third party's benefit. RECEIVING PARTY ACKNOWLEDGES THAT THE CONFIDENTIAL INFORMATION IS RECEIVED "AS IS" FOR EVALUATION PURPOSES ONLY AND IS NOT TO BE RELIED UPON FOR ANY PURPOSE EXCEPT AS SET FORTH IN WRITING BY DISCLOSING PARTY. Disclosing Party makes no representations or warranties as to the accuracy, completeness, condition, suitability or performance of the Confidential Information, and Disclosing Party shall have no liability whatsoever to Receiving Party resulting from its use of the Confidential Information.

**4. Reservation of Rights.** All rights not expressly granted by this Agreement are retained by Disclosing Party. Each party recognizes and agrees that nothing contained in this Agreement will be construed as granting any rights to a Receiving Party, by license or otherwise, to use any of the Disclosing Party's Confidential Information except as specified in this Agreement. All Confidential Information shall remain the property of Disclosing Party.

**5. Return of Confidential Information.** Receiving Party shall destroy or return to Disclosing Party, at Disclosing Party sole option, all Confidential Information that Receiving Party possesses, regardless of whether the Confidential Information is in written, graphic or machine-readable form upon the earlier of: (i) completion of Receiving Party's review; or (ii) within five (5) business days of the request of Disclosing Party.

**6. Injunctive Relief.** Receiving Party acknowledges that Disclosing Party will be irreparably harmed if Receiving Party's obligations under this Agreement are not specifically enforced and that Disclosing Party would not have an adequate remedy at law in the event of an actual or threatened violation by Receiving Party of its obligations. Therefore, Receiving Party agrees that Disclosing Party shall be entitled to an injunction or any appropriate decree of specific performance for any actual or threatened violations or breaches by Receiving Party or its employees and agents without the necessity of Disclosing Party showing actual damages or that monetary damages would not afford an adequate remedy.

**7. No Required Disclosure or Further Obligation.** Nothing contained herein shall be construed as requiring either party to disclose any Confidential Information to the other. Any such disclosure shall be made in the sole discretion of the Disclosing Party. Neither party shall be under any obligation of any kind whatsoever to enter into any further agreement with the other party by reason of this Agreement.

**8. Non-circumvention; Non-Solicitation.** Upon execution of this Agreement and for a period of one (1) year thereafter both parties agree not to solicit any employee or of the other without the prior

written consent of the other party. Each party agrees that it shall not, directly or indirectly, circumvent the other with respect to such party's actual, proposed or potential business plans and opportunities.

**9.** **Term.** Except as provided herein, this Agreement, and all rights and obligations contained herein, shall terminate five (5) years from the Effective Date (except for trade secrets, which shall be held in confidence for so long as they are protected under applicable law as trade secrets).

**10.** **General.**

11.1 Governing Law and Venue. This Agreement shall be governed by and construed in accordance with the laws of the State of California without reference to the principles of conflict of laws. Except for actions seeking injunctive relief (which may be brought in any appropriate jurisdiction) suit under this Agreement shall only be brought in a court of competent jurisdiction in the County of San Diego, State of California. This choice of venue is intended by the parties to be mandatory and not permissive in nature, and to preclude the possibility of litigation between the parties with respect to, or arising out of, this Agreement in any jurisdiction other than that specified in this Section. Each party waives any right it may have to assert the doctrine of forum non conveniens or similar doctrine or to object to venue with respect to any proceeding brought in accordance with this Section.

11.2 Severability. If for any reason a court of competent jurisdiction finds any provision of this Agreement, or portion thereof, to be unenforceable, that provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement shall continue in full force and effect.

11.3 Survival. The provisions of Sections 3 through 5, inclusive, and 11 of this Agreement shall survive any expiration or termination of this Agreement.

11.4 No Joint Venture. The Parties hereto agree that this Agreement is for the purposes of protecting Disclosing Party's Confidential Information only. This Agreement is not a joint venture or other such business arrangement; and any agreement between the Parties as to any existing or future business activities is or will be set forth in other or subsequent written agreements, respectively.

11.5 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Agreement and all of which, when taken together, shall be deemed to constitute one and the same Agreement.

11.6 Entire Agreement. This Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements or understandings. This Agreement shall not be modified except in writing signed by both Parties.

The Parties hereto have executed this Agreement by their duly authorized representatives with full rights, power and authority to enter into and perform this Agreement.

**"MFS"**

**MONTEREY FINANCIAL SERVICES, INC.**

By: _Shaun Lucas_
Print Name: _Shaun Lucas_
Print Title: _EVP_
Date: _6-12-15_

**"Company"**

**ONE ROAD LENDING LLC**

By: _Dusty Wunderlich_
Print Name: Dustin Wunderlich
Print Title: CEO
Date: 06/12/2015

SIGN HERE

# EXHIBIT C

| FACTS | WHAT DOES MONTEREY FINANCIAL SERVICES, INC. DO WITH YOUR PERSONAL INFORMATION? |
|---|---|

Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share and protect your personal information. Please read this notice carefully to understand what we do.

The types of personal information we collect and share depend on the product or service you have with us. This information can include:

- Social Security number and income
- Credit history and payment history
- Credit scores and employment information

When you are *no longer* our customer, we continue to share your information as described in this notice.

All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons MONTEREY FINANCIAL SERVICES, INC. chooses to share; and whether you can limit this sharing.

| | | |
|---|---|---|
| For our everyday business purposes— such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, report to credit bureaus, or for optional Debt Protection Program. | Yes | No |
| For our marketing purposes— to offer our products and services to you | No | No |
| For joint marketing with other financial companies | No | No |
| For our affiliates' everyday business purposes— information about your transactions and experiences | No | No |
| For our affiliates' everyday business purposes— information about your creditworthiness | No | No |
| For nonaffiliates to market to you | No | No |

Call (877) 399-6374    or go to montereyfinancial.com

**Page 2**

| | |
|---|---|
| Who is providing this notice? | MONTEREY FINANCIAL SERVICES, INC. |
| How does MONTEREY FINANCIAL SERVICES, INC. protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| How does MONTEREY FINANCIAL SERVICES, INC. collect my personal information? | We collect your personal information, for example, when you<br><br>☒ Applications or other forms you submit to us<br>☒ Consumer credit bureaus<br>☒ A retailer or other party who originally provided you with credit if we purchased your account from such retailer or other party |
| Why can't I limit all sharing? | Federal law gives you the right to limit only<br><br>☒ sharing for affiliates' everyday business purposes—information about your creditworthiness<br>☒ affiliates from using your information to market to you<br>☒ sharing for nonaffiliates to market to you<br><br>State laws and individual companies may give you additional rights to limit sharing. |
| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>☒ MONTEREY FINANCIAL SERVICES, INC. does not share with it's affiliates. |
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>☒ MONTEREY FINANCIAL SERVICES, INC. does not share with nonaffiliates. |
| Joint marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br><br>☒ MONTEREY FINANCIAL SERVICES, INC. does not joint market. |

Your account#:

# EXHIBIT "G"

# EXHIBIT "G"

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

# RECEIVABLES PURCHASE AGREEMENT

This Receivables Purchase Agreement (hereinafter "Agreement") is entered into as of **February 27, 2017** (the "Effective Date"), by and between **MONTEREY FINANCIAL SERVICES, LLC** ("MFS"), a California limited liability company with its principal place of business located at 4095 Avenida de la Plata, in Oceanside, California 92056 and, **BOON LLC** ("SELLER"), a(n) Nevada Limited Liability Company, with its principal place of business located at 9484 Double R Blvd Suite B, Reno, Nevada 89521, with respect to the following facts:

## RECITALS

A.     SELLER is in the business of providing certain products and services to various individuals from time to time, and SELLER allows said individuals to finance the cost of such products and services by entering into retail installment contracts, promissory notes, security agreements, membership agreements and/or other instruments (each, a "Contract" and collectively, the "Contracts"). SELLER's services and/or products are described on Schedule "A" attached hereto and incorporated herein by this reference.

B.     MFS is in the business of purchasing instruments such as the Contracts in its ordinary course of business.

NOW, THEREFORE, in consideration of the above promises and of the representations, warranties and agreements contained herein, the parties hereby covenant and agree as follows:

## AGREEMENT

1.     **DEFINITIONS:** The following terms shall have the following meaning as used in this Agreement.

(a)     "Assignment" means an Irrevocable Assignment substantially in the form attached hereto as Exhibit "A", transferring and assigning to MFS all of SELLER's right, title and interest in and to a Purchased Contract, all payments thereunder and all related guaranties and collateral therefor in a form prescribed by MFS.

(b)     "Authenticate(d)" means to sign, execute or otherwise adopt a symbol or encrypt or similarly process a record in whole or in part, with the present of the authenticating person to identify the person and adopt or accept a record.

(c)     "Contract" has the meaning set forth in Schedule A above and must be in a form approved by MFS.

(d)     "Contract/Credit Application" means an Authenticated Contract (which is in original, executed form if on paper), an original credit application, and/or an original credit report or statement concerning the Customer and any related documents, information and Records from time to time required by MFS in accordance with MFS' standard procedures.

(e)     "Customer" means an individual who enters into a Contract with SELLER.

(f)     "Default" means (i) a breach by SELLER, which has not been cured during any applicable cure period, of any representation, warranty, covenant, term or condition of this Agreement or of any other agreements to which SELLER is obligated or by which it is bound in connection with a Contract, (ii) a default under any guaranty of the obligations of SELLER hereunder or a default in SELLER's repurchase obligations as set forth in Section 6 hereof, in each case which has not been cured during any applicable cure period, (iii) a default by SELLER under any other agreement by and between SELLER or any affiliate thereof and MFS and any affiliate thereof which has not been cured during any applicable cure period, or (iv) a Material Adverse Change in Financial Condition with respect to SELLER.

(g)     "Defaulted Contract" has the meaning set forth in Section 6(b) hereof.

(h)     "Event of Cancellation" shall, with respect to a Contract, refer to (i) a Material Adverse Change in Financial Condition, business or operations of SELLER since the date of this Agreement or of the Customer since the date of the related  Final Contract/Credit Applications; (ii) the occurrence of an event which causes a representation made by the Customer, SELLER or any other party in connection with the Contract or under this Agreement to be or become false or

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

misleading in any material respect whether or not true when made; (iii) a breach of any term of such Contract, or of any related guaranty or credit support agreement, whether by the Customer or SELLER, including without limitation, failure of SELLER to deliver the underlying products or services to any Customer; (iv) any Default; (v) notification by a Customer to SELLER or to MFS of its intent to cancel all or any part of the Contract; or (vi) if the SELLER and/or MFS is named in a lawsuit over the actions or inactions of the SELLER.

(i)    "Final Contract/Credit Application" means such documents or other Records as MFS shall from time to time require in accordance with its standard procedures in order to complete the purchase of a Contract and to pay the Purchase Price of the Contract to SELLER including, without limitation, (i) an Assignment; (ii) if the Purchased Contract is originally executed in paper form, the one and only executed original of the Purchased Contract; or, (iii) any Uniform Commercial Code financing statements necessary to perfect MFS' interest in the Purchased Contract; and (iv) any other document, instrument or Record required by the terms of MFS' written notice to SELLER pursuant to Section 2 below including, without limitation, any guaranties or security agreements.

(j)    "Insolvency Event" means, with respect to any person or entity, (1) dissolution, liquidation or failure to operate as a going concern; (2) voluntarily or involuntarily filing bankruptcy, making an assignment, arrangement or composition with or for the benefit of creditors; appointment of a receiver; (2) it shall become insolvent or unable to pay its debts as they become due; or (3) it shall seek or become subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its property; (4) it shall have a secured party take possession of all or substantially all its property or have a distress, execution, attachment, sequestration or other legal process levied or enforced against all or substantially all its property and such secured party shall maintain possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter.

(k)    "Material Adverse Change in Financial Condition" means a (1) material adverse change in the balance sheet or profit and loss statements or other financial condition or prospects of SELLER or a Customer from time to time, as determined by MFS in its sole discretion; (2) change in the corporate structure or any material change the ownership or capitalization of the SELLER, as determined by MFS in its sole discretion, (3) an Insolvency Event relating to the SELLER.

(l)    "Origination Fee" means the non-refundable and renewing fee payable from SELLER to MFS on the Effective Date and each annual anniversary thereafter in the amounts set forth on Schedule "A", attached hereto, to cover the expenses of MFS in, among other things, reviewing SELLER and this transaction including, without limitation, expenses in obtaining credit reports concerning SELLER, in obtaining a Dun and Bradstreet rating concerning SELLER, in performing and title and/or Uniform Commercial Code searches concerning SELLER and in the filing of Uniform Commercial Code financing statements.

(m)    "Purchased Contract" means a Contract, the Customer of which meets all of the credit and income requirements of MFS at the time it is purchased and which MFS elects, in its sole discretion, to purchase pursuant to the terms hereof.

(n)    "Purchase Price," with respect to each Contract, means the amount set forth on the attached Schedule "A".

(o)    "Repurchased Contract" means a Purchased Contract which has been repurchased by SELLER pursuant to the terms hereof.

(p)    "Record" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

(q)    "Repurchase Price" means the price at which SELLER is obligated to repurchase a Purchased Contract from MFS, and shall be an amount equal to (i) the principal outstanding balance of the Purchased Contract as of the original Effective Date of purchase from SELLER, less all payments attributable to principal received by MFS for such Purchased Contract, the result of which shall be multiplied by the original Purchase Price Rate as set forth in Schedule "A" attached hereto; plus (ii) a Repurchase Fee in an amount set forth in Schedule "A" attached hereto.

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

(r)    "Servicing Contract" means any Contract which MFS has elected not to purchase for any reason and any Repurchased Contracts, which MFS elects, in its sole discretion, to administer and service pursuant to the terms of this Agreement.

(s)    "Servicing Fee," with respect to each Servicing Contract, means the amount set forth on Schedule "A" attached hereto which will be paid by SELLER to MFS as compensation for MFS' administration and servicing of the Servicing Contracts.

(t)    "Term," with respect to this Agreement, means the period of time set forth on Schedule "A" attached hereto; provided, however, that MFS may terminate this Agreement immediately upon notice to SELLER in the event of a Default or upon thirty (30) days notice without Default.

2.    **PURCHASE OF CONTRACTS:** Subject to the terms and conditions of this Agreement, during the Term, MFS shall have the option, but not the obligation, in its sole discretion and on a case by case basis, to purchase all of SELLER'S right, title and interest in and to the Contracts submitted by SELLER to MFS.    MFS shall give BOON LLC notice of their intent to stop purchasing and give 30 day notice unless the reason behind Monterey's intent to stop purchasing contracts are for any of the following reason: BOON LLC receives excessive Attorney General Complaints, MFS receives any attorney contact about BOON LLC, any delinquency issues with BOON LLC contracts purchased or serviced by MFS, or BOON LLC does not adhere to the Full Recourse guideline set forth in this agreement. If any of the reasons listed above are what has lead MFS to stop purchasing contracts then MFS is not required to give any type of notice. Upon Authentication of a Contract by a Customer, SELLER shall provide to MFS the Contract/Credit Application. Upon receipt thereof, MFS shall review the Contract/Credit Application and shall notify SELLER whether it elects to exercise its option to purchase such Contract by delivery of written notice to SELLER within five business (5) days after MFS' receipt of the Contract/Credit Application.    MFS' obligation to purchase any Contracts shall be conditioned upon MFS' receipt of a complete Final Contract/Credit Application with respect thereto in form and substance acceptable to MFS and any other information MFS may reasonably request relating thereto.  If MFS exercises its right to purchase a Contract, (a) the Contract that bears the confirmation code entered by the Customer shall be deemed to be the "single, authoritative copy" of such Contract (as such terms are used in section 9-105(1) of the Uniform Commercial Code). (b) such Contract (whether in electronic or hard copy form) may not be altered by SELLER, and may be altered by MFS in accordance with law upon prior written notice to SELLER; (c) any other copies of the Contract printed for any reason shall each be clearly and conspicuously labeled "COPY."  In no event shall MFS assume or be delegated any of SELLER's duties, responsibilities, liabilities or obligations to the Customer under any Contract and SELLER shall remain liable therefore notwithstanding any assignment of a Purchased Contract to MFS.  The parties agree that MFS shall be entitled to directly receive and retain any and all amounts due and payable under the Purchased Contracts. All Purchased Contracts shall be sold to MFS subject to the representations, warranties, covenants, agreements, terms and conditions set forth in this Agreement, and shall be accompanied by an Assignment.   In addition MFS reserves the right to verbally verify the Contract with the Customer thereunder.

3.    **PREAPPROVAL:** BOON LLC will be using their own credit approval platform for pre-approval of all contracts to qualify accounts for purchase by MFS.  All contracts that are to be purchased by MFS must meet all requirements and follow all attributes previously agreed upon by MFS and BOON LLC  The attributes that must be met are as follow: All consumers must have a 600 or greater Vantage score, Consumer may have no more than 2 charge-off accounts listed on their credit report in the last 24 months, All bankruptcy's listed on the credit report must be closed or discharged, Consumer can have no more than 1 bankruptcy listed on their credit report, All consumers with a Vantage Score between 600-650 must have a minimum income of $1,500 and shall be approved for a finance amount no greater than $2,500, Consumers with a Vantage score of 650 or greater minimum shall be approved for a max finance amount no greater than $5,000. These attributes and requirements can also be found in section VI Customer Credit Approval. Any customer approved for purchase through the BOON LLC approval platform shall be valid for (30) days from the date of the approval; provided that there are no changes in respect to such customer, the information presented to MFS in connection with the pre-approval process, or the relating contract/ credit application and all other relating therto unchanged.  Within said thirty (30) day period, SELLER shall send MFS the original Contract or Record, the original Authenticated Contract/Credit Application, the certificate of completion, if applicable, and employment information, if applicable.  If this information is not received by MFS within the thirty (30) day period, MFS will have the option to reject the Contract or to re-qualify the same under MFS' credit guidelines.

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

4. **FUNDING OF PURCHASE PRICE:**

(a)    Provided that no Event of Cancellation has occurred with respect to a Contract that MFS has elected to purchase, MFS shall, within five (5) business days after SELLER's submission of a complete Final Contract/Credit Application to MFS, pay to SELLER the Purchase Price for each Purchased Contract less (i) the outstanding amount of the Origination Fee, which shall be withheld by MFS from the Purchase Price until the full Origination Fee due for such year (whether it be the initial Origination Fee or the renewal fee, in each case as set forth in Schedule "A") has been paid in full, and (iii) any adjustment to Purchase Price, if applicable, as set forth in Schedule "A".

5. **REPRESENTATIONS AND WARRANTIES:**

(a)    SELLER hereby represents, warrants and covenants to MFS, its successors and assigns, as of the date hereof, as of the date of submission of each Contract/Credit Application, Final Contract/Credit Application and Assignment in respect of each Contract and during the Term of this Agreement, that:

(1)    If a corporation, partnership or limited liability company, SELLER is duly organized and validly existing and in good standing in the state of its incorporation as such, and has full power to carry on its business as it is presently conducted including, without limitation, the sale of the Contracts, to enter into this Agreement and to carry out the transactions contemplated hereby;

(2)    The execution and delivery of this Agreement, the assignment of the Purchased Contracts to MFS, and the performance by SELLER of the transactions contemplated hereby have been duly authorized by all necessary action, including any action required under SELLER's governing instruments;

(3)    The execution, delivery and performance of this Agreement and the assignment of the Purchased Contracts to MFS, and the execution of any other instrument related to this Agreement, constitute a legal, valid and binding obligation of SELLER enforceable in accordance with its terms, without any offsets or counterclaims, and no further actions are required for SELLER to enter into this Agreement and such other instruments;

(4)    All of SELLER's business operations are duly licensed and permitted under all federal, state and local laws, rules and regulations of any governmental authority;

(5)    SELLER has duly paid any and all license, franchise, corporation or other taxes, fees, imposts, duties or charges levied, assessed or imposed upon it or upon any of its properties of whatsoever kind or description;

(6)    Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will constitute a violation or default of any statute, rule or decree of any court, administrative agency or governmental body to which SELLER is or may be subject;

(7)    There are and will be no agreements between SELLER or its agents and any Customer in connection with any Purchased Contract and no express or implied warranties have been or will be made by SELLER or its agents to such Customer, except as set forth in the Contract;

(8)    SELLER and its agents have not participated in and have no knowledge of any fraudulent and/or misleading act in connection with any Contract or with respect to any Customer;

(9)    Each Customer has presented appropriate documentation to verify his or her identity and has legal capacity to enter such Contract and has not engaged in any fraud or misrepresentation with respect to such Contract and the Authentication provided by the named Customer is genuine;

(10)    If a Contract is in electronic form, (a) SELLER has provided to the Customer all disclosures in such form and manner as may be necessary to create a valid and enforceable electronic contract, (b) the Customer has consented to conducting the electronic transaction in accordance with applicable law; and (c) the Contract was consummated through the SELLER's web site in accordance with applicable law.

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

(11)     Each Contract is and shall be valid, genuine and noncancellable, enforceable according to its terms (including, but not limited to, terms related to interest rate or time price differential), and each transaction (including the application process and the origination of the Contract) was at the time of its origination and is as of the date of the assignment of the same to MFS in compliance with applicable laws, rules and regulations of any governmental authority whether federal, state, county, municipal or otherwise including, without limitation, usury laws, electronic or digital signature laws, electronic transaction laws, the Federal Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Federal Trade Commission Act, the Magnuson-Moss Warranty Act, Federal Reserve Board Regulations B, M and Z, state adaptations of the Consumer Credit Protection Act (or parts thereof) and of the Uniform Consumer Credit Code and any other consumer credit, equal opportunity, disclosure or repossession laws or regulations applicable with respect to a particular Contract;

(12)     Each Contract is a valid deferred payment obligation for the amount therein set forth and such Contract shall not be subject to any disputes, offsets or counterclaims and the property, goods or services described in the Contract have never been the subject of any other Contract between SELLER and the Customer and the Contract has not been rescinded by SELLER or Customer for any reason whatsoever, SELLER is not in breach under any obligation to any Customer under any Contract, and has no actual knowledge of any personal defenses that the Customer could raise against the enforcement of the terms of any Contract; SELLER has no actual knowledge of any facts which may result in the uncollectability or unenforecability of any Contract;

(13)     All credit or other information reasonably relevant to a credit determination concerning the Customer shall be the sole responsibility of the SELLER to be disclosed to MFS and such credit information and all other information supplied by SELLER in connections with any Contract shall be true, complete and correct as of the date submitted; SELLER shall supplement such information as necessary so that such information remains true, complete and correct;  SELLER has no knowledge of any facts, which presently or upon the occurrence of certain events in the future, may result in the uncollectability and/or unenforceability of the Contract; SELLER acknowledges that MFS will rely upon information appearing on SELLER's records relating to all Contracts  and Final Contracts/Credit Applications, and in light of such acknowledgment, each item of information contained in and appearing on such records accurately reflects their true status;

(14)     Each Contract is current and the Customer is not in default with respect to any term thereunder as of the date of submission of each such Contract/Credit Application, Final Contract/Credit Application and Assignment in respect of each Contract;

(15)     SELLER owns each Contract submitted to MFS hereunder free and clear of any liens, charges, security interests, encumbrances or other restrictions or transfer which may adversely affect MFS' rights with respect thereto, including without limitation, MFS' rights under this Agreement to be the assignee of all Purchased Contracts and to collect all monies due thereunder, SELLER has the absolute right to sell, assign and transfer the contracts free and clear of all rights of third parties, and upon assignment MFS will obtain good title to such Purchased Contract free and clear of any liens, charges, encumbrances or other restrictions whatsoever;

(16)     The execution and delivery by SELLER  of this Agreement and the assignment of the Purchased Contracts to MFS and the security interests granted to MFS from time to time pursuant to the terms hereof, do not conflict with or constitute a material breach or default with respect to any indenture, loan or credit agreement, mortgage, lease, deed or other agreement to which it is a party or by which it or its properties are bound and there are no suits or proceedings pending or, to the knowledge of SELLER, threatened in any court or before any regulatory commission, board or other administrative or governmental agency against or affecting SELLER which could materially impair SELLER's ability to perform its obligations hereunder;

(17)     The financial statements of SELLER delivered to MFS from time to time fairly present the financial position of SELLER as of the date thereof in conformity with generally accepted accounting principles consistently applied and the results of operations of SELLER for the periods covered thereby and do not, as of the date thereof, include any material misstatement or omit to state any material liability, absolute or contingent, and since the date of the latest such financial statements, there has been no Material Adverse Change in the Financial Condition of SELLER;

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

(18)    There is no litigation or other proceeding pending, or to the best of SELLER's knowledge, threatened against SELLER that would affect SELLER'S ability to perform each and every of its obligations under this Agreement or any Agreement or instrument related hereto;

(19)    SELLER has delivered to Customer all products and services required to be delivered and/or performed in accordance with the Contract;

(20)    No false, fraudulent or misleading representations were made nor were unfair or deceptive trade practices engaged in by SELLER with respect to the Customer or the Contract and no statements, promises or representations about the payment terms under the Contract, except as stated in writing in the Contract;

(21)    SELLER is not insolvent, nor will the SELLER be made insolvent by the transfer or assignment of the Contacts, nor does the SELLER anticipate any pending Insolvency Event;

(22)    Each Contract has been serviced by SELLER in conformity with all applicable laws, rules and regulations and in conformity with SELLER's policies and procedures that are consistent with customary and prudent industry standards; and

(23)    In the event of any (a) transfer of control of SELLER, including, without limitation, any merger, consolidation or reorganization of SELLER with or into any person, firm or entity, where SELLER is not the surviving entity in such merger, consolidation or reorganization ( a "Change of Control Event"), (b) sale, lease conveyance, exchange, transfer or other disposition of all, or substantially all, the assets of SELLER (an "Asset Sale"), or (c) Insolvency Event of SELLER, prior to such event SELLER shall (x) give MFS written notice of the date of such event and, in the event of a Change of Control Event or an Asset Sale, the identity of the surviving or acquiring entity, and (y) purchase all outstanding amounts on the Purchased Contracts at the same rate as originally purchased by MFS hereunder; provided, however, that in the event of a Change of Control Event or an Asset Sale, MFS shall be entitled to elect, in its sole and absolute discretion, to have the surviving or acquiring corporation, as the case may be, to continue to honor the Purchased Contracts and assume SELLER's obligations hereunder, including, without limitation, providing any ongoing services described thereunder, subject to executing such documents as MFS may reasonable request.

(b)    The representations and warranties contained herein shall be deemed to be continuing representations, warranties and covenants of SELLER and shall continue beyond the Term of this Agreement and until all obligations of SELLER hereunder have been fully performed and all sums due to MFS under all Purchased Contracts and hereunder have been paid in full and MFS no longer has any contingent liability to return any amounts which it may have received pursuant to any Purchased Contract.

## 6.    SELLER'S REPURCHASE OBLIGATIONS; MFS' PROTECTION AGAINST LOSSES UPON DEFAULT:

(a)    If (i) SELLER knows or has reason to know that any Contract is not the bona fide legal obligation of the Customer, or any Contract and/or Authoritative Copy of an electronic Contract is the subject of fraud, is invalid, or has been tampered with in any way; (ii) any Contract becomes the subject of an interest rate reduction in accordance with the terms of the Soldier's and Sailor's Civil Relief Act; (iii) any of SELLER's representations or warranties contained in this Agreement shall be materially untrue or incorrect; (iv) any of SELLER's covenants and agreements contained herein shall be breached by SELLER with respect to any particular Purchased Contract(s) and, if capable of being cured, SELLER fails to cure such breach within thirty (30) days after written notice thereof; (v) the Customer does not receive the products and/or services contracted for in the Contract; or (vi) the Customer cancels the Contract pursuant to the terms of such Contract; (vii) if the Customer contact information provided by the SELLER to MFS in the contract and/or credit application proves to be insufficient to the extent that MFS is unable to establish contact within the first 90 days and the Customer's first payment to MFS remains unpaid, then SELLER unconditionally agrees that it will, within thirty (30) days after MFS' written notice and demand to SELLER, either and at MFS' option (aa) repurchase the Purchased Contract(s) affected by such breach for a price equal to the Repurchase Price; or (bb) replace the Purchased Contract affected by such breach by assigning to MFS all of its right, title and interest in and to Contract(s) owned by SELLER with a price equal to the Repurchase Price, which substituted Contracts shall be subject to review and approval of MFS in its sole discretion.  In such event, MFS agrees to reassign the applicable Purchased Contract to SELLER, AS IS, WHERE IS, WITHOUT RECOURSE OR WARRANTY OF ANY KIND

---

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

(except that MFS shall represent and warrant that it owns the applicable Purchased Contract and it has not transferred it to a third party).

      (b)    In addition to SELLER's obligation to repurchase any Purchased Contracts pursuant to Section 6(a) above, (i) if any installment on a Contract becomes due and remains unpaid for more than ninety (90) days; upon the occurrence of an Insolvency Event with respect to any Customer (each, a "Defaulted Contract" and collectively, the "Defaulted Contracts"), then in any of such events, SELLER shall, within thirty (30) days after MFS' written notice of the Defaulted Contract, either and at MFS' option (x) repurchase the Defaulted Contract; or (y) replace the Defaulted Contract(s) on the terms set forth in Section 6(a) above. In addition to any remedy set forth herein or available to MFS under applicable law and equity and in addition to any other amounts owed by SELLER to MFS, MFS shall be entitled to offset any and all amounts it and its affiliates and agents incur in connection with collection efforts and efforts to remedy any Default (including, without limitation, any travel costs).

      (c)    If SELLER is obligated to repurchase a Purchased Contract for any reason and does not provide MFS with cash or an acceptable replacement Contract(s) as set forth in this Section 6 within thirty (30) days following notice by MFS to SELLER as provided in this Section 6 (the date said notice is given being referred to herein as the "Notice Date"), then interest shall accrue on all amounts owed by SELLER (including, without limitation, the Repurchase Price of any Defaulted Contract and any costs incurred by MFS and its affiliates and agents in connection with collection and remedial efforts relating to any such Defaulted Contract or the repurchase of any Purchased Contract) to MFS at the rate of one and one half percent (1.5%) per month under applicable law from the Notice Date until paid in full.

      **7.**    **SECURITY AGREEMENT IN COLLATERAL:** To secure the accuracy and full performance of each of SELLER's representations, warranties, covenants and obligations hereunder, SELLER hereby grants to MFS a first priority security interest (the "Security Interest") in all of SELLER's right, title and interest in and to (i) all of the Purchased Contracts, (ii) all of the Serviced Contracts, (iii) all proceeds of the foregoing. The Purchased Contracts, Serviced Contracts, and all proceeds of the foregoing are sometimes hereinafter collectively referred to as the "Collateral." The transactions contemplated hereby are a full and absolute sale of the Purchased Contracts, subject to the conditions herein and no obligations and/or rights of SELLER hereunder shall in any way be construed to imply or grant SELLER any direct or indirect ownership interest and/or legal or equitable title in and/or to the Purchased Contracts.

      **8.**    **RIGHT OF OFFSET** MFS has the right, without notice to SELLER to offset amounts owed by SELLER to MFS hereunder (including any and all accrued interest) and amounts incurred by MFS and its affiliates and agents in connection with collection and remedial efforts relating to any Default (including, without limitation, any travel costs) against (i) proceeds from Serviced Contracts, (ii) Proceeds from Collection Contracts, and (iii) any other amounts payable by MFS to SELLER. Nothing herein shall require MFS to first seek or exhaust any remedy against the Customer, its successors and assigns, or any other person obligated with respect to the Contract, or to first foreclose, exhaust or otherwise proceed against any collateral or security which may be given in connection with the Contract, if any.

      **9.**    **RIGHT TO INSPECT:** MFS (through any of its officers, employees, or agents) shall have the right from time to time hereafter at its sole cost and expense to audit and inspect the books and financial statements of SELLER, and to check, test and appraise the Collateral in order to verify financial condition or the amount, quality, value, condition of, or any other matter relating to Collateral.

      **10.**    **INDEMNIFICATION:**

      (a)    SELLER and MFS each hereby agree to defend, indemnify and hold harmless each other, and the other party's affiliates, subsidiaries, employees, officers, directors, shareholders, attorneys and agents, from and against any and all losses, claims, liabilities, demands and expenses whatsoever, including without limitation reasonable attorneys' fees and costs arising out of or in connection with any breach by the indemnifying party of its representations, warranties, covenants or obligations. All indemnities and obligations contained herein shall survive the expiration or termination of the Agreement and the expiration or termination of any Purchased Contract or any Servicing Contract.

      (b)    To the extent that SELLER elects to utilize in its operations, including but not limited to, in its individual transactions and dealings with Customers, any form contract, notice, or other written instrument (collectively, "Written Instruments") which MFS may volunteer, supply, or provide to SELLER from time to time, MFS makes no representation or

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

warranty as to the fitness of said Written Instruments and SELLER expressly agrees to hold MFS harmless for the same. Pursuant to Section 5(a)(11) of this Agreement, SELLER represents and warrants that any and all contracts or Written Instruments underlying each Contract is compliant with all applicable law, and is legally binding and fully enforceable.

## 11.    SERVICING OF CONTRACTS:

(a)    As part of the consideration for MFS entering into this Agreement and agreeing to purchase Contracts from SELLER at its discretion, SELLER agrees that during the Term hereof, MFS shall have the option but not the obligation, in MFS' sole discretion, to service, as SELLER's exclusive collection agent, all Servicing Contracts entered into by SELLER and shall be entitled to retain the Servicing Fee for its performance of such services.  If MFS elects to administer and service any Servicing Contracts, MFS shall perform the following duties with respect to such Servicing Contracts to the best of its skill and ability:  (i)  inform each Customer of the billing arrangements in accordance with the terms of the Accounts, proceed to collect all payments due on the Accounts; thereunder by posting and depositing all payments or like monies received on the Servicing Contracts within one business day (ii) use its own funds, tools, supplies and equipment in the performance of its services hereunder, (iii) maintain books and records of all Servicing Contracts in accordance with generally accepted accounting principles including, without limitation records concerning principal, interest, late charges, and pre-payments received through pre-authorized debits, checks, drafts or other items of payment and, upon SELLER's written request, give access thereto to SELLER; (iv) provide SELLER monthly with a full and complete accounting in respect of each and every Servicing Contract; (v) service such delinquent Servicing Contracts with as many telephone calls, text, e-mails, and any other communications  and letters as MFS deems reasonably necessary and in accordance with all applicable laws. For purposes of this Agreement, "Delinquent Account(s)" shall mean an Account which has a past due amount outstanding for a period in excess of five (5) days; (vi) remit to SELLER, on a monthly basis, the Collected Funds less (A) the Servicing Fee, (B) the amount of any funds which MFS is required to return to a Customer for any reason including, without limitations, the Customer's bankruptcy or an erroneous payment, and (C) any other amounts due to MFS which may be offset pursuant to the terms of this Agreement, and (vii) perform such other duties and furnish such reports as are reasonable and customary for billing agents in California.

(b)    SELLER shall fully cooperate with MFS in MFS' performance of the foregoing duties. Notwithstanding the generality of the foregoing, SELLER agrees that it will submit to MFS in a timely manner, each of its Servicing Contracts including the credit statement, the executed Contract, all supporting documentation, the current balance and the date of the next payment in order to enable MFS to arrange for the periodic servicing of such Servicing Contract.

(c)    In the event any legal action or other legal or non-legal proceeding is brought relating to any of the Servicing Contracts, MFS will deliver to SELLER promptly after SELLER's written request therefor, such papers as MFS may have in its possession that SELLER reasonably deems relevant to such action, and SELLER shall be obligated to indemnify MFS pursuant to the terms of Section 10.

(d)    MFS may at any time, in its sole discretion, withdraw from administering and servicing any or all Servicing Contracts.

(e)    SELLER acknowledges and agrees MFS' rights with respect to the Service Contracts shall serve as additional Collateral for the security interest, and in accordance therewith, MFS shall be entitled to retain all Service Contracts until such time as all amounts due MFS under all Purchased Contracts and otherwise hereunder have been paid in full. If SELLER ceases to place new Contracts, MFS reserves the right to withhold Service proceeds until such time that proceeds held exceeds the Purchase Price of the remaining aggregate principal outstanding balance of all Purchased Contracts.

## 12.    MFS' RIGHTS TO DEAL WITH CONTRACTS:  MFS shall have the right to deal with all Contracts and Customers in the sole exercise of its business judgment and, without limiting the generality of the foregoing, may do the following without notice to or consent by SELLER:  (a) amend any Contract or renew or extend the time for payment or performance or grant any other indulgence to any Customer; (b) make any settlements or compromises therewith; (c) demand additional collateral or release any collateral securing such Contract; (d) restructure, defer or otherwise alter payment terms of such Contract; and (e) transfer or assign any of its rights or obligations in regard of any Contract without the prior written consent of SELLER.  MFS' and SELLER's rights and obligations hereunder shall remain unaffected by any such activities.

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

13.   **COVENANTS OF SELLER:**  During the Term hereof, SELLER agrees to: (a) cooperate with MFS in giving notice to the Customer of the assignment of the Purchased Contract; (b) comply with all of SELLER's representations, warranties and other statutory and contractual obligations to the Customer; (c) in the event SELLER receives any payment on a Contract, SELLER shall promptly notify MFS of its receipt of the same and promptly forward such payment to MFS and SELLER hereby irrevocably appoints MFS its attorney-in-fact to act in its name and stead in regard of the Contracts, including without limitation, the right to endorse or sign SELLER's name on all checks, collections, receipts or other documents with regard to the Contracts, as MFS deems necessary or appropriate, in its discretion, to protect MFS' right, title and interest in and to the Contract and any security intended to be afforded thereby, (d) give MFS written notice of any Default hereunder or any claim which might adversely affect the rights of MFS hereunder; (e) conduct its business in accordance with sound business practices and standards and perform and fulfill all obligations to Customers under Contracts and related marketing materials, brochures and/or agreements delivered to Customers; (f) maintain all licenses and authorizations required by all applicable regulatory authorities; (g) secure, maintain and provide evidence of liability insurance in amounts as may be required by MFS; (h) notify MFS in writing of any change of ownership and/or any change in capitalization; and (i) promptly deliver to MFS such information concerning the financial or other condition of SELLER as MFS may reasonably request.

14.   **DEFAULT AND REMEDIES:**  Upon the occurrence of a Default by, or with respect to, SELLER, MFS may exercise any or all remedies available to MFS under applicable law and as referenced in Section 6.

15.   **ORIGINATION FEE:**  A non-refundable and renewing Origination Fee payable on the Effective Date and each anniversary thereafter during the Term in the amounts set forth on Schedule "A" must accompany application for financing the SELLERS receivables.  SELLER hereby acknowledges and agrees that any waiver of the Origination Fee in any year by MFS does not and shall not constitute a waiver of or its right to charge and collect the Origination Fee due in any subsequent year and SELLER is and shall continue to be responsible for the same.  This fee covers, among other things, the credit check of the SELLER and to perfect MFS interest in the Purchased Contracts, with the filing of a UCC-1.

16.   **MISCELLANEOUS:**

(a)     SELLER further acknowledges and agrees that an assignment, transfer or sale to a third party in one or a series of related transactions of a fifty percent fully-diluted ownership interest in the company and/or a controlling voting interest in SELLER shall be deemed to be an assignment under this Agreement, which shall require the consent of MFS. SELLER further acknowledges and agrees that MFS may condition any consent to an assignment on both SELLER and the proposed assignee continuing to be jointly and severally bound by all obligations of SELLER hereunder.  In addition, MFS may withhold its consent to such assignment, in its sole and absolute discretion, in light of SELLER's unique ability to provide services and/or products to its Customers who enter into Contracts purchased hereunder.

(b)     The provisions of this Agreement and the representations, rights and obligations of the parties hereto shall survive the execution and delivery hereof, and except as they relate to entering into further Contracts, shall survive the termination of this Agreement.

(c)     Any notice required to be given hereunder shall be delivered personally, shall be sent by first class mail, , return receipt requested, by overnight courier, or by facsimile or electronic mail, to the respective parties at the addresses given in the preamble of this Agreement, which addresses may be changed by the parties by written notice conforming to the requirements of this Agreement.  Any such notice deposited in the mail shall be conclusively deemed delivered to and received by the addressee four (4) days after deposit in the mail, if all of the foregoing conditions of notice shall have been satisfied.  All facsimile communications shall be deemed delivered and received on the date of the facsimile, if (1) the transmittal form showing a successful transmittal is retained by the sender, and (b) the facsimile communication is followed by mailing a copy thereof to the addressee of the facsimile in accordance with this paragraph.

(d)     The parties agree that this Agreement has been executed and delivered in, and shall be construed in accordance with the internal laws of the State of California as applied to contracts between California residents entered into and to be performed wholly within California.  SELLER hereby consents to the jurisdiction of any local, state or federal court located within the County of San Diego, State of California; provided, however, nothing contained herein shall preclude MFS from commencing any action hereunder in any Court having jurisdiction thereof.   EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

(e)    If at any time any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement.

(f)    This Agreement together with all schedules and exhibits attached hereto, constitutes the entire agreement between the parties concerning the subject matter hereof and incorporates all representations made in connection with negotiation of the same.  All prior or contemporaneous agreements, understandings, representation, warranties and statements, oral or written, relating to the subject matter hereof are superseded and are null and void. The terms hereof may not be terminated, amended, supplemented or modified orally, but only by an instrument duly executed by each of the parties hereto.  The recitals set forth above are incorporated herein by this reference.

(g)    This Agreement and any amendments hereto shall be binding on and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

(h)    In the event there is any conflict between this Agreement and any ancillary agreements with respect to any Contract, the terms and conditions of this Agreement shall control.

(i)    If either party commences legal proceedings for any relief against the other party arising out this Agreement, the losing party shall pay the prevailing parties legal costs and expenses, including without limitation, reasonable attorney's fees.

(j)    This Agreement may be executed in one or more identical counterparts, all of which shall together constitute one and the same instrument when each party has signed one counterpart.  To them as much extent permitted by applicable law, in the event that any signature to this Agreement or any amendment hereto is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

(k)    Additional terms of this Agreement, all of which are hereby incorporated herein by this reference, are set forth in the following schedules, addenda, exhibits or riders attached hereto.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective duly authorized representatives on the date first above written.

**SELLER:**                                              MFS:

BOON LLC                                                **MONTEREY FINANCIAL SERVICES, LLC**

a Nevada limited liability company                      a California limited liability company

By: _Dusty Wunderlich_                                  By: _Shaun Lucas_
    3663001033154C3                                         72C29254307E412

Print: Dusty Wunderlich                                 Print: Shaun Lucas

Title: CEO                                              Title: Executive Vice President

Date: 3/2/2017                                          Date: 2/28/2017

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

**Federal Tax I.D.#** 35-2566540

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

# SCHEDULE A

to that **RECEIVABLES PURCHASE AGREEMENT**
dated February 27, 2017
by and between

**MONTEREY FINANCIAL SERVICES, LLC**
and
**BOON LLC**

---

**I.    DESCRIPTION OF SELLERS SERVICES/PRODUCTS:**

Medical devices

**II.    PURCHASE PRICE:**

The Purchase Price of a Purchased Contract, also understood as a purchase rate, shall be a percentage of the total principal balance, excluding any interest charges (the "Contract Balance") owed by the Customer named therein calculated as follows:

    a.  Eighty-three percent (83%) of the Contract Balance for Purchased Contracts payable in zero (0) months to fifteen (15) months from the date of assignment to MFS; and

    b.  Eighty-two percent (82%) of the Contract Balance for Purchased Contracts payable in sixteen (16) months to eighteen (18) months from the date of assignment to MFS;

    c.  Seventy-seven percent (77%) of the Contract Balance for Purchased Contracts payable in nineteen (19) months to twenty-four (24) months from the date of assignment to MFS;

    d.  Seventy-three percent (73%) of the Contract Balance for Purchased Contracts payable in twenty-five (25) months to thirty (30) months from the date of assignment to MFS;

    e.  Seventy percent (70%) of the Contract Balance for Purchased Contracts payable in thirty-one (31) months to thirty-six (36) months from the date of assignment to MFS;

    f.  Sixty-four percent (64%) of the Contract Balance for Purchased Contracts payable in thirty-seven (37) months to forty-eight (48) months from the date of assignment to MFS; and

The interest rate of the Consumer Contracts purchased at the above rates will be at zero percent (0%) or greater.  For each one percent (1%) drop below this percentage the purchase price will be reduced by one percent (1%).

**III.    ADJUSTMENTS TO PURCHASE PRICE:**

The foregoing Purchase Price percentages may be adjusted inversely either up or down on the date of purchase of a Contract by an amount equal to the change in the Three Month LIBOR as published in the Wall Street Journal ("LIBOR") from the first day of each month if the LIBOR rises above the rate of the LIBOR as it is published on the 1st day of the month of the Effective Date of this Agreement, which is 1.03%.

**IV.    STIPULATIONS:**

    a.  All documents signed and UCC-1 filed.
    b.  Full recourse

---

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

   c.   Servicing Collateral: Client must maintain a 55% servicing to finance ratio based off of the current outstanding balance in Monterey's finance agency at all times.

   d.   Boon, LLC will be responsible for any deficiency amount remaining on all contracts where their consumers take advantage of the early payoff option included in the lease agreement, if any is owed, in addition I DO LENDING, LLC will be charged a 9% fee on all early buyout/termination contracts. The 9% fee will be based off of the MFS funding amount on each contract. This fee will remain in place on all contracts regardless of if there is a deficiency amount owed.

   e.   If the Client defaults on the agreed up deficiency calculation for consumers who have taken advantage of the early buyout option on their lease agreement the Client will be charged the full buyback amount.

   f.   36+ term accounts will be placed in MFS Servicing company.

## V.   **GENERAL FEES:**

   a.   <u>SET-UP FEE</u>:  A fee of zero dollars ($0.00) will be charged on each new Contract purchased.

   b.   <u>CHARGEBACK FEE</u>:  MFS shall be entitled to a processing fee for any credit card chargeback due to consumer disputes (presently $25.00).  Furthermore, SELLER shall be responsible for any additional fees, fines or penalties which MFS may incur from the merchant providers due to high or excessive consumer disputes or charge-backs.

   c.   <u>REPURCHASE FEE</u>:  The Repurchase Fee for each Repurchased Contract shall be thirty dollars ($30.00).

   d.   <u>ORIGINATION FEE</u>:  The non-refundable and renewing Origination Fee shall initially be five hundred dollars ($500.00) and shall be renewed on each anniversary of the Effective Date of this Agreement in the amount of two hundred fifty dollars ($250.00). The initial Origination Fee shall be withheld by MFS from the Purchase Price and/or Servicing Fee of the first Contract(s) purchased or serviced in each year during the Term until the full Origination Fee due for such year has been paid in full (as provided in Section 4(a) of the Agreement). All renewal Origination Fees shall be invoiced or offset from any amounts due to SELLER from MFS under this Agreement.

## VI.   **CUSTOMER CREDIT APPROVAL:**

In connection with Contracts to be sold to MFS pursuant to this Agreement, prior to entering into any retail installment agreement or Contract with prospective Customers, for each such prospective Customer SELLER shall may either submit a credit approval application through MFS' proprietary online credit approval system or the consumers must be run through and approved for finance through the BOON LLC pre-approval platform. All contracts that are to be purchased by MFS must meet all requirements and follow all attributes previously agreed upon by MFS and BOON LLC. The attributes that must be met are as follow: All consumers must have a 600 or greater Vantage score, Consumer may have no more than 2 charge-off accounts listed on their credit report in the last 24 months, All bankruptcy's listed on the credit report must be closed or discharged, Consumer can have no more than 1 bankruptcy listed on their credit report,, All consumers with a Vantage Score between 600-650 must have a minimum income of $1,500 and shall be approved for a finance amount no greater than $2,500, Consumers with a Vantage score of 650 or greater minimum shall be approved for a max finance amount no greater than $5,000. These attributes and requirements can also be found in section Listed as Pre-Approval. It is understood and agreed that SELLER shall offer for sale to MFS, each contract which meets the above requirements and is approved

## VII.   **TERM:**

The Term of this Agreement is a period of one (1) year(s) commencing on the Effective Date and ending on the first anniversary thereafter.  The Term shall automatically renew unless either party provides the other written notice at least thirty (30) days of its intent not to renew the same; provided, however that, notwithstanding any termination or expiration of this Agreement, SELLER's obligations to MFS shall continue and MFS shall be entitled to collect all outstanding payments under all Purchased Contracts until they have been paid in full.

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

Notwithstanding the termination of this Agreement due to expiration of its Term, SELLER's obligations to MFS shall continue and MFS shall be entitled to collect all outstanding payments under all Purchased Contracts until they have been paid in full.

## VIII.  **SERVICING FEE:**

SELLER agrees that MFS shall be entitled to the following fees, all of which, collectively, shall constitute the Servicing Fee:

a.  A flat rate of four dollars ($4.00) per month will be charged to SELLER for each Account serviced by MFS.

b.  A one-time processing set-up fee of five dollars ($5.00) will be charged to SELLER per Account.

c.  MFS shall be entitled to a ten dollar ($10.00) processing fee for any Account cancelled by the SELLER.

d.  MFS shall be entitled to a credit card chargeback fee of twenty five dollars ($25.00) for each credit card payment chargeback or reversal due to Customer disputes.

e.  Should SELLER elect to have MFS report the Accounts to the credit reporting agencies, there will be a one time set up fee of two hundred dollars ($200.00), as well as a recurring monthly administrative fee of fifty dollars ($50.00).

f.  In the event MFS is required to send a coupon book to a customer for ongoing monthly payments, SELLER will be charged a set-up fee of five dollars ($5.00).

g.  Should SELLER later elect to sell any of the servicing Accounts to MFS, a four dollar ($4.00) account conversion fee will be charged to SELLER for each Account purchased.  Said account conversion fee would be deducted from the purchase price payout.

h.  Should the Accounts be of the type and nature that require SELLER to provide Customers with an IRS Form 1098, and should SELLER request that MFS send said Form 1098 to Customers, MFS shall charge SELLER a fee of five dollars $5.00) for each Form 1098 sent.

Please note that the correct tax payer identification number (TIN) or social security number (SS#) must be included for each Form 1098 filed with the IRS.  To the extent that there is a missing or incorrect TIN or SS# associated with the Account placed by SELLER, the IRS may impose a per account fee or penalty.  To the extent that MFS incurs any penalties, fees, costs, or expenses associated with an incorrect or missing TIN or SS#, SELLER shall indemnify MFS for the same.

Please also note that MFS shall not issue any Form 1098's for consumers residing outside of the United States of America

i.  MFS shall collect and retain all late charges, NSF fees, and consumer payment fees by which it collects from Customers.

j.  SELLER shall be responsible for all credit card fees, including but not limited to, per transaction fees and excess chargeback penalties or fines.

k.  On a case by case basis MFS may agree from time to time, to arrange for certain additional logistics-related services not expressly set forth in the Agreement or related addenda, including, but not limited to, courier

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

services, special programming, special projects, and or the arrangement of lock box services. Should MFS agree to perform said services on an individual basis, SELLER shall reimburse MFS for all of MFS' costs and expenses related to the performance or procurement of said service. Any reimbursement due hereunder to be deducted from SELLER's monthly payout.

I.   SELLER agrees that MFS may adjust the fees set forth herein on an annual basis in an amount not to exceed ten percent (10%).

## IX.   PRIVACY POLICY:

Please be advised that the Federal Trade Commission recently passed the Privacy of Consumer Financial Information Act known as the Gramm-Leach-Bliley Act (the "Act"). Generally, the Act states that on or before July 1, 2001 all businesses must provide to each Customer notices setting forth its privacy policies. This notice must then be made available initially to all new Customers after July 1, 2001 and then annually to all Customers. We can supply you with a copy of the Act upon request.

MFS must provide these notices to all Customers under Purchased Contracts. All servicing and collection agency clients of MFS must provide this notice to all their customers.

Attached as Exhibit "C" is a sample of the notice MFS will be using. We strongly recommend SELLER review the Act and MFS' notice (if you plan to have MFS provide the notice for you) to ensure you will comply with the Act.

_____X_____Yes, I would like MFS to provide the Privacy Policy to each of my Consumers for a fee of two dollars and no cents ($2.00) per account. (See attached Exhibit "C"). Should SELLER fail to pay the aforementioned fee, MFS reserves the right to discontinue providing privacy notice.

_____No, I would not like MFS to provide the Privacy Policy to each of my Consumers.

**ACKNOWLEDGEMENT** (initialed): _____    _____
                                       SELLER          MFS

### *"THE REMAINDER OF THIS PAGE HAS BEEN LEFT BLANK INTENTIONALLY"*

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

# EXHIBIT A
## FORM OF IRREVOCABLE ASSIGNMENT

FOR VALUE RECEIVED, the undersigned (the "Assignor") hereby sells, assigns and transfers unto **MONTEREY FINANCIAL SERVICES, LLC.**, ("MFS") a California limited liability company ("Assignee"), its successors and assigns, all of Assignor's right, title and interest in and to the contracts, promissory notes, security agreements, membership agreements, instruments and accounts receivable (each, a "Contract" and collectively, the "Contracts") described on the attached Annex A, together with the property described therein, if any, and all rights and remedies thereunder, including all guaranties thereof or collateral security therefore, without recourse or warranty except as provided herein. Assignor authorizes Assignee to collect any and all installments and payments due on each Contract and to take action thereunder which Assignor might otherwise take with respect to each Contract. This Assignment is being delivered pursuant to and upon all of the representations, warranties, covenants and agreements on the part of the undersigned Assignor contained in that certain Receivables Purchase Agreement, dated as of February 27, 2017. (the "Agreement") between Assignor and Assignee, which Agreement contains certain representations, warranties and covenants from Assignor to Assignee, including, without limitation, certain obligations on behalf of the Assignor to repurchase the Contracts or to replace the Contracts upon the terms and conditions set forth therein. This Assignment shall be governed by and interpreted in accordance with the terms of the Agreement and the laws of the State of California. Capitalized terms used herein, which are not defined herein, shall have the meanings set forth in the Agreement.

Assignee may, without notice to Assignor, enter into any settlement, forbearance or other variation in terms in connection with any Contract, or discharge or release the obligations of the Obligor or other person, by operation of law or otherwise, without affecting Assignor's liability hereunder, except that any settlement, forbearance, or other variation by Assignee or its assigns shall not cause Assignor's Repurchase Price to be greater than it would have been in the absence of the settlement, forbearance, or other variation. Assignee's failure or delay in enforcing any right hereunder does not constitute a waiver of that right. Assignor shall not make any collections or repossessions with respect to the Contracts.

Assignor hereby certifies on and as of the date hereof (a) that each and every representation and warranty of the undersigned contained in the Agreement is true and correct on and as of the date hereof in all material respects with the same force and effect as if originally expressed on and as of the date hereof and (b) that each of the conditions set forth in the Agreement with respect to the purchase of the Contracts hereunder has been fulfilled or waived on the date hereof.

Assignor does not delegate and Assignee shall not be required to assume any of the duties, responsibilities, liabilities or obligations of Assignor under any Contract assigned hereunder and Assignor shall remain liable therefore notwithstanding the assignment contained herein.

IN WITNESS WHEREOF, the undersigned has executed this Form Of Irrevocable Assignment to be duly executed this _____ day of _____, 20___.

3/2/2017

**BOON LLC**

By: _____
DocuSigned by:
*Dusty Wunderlich*
3663001033154C3...

CEO
Title: _____

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

# EXHIBIT B
## NON-DISCLOSURE AGREEMENT

This Non-Disclosure Agreement (the "Agreement") is made and entered into as of the last date set forth below by and between MONTEREY FINANCIAL SERVICES, LLC, a California limited liability company ("MFS") and the individual or entity identified below ("Company").

MONTEREY FINANCIAL SERVICES, LLC and the Company are evaluating a potential business relationship (hereinafter, the "Proposed Business Relationship") pursuant to which they may disclose to each other certain Confidential Information (as defined below). MFS and the Company each desire to share in confidence some of such Confidential Information in their possession with one another on the condition that each party provides proper safeguards to protect the other party's Confidential Information. The party providing Confidential Information in each case is called the "Disclosing Party"; the party receiving the Confidential Information is called the "Receiving Party." For purposes of this Agreement, each party hereto shall be deemed to include any parent and/or subsidiary companies under common control.

In consideration of the foregoing and of the mutual covenants and agreements hereinafter set forth and intending to be legally bound, the parties hereby agree as follows:

**1.    Definition of Confidential Information.** "Confidential Information" shall mean, with respect to a party hereto, all information or material which (i) gives that party some competitive business advantage or the opportunity of obtaining such advantage or the disclosure of which could be detrimental to the interests of that party; or (ii) which is either (A) marked "Confidential", "Restricted," or "Proprietary Information" or other similar marking, (B) known by the parties to be considered confidential and proprietary or (C) from all the relevant circumstances should reasonably be assumed to be confidential and proprietary, including without limitation, the Proposed Business Relationship and any and all discussion, negotiations or conversations stemming therefrom. Notwithstanding the foregoing, Confidential Information shall not be information which: (i) has entered the public domain through no action or failure to act of Receiving Party; (ii) prior to disclosure hereunder was already lawfully in Receiving Party's possession without any obligation of confidentiality; (iii) subsequent to disclosure hereunder is obtained by Receiving Party on a nonconfidential basis from a third party who has the right to disclose such information to Receiving Party; or (iv) is ordered to be or otherwise required to be disclosed by Receiving Party by a court of law or other governmental body provided, however, that Disclosing Party is notified of such order or requirement and given a reasonable opportunity to intervene.

**2.    Non-Disclosure.** Receiving Party agrees to: (i) keep confidential the negotiations and discussions regarding the Proposed Business Relationship as well as the Confidential Information; (ii) use the same degree of care (and in no event less than reasonable care) in protecting the Confidential Information that Receiving Party would use to protect its own Confidential Information of a similar nature; (iii) not to copy, publish, show, or disclose any information

relating to the Confidential Information and/or Proposed Business Relationship or discussions thereof, and (iv) to return the Confidential Information to Disclosing Party in accordance with Section 6. Receiving Party will not show or otherwise disclose the contents of the Confidential Information to any third parties without Disclosing Party's written consent.

**3.    Removal of Notices.** Receiving Party shall not remove any copyright, trade mark, service mark or other proprietary rights notice attached to or included in any Confidential Information furnished by Disclosing Party.

**4.    Use of Confidential Information.** The Confidential Information shall be used by Receiving Party solely as permitted hereunder. Each party agrees not to use Confidential Information of the other party for its own or any third party's benefit. RECEIVING PARTY ACKNOWLEDGES THAT THE CONFIDENTIAL INFORMATION IS RECEIVED "AS IS" FOR EVALUATION PURPOSES ONLY AND IS NOT TO BE RELIED UPON FOR ANY PURPOSE EXCEPT AS SET FORTH IN WRITING BY DISCLOSING PARTY. Disclosing Party makes no representations or warranties as to the accuracy, completeness, condition, suitability or performance of the Confidential Information, and Disclosing Party shall have no liability whatsoever to Receiving Party resulting from its use of the Confidential Information.

**5.    Reservation of Rights.** All rights not expressly granted by this Agreement are retained by Disclosing Party. Each party recognizes and agrees that nothing contained in this Agreement will be construed as granting any rights to a Receiving Party, by license or otherwise, to use any of the Disclosing Party's Confidential Information except as specified in this Agreement. All Confidential Information shall remain the property of Disclosing Party.

**6.    Return of Confidential Information.** Receiving Party shall destroy or return to Disclosing Party, at Disclosing Party sole option, all Confidential Information that Receiving Party possesses, regardless of whether the Confidential Information is in written, graphic or machine-readable form upon the earlier of: (i) completion of Receiving Party's review; or (ii) within five (5) business days of the request of Disclosing Party.

**7.    Injunctive Relief.** Receiving Party acknowledges that Disclosing Party will be irreparably harmed if Receiving Party's obligations under this Agreement are not specifically enforced and that Disclosing Party would not have an adequate remedy at law in the event of an actual or threatened violation by Receiving Party of its obligations. Therefore, Receiving Party agrees that Disclosing Party shall be entitled to an injunction or any appropriate decree of specific performance for any actual or threatened violations or breaches by Receiving Party or its employees and agents without the necessity of Disclosing Party showing actual damages or that monetary damages would not afford an adequate remedy.

**8.    No Required Disclosure or Further Obligation.** Nothing contained herein shall be construed as requiring either party to disclose any Confidential Information to the other. Any such disclosure shall be made in the sole discretion of the Disclosing Party. Neither party shall be under any obligation of any kind whatsoever to enter into any further agreement with the other party by reason of this Agreement.

**9.    Non-circumvention; Non-Solicitation.** Upon execution of this Agreement and for a period of one (1) year thereafter both parties agree not to solicit any employee or of the other without the prior written consent of the other party. Each party agrees that it shall not,

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

directly or indirectly, circumvent the other with respect to such party's actual, proposed or potential business plans and opportunities.

**10.    Term.**    Except as provided herein, this Agreement, and all rights and obligations contained herein, shall terminate five (5) years from the Effective Date (except for trade secrets, which shall be held in confidence for so long as they are protected under applicable law as trade secrets).

**11.    General.**

11.1 Governing Law and Venue. This Agreement shall be governed by and construed in accordance with the laws of the State of California without reference to the principles of conflict of laws. Except for actions seeking injunctive relief (which may be brought in any appropriate jurisdiction) suit under this Agreement shall only be brought in a court of competent jurisdiction in the County of San Diego, State of California. This choice of venue is intended by the parties to be mandatory and not permissive in nature, and to preclude the possibility of litigation between the parties with respect to, or arising out of, this Agreement in any jurisdiction other than that specified in this Section. Each party waives any right it may have to assert the doctrine of forum non conveniens or similar doctrine or to object to venue with respect to any proceeding brought in accordance with this Section.

11.2 Severability. If for any reason a court of competent jurisdiction finds any provision of this Agreement, or

portion thereof, to be unenforceable, that provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement shall continue in full force and effect.

11.3 Survival. The provisions of Sections 3 through 5, inclusive, and 11 of this Agreement shall survive any expiration or termination of this Agreement.

11.4 No Joint Venture. The Parties hereto agree that this Agreement is for the purposes of protecting Disclosing Party's Confidential Information only. This Agreement is not a joint venture or other such business arrangement; and any agreement between the Parties as to any existing or future business activities is or will be set forth in other or subsequent written agreements, respectively.

11.5 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Agreement and all of which, when taken together, shall be deemed to constitute one and the same Agreement.

11.6 Entire Agreement. This Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements or understandings. This Agreement shall not be modified except in writing signed by both Parties.

The Parties hereto have executed this Agreement by their duly authorized representatives with full rights, power and authority to enter into and perform this Agreement.

*"MFS"*    **MONTEREY FINANCIAL SERVICES, LLC**

By: _Shaun Lucas_ (DocuSigned by: 72C29254307E412...)

Print: Shaun Lucas

Title: Executive Vice President

Date: 2/28/2017

*"Company"*    **BOON LLC**

By: _Dusty Wunderlich_ (DocuSigned by: 3663001033154C3...)

Print: Dusty Wunderlich

Title: CEO

Date: 3/2/2017

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

# EXHIBIT C

| FACTS | WHAT DOES MONTEREY FINANCIAL SERVICES, LLC DO WITH YOUR PERSONAL INFORMATION? |
|---|---|

| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share and protect your personal information. Please read this notice carefully to understand what we do. |
|---|---|
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br><br>Social Security number and income<br><br>Credit history and payment history<br><br>Credit scores and employment information<br><br>When you are *no longer* our customer, we continue to share your information as described in this notice. |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons MONTEREY FINANCIAL SERVICES, LLC chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does MONTEREY FINANCIAL SERVICES, LLC share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes—**<br>such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, report to credit bureaus, or for optional Debt Protection Program. | Yes | No |
| **For our marketing purposes—**<br>to offer our products and services to you | No | No |
| **For joint marketing with other financial companies** | No | No |
| **For our affiliates' everyday business purposes—**<br>information about your transactions and experiences | No | No |
| **For our affiliates' everyday business purposes—**<br>information about your creditworthiness | No | No |
| **For nonaffiliates to market to you** | No | No |

| Questions? | Call (877) 399-6374    or go to montereyfinancial.com |
|---|---|

---

161005MOR.SRV.FR    Receivables Purchase Agreement & Servicing            Boon LLC                Exhibit "C"

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

**Page 2**

## Who we are

| | |
|---|---|
| **Who is providing this notice?** | **MONTEREY FINANCIAL SERVICES, LLC** |

## What we do

| | |
|---|---|
| How does MONTEREY FINANCIAL SERVICES, LLC protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| How does MONTEREY FINANCIAL SERVICES, LLC collect my personal information? | We collect your personal information, for example, when you<br><br>■ Applications or other forms you submit to us<br><br>■ Consumer credit bureaus<br><br>■ A retailer or other party who originally provided you with credit if we purchased your account from such retailer or other party |
| Why can't I limit all sharing? | Federal law gives you the right to limit only<br><br>■ sharing for affiliates' everyday business purposes—information about your creditworthiness<br><br>■ affiliates from using your information to market to you<br><br>■ sharing for nonaffiliates to market to you<br><br>State laws and individual companies may give you additional rights to limit sharing. |

## Definitions

| | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>■ **MONTEREY FINANCIAL SERVICES, LLC** does not share with it's affiliates. |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>■ **MONTEREY FINANCIAL SERVICES, LLC** does not share with nonaffiliates. |
| **Joint marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br><br>■ **MONTEREY FINANCIAL SERVICES, LLC** does not joint market. |

## Other important information

Your account#:

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

# EXHIBIT D

## CLIENT AGREEMENT
## REGARDING INTERNET ACCESS TO CONFIDENTIAL INFORMATION

For the convenience of its existing and future clients, MONTEREY FINANCIAL SERVICES, LLC (MFS) has created a website at www.montereyfinancial.com (Website) by which its clients and certain related persons can access financial information concerning their individual or corporate accounts or portfolios with respect to which MFS provides services over the Internet. By entering into this Client Agreement Regarding Internet Access to Confidential Information (Agreement), you are expressly authorizing MFS to provide you with access to your account or portfolio information over the Internet by and through the Website, and are further acknowledging, assenting and agreeing to each of the following:

## DUTIES OF CLIENTS

It is your responsibility to: (1) determine whether the information obtained from or through the Website fulfills your intended needs and purposes; (2) ascertain whether you have adequate legal rights to store, reproduce or otherwise make use of the information obtained from or through the Website; (3) observe the requirements of any and all legal obligations that apply to Internet activities, including but not limited to obligations imposed by copyright, secrecy, defamation, decency and export laws; and (4) exercise care to isolate any and all information obtained through the use of the Website such that if that information is contaminated or infected, it will not damage or affect your system or the information stored in your system.

## INFORMATION (Not Warranted or Guaranteed in Any Way)

Information and materials provided on the Website by any third party have not been independently authenticated in whole or in part by MFS. MFS does not provide, sell, license, or lease any of these materials. Unless otherwise explicitly stated, the materials on the Website are provided as is, and are for commercial use only. All express or implied conditions, representations, and warranties, whether express or implied, including any implied warranty of merchantability, fitness for a particular purpose, or non-infringement, are disclaimed, except to the extent that such disclaimers are held to be legally invalid. MFS makes no representations, warranties, or guaranties as to the quality suitability, truth, timeliness, accuracy or completeness of the materials contained on the Website. MFS further makes no representations, warranties, or guaranties that any information or software obtained from or through the Website will be free of viruses, worms, Trojan horses or any other contaminating or destructive coding or entity, or that the performance of the Website will be uninterrupted or error-free or that defects in the information obtained from or through the Website will be corrected. Any questions regarding the information and materials on the Website should be addressed directly to the provider of such information and materials.

## NON-DISCLOSURE

The information and materials contained in the Website are for your internal use only and you are further agreeing not to use or disclose such information and materials for any other purpose and that you will use reasonable measures to prevent the unauthorized disclosure or use of such information and materials. You are also agreeing to protect, defend, indemnify and hold harmless MFS from and against any and all costs, losses, liabilities, damages, lawsuits, claims, demands and expenses incurred in connection with, arising out of or resulting from your unauthorized use or disclosure of such information and materials.

## LIMITATION ON LIABILITY

MFS shall not be liable for any damages suffered as a result of using, modifying, contributing, copying, distributing, or downloading the information and materials on the Website. In no event shall MFS be liable for any direct, indirect, punitive, special incidental or consequential damage, including loss of business revenue, profits, use, or other economic advantage, however it arises, whether for breach of contract, tort or otherwise. Moreover, you are agreeing to assume sole responsibility for adequately protecting your data and equipment used in connection with the Website and will not make a claim against MFS for any damages or loss resulting from the use of the Website or the information and materials contained therein. You

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

further agree that by accessing the Website, you will hold MFS harmless from, and you covenant not to sue MFS for, any claims based on or arising out of your use of the Website.

## COPYRIGHT

All information, documents, products, software, and services provided on the Website are the copyrighted work of MFS and/or their respective manufactures, authors, developers and vendors.  No part of the Website, including logos, graphics, sounds or images, may be reproduced or retransmitted in any way, or by any means, without the prior express written permission of MFS.  You also may not mirror any information or materials contained on the Website or any other server without MFS's express written permission.  Nothing in the Website shall be construed as conferring any license under any of MFS's intellectual property rights, whether by estoppel, implication, or otherwise.

## LINKS

This Website may be linked to other websites, which are not under the control of and are not maintained by MFS.  MFS is not responsible for the content of these linked sites.  MFS is providing these links to you only as a convenience, and the inclusion of any link to such websites does not imply endorsement by MFS of such websites.  MFS makes no representations concerning the content of any such website nor does it assume any obligation to inspect, review, investigate, or monitor such websites.

## ACCESS CODES AND PASSWORDS

Access to this Website is restricted solely to authorized clients of MFS and is protected by the use of various security measures and protocols, including the issuance and use of access codes and passwords.  Such codes and passwords are the exclusive property of MFS and cannot be transferred without the express written permission of MFS.  MFS reserves the right to restrict access to the Website and any information contained therein as it sees fit and subject to its sole and absolute discretion.

## UNAUTHORIZED ACCESS

The information and materials contained in the Website are considered confidential and are provided only for authorized clients of MFS.  MFS attempts to take all reasonable steps to ensure that the information and materials contained in the Website are protected against unauthorized access.  As is the case with any security measure or protocol, however, there is no way to guarantee the effectiveness of such security measure or protocol. Consequently, MFS specifically disclaims any liability for any damages, whether direct or indirect, resulting from the unauthorized access of the Website or the unauthorized use of any information contained therein.

## MISCELLANEOUS

This Agreement shall be governed by and interpreted and construed in accordance with the internal laws of the State of California, as applied to contracts between California residents entered into and to be performed wholly within California, without regard to principles of conflicts of laws.  All terms of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties hereto and their respective heirs, legal representatives, successors and assigns. Neither party may assign any rights or delegate any duties under this Agreement without the other's prior written consent, and any attempt to do so without that consent will be void.  In the event any action is brought for enforcement or interpretation of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs incurred in said action, including enforcement and collection of any judgment or award rendered therein.  Said costs and attorneys' fees shall be included as part of the judgment in any such action. This Agreement constitutes the full and complete agreement between the parties on the subject matter hereof, and all prior agreements or understandings between the parties regarding such subject matter shall be null and void.

DocuSign Envelope ID: FA86C969-D52D-458D-AB0E-60C8CA081E40

**ACCEPTED AND AGREED TO:**

**BOON LLC**

a North Carolina limited liability company

By: _Dusty Wunderlich_
3663001033154C3...

Print: Dusty Wunderlich

Title: CEO

Date: 3/2/2017

Email: dusty@bristleconeholdings.com

**MFS:**

**MONTEREY FINANCIAL SERVICES, LLC**

a California limited liability company

By: _Shaun Lucas_
72C29254307E412...

Print: Shaun Lucas

Title: Executive Vice President

Date: 2/28/2017